UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**MEMORANDUM & ORDER**

G.M.M., a minor child by his mother and
natural guardian, NIKI HERNANDEZ-
ADAMS, and NIKI HERNANDEZ-ADAMS,
individually,

13-CV-5059

                    Plaintiffs,

    –   against –

MARK KIMPSON,
                    Defendant.

**Parties**

G.M.M
Niki Hernandez-Adams

Mark Kimpson

**Appearances**

Stephen M. Cantor
Stephen M. Cantor, P.C.
325 Broadway, Suite 502
New York, NY 10007
(212) 732-8456
smcantor@hotmail.com

Roger V. Archibald
16 Court Street, Suite 2400
Brooklyn, NY 11241
(718) 237-1111
nkiba@aol.com

JACK B. WEINSTEIN, Senior United States District Judge:

## Table of Contents

I.     Introduction ............................................................................................................. 2
II.    Facts ..................................................................................................................... 4
   A.  Purchase of 490 Macdonough Street by Defendant ............................................ 4
   B.  Renovations to 490 Macdonough Street ........................................................... 5
   C.  Expectant Mother and Husband Rent Basement Apartment of 490 Macdonough Street ... 7
      1.  Lead-Based Paint Disclosure Form ........................................................... 9
      2.  Move-In and Birth of G.M.M. ................................................................. 10
      3.  G.M.M.'s First-Year Medical Check-Up ................................................. 10
      4.  Apartment Tested For Lead Paint ............................................................ 11
   D.  Aftermath ................................................................................................... 12
      1.  Plaintiffs Leave Brooklyn ....................................................................... 12
      2.  Neurological and Psychological Evaluations of G.M.M. ........................... 13
III.   Summary Judgment Standard ................................................................................ 14
IV.   Law ..................................................................................................................... 15
   A.  New York City Childhood Lead Poisoning Prevention Act ................................ 15
      1.  Original Legislation ................................................................................ 16
      2.  Application by the New York Court of Appeals ........................................ 18
      3.  Modification to Legislation ..................................................................... 21
      4.  New York Court of Appeals Interpretation ............................................... 22
      5.  Landlords' Responsibilities under Current Statute ..................................... 24
   B.  Federal Residential Lead–Based Paint Hazard Reduction Act ........................... 27
   C.  Negligence ................................................................................................. 31
   D.  Warranty of Habitability and Construction ..................................................... 33
V.    Application of Law to Facts .................................................................................. 35
   A.  New York City Childhood Lead Poisoning Prevention Act ................................ 35
   B.  Federal Residential Lead–Based Paint Hazard Reduction Act ........................... 36
   C.  Negligence ................................................................................................. 37
   D.  Warranty of Habitability and Construction ..................................................... 37
VI.   Conclusion .......................................................................................................... 37

## I.    Introduction

This case considers whether constructive notice of a hazardous lead condition applies to a

landlord of a pre-1960 multiple dwelling building allegedly "gut-renovated" in 2011. It does not.

Such a renovation, carried out properly, is designed to remove an existing hazardous lead

condition. The sufficiency of the renovation is a question of fact that pivots on documentary and other evidence, including the credibility of expert and other witness testimony.

Plaintiffs Niki Hernandez-Adams and her son G.M.M. ("plaintiffs") are both currently Texas residents and former tenants of 490 Macdonough Street, Brooklyn, New York 11233 ("490 Macdonough Street"). They allege that defendant Mark Kimpson, the landlord-owner, is liable for G.M.M.'s elevated blood-lead levels, discovered in the then one-year old infant by his pediatrician in August 2012. On plaintiffs' motion for summary judgment, they argue that defendant violated the New York City Childhood Lead Poisoning Prevention Act ("NYCLPA"), the Federal Residential Lead-Based Paint Hazard Reduction Act ("RLPHRA"), was negligent, and breached the tenants' warranty of habitability.

Relying on the expert reports of a professional engineer and a lead paint expert, defendant counters these claims. He argues that the gut-renovation eliminated all traces of hazardous lead paint in the apartment. He asserts that Hernandez-Adams' knee surgery, carried out during her first trimester, subjected her fetus to the dangers of anesthesia, which studies have shown can result in brain and central nervous system deficits.

In September 2012, the New York City Department of Health and Mental Hygiene ("DOHMH") found twenty-three lead-based paint violations in 490 Macdonough Street. Kimpson does not dispute these findings, but points to the opinion of his lead expert that the device used by DOHMH identifies encapsulated lead paint that, under the law, does not qualify as a hazardous lead paint condition. He also suggests that plaintiffs' dogs severely scratched the walls and the moldings in the apartment, and thus are conceivably to blame for the lead paint findings of DOHMH.

At this stage of the litigation, substantial questions of material fact remain: *First*, whether the renovation sufficiently encapsulated the lead-based condition in accordance with the law; *second*, whether the testing results performed by DOHMH were accurate; *third*, whether it is possible that plaintiffs' dogs disturbed the encapsulated lead paint so that the hazardous lead condition was created by plaintiffs; and, *fourth*, the cause of the infant plaintiff's injury, if any.

Plaintiffs' motions for summary judgment are denied.

## II. Facts

### A. Purchase of 490 Macdonough Street by Defendant

In May 2011, defendant Mark Kimpson owned 490 Macdonough Street. (Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Pl.'s Summ. J. Mot.") Ex. 8, Kimpson Deposition Transcript, 19:14–19, ECF No. 21-9 ("Kimpson Dep.").) Built in 1899, this multiple-dwelling construction contained three apartments. (*See* Summ. J. Hr'g Tr., Mar. 19, 2015 ("Hr'g Tr.").) The defendant had been a landlord in Brooklyn for some twenty years, but apparently knew nothing about lead regulations or requirements. (*Id.*)

Kimpson purchased the building in December 2010 at a New York City Public Administration Auction. (*Id.*) The building was then uninhabitable, requiring complete renovation. (Kimpson Dep. 9:24–10:6.) Defendant does not recall signing any paperwork, or receiving any forms, regarding warnings about the hazards of lead-based paint. (*See* Hr'g Tr.) After he acquired the building, defendant did not have it tested for the presence of lead. (Kimpson Dep. 59:3–9.) Nor did he have an engineer or inspector investigate for any potentially toxic or dangerous substance. (*Id.* at 78:13–17.)

### B. Renovations to 490 Macdonough Street

On or about February 1, 2011, Kimpson entered into an oral contract with "Randy," whose last name is unknown, to have 490 Macdonough Street fully renovated. (*See* Hr'g Tr.; Kimpson Dep. 12:10–11.) Defendant never signed a formal contract with Randy, and Kimpson cannot recall whether Randy was licensed. (*See* Hr'g Tr.) Randy was allegedly paid in cash. (Kimpson Dep. 11:21–25.) No written receipt, bill, or invoice documenting the transaction has been located. (*Id.* at 12:19–21.) The following exchange took place at defendant's deposition:

> Q    Was the contractor or person who did the work a friend of yours or someone you knew before?
> A    No, it was just [an] associate, someone that recommended somebody that did work.
>
> Q    Had he ever done work for you before in any other building?
> A    No.
>
> Q    What's his name?
> A    Randy.
>
> Q    Does he have a company name?
> A    Not that I know of.
>
> Q    Did you pay him in cash or by check?
> A    Cash.
>
> Q    Was that for everything in each apartment?
> A    Yes.
>
> Q    Did he give you invoices or paid bills for each time you paid him in cash?
> A    No.

(*Id.* at 12:2–21.) In addition to other improvements, according to Kimpson, each of the three apartments received new five-eighths sheetrock "all around." (Def.'s Mem. of Law in Opp. to

Pl.'s Mot. for Summ. J. ("Def.'s Opp.") Ex. 1, Kimpson Affidavit ¶ 3, ECF No. 28-1 ("Kimpson Aff.").)  He explained:

> [E]verything got Sheetrocked.  Everything.  It was five-eighths Sheetrock.  The fireproof, everything.  So everything five-eighths Sheetrocked all the way around, primed, paint[ed] it two coats of paint.  New wood floors went down.

(Kimpson Dep. 13:18–22.)  Although the old ceiling beams remained, the kitchens and bathrooms underwent complete renovation as well.  (*Id.* at 14:20–15:6, 15:19–16:6.)

On February 5, 2015, Alex Moussavi, P.E., an engineer hired by defendant, performed an assessment of the ground floor apartment, which had been inhabited by plaintiffs.  (Def.'s Opp. Ex. 3, Moussavi Affidavit ¶ 6, ECF No. 28-3 ("Moussavi Aff.").)  He approved the quality of the renovation, concluding:

> The ground level apartment was totally renovated in 2011.  The walls and ceilings were entirely encapsulated with new drywall. The floor covering was hardwood floor.  The method of encapsulation, the workmanship, the quality control, the safety and the overall renovation of the ground level apartment was found to be acceptable and met the engineering and construction industry design standards.

(Moussavi Aff. ¶ 8B)

Arthur A. Morales, a certified lead-based paint tester hired by Kimpson, performed an assessment of the apartment on February 3, 2015.  (Def.'s Opp. Ex. 2, Morales Affidavit ¶ 20, ECF No. 28-2 ("Morales Aff.").)  The assessment was made using an X-Ray fluorescence device on the painted surfaces in the apartment.  (Morales Aff. Ex. B at 3 (report of results from Feb. 3, 2015 inspection).)  Out of the 197 readings that he took during his assessment, 135 tested positive for unacceptable amounts of lead.  (*Id.* at 9–14.)  The surfaces that tested positive were "walls; ceilings; doors, door casings, and doorjambs; window casings; and closet and cabinet

walls, ceilings, baseboard, shelves and brackets." (*Id.* at 4.) There were fourteen readings involving walls and ceilings where the device "read through" the sheetrock to the underlying painted surface. (*Id.* at 9–14.) Morales's report was generally favorable to defendant:

> The positive window casings, door casings, baseboards and closet and cabinet shelves, brackets and drawers are not undergoing any excessive friction or impact and the paint is in good condition.
>
> The paint on the positive walls and ceilings is in good condition. As mentioned previously, the majority of the lead-based paint on the walls and ceiling is enclosed with drywall.
>
> The paint on the doors and doorjambs potentially undergoes friction and impact during each use.
>
> . . .
>
> The positive readings that were obtained on several wall and ceiling drywall surfaces . . . [were] the result of the XRF device "reading thru" [*sic*] the drywall (sheetrock) material to the painted surface that is covered.
>
> . . .
>
> Any testing done with the commonly accepted X-Ray Fluorescence Device [which was used by DOHMH] will result in higher testing levels as the device reads thru [*sic*] drywall. As a consequence, inaccurate positive lead-paint levels may be noted, even in arrears where the paint is in good condition and the drywall has encapsulated the paint containing lead.

(*Id.* at 5–6.) Morales opined: "Complete enclosure with drywall material is an acceptable abatement method. The lead-based paint at these drywall surfaces is not accessible in the living space." (Morales Aff. ¶ 21B.)

## C. Expectant Mother and Husband Rent Basement Apartment of 490 Macdonough Street

In early May 2011, a visibly six-months pregnant Niki Hernandez-Adams, a freelance costume designer, and her husband Joshua Mendez, a restaurant manager, viewed the ground floor apartment of 490 Macdonough Street. (*See* Hr'g Tr.; Pl.'s Summ. J. Mot. Ex. 8,

Hernandez-Adams Deposition Transcript (June 25, 2014), 11:23, ECF No. 21-9 ("Hernandez-Adams June Dep."); Pl.'s Summ. J. Mot. Ex. 8, Mendez Deposition Transcript (June 25, 2014), 7:17–18, 9:16–19, ECF No. 21-9 ("Mendez June Dep.").)

Natalie Crosby, an employee of Douglas Elliman Real Estate, showed the apartment to the couple and introduced them to Kimpson. (*See* Hr'g Tr.) The couple discussed the pregnancy with Kimpson. (Pl.'s Summ. J. Mot. Ex. 8, Hernandez-Adams Deposition Transcript (October 1, 2014), 14:20–25, ECF No. 21-9 ("Hernandez-Adams Oct. Dep.").)

On May 6, 2011, the couple signed a one-year lease for the apartment in Crosby's and Kimpson's presence. (*Id.* at 19:5–8.) Hernandez-Adams explained:

> We decided that we liked the apartment. The size of it was what we were looking for. And we were reassured that there was—*it was new*—you know, there was new work going on, that it was going to be in good shape. Natalie had mentioned that she had a lot of confidence in [Mr. Kimpson] as a landlord, and she said he did good work. So we decided it was going to be a good place for us to have our family.

(*Id.* at 14:12–19 (emphasis added).) "We needed a yard. We needed a garden. So that was primarily why we looked at that apartment. . . . We have two dogs. So we needed a backyard for them." Mendez stated: "We were very happy and we loved [the] apartment. We liked the layout. We liked the location." (Mendez June Dep 15:3–5.)

At the lease signing, Kimpson crossed out and initialed the line that read: "Dogs, cats or other animals or pets are not allowed in the Apartment or Building." (Pl.'s Summ. J. Mot. Ex. 2 ¶ 27(6), ECF No. 21-3 ("Lease").) The lease contained the following "warranty of habitability" provision: "Landlord states that the Apartment and Building are fit for human living and there is no condition dangerous to health, life or safety." (Lease ¶ 32.)

## 1. Lead-Based Paint Disclosure Form

After the lease was signed, Crosby handed plaintiff Hernandez-Adams a single page form reading: "Disclosure of Information on Lead-Based Paint and/or Lead-Based Hazards." (Pl.'s Summ. J. Mot. Ex. 1, ECF No. 21-2 ("Lead Disclosure Form"); Hernandez-Adams Oct. Dep. 20:17–23.) The "Lead Warning Statement" near the top of the form read:

> Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.

(Lead Disclosure Form.) Defendant initialed the following statement: "Lessor has no knowledge of lead-based paint and/or lead-based paint hazards in the housing." (*Id.*) Absent are his initials from the printed statement, "Lessor has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing." (*Id.*)

Because neither she nor her husband received the "Protect Your Family from Lead in Your Home" pamphlet, plaintiff Hernandez-Adams did not initial the statement on the form that reads: "Lessee has received the pamphlet Protect Your Family from Lead in Your Home." (*Id.*; Hernandez-Adams Oct. Dep. 22:19–23; Pl.'s Summ. J. Mot. Ex. 8, Mendez Deposition Transcript (October 1, 2014), 21:24–22:6, ECF No. 21-9 ("Mendez Oct. Dep.").)

On the form, under the "Agent's Acknowledgment," Crosby's initials appear next to the sentence, "Agent has informed the lessor of the lessor's obligations under U.S.C. 4852d and is aware of his/her responsibility to ensure compliance." (Lead Disclosure Form.) The form is signed by plaintiff and Crosby below the "Certification of Accuracy," which reads: "The

following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate." (*Id.*)

### 2. Move-In and Birth of G.M.M.

Before the end of May 2011, the couple had moved into the ground floor apartment at 490 Macdonough Street. (Mendez Oct. Dep. 22:15–19.)

On August 1, 2011, Hernandez-Adams gave birth to plaintiff G.M.M. in her ground floor apartment. (Hernandez-Adams June Dep. 14:15–16.) Kimpson testified that he saw G.M.M. on the day of his birth and, on subsequent occasions, observed the infant crawling on the floor of the ground floor apartment. (Kimpson Dep. 84:15–17, 83:3–6.)

Kimpson recalls that, the family dogs would run to the door and begin scratching frantically, as though they were trying to escape. (Kimpson Aff. ¶ 9.) After the lead-based paint issue came to his attention, he observed that much of the molding in the apartment was severely scratched, and states that, after the family left, he had to replace the front door due to damage by the dogs. (*Id.* at ¶ 10.)

### 3. G.M.M.'s First-Year Medical Check-Up

Approximately one year after G.M.M.'s birth, on or about August 1, 2012, Hernandez-Adams took G.M.M. for his first year medical check-up. (*See* Hr'g Tr.) Three days later, on August 4, G.M.M.'s blood work revealed that the infant had an elevated blood-lead level of 9 µg/dL. (*Id.*)

On this day, G.M.M.'s pediatrician contacted Hernandez-Adams about the results. (*Id.*) The pediatrician asked the mother a series of questions. Elicited was the fact that the mother, Hernandez-Adams, underwent knee surgery at six weeks of pregnancy where anesthesia was administered and hydrocodone prescribed. (*Id.*)

Defendant proffers an opinion that the anesthesia administered during the knee surgery had the capacity to cause, or at least partially cause, the deleterious effects on G.M.M. while he was in the womb. (*Id.*; *see also*, *e.g.*, Albert R. Hollenbeck, J. of Child Psych. and Human Dev. 126–134 (1985) ("Previous human observation and considerable animal data suggest that early trimester anesthesia exposure may result in neo natal behavioral changes.").)

G.M.M.'s pediatrician recommended that Hernandez-Adams have the apartment she was then living in tested for lead paint. (Hernandez-Adams June Dep. 43:9–11.)

### 4. Apartment Tested For Lead Paint

On August 27, 2012, following her pediatrician's recommendation, the mother had the apartment tested by the Lead Poisoning Prevention Program ("LPPP") of DOHMH. (Pl.'s Summ. J. Mot. Ex. 3, ECF No. 21-4. ("Pl.'s Ex. 3.").) Twenty-three lead-based paint violations were found. (*Id.*) Lead-based paint was found on the walls, doors, ceiling, closets and windows, and in the cabinets, vestibule, hallway, foyer, living room, kitchen and bedroom. (*Id.*) DOHMH determined that:

> [The ground floor apartment] dwelling unit contains lead based paint with a concentration of lead equal to or greater than 1.0 milligrams of lead per square centimeter, and which is peeling, and/or located on one or more friction surfaces, or on another surface that the Department has determined to be a lead hazard, because of its condition, location, or accessibility to children, in violation of the New York City Health Code Section 173.13 (d)(l).

(Pl.'s Summ. J. Mot. Ex. 4, ECF No. 21-5 ("Pl.'s Ex. 4").)

One week later, on September 5, the apartment was tested for lead dust by a private environmental testing company hired by plaintiffs. A total of fourteen swipes were taken. Half of these were found to contain lead dust in amounts above the permissible level established by the LPPP. (Pl.'s Summ. J. Mot. Ex. 7, ECF No. 21-8.) Lead-contaminated dust—a lead-based

paint hazard—was found on the floors of the foyer, living room, hallway and bedroom.  (*Id.*)  A letter dated September 12, 2012 advised of these results.  (Pl.'s Summ. J. Mot. Ex. 6, ECF No. 21-7.)

Two weeks later, on September 25, DOHMH sent defendant a letter, noting:  "[P]ursuant to New York City Health Code . . . you have not filed with the LPPP notification of lead abatement."  (Pl.'s Summ. J. Mot. Ex. 5, ECF No. 21-6.)

On November 9, 2012, a letter from DOHMH addressed to Kimpson informed defendant that he "ha[d] not retained a third party inspector to conduct a visual inspection and surface dust testing" of the apartment post lead abatement efforts.  (Pl.'s Summ. J. Mot. Ex. 8, ECF No. 21-9.)

### D.  Aftermath

#### 1.  Plaintiffs Leave Brooklyn

Sometime in October 2012, plaintiffs moved to Texas.  (Hernandez-Adams June Dep. 14:6–10.)

When Kimpson inspected the apartment upon learning of the purported lead paint issue, he found that several of the walls and moldings within the apartment were severely scratched and damaged and that the paint in those areas was also in very poor condition.  (Kimpson Aff. ¶ 10.) According to defendant's expert, "Lead-paint does not pose a health hazard unless the encapsulated paint is of poor condition or if the paint has been disturbed by friction, poor cleaning or scratching like that done by a dog."   (Morales Aff. ¶ 22B.)

Kimpson claims that the Hernandez-Adams family caused the damage to the apartment that had been fully renovated before its occupancy in 2011.  (Kimpson Aff. ¶ 10.)

## 2. Neurological and Psychological Evaluations of G.M.M.

A neuropsychological evaluation was administered to G.M.M. on April 24, 2014 by plaintiffs' expert Robert M. Gordon, Psy.D. (*See* Hr'g Tr. (referencing Letter from Stephen M. Cantor to Hon. Steven M. Gold, C.M.J., Feb. 18, 2015, ECF No. 29 ("Feb. 18 Ltr.")).) He is a licensed psychologist and Clinical Associate Professor in the Department of Rehabilitation Medicine at New York University's Langone Medical Center. (Feb. 18 Ltr. at 5.) Dr. Gordon found that "G.M.M.'s deficits in the areas of expressive language, attention and concentration, short-term memory and behavioral difficulties are causally related to his high lead levels between the critical ages of 1-2." (*Id.* at 6.) The results of Gordon's testing and clinical observations indicated that G.M.M. "has a diagnosis of Attention-Deficit/Hyperactivity Disorder, Predominantly Inattentive Type and an Expressive Language Disorder." (*Id.* at 5.) "He is displaying significant behavioral issues including hitting, biting, and pushing others and frequent temper tantrums." (*Id.*)

Kenneth W. Reagles, Ph.D., a vocational rehabilitation expert, examined G.M.M's condition in a September 15, 2014 report. (*Id.* at 6.) He analyzed the consequences of G .M.M.'s elevated lead levels, the subsequent aftereffects of the injury, and the impact of the injuries upon G.M.M.'s capacities. (*Id.*) According to Dr. Reagles, G.M.M.'s impairments and corresponding cognitive limitations secondary to lead poisoning established serious, enduring problems, such as:

> <u>Expressive Language Disorder</u>:  "G.M.M.'s inability to communicate his feelings are manifested as problems with frustration and anger.  Speech and language therapy has been recommended."

Attention Deficit-Hyperactivity Disorder: "G.M.M was diagnosed with ADHD that is manifested as a diminution of his capacity to sustain attention, focus, and concentration."

Emotional: "G.M.M. has a low tolerance for frustration, diminution of coping skills, and difficulty managing his anger, which is manifested as frequent temper tantrums and significant aggressive behavior, such as pushing, hitting, kicking, and biting others."

Cognitive Deficits: G.M.M. "has significant weakness in the area of executive functioning, manifested as an inability to stay on task, difficulty with planning and carrying out an activity, and relative inability to complete tasks and assignments."

Behavioral Issues: "Perhaps the major concern of the parents is G.M.M.'s poor socialization and behavioral difficulties."

(*Id.*)

## III.    Summary Judgment Standard

Summary judgment will be granted when it is shown that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We resolve all ambiguities and draw all reasonable inferences in the light most favorable to the nonmoving party." *Steffenhagen v. Sullivan*, 579 F. App'x 32, 33 (2d Cir. 2014) (plaintiff denied summary judgment where no evidence was introduced raising question of fact as to notice or reasonable abatement of lead paint condition) (internal quotation marks and citations removed). "[I]n determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant." *Hill v. Patterson*, No. 11–CV–0392, 2014 WL 788870, *2 (N.D.N.Y. Feb 24, 2014) (denying plaintiff's motion for summary judgment for failure to demonstrate that there are no issues of material fact) (citations omitted). Summary judgment is only appropriate "where the record taken as a whole could not

lead a rational trier of fact to find for the non-moving party." *Steffenhagen*, 579 F. App'x at 33

(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

Summary judgment is inappropriate where the parties' expert reports are in disagreement.

*Harrison v. Ford Motor Co.*, No. 3:11–CV–0840, 2013 WL 3098695, *8 (N.D.N.Y. 2013) ("The

Court is wary of awarding summary judgment where there are conflicting expert reports.")

(citations omitted). "The credibility of competing expert witnesses is a matter for the jury, and

not a matter to be decided on summary judgment." *Scanner Tech. Corp. v. Icos Vision Sys.*

*Corp., N.V.*, 253 F.Supp.2d 624, 634 (S.D.N.Y. 2003) (denying both plaintiff's and defendant's

motions for summary judgment where competing expert reports raise material issues of fact).

## IV.  Law

### A.  New York City Childhood Lead Poisoning Prevention Act

The NYCLPA underwent three iterations before arriving at its present form.

*First*, the City Council passed Local Law 1 of 1982 in an effort to combat childhood lead

poisoning from the ingestion of lead-based paint.  N.Y.C. Local Law No. 1 (1982).  This

legislation created the presumption that any cracked or peeling paint in a multiple dwelling

property built before 1960 where a child under six years resides was lead-based paint; it

mandated its removal.  *See* N.Y.C. Admin. Code § 27-2013(h) (repealed 1999).  In 1996, the

New York Court of Appeals created a standard for applying the legislation, which is still used

with respect to the current form of the statute.  *See Juarez by Juarez v. Wavecrest Mgmt. Team*

*Ltd.*, 672 N.E.2d 135, 139 (N.Y. 1996); *see*, *e.g.*, *Kaur v. Velez*, 875 N.Y.S.2d 211, 212 (N.Y.

App. Div. 2d Dep't 2009) (citing *Juarez* for common-law application of N.Y.C. Admin. Code

sections 27-2056.3 and 27-2056.18).

*Second*, after concerns were raised that the legislation was creating more harm than good by mandating complete removal of all lead-based paint, the City Council passed Local Law 38 of 1999. N.Y.C. Local Law No. 38 (1999). This legislation was overturned by the New York Court of Appeals for failure to comply with state law concerning the evaluation of environmental hazards. *N.Y.C. Coalition to End Lead Poisoning v. Vallone*, 794 N.E.2d 672 (N.Y. 2003).

*Third*, in response, the City Council passed Local Law 1 of 2004, which is in force today. N.Y.C. Local Law No.1 (2004).

### 1. Original Legislation

In 1982, the City Council enacted a statute to reduce the number of lead poisoning cases in children. N.Y.C. Local Law No. 1 (1982); N.Y.C. Admin. Code § 27-2013(h) (repealed 1999). It contained a rebuttable presumption that, if peeling paint was found in a pre-1960 multiple dwelling building where a child six or younger resided, the paint was lead-based:

> In any multiple dwelling erected prior to January first, nineteen hundred sixty in which paint or other similar surface-coating material is found to be peeling on the interior walls, ceilings, doors, window sills or moldings in any dwelling unit in which a child or children six (6) years of age or under reside, it shall be presumed that the peeling substance contains more than 0.5 percent of metallic lead based on the non-volatile content of the paint or other similar surface-coating material or having a reading of 0.7 milligrams of lead per square centimeter or greater.

*Id*. at § 27-2013(h)(2). The presence of paint containing these lead values constituted a "Class C immediately hazardous violation"; it could result in recurring daily civil penalties. *Id.* at § 27-2013(h)(1)(3); *see* 28 N.Y.C.R.R. § 44-01 (defining "class C violation" as an "immediate hazardous violation" of the Housing Maintenance Code); N.Y.C. Admin. Code § 27-2115 (imposing daily civil penalties for "immediate hazardous violations"). This law also required the

removal or covering of practically all lead-based paint in a multiple dwelling where young children resided:

> The owner of a multiple dwelling shall remove or cover in a manner approved by the department any paint or other similar surface-coating material having a reading of 0.7 milligrams of lead per square centimeter or greater or containing more than 0.5 percent of metallic lead based on the non-volatile content of the paint or other similar surface-coating material on the interior walls, ceilings, doors, window sills or moldings in any dwelling unit in which a child or children six (6) years of age and under reside.

N.Y.C. Admin. Code § 27-2013(h)(1) (repealed 1999); *see also*, *N.Y.C. Coalition to End Lead Poisoning v. Giuliani*, 660 N.Y.S.2d 634, 637 (N.Y. Sup. Ct. N.Y. Cnty. 1997), *aff'd*, 669 N.Y.S.2d 552 (N.Y. App. Div. 1st Dep't 1998).

Devising the necessary safety precautions for the removal procedure was left to DOHMH.  N.Y.C. Admin. Code § 27-2013(h)(4) (repealed 1999); 24 N.Y.C.R.R. § 173.14 (repealed and added 2004) (safety standards for lead-based paint abatement and remediation, and work that disturbs lead-based paint) ("Health Code").  The Department of Housing Preservation and Development ("HPD") was required to establish enforcement procedures.  N.Y.C. Admin. Code § 27-2013(h)(5) (repealed 1999).  HPD did not create enforcement regulations required by the statute for over fifteen years, leading to a number of injunctions and fines against the department for failure to promulgate the required regulations establishing enforcement procedures.  *See, e.g.*, *Giuliani*, 660 N.Y.S.2d at 635.  *See also N.Y.C. Coalition to End Lead Poisoning v. Koch*, 524 N.Y.S.2d 314, 321 (N.Y. Sup. Ct. N.Y. Cnty. 1987), *aff'd*, 526 N.Y.S.2d 918 (N.Y. App. Div. 1st Dep't 1988) (denying city's motion to dismiss suit compelling enforcement of the Health Code concerning lead paint); *N.Y.C. Coalition to End Lead Poisoning v. Koch*, 566 N.Y.S.2d 861 (N.Y. App. Div. 1st Dep't 1991) (affirming preliminary injunction

compelling HPD to comport its regulations with the requirements of N.Y.C. Admin. Code

section 27-2013(h)); *N.Y.C. Coalition to End Lead Poisoning v. Koch*, 629 N.Y.S.2d 17, 216

A.D.2d 219, 219 (N.Y. App. Div. 1st Dep't 1995) (contempt proceedings are appropriate against

HPD for failure to comply with injunction requiring promulgation of regulations and

enforcement of duties under N.Y.C. Admin. Code section 27-2013(h)).

## 2. Application by the New York Court of Appeals

In the leading case regarding exposure by children to lead-based paint, the New York

Court of Appeals acknowledged the seriousness of the problem, but held that negligence had to

be shown to support liability. *Juarez*, 672 N.E.2d at 139 (holding that when a landlord has

notice that a child under age six is living in an apartment built before 1960 with peeling paint,

the landlord has constructive notice of a hazardous lead-based paint condition). It wrote:

> The serious health hazard posed to children by exposure to lead-based paint is by now well established. Children under the age of six, whose nervous systems are still developing, are particularly vulnerable to the damage caused by lead poisoning. High blood lead levels can produce brain damage, coma or death, and even relatively low levels can lead to significant nervous system damage.
>
> While the use of lead-based paint on interior building surfaces has been prohibited since January 1960, such paint continues to cover the walls of two out of three City dwellings. Its widespread use thus renders lead poisoning a continuing threat to the health of young children in New York City, especially those in older and poverty-ridden neighborhoods. Indeed, childhood lead-paint poisoning may be the most significant environmental disease in New York City, in terms of the numbers of cases, the severity of the medical damage created, and the personal, social, and economic costs it imposes.
>
> Abatement of lead-based paint is an expensive process. With nearly two million apartments in New York City built before lead-based paint was banned in 1960, addressing this problem therefore

> requires a weighing of policy interests, a responsibility that rests with Federal, State and local legislative bodies.

*Id.* (internal quotation marks and citations omitted).

With respect to the 1982 legislation, the court explained:

> [The law] does not itself create an additional standard of care. Rather, [it] defines a particular hazardous condition—the presence of specified levels of lead-based paint in an apartment occupied by a child six years of age or under—to which a landlord's general duty to repair applies. That is, [it] simply obligates landlords to remedy a specific dangerous defect. *Breach of a landlord's general statutory duty to maintain leased premises in a safe condition, moreover, does not impose liability without fault, but requires a showing of those elements comprising common-law negligence.*
>
> . . . [The statute] places a duty on landlords to abate a lead hazard. *Where, however, a landlord establishes that it exercised due care, it will not be held liable.* To avoid liability, a landlord must prove that, even though it violated [the statute], *it was acting reasonably* under the circumstances.
>
> . . . [T]he adequacy of a landlord's efforts to discharge its duty to remedy a hazardous lead condition is to be governed by a standard of reasonableness.
>
> . . . [W]here a landlord has notice that a child under the specified age is residing in an apartment, [the legislation] provides for constructive notice of the hazardous lead condition. . . . [It] thus gives landlords authority to enter dwelling units occupied by such children for the very purpose of inspecting for and repairing a lead paint defect.

*Id.* at 141–42 (citations omitted) (emphasis added). Summing up, it ruled:

> Local Law 1 [of 1982] imposes a standard of reasonableness, under which a landlord could show that the hazard existed *despite* his diligent and reasonable efforts to prevent it. Thus, a landlord may prove that even if it violated [the law], it will not be held liable for damages sustained as a result of that violation if its exercised due case and acted reasonably under the circumstances.

*Rivas v. 1340 Hudson Realty Corp.*, 650 N.Y.S.2d 732, 735 (N.Y. App. Div. 1st Dep't 1996) (jury should have been allowed to consider whether landlord reasonably abated lead-based paint hazard) (internal quotation marks and citations omitted) (emphasis in original).

"[T]he statutory duty to abate the hazard stems from the correlative statutory right granted to landlords to '*enter dwelling units* occupied by such children for the very purpose of inspecting for and repairing a lead paint defect,' [which] does not flow from the presence of a specific child on the premises or run exclusively for the benefit of such child." *Baptiste v. New York City Hous. Auth.*, 675 N.Y.S.2d 802, 177 Misc.2d 51, 53 (N.Y. Sup. Ct. Kings Cnty. 1998) (citing *Juarez*, 672 N.E2d at 135) (emphasis in original). *See also Roni v. Rahim*, 854 N.Y.S.2d 484, 49 A.D.3d 851, 853 (N.Y. App. Div. 2d Dep't 2008) (defendant bank was not entitled to summary judgment because it was not able to establish it was not the owner of structure built in 1933 where infant plaintiff allegedly ingested lead paint); *Jolicoeur v. Great Oaks Assocs., Ltd.*, 841 N.Y.S.2d 665 (N.Y. App. Div. 2d Dep't 2007) (defendants not able to rebut presumption that peeling paint contains lead for purposes of summary judgment when building was built before 1960, and no evidence is shown demonstrating defendants lacked notice of presence of child under age six and of alleged existence of peeling paint).

Complete and adequate renovation of a pre-1960 multiple dwelling building rebuts the presumption that a lead-based paint hazard is present in the apartment. *See Carrero v. 266 Himrod Associates, LLC*, 770 N.Y.S.2d 747, 738 (N.Y. App. Div. 2d Dep't 2004) (defendants entitled to summary judgment where *apartment had been completely renovated and inspected* by the New York City Department of Health, and defendants had no actual or constructive notice of peeling or damaged paint that would trigger presumption of existence of lead-based paint hazard). *But see Morales ex rel Coria v. Reyes*, 187 Misc.2d 390, 394 (N.Y. S. Ct. Kings Cnty.

2001) (renovation does not entitle defendants to summary judgment in favor where renovation was to convert building built in 1899 into multiple dwelling residence and not for lead abatement purposes).

### 3. Modification to Legislation

In an attempt to provide adequate enforcement provisions, comply with court orders, and overturn court rulings regarding the necessary removal of intact lead paint, the City Council passed Local Law 38 in 1999. N.Y.C. Local Law No. 38 (1999); N.Y.C. Admin. Code § 27-2056.1 *et seq.* (repealed and added 2004).

The requirement that intact lead paint needed to be removed from surfaces was no longer necessary. N.Y.C. Admin. Code § 27-2056.2(b) (repealed and added 2004) (allowing for owners to correct a lead-based paint hazard by using measures specified in Health Code section 173.14); 24 N.Y.C.R.R. § 173.14 (rules governing abatement and remediation of lead-based paint, including encapsulation by permanently covering or coating the lead-based paint with a barrier between it and the environment). The reason for this change was to avoid dangers of the prior complete removal requirement:

> According to various experts' testimony, this complete removal requirement [in Local Law 1 of 1982] would likely have the effect of increasing children's exposure to lead dust. . . . Local Law 38 also addressed the issue of lead dust, incorporating some but not all of the Health Code's remediation provisions as well as the Administrative Code into the law. Adversaries of [Local Law 38] believed that the level of attention paid to lead dust was inadequate.

*Cmty. Pres. Corp. v. Miller*, 781 N.Y.S.2d 603, 605–06 (N.Y. Sup. Ct. N.Y. Cnty. 2004), *aff'd*, 788 N.Y.S.2d 609 (N.Y. App. Div. 1st Dep't 2005).

Local Law 38 allowed for "interim" remediation procedures less strict than those in the Health Code; it did not specify the time within which an owner was required to comply. N.Y.C. Admin. Code § 27-2056.2(a) (repealed and added 2004) (interim remediation controls in the absence of the issuance of a lead-based paint hazard violation); *Id.* at § 27-2056.5(b) (repealed and added 2004) (interim remediation controls if lead-based paint hazard violation has been issued).

### 4. New York Court of Appeals Interpretation

In 2003, the Court of Appeals unanimously overturned Local Law 38 for failure to comply with New York State's Quality Review Act ("SEQRA"). *Vallone*, 794 N.E.2d at 673 (invalidating Local Law 38 for the City Council's failure to include lead dust in the "Negative Declaration" of environmental effects mandated by SEQRA). This decision reinstated the 1982 statute in part. *Id.* at 679.

In response, the City Council drafted and passed Local Law 1 of 2004, known as the New York City Childhood Lead Poisoning Prevention Act of 2003 ("NYCLPA"). N.Y.C. Local Law No. 1 (2004); N.Y.C. Admin. Code § 27-2056.1 *et seq.* The 2004 law, which remains in effect today, requires the removal or covering of lead-based paint that is peeling or on a damaged subsurface. A lead-based paint hazard is defined as follows:

> [P]aint or other similar surface coating material containing 1.0 milligrams of lead per square centimeter or greater, as determined by laboratory analysis, or by an x-ray fluorescence analyzer . . . . If laboratory analysis is used to determine lead content, results shall be reported in milligrams of lead per square centimeter. Where the surface area of a paint chip sample cannot be accurately measured or if an accurately measured paint chip sample cannot be removed, a laboratory analysis may be reported in percent by weight. In such case, lead-based paint shall mean any paint or other similar surface-coating material containing more than 0.5% of metallic lead.

N.Y.C. Admin. Code § 27-2056.2(7).  In accordance with contemporary HUD standards, this statutory definition represents an increase of 0.3 milligrams of lead per square centimeter over the threshold in Local Law 1 of 1982.  *See* 24 C.F.R. § 35.86 ("Lead-based paint means paint or other surface coatings that contain lead equal to or in excess of 1.0 milligram per square centimeter or 0.5 percent by weight.")

The 2004 statute eliminated the 1982's legislation requirement that intact lead-based paint with a reading of 0.7 milligrams of lead per square centimeter or greater than 0.5 percent be removed in a multiple dwelling where a child under seven resides.  N.Y.C. Admin. Code §§ 27-2056.3 (owner's responsibility to remediate lead-based paint hazard), 27-2056.11 (mandating that agency promulgate rules for work practices involving abatement or remediation of lead-based paint hazards); 24 N.Y.C.R.R. § 173.14 (rules governing abatement and remediation of lead-based paint, including removal and encapsulation).

Similarly to the 1982 law, the 2004 legislation contains a presumption that, in the dwelling unit and the common areas in pre-1960 buildings where a child under seven resides, all "paint or other similar surface-coating material" and the paint on all "chewable surfaces" are lead based paint.  N.Y.C. Admin. Code §§ 27-2056.5 (establishing presumption of lead-based paint in dwelling constructed prior to 1960 in which a child of "applicable age" resides and methods of rebutting said presumption), 27-2056.18 ("applicable age" means under seven years, and allows board of health to redefine as under six years).  As with the 1982 law, the lead-based paint presumption is rebuttable.  *Id.* at § 27-2056.5.  The presumption is defined as follows:

> In any multiple dwelling erected prior to January 1, 1960, it shall be presumed that the paint or other similar surface-coating material in any dwelling unit where a child of applicable age resides or in the common areas is lead-based paint.  The presumption established by this section may be rebutted by the owner of the

23

> dwelling or dwelling unit by submitting to the department a sworn
> written statement by the owner supported by lead-based paint
> testing or sampling results, a sworn written statement by the person
> who performed the testing if performed by an employee or agent of
> the owner, and such other proof as the department may require.
> Testing performed to rebut the presumption may only be
> performed by a person who has been certified as an inspector or
> risk assessor in accordance with . . . federal regulations or any
> successor regulations. The determination as to whether such proof
> is adequate to rebut the presumption established by this section
> shall be made by the department.

*Id.*

Whereas Local Law 1 of 1982 presumed that only peeling paint was lead-based, the 2004 law indicates that the presumption also applies to paint that is on a "deteriorated subsurface." "The existence of lead-based paint in any dwelling unit in a multiple dwelling where a child of applicable age resides shall constitute a class C immediately hazardous violation if such paint is peeling *or is on a deteriorated subsurface*." *Id.* at § 27-2056.6 (emphasis added). The statute defines a "deteriorated subsurface" as "an unstable or unsound painted subsurface, an indication of which can be observed through a visual inspection, including, but not limited to, rotted or decayed wood, or wood or plaster that has been subject to moisture or disturbance." *Id.* at § 27-2056.2(3).

### 5. Landlords' Responsibilities under Current Statute

Under the current statute, in a multiple-dwelling unit built before 1960, the landlord is required to: (1) annually investigate for lead-based paint hazards if young children live in the building; (2) notify tenants about the landlord's responsibilities in regards to lead-based paint; (3) inquire, both at the time the lease is signed and annually thereafter, whether a child under age seven resides in the unit; and (4) notify the tenants of the results of any investigation and distribute any resulting report. *See* N.Y.C. Admin. Code §§ 27-2056.4(a) (landlord must

investigate annually the dwelling units in which children under age seven reside, and to inspect all common areas for the presence of lead based paint hazards if a child under age seven resides in the building), 27-2056.4(c) (landlord must notify tenants on the lease, in both English and Spanish, of the landlord's responsibilities under the statute and provide a pamphlet advising of the hazards of lead-based paint), 27-2056.4(d) (landlord must inquire when the lease is signed if children under seven years of age will live in the apartment), 27-2056.4(e) (landlord must inquire of each tenant annually whether children under seven years of age reside in the apartment), 27-2056.4(f) ("The owner shall inform the occupant in writing of the results of an investigation undertaken pursuant to this section and shall provide a copy of any such report received or generated by an investigation.").

The two provisions contained in the current statute—applicable during plaintiffs' residence—are the crux of the instant litigation. The first places the burden on the owner to remediate an unsafe lead condition:

> The existence of a lead-based paint hazard in any multiple dwelling where a child of applicable age resides is hereby declared to constitute a condition dangerous to life and health. An owner shall take action to prevent the reasonably foreseeable occurrence of such a condition and shall expeditiously remediate such condition and any underlying defect, when such underlying defect exists.

*Id.* at § 27-2056.3.

The second requirement spells out the owner's remediation duties:

> Upon turnover of any dwelling unit in a multiple dwelling erected prior to January 1, 1960 or a dwelling unit in a private dwelling erected prior to January 1, 1960 where each dwelling unit is to be occupied by persons other than the owner or owner's family, the owner shall within such dwelling unit have the responsibility to:

> (1) remediate all lead-based paint hazards and any underlying
>     defects, when such underlying defects exist;
>
> (2) make all bare floors, window sills, and window wells in the
>     dwelling unit smooth and cleanable;
>
> (3) provide for the removal or permanent covering of all lead-
>     based paint on all friction surfaces on all doors and door
>     frames; and
>
> (4) provide for the removal or permanent covering of all lead-
>     based paint on all friction surfaces on all windows, or
>     provide for the installation of replacement window
>     channels or sides on all lead-based painted friction surfaces
>     on all windows.

*Id.* at § 27-2056.8.

As with the 1982 legislation, "[v]iolation of Local Law 1 [of 2004] . . . does not result in absolute liability for injuries caused by exposure to lead." *Shafi v. Motta*, 900 N.Y.S.2d 410, 411(N.Y. App. Div. 2d Dep't 2010) (citations omitted). The *Juarez* reasonable person liability standard established by the New York Court of Appeals in 1996 is still followed. *See*, *e.g.*, *Kaur*, 875 N.Y.S.2d at 212 (citing *Juarez* for common-law application of N.Y.C. Admin. Code sections 27-2056.3 and 27-2056.18).

In order to prove a cause of action under the NYCLPA, a plaintiff must show:

> (1) [T]he defendant had constructive notice of the hazardous
>     lead condition in the apartment they occupied[;]
>
> (2) [T]he defendant did not take reasonable steps to remedy the
>     hazardous lead condition[;] and
>
> (3) [T]he hazardous lead condition was the proximate cause of
>     the infant plaintiff's injuries.

*Id.* "[The NYCLPA] imputes to a landlord constructive notice of a hazardous condition . . . where the landlord has actual notice that a child under the age of six resides in the unit." *Shafi*, 900 N.Y.S.2d at 411 (citations omitted). The presumption of constructive notice can be rebutted

when a multiple dwelling unit built before 1960 has undergone thorough renovation such that the interior can be considered a new building. *See Rivera v. Neighborhood P'ship,* No. 81762006, 2013 WL 6702680, \*6 (N.Y. Sup. Ct. Bronx Cnty. June 24, 2013) *aff'd sub nom. Rivera v. Neighborhood P'ship Hous. Dev. Fund Co. Inc.*, 985 N.Y.S.2d 485 (N.Y. App. Div. 1st Dep't 2014) (granting summary judgment in favor of defendants where "gut-renovation" of multiple dwelling unit built before 1960 "removed any presumption that defendants had reason to know of, or suspect, the presence of any lead" under the NYCLPA).

### B. Federal Residential Lead–Based Paint Hazard Reduction Act

Congress enacted the Residential Lead-Based Paint Hazard Reduction Act ("RLPHRA") as Title X of the Housing and Community Development Act of 1992. 42 U.S.C. §§ 4851 *et seq.* It found that lead poisoning affected as many as three million children under the age of six—and that the ingestion of household dust arising from lead-based paint was the most common cause of lead poisoning in children, *see* 42 U.S.C. §§ 4851(1), (4). The RLPHRA declares as an objective the development of "a national strategy to build the infrastructure necessary to eliminate lead-based paint hazards in all housing as expeditiously as possible." 42 U.S.C. § 4851a(1). To implement this goal, Congress provided grants to evaluate and reduce lead-based paint hazards in privately owned low-income housing; it developed requirements ensuring that federally owned housing is free from lead-based paint hazards. *See Sweet v. Sheahan*, 235 F.3d 80, 87 (2d Cir. 2000) (citing 42 U.S.C. §§ 4852, 4822).

The RLPHRA directs the Secretary of the Department of Housing and Urban Development ("HUD") and the Administrator of the Environmental Protection Agency ("EPA") to promulgate regulations mandating the disclosure of lead-based paint hazards in privately owned housing that is sold or leased. *See* 42 U.S.C. § 4852d. The statute states that HUD and

the EPA "shall promulgate regulations . . . for the disclosure of lead-based paint hazards in target

housing which is offered for sale or lease." *Id.* at § 4852d(a)(1). It specifies:

> The regulations shall require that, before the purchaser or lessee is
> obligated under any contract to purchase or lease the housing, the
> seller or lessor shall[:]
>
> > a. provide the purchaser or lessee with a lead hazard
> > information pamphlet . . . ;
> >
> > b. disclose to the purchaser or lessee the presence of any
> > known lead-based paint, or any known lead-based paint
> > hazards . . . ;
> >
> > c. permit the purchaser a 10 day period . . . to conduct a
> > risk assessment or inspection for the presence of lead-
> > based paint hazards.

*Id.* at § 4852d(a)(1).

The statute provides that the regulations "shall" require a lead warning statement in all

contracts for the purchase and sale of "target housing." *Id.* at § 4852d(a)(2). "Target housing"

refers to any housing constructed before 1978. 24 C.F.R. § 35.86; 40 C.F.R. § 745.103 (same).

The statute details the specific language to be used in the warning statement:

> Every purchaser of any interest in residential real property on
> which a residential dwelling was built prior to 1978 is notified that
> such property may present exposure to lead from lead-based paint
> that may place young children at risk of developing lead poisoning.
> Lead poisoning in young children may produce permanent
> neurological damage, including learning disabilities, reduced
> intelligence quotient, behavioral problems, and impaired memory.
> Lead poisoning also poses a particular risk to pregnant women.
> The seller of any interest in residential real property is required to
> provide the buyer with any information on lead-based paint
> hazards from risk assessments or inspections in the seller's
> possession and notify the buyer of any known lead-based paint
> hazards. A risk assessment or inspection for possible lead-based
> paint hazards is recommended prior to purchase.

42 U.S.C. § 4852d(a)(3).

Regulations promulgated by the agencies required that the lessor: (1) provide lessees with an EPA-approved lead hazard information pamphlet; (2) disclose to lessees the presence of, and any information about, known lead-based paint and/or lead-based paint hazards in the building; (3) disclose to the agent the same information regarding lead-based paint and lead-based paint hazards that must be disclosed to lessees; and (4) provide to lessees records about lead-based paint and/or lead-based paint hazards in the apartment and common areas, and other apartments if they are part of a lead-based paint reduction in the building itself. *See* 24 C.F.R. § 35.88(a)(1) (requiring that lessors provide lessees with an EPA-approved lead hazard pamphlet and specifying what EPA documents it must contain), 40 C.F.R. § 745.107(a)(1) (same); 24 C.F.R. § 35.88(a)(2) (requiring lessors to disclose to lessees information about known lead-based paint and/or lead-based paint hazards in the building including reason why they are thought to exist, location, and the condition of painted surfaces), 40 C.F.R. § 745.107(a)(2) (same); 24 C.F.R. § 35.88(a)(3) (requiring lessors to disclose to agents information about known lead-based paint and/or lead-based paint hazards in the building including reason why they are thought to exist, location, and the condition of painted surfaces), 40 C.F.R. § 745.107(a)(3) (same); 24 C.F.R. § 35.88(a)(3) (requiring lessor to provide to lessees all available records pertaining to lead-based paint and/or lead-based paint hazards in the apartment and common areas, and other apartments as well if they are part of a lead-based paint reduction in the building as a whole), 40 C.F.R. § 745.107(a)(4) (same).

These regulations do not impose a duty on a landlord to inspect or remediate. 24 C.F.R. § 35.88(a) ("Nothing in this section implies a positive obligation on the seller or lessor to conduct any evaluation or reduction activities."); 40 C.F.R. § 745.107(a) (same). If an agent is employed on behalf of the seller or lessor to sell or lease a property, the onus is on the agent to

ensure compliance with the statute. *See* 42 U.S.C. § 4852d(a)(4) (imposing duty on agent to ensure compliance); 24 C.F.R. § 35.94 (detailing agent's responsibilities); 40 C.F.R. § 745.115 (same).

"Any person who *knowingly* violates the provisions of this section shall be jointly and severally liable to the purchaser or lessee in an amount equal to 3 times the amount of damages incurred by such individual." 42 U.S.C. § 4852d(b)(3) (emphasis added). "Knowingly" is to be construed as meaning that the "defendant was aware of his or her conduct and that defendant did not perform it merely through ignorance, mistake or accident." *Smith v. Coldwell Real Estate Banker Services*, 122 F. Supp. 2d 267, 273 (D. Conn. 2000) (dismissing plaintiff's summary judgment motion against sellers for failure to establish reasonable inference of "knowing" violation of section 4852d and granting summary judgment against agents for violating section 4852d).

This knowledge standard, a higher burden then mere negligence, was intentionally chosen by Congress. *See Randall v. Laconia, NH*, 679 F.3d 1, 8 (1st Cir. 2012) (Howard, J., concurring); *see also, e.g.*, *Rick v. Sperau*, No. 12-CV-1627, 2013 WL 1314417, *7 (D. Md. Mar. 29, 2013) (finding material issue of fact over whether seller or agent had knowledge of lead paint condition); *Kearney v. Elias*, No. 07–CV–149, 2008 WL 3502116, *4 (D.N.H. Aug. 11, 2008) (granting plaintiffs summary judgment against seller defendants for failure to comply with section 4852d); *Pellegrini v. Century 21*, C.A. No. 05-CV-30077, 2007 WL 2219331, *8–9 (D. Mass. July 20, 2007) (seller defendant's motion for summary judgment denied because material issue of fact remained as to whether defendant knowingly did not send lead-based paint hazard pamphlet to plaintiff pursuant to section 4852d).

In order to establish a claim under section 4852d, a plaintiff must show that:

(1) She or he was a lessee;

(2) Defendant was a lessor who failed to make the proper disclosures;

(3) The leased property was "target housing"; and

(4) The lease contract was signed after the regulations [were effective].

*Kaye v. Acme Investments, Inc.*, No. 08–12570, 2008 WL 5188712, *3 (E.D. Mich. Dec. 8, 2008) (dismissing plaintiff's section 4852d complaint for failure to show damages resulting from technical violation of federal statute).

## C. Negligence

To state a claim for liability as a result of a defendant's negligence, a plaintiff must demonstrate that (1) the defendant owed the plaintiff a cognizable duty of care, (2) breached that duty, and (3) the plaintiff suffered damages as a proximate result of the breach. *Evans v. United States*, No. 11–CV–1661, 2013 WL 3967119, *24 (E.D.N.Y. July 31, 2013). The plaintiff must show that the landlord (1) "had actual or constructive notice of . . . a hazardous condition" and (2) "a reasonable opportunity to remedy[] the hazardous condition." *Pagan v. Rafter*, 969 N.Y.S.2d 265, 267 (N.Y. App. Div. 4th Dep't 2013) (quoting *Rodriguez v. Trakansook*, 887 N.Y.S.2d 860 (N.Y. App. Div. 2d Dep't 2009)). *See also Chapman v. Silber*, 760 N.E.2d 329, 97 N.Y.2d 9, 20 (N.Y. 2001) (landlord can be liable for lead paint hazard under common-law negligence principles despite lack of statutory scheme imposing liability).

Actual notice of a hazardous lead paint condition is established where the plaintiff demonstrates that the landlord was actually aware that "(1) some or all of the leased premises was painted with lead-based paint; (2) the paint containing lead was in a state of disrepair, [*i.e.*, it was flaking, peeling, or cracking]; and (3) it presented a danger of lead exposure to infants who

might ingest flakes or chips of paint containing lead." *Steffenhagen v. Morrill*, No. 09-CV-6485,

2013 WL 6181856, at *5 (W.D.N.Y. Nov. 25, 2013) (granting summary judgment for defendants

where plaintiff failed to establish that defendants had notice of dangerous or defective condition

with respect to lead paint), *aff'd sub nom. Steffenhagen v. Sullivan*, 579 F. App'x 32 (2d Cir.

2014). *See also, e.g.*, *Stover v. Robilotto*, 716 N.Y.S.2d 146 (N.Y. App. Div. 3d Dep't 2000),

*aff'd*, 760 N.E.2d 329 (N.Y. 2001) (evidence of a landlord's mere awareness of chipping paint

will generally not satisfy the requirement that the landlord was aware of a defective lead paint

condition); *Flores ex rel. Hernandez v. Cathedral Properties LLC*, 955 N.Y.S.2d 324, 325 (N.Y.

App. Div. 1st Dep't 2012) (defendants not liable for lead paint poisoning where defendants had

no knowledge that children under the age of seven were residing in the leased premises).

Constructive notice of a hazardous lead paint condition is established if a plaintiff can

establish that the landlord:

> (1) Retained a right of entry to the premises and assumed a
>     duty to make repairs;
>
> (2) Knew that the apartment was constructed at a time before
>     lead-based interior paint was banned;
>
> (3) Was aware that paint was peeling on the premises;
>
> (4) Knew of the hazards of lead-based paint to young children;
>     and
>
> (5) Knew that a young child lived in the apartment.

*Chapman*, 760 N.E.2d at 331; *Jackson v. Vatter*, 994 N.Y.S.2d 222, 223 (N.Y. App. Div. 4th

Dep't 2014) (same). *See also Pagan*, 969 N.Y.S.2d at 267 ("The factors set forth in *Chapman*

. . . remain the bases for determining whether a landlord knew or should have known of the

existence of a hazardous lead paint condition and thus may be held liable in a lead paint case.").

To establish that a landlord retained a right of entry to the premises, the plaintiff must

demonstrate that the landlord retained the right to access the leased premises without the permission of the tenants. *Sanders v. Patrick*, 943 N.Y.S.2d 350, 352 (N.Y. App. Div. 4th Dep't 2012), *leave to appeal denied*, 979 N.E.2d 814 (N.Y. 2012) (although landlord retained key to apartment, landlord did not have right to enter leased premises without tenants' permission).

If a landlord did not have actual or constructive notice of a hazardous lead-based paint condition, a plaintiff will be unable to prove that the landlord had a duty to remedy the condition and/or prevent exposure to the plaintiff. *Gonzales v. Nemetz*, 714 N.Y.S.2d 751, 752 (N.Y. App. Div. 2d Dep't 2000) (landlord had no duty to prevent exposure to or remedy chipping or peeling paint in building built before lead-based paint was banned where landlord was unaware that chipping or peeling paint contained lead and of the dangers to children of lead poisoning); *Boler v. Malik*, 700 N.Y.S.2d 323, 324 (N.Y. App. Div. 4th Dep't 1999) (actual or constructive notice of hazardous lead paint condition cannot be imputed merely through knowledge of chipping or peeling paint); *Andrade by Andrade v. Wong*, 675 N.Y.S.2d 112, 113 (N.Y. App. Div. 2d Dep't 1998) ("knowledge that an apartment contains chipping and peeling paint does not establish notice that the premises contained lead-based paint"). *But see Wynn ex rel. Wynn v. T.R.I.P. Redevelopment Assoc's*, 745 N.Y.S.2d 97, 101 (N.Y. App. Div. 3d Dep't 2002) (defendant's motion for summary judgment denied where plaintiffs raised sufficient question of fact as to whether defendant had notice of lead-based paint hazard in common areas of building after interior renovation).

### D. Warranty of Habitability and Construction

New York Real Property Law section 235-b provides an implied warranty of habitability in residential leases:

> [I]n every written or oral lease or rental agreement for residential premises the landlord or lessor shall be deemed to covenant . . . that the premises . . . are fit for human habitation . . . and that the occupants . . . shall not be subjected to any conditions which would be dangerous, hazardous or detrimental to their life, health or safety.

N.Y. Real Property Law § 235–b. "[T]he proper measure of damages for breach of the warranty is the difference between the fair market value of the premises if they had been as warranted, as measured by the rent reserved under the lease, and the value of the premises during the period of the breach." *Newkirk v. Scala*, 935 N.Y.S.2d 176, 178 (N.Y. App. Div. 3d Dep't 2011) (quoting *Park W. Mgmt. Corp. v. Mitchell*, 391 N.E.2d 1288, 1296 (N.Y. 1979)).

Under section 235–b, a landlord's liability "is conditioned upon a showing that the landlord had notice of the defect and a reasonable time to repair." *Mahlmann v. Yelverton*, 439 N.Y.S.2d 568, 571 (N.Y. Civil Ct. Queens Cnty. 1980) (citations omitted); *see also Szewczuk v. Stellar 117 Garth, LLC*, No. 09-CV-1570, 2012 WL 8141900, at *4 (S.D.N.Y. Sept. 4, 2012), *aff'd*, 541 F. App'x 30 (2d Cir. 2013) (summary judgment granted in favor of defendants because plaintiffs are unable to show hazardous condition when lead paint is still intact).

"[The] landlord is not required to ensure that the premises are . . . perfect or . . . aesthetically pleasing . . . ; he does warrant, however, that there are no conditions that materially affect the health and safety of tenants." *100 W 174 LLC v. Haskins*, 45 Misc.3d 1222(A), 2014 N.Y. Slip Op. 51673(U), *3 (N.Y. Civil Ct. Bronx Cnty. Nov. 26, 2014) (quoting *Park W. Mgmt. Corp.*, 391 N.E.2d at 1294) (tenant allowed rent abatement for breach of warranty of habitability, violations of which include deteriorated paint that tested positive for lead content after HPD inspection). A "plaintiff may not rely upon any alleged breach of the warranty of habitability to

recover damages for personal injuries." *Sanders*, 943 N.Y.S.2d at 352 (internal quotation marks and citations omitted).

## V.     Application of Law to Facts

### A.  New York City Childhood Lead Poisoning Prevention Act

Making all disputed factual inferences in favor of defendant, plaintiffs cannot establish on their motion for summary judgment that defendant had constructive notice of the allegedly hazardous lead condition present in 490 Macdonough Street while it was occupied by plaintiffs, an element necessary to establish liability under the Act.  *See supra* Part IV.A.5.

When sections 27–2056.3 and 27–2056.8 of the NYCLPA are read together, it becomes clear that an appropriately carried out "gut-renovation" of a pre-1960 multiple dwelling building fulfills the owner's duty under the statute to "remediate all lead-based paint hazards and any underlying defects."  *See* N.Y.C. Admin. Code § 27–2056.8(1).  In accordance with the NYCLPA, a "gut-renovation" "make[s] all bare floors, window sills, and window wells in the dwelling unit smooth and cleanable," providing for "the removal *or permanent covering of all lead-based paint* on all friction surfaces on all doors and door frames . . . [and] all windows."  *Id.* at § 27–2056.8(2)–(4) (emphasis added).  Such a renovation qualifies as taking "action to prevent the reasonably foreseeable occurrence" of a lead-based paint hazard.  N.Y.C. Admin. Code § 27–2056.3.  *See also supra* Part IV.A.2, 5 (discussing cases).  If a landlord can establish that a pre-1960 multiple unit building was gut-renovated, the rebuttable presumption regarding constructive notice of a hazardous lead condition contained in the NYCLPA is overcome.

As already noted in Part I, *supra*, the following questions of material fact regarding the renovation exist.  *First*, whether the renovation sufficiently encapsulated the lead-based condition in accordance with the work practices established pursuant to the Act is disputed.

*Second*, doubts have been raised as to the sufficiency of the lead-based paint testing conducted by DOHMH. *Third*, there is a question of whether plaintiffs' dogs are responsible for allegedly disturbing the lead paint that it claimed to have been fully encapsulated during the gut-renovation. *Fourth*, the extent to which the lead found in the apartment caused the infant plaintiff's injury, as opposed to the mother's knee surgery during her first trimester of pregnancy, is currently unknown.

Drawing all disputed factual inferences in favor of the non-movant, defendant Kimpson may be able to demonstrate that he fulfilled his responsibility under the statute and applicable case law. *See supra* Part IV.A.

Motion for summary judgment on the NYCLPA claim is denied.

## B. Federal Residential Lead–Based Paint Hazard Reduction Act

Plaintiffs allege violation of the RLPHRA because defendant failed to provide them with the pamphlet referred to in the lead disclosure form they received on the date of the lease signing. This error, plaintiffs allege, entitles them to "3 times the amount of damages incurred." 42 U.S.C. § 4852d(b)(3).

Pursuant to section 4852d(a)(1) of Title 42 of the United States Code, if an agent is employed on behalf of the lessor to lease the property, the onus is on the agent to ensure full compliance with the statute. *See supra* Part IV.B. No positive obligation is imposed on the lessor to conduct any evaluation of the premises. *Id.* The agent is not being sued. Liability under the federal statute does not fall on defendant based on evidence presently before the court.

Plaintiffs' motion for summary judgment under the RLPHRA is denied.

### C. Negligence

For the same reasons that plaintiffs have not established liability under the NYCLPA, they have not established defendant's negligence on a motion for summary judgment. Sufficient evidence has not been marshaled to demonstrate that Kimpson had constructive notice of the hazardous lead-paint condition or was, in fact, aware of the condition. *See supra* Part IV.C.

Motion for summary judgment on the negligence claim is denied.

### D. Warranty of Habitability and Construction

Because questions of material fact permeate this case regarding the sufficiency and extent of the renovation performed on 490 Macdonough Street, plaintiffs have not established that Kimpson was on notice of the hazardous lead-based paint condition in the ground floor apartment and failed to abate it. *See supra* Part IV.D.

Plaintiffs' motion for summary judgment regarding defendant's violation of its warranty of habitability and construction is denied.

## VI. Conclusion

Plaintiffs' motions for summary judgment are denied in their entirety.

A *Daubert* hearing is scheduled for April 22, 2015 at 10:30 a.m. All experts will be made available in person or by telephone. Expert reports shall be filed on April 15, 2015.

Trial will start on June 29, 2015 at 2:00 p.m. A jury will be selected before a magistrate judge, beginning at 9:30 a.m. On this date, the parties shall provide the court with courtesy copies of witness lists and exhibits, pre-marked in tabbed binders.

*In limine* motions will be heard on June 22, 2015 at 10:00 a.m.

By June 15, 2015, the parties shall submit to the court proposed jury charges and verdict sheets, *in limine* motions, and any supporting briefs. They shall also exchange and file with the

court: (1) lists of pre-marked exhibits proposed for use at trial, together with copies of all exhibits; (2) lists of potential witnesses together with brief summaries of proposed testimony; and (3) stipulations with respect to all undisputed facts.

Any disputes related to briefing schedules or discovery are respectfully referred to the magistrate judge.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: March 19, 2015
      Brooklyn, New York