UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

G.M.M., *a minor child by his mother and
natural guardian*, NIKI HERNANDEZ-
ADAMS, *and* NIKI HERNANDEZ-ADAMS,
*individually*,

                        Plaintiffs,

    –   against –

MARK KIMPSON,
                        Defendant.

**MEMORANDUM & ORDER**

13-CV-5059

**Parties**

G.M.M.
Niki Hernandez-Adams

Mark Kimpson

**Appearances**

Steven Kenneth Frankel
Frankel, Rudder and Lowery
319 Broadway, Suite 500
New York, NY 10007
(212) 732-0001
FrankelRudd@aol.com

Stephen M. Cantor
Stephen M. Cantor, P.C.
325 Broadway, Suite 502
New York, NY 10007
(212) 732-8456
smcantor@hotmail.com

Roger V. Archibald
16 Court Street, Suite 2400
Brooklyn, NY 11241
(718) 237-1111
nkiba@aol.com

**J**ACK **B. W**EINSTEIN**, Senior United States District Judge:**

## Table of Contents

I.   Introduction ...................................................................................................... 3
II.  Communities Disproportionately Harmed By Lead-Based Paint ....................... 4
III. Facts ................................................................................................................ 6
    A.  Summary of Case .................................................................................... 6
    B.  Expert Testimony Regarding Ethnicity-Based Statistics ............................. 7
        1.  Plaintiffs' Experts ........................................................................... 7
        2.  Defendant's Expert ....................................................................... 13
IV. The *McMillan* Rule ...................................................................................... 14
    A.  Law .......................................................................................................... 14
        1.  The Case ...................................................................................... 14
        2.  Scholarship .................................................................................. 21
            a.  Use of Minority-Specific Data in Tort Cases ............................... 21
            b.  Use of Minority-Specific Data in Lead-Based Paint Cases ......... 25
        3.  Race and Ethnicity ....................................................................... 26
            a.  United States Census ............................................................... 26
            b.  Critiques of Census Practices ................................................... 31
    B.  Application ............................................................................................... 34
V.  Life, Worklife, and Educational Attainment Expectancy Tables ..................... 35
    A.  History .................................................................................................... 35
    B.  Law ........................................................................................................ 38
    C.  Application .............................................................................................. 40
VI. Categorical Advantages Afforded to Members of Historically Disadvantaged Minorities
    Not Inconsistent with Excluding Evidence of Race or Ethnicity Where Appropriate ........ 44
    A.  Law ........................................................................................................ 45
    B.  Application .............................................................................................. 49
VII. Constitutional Requirements Supplementing Rule 403 of the Federal Rules of Evidence 49
VIII. Conclusion ..................................................................................................... 51

## I.    Introduction

Posed is the question:  can statistics based on the ethnicity (in this case, "Hispanic") of a child be relied upon to find a reduced likelihood of his obtaining higher education, resulting in reduced damages in a tort case?  The answer is no.

A mother suing on behalf of herself and her child claimed injury to the infant's central nervous system caused by his absorption of lead dust.  The defendant was the owner and lessor of the apartment the plaintiffs lived in during the child's gestation, birth, and first year of life.  The apartment, the jury found, contained lead-based paint that had not been properly removed or encapsulated.  The total verdict in favor of plaintiffs was $2,005,000.

When the case was tried, the child was less than four years old.  A critical factor in determining damages required ascertaining the infant's prospects for obtaining postsecondary education degrees had he not suffered from lead poisoning.  In contesting damages, defendant's attorney attempted to show, through the use of expert economic testimony, statistics and cross-examination of the plaintiffs' experts, that because the child was "Hispanic," his likelihood of obtaining a Bachelor, Master, or Doctoral degree, and any corresponding elevated income, was improbable.

The father has a baccalaureate degree, the mother has a Master of Fine Arts; both held responsible income-generating jobs; the family was stable; and the parents were caring.  Based upon his specific family background, had the child not been injured, there was a high probability of superior educational attainment and corresponding high earnings.  Treated by experts as a "Hispanic," his potential, based on the education and income of "average 'Hispanics' in the United States," was relatively low.

At trial, the court ruled that, for the purposes of projecting damages, the specific characteristics of the child and his family, rather than the characterization of the child as a

member of a particular ethnic group, must be used in determining damages. The ruling was based on the same constitutional and other factors relied upon in *McMillan v. City of New York*, 253 F.R.D. 247 (E.D.N.Y. 2008). That case held that statistical evidence used to prove that a spinal cord-injured "African-American" was likely to survive for fewer years than occidental persons with similar injuries violated the equal protection and due process clauses of the United States Constitution, and was inadmissible in computing life expectancy and damages.

## II.     Communities Disproportionately Harmed By Lead-Based Paint

Lead-based paint is the primary means by which children are exposed to lead. *See* Center for Disease Control and Prevention ("CDC"), *Preventing Lead Poisoning in Young Children* 1, 4 (2005), http://www.cdc.gov/ nceh/lead/publications/PrevLeadPoisoning.pdf (last visited July 28, 2015). Lead poisoning is often caused by ingesting paint chips or dust, likely to be found in older buildings in low-income neighborhoods. *See* CDC, *Managing Elevated Blood Lead Levels in Young Children* 4, 17 (2002), http://www.cdc.gov/nceh/lead/casemanagement/managing EBLLs.pdf (last visited July 28, 2015).

> Lead paint poisoning, while dangerous for everyone, tends to manifest itself primarily in young children. Not only are young children more likely than adults to ingest lead paint, but children's bodies are particularly susceptible—biologically and developmentally—to the effects of lead paint. The poisoned population has other defining characteristics, namely that the young children are generally members of minorities from low-income families. Such families often occupy the older, deteriorating urban housing where lead paint remains prevalent. Their children have high risks of exposure to lead paint, especially since the severity of the physical and psychological effects of lead paint depends on the amount of lead paint ingested.

Laura Greenberg, *Compensating the Lead Poisoned Child: Proposals for Mitigating Discriminatory Damages Awards*, 28 B.C. Envtl. Aff. L. Rev. 429, 431–32 (2001).

Because low-income and minority families are more likely to occupy older homes with lead-based paint, the majority of children poisoned by lead in the United States are poor African-American and Latino children.  *See* Martha Chamallas & Jennifer B. Wriggins, *The Measure of Injury: Race, Gender, and Tort Law* 1, 138–53 (2010) (analyzing how tort law and lead-paint case damage awards demonstrate racial and ethnic bias in the judicial system); CDC, *Using GIS to Assess and Direct Childhood Lead Poisoning Prevention: Guidance for State and Local Childhood Lead Poisoning Prevention Programs* 1, 2 (2004), http://www.cdc.gov/nceh/lead/publications/UsingGIS.pdf (last visited July 28, 2015) (concluding that children at greatest risk for lead poisoning are those whose families are poor and live in substandard housing built before 1950, and that these children tend to be "African-American" or of "Hispanic" ethnicity); *see also* CDC, *Surveillance for Elevated Blood Levels Among Children–United States 1997–2001*, 52 Morbidity and Mortality Weekly Report No. ss–10 at 5 (2003) (discussing the lasting harms of lead exposure on children and the preventative measures taken to reduce such exposure); James L. Pirkle, *Exposure of the U.S. Population to Lead*, 106 Envtl. Health Perspectives 1, 11 (1998) (asserting new efforts must address the difficult problem of lead paint exposure, especially in older houses, as well as lead in dust and soil to remedy the prevalence of elevated blood-lead levels in children); Debra Brody *et al.*, *Blood Lead Levels in the U.S. Population*, 272 J. Am. Med. Ass'n 277, 279 (1994) (highlighting how exposure to lead at levels that may adversely affect the health of children remains a problem especially for those who are minority, urban, and from low-income families).

The building containing plaintiffs' apartment was old.  *See* Jury Instructions and Signed Verdict Sheet 6, July 10, 2015, ECF No. 83 ("Jury Instructions and Verdict").  It contained lead

paint, which was, at least in part, covered by sheetrock or new paint installed by the landlord before the family moved in. *See* Trial Transcript ("Trial Tr.") 677:15–678:5, July 6, 2015.

"Until recently, children were identified as having a blood lead 'level of concern'" if their blood-lead test resulted in "10 or more micrograms per deciliter of lead in blood." CDC, Lead, *Update on Blood Lead Levels in Children*, http://www.cdc.gov/nceh/lead/ACCLPP/ blood_lead_levels.htm (last visited July 28, 2015). In expanding protection against this serious health danger, the CDC now suggests professional monitoring of children with five micrograms per deciliter of lead in the blood. *Id.*

The child in this case had almost ten micrograms per deciliter of lead in his blood. *See* Trial Tr. 344:8–13, June 30, 2015.

### III.  Facts

#### A.  Summary of Case

This case was tried by a jury. *See G.M.M. v. Kimpson*, No. 13-CV-5059, 2015 WL 1285704, at *5 (E.D.N.Y. Mar. 19, 2015) (denying plaintiffs' motion for summary judgment and holding that fact issues existed as to whether landlord's renovation encapsulated paint and whether exposure to lead caused infant's condition). After a two-week trial with extensive expert testimony, the jury returned a verdict in favor of plaintiffs on three theories: that the defendant (1) violated the New York City Childhood Lead Poisoning Prevention Act; (2) was negligent; and (3) violated New York Real Property Law section 235-b, which provides for an implied warranty of habitability in residential leases. *See* Jury Instructions and Verdict 19.

The infant plaintiff, G.M.M., and his mother, Niki Hernandez-Adams, were tenants in the basement apartment located at 490 Macdonough Street in Brooklyn, New York. *Id.* at 6. They alleged that defendant Mark Kimpson, their landlord, and the owner of the three-family apartment house at that location, was liable for the infant's elevated blood-lead levels. *Id.* This

blood-lead level was first discovered by G.M.M.'s pediatrician when the infant was one year old. *Id.*

Defendant argued that he had sufficiently encapsulated the hazardous lead-based paint in the apartment. *Id.* at 7. He contended that plaintiffs' dog severely scratched the walls and the moldings in the apartment, releasing lead dust. *Id.* He also maintained that the infant's cognitive and behavioral difficulties resulted from other medical conditions of his mother during gestation. *Id.*

**B. Expert Testimony Regarding Ethnicity-Based Statistics**

During trial, testimony regarding the future economic prospects of the child-plaintiff, had he not been poisoned with lead, were discussed by three experts: Dr. Kenneth William Reagles, plaintiffs' forensic rehabilitation expert, Dr. Frank Tinari, plaintiffs' forensic economist, and Dr. Bernard F. Lentz, defendant's forensic economist.

**1. Plaintiffs' Experts**

Dr. Reagles is a specialist in vocational rehabilitation and a retired professor of rehabilitation services at Syracuse University. *See* Trial Tr. 396:18–25, 397:15–17, June 30, 2015. He characterized his vocation as "render[ing] opinions about what a youngster might have become had [he] not become disabled. And then to contrast that with [his] circumstances presently and the barriers to education and employment that are confronted by individuals such as [G.M.M.]." *Id.* at 399:13–15, 399:20–25, June 30, 2015.

Reagles' direct testimony predicted what the child would have become without the injury. He noted the general "Hispanic" background of the boy, but placed primary reliance on the parents' specific backgrounds:

> The first question is what would this child ha[ve] become had he
> not incurred neurological communication behavioral issues. . . .
> Then the second question becomes, based upon the deficits that

have been identified by the neuropsychologists in particular as well as physicians and educational personnel, what other kinds of difficulties that he faces today? . . .

[T]he first question was addressed by a standard methodology of predicting what individuals will become. And it is based upon, as you might expect, the educational and vocational accomplishments of parents and adults who are around a child during that developmental process. We know that adults have a profound influence on children with regard towards values, towards education and work.

[T]he first thing I did was to take a history from [G.M.M.'s] mom with regard to not only her family history, but also the father's family history. I was particularly interested in what their educational accomplishments were, what their work has been. I was interested with regard to the parents specifically, whether both parents are present in the home, and they have been during the developmental process because we know if one of the parents is not there, then the child faces some difficulties.

We look at such things as the family income. *We look at ethnicity because those are factors.* And based upon those factors, [I was] able to render an opinion about what [G.M.M.] might have become had he not been impaired by the deficits that have been described by the neuropsychologists and others[.] . . .

. . . This is a family that has had some substantial educational accomplishments. I identified 14 individuals, grandparents, aunts and uncles and parents, for whom we knew the educational accomplishments.

Of those 14 individuals, a hundred percent of them had graduated from high school. 75 percent of them had had some college education. 60 percent of them had completed baccalaureate degrees. And 30 percent of them had completed master's degrees. *So here's a family that if you look at that picture, you have a picture of not only educational accomplishment, but it may be inferred positive values towards education.*
. . .

. . . [T]he educational accomplishments of the parents can be used to predict the educational accomplishments of children. . . . [T]here are literally hundreds of studies that have been done to show the relationship between parental and family educational accomplishments and the educational accomplishments of children.

. . .

[T]he first opinion that I was asked to render is what this child might have become had he not been rendered disabled. And it's my opinion that based upon the evidence that I reviewed that this child would have been capable of a master's degree, that is two years of study beyond a four-year college degree, and may have been capable of what we call a professional degree, that would be a Ph.D. . . .

*. . . [W]e see children achieving higher levels of education, educational achievement, than their parents as a generality. And it is particularly true in Hispanic families. And one of the reasons for that is that the Hispanic population is a relatively young population within the general fabric of our society. Many of them have been here for maybe one or two generations. And they came from backgrounds, many of them, without substantial educational histories.*

*So even . . . within the Hispanic population there is even a more pronounced tendency for their children to have higher levels of educational achievement than their parents.*

*Id.* at 400:19–406:1, June 30, 2015 (emphasis added).

On cross-examination, defense counsel emphasized the low general educational backgrounds of the ethnic group he characterized as "Hispanics."

Q   . . . Now, in coming up with [your] conclusion, did you look at national statistics in general for males who attain master's degrees and professional degrees, just in general of the population, all people considered, whether they be whites, blacks, Hispanics, Asians, just the entire population, the plurality of the population, did you look at that?

A   I did take that into consideration. And as I testified earlier, I was focused on the population of individuals whose ethnicity was Hispanic.

Q   Okay. No, I understand that, but I just want to know if in your conclusions if that was part of it, you looked at the whole population, correct?

A   Well, when you say "the whole population," I relied upon the normative information . . . [and] the literally hundreds of other studies that have looked at the relationship not only of

9

parental educational accomplishment but also divided by such factors as ethnicity, socioeconomic status, number of children in the household, whether both parents were present in the household.

. . .

Q   My question is . . . did you first look at what the general population is doing in terms of the attainment of master's degrees and professional degrees as a threshold matter? . . .

A   Yes, I did. . . .

Q   For example, in [one 2009] study, . . . they are looking at males, just males, the entire male population, they are saying 41 percent of them had bachelor's degrees. . . . And then they had other tables, didn't they? *Didn't they have tables that zeroed in on specific ethnicities, correct?*
. . .

*Isn't it true, though, Dr. Reagles, that in those tables the attainment of Hispanics of attaining master's degrees was in the neighborhood of 7.37 percent . . . ?*
. . .

Q   *Additionally, in terms of professional degrees, less than 2 percent of Hispanic males earned professional degrees. The exact number is 1.97 percent.* . . .

Q   Okay. So when you testified earlier that [G.M.M.] has a better than 70 percent chance of earning a master's degree and a better than 50 percent chance of earning a professional degree, how do you come to that conclusion . . . ?

A   Well, again, that was my testimony at the time of our telephone conference. I revisited that particular model and concluded that I couldn't rely upon that model exclusively. I went back to the way that we have done this for years and years . . . and utilized the correlational studies that are in the literature that were cited in my report in arriving at the opinion not with regard to a percentage of probability, but an opinion that had this, the deficits not happened to [G.M.M.], that he would have been capable of achieving a master's degree and perhaps even a professional degree.
. . .

Q   [C]orrect me if I'm wrong now, but you look at the parents, but you also have to look at the ethnicity of the individual, right?

A   Yes.

Q   Their lifestyle, the salaries generated by the parents?

A   Socioeconomics.

Q   You have to go – it's like an accordion and you're going further and further out because you have to get all of that in order to compress the accordion and get the probability quotient, correct?  Would you agree with that assessment?

A   With the correlation coefficient.

Q   Okay.  *So in this particular case, . . . would you say that it is a high probability, a medium probability or a low probability that [G.M.M.], a Hispanic male, will attain a master's degree*?

A   *I think it is a moderately high probability that he would, based upon the family circumstances that he came from, had this incident not occurred, he would have had a moderately high probability of completing a master's degree.*
    *. . .*

Q   *Now, you're also agreeing with me with the figures that I delineated earlier regarding Hispanics in general and the attainment of master's degrees and professional degrees, correct?*

*Id.* at 417:19–430:21, June 30, 2015 (emphasis added).

Precluding an answer, the court, on its own motion, ruled, excluding

ethnicity as a factor in damages computations:

Excuse me.  I won't allow you to continue along those lines.  Hispanics is too general a category. . . .  You'll have to be more definitive with respect to this particular family.  We have professors as well as gardeners who are Hispanics, and I don't believe that we ought to go forward in federal court with that assumption of uniformity . . . .
. . .
*Now, ladies and gentlemen, [addressing the jury] . . . I am now instructing you that as a matter of constitutional and federal law, it is inappropriate where there is a case involving an individual with a Hispanic background to rely upon a table which is undifferentiated as to Hispanic individuals.*

*Id.* at 430:23–431:7, 436:15–20, June 30, 2015 (emphasis added).

The court then inquired of the expert:

> [I]f we struck from the information that you're relying upon undifferentiated statistics with respect to, quote, Hispanics, unquote, in what way, if any, would your testimony be changed?

*Id.* at 436:24–437:2, June 30, 2015.

Dr. Reagles responded:  "Not materially and substantially at all."  *Id.* at 437:11–12, June 30, 2015.

After the jury left the courtroom, the court explained that it was relying on its decision in *McMillan v. City of New York*, 253 F.R.D. 247 (E.D.N.Y. 2008), and the case's "[d]iscussion of race sociology and statistics."  *Id.* at 441:11–14, June 30, 2015.  Neither party objected to the ruling.  *Id.* at 441:15–20, June 30, 2015.

On July 6, 2015, before plaintiffs' separate economic expert, Dr. Tinari, took the stand, the court reminded the jury of its June 30, 2015 ruling, adding:

> I am now instructing you that as a matter of constitutional and federal law it is inappropriate where there is a case involving an individual with a Hispanic background . . . to rely upon . . . assumptions by a witness [premised on ethnicity.]
>
> You cannot treat the child as an average Hispanic but [may] only [treat] him with respect to his specific characteristics, such as the mother's degree, where he is living, the kind of family he is coming from, et cetera. . . .  But *you cannot say that, for example, Hispanics generally go to college less than others and therefore use that statistic or that analysis or that chart*.

Trial Tr. 576:19–577:8, July 6, 2015 (emphasis added).  Plaintiffs' economic expert was then instructed as follows:

> I'm instructing you now, doctor, that all your testimony with respect to your projections must be based on this direction I'm now giving to the jury[.]

*Id.* at 577:10–12, July 6, 2015.

The economic expert projected plaintiffs' total future economic losses to be between 2.5 and 4 million dollars. *Id.* at 561:13–16, July 6, 2015. He explained that he had "not included in [his] opinion any assumption of what an average Hispanic would do." *Id.* at 578:3–5, July 6, 2015.

### 2. Defendant's Expert

Dr. Lentz was defendant's forensic economist. *See* Trial Tr. 1128:5–11, 19–21, July 8, 2015. He holds a doctorate in economics and has conducted research and taught at Virginia Tech, Ursinus College, the University of Pennsylvania, and Drexel University. *Id.* at 1129:25–1135:6, July 8, 2015. Dr. Lentz testified about his analysis of occupational inheritance and the plaintiff-child's measure of economic loss. *Id.* at 1128:5–1174:22, July 8, 2015. He found that, because the child-plaintiff was "Hispanic," his future economic loss of earnings was lower than that projected by plaintiffs' forensic economist. *See* Trial Tr. 1140:15–1141:6, 1148:15–19, 1159:16–1160, July 8, 2015. The basis for the assessment was rooted in the following data:

> **Earning Capacity**. According to the National Center for Education Statistics, 2.1 % of *Hispanic males* held a Master's degree or better in 2013 while 13.1 % held a Bachelor's or higher degrees. It can also be noted that 73.1 % of *Hispanic males* held a high school degree or better.

*See* Daubert Hr'g, Court Ex. 8–F at 5, June 22, 2015 (emphasis added).

The following colloquy took place between the court and Dr. Lentz:

> THE COURT: [B]efore you testify, Doctor. . . . I note that your report relies upon Hispanic males' education statistics. . . .
>
> THE WITNESS: Yes.
>
> THE COURT: And Hispanic males' academic achievements.
>
> THE WITNESS: Correct.
>
> THE COURT: On the average.

13

THE WITNESS: Yes.

THE COURT: I have ruled that it is unconstitutional to base damages on the characteristics of a person injured as a[] Hispanic or a member of any other ethnic group. *So all of your answers should be based upon individual characteristics and not the general characteristics of a group, ethnic group.* Is that clear to you[?]

THE WITNESS: I believe so, sir.

Trial Tr. 1140:15–1141:6, July 8, 2015 (emphasis added).

Taking the court's ruling into consideration, Dr. Lentz ultimately projected that if the plaintiff-child obtained a baccalaureate degree, his total future economic loss would amount to $2,509,542. *Id.* at 1160:2–6, July 8, 2015. If he earned only a high school diploma, his total future economic loss was projected at $1,384,776. *Id.* at 1160:7–12, July 8, 2015. A career pursued in the "arts and design" field after earning one or more postsecondary education degrees was estimated to yield $1,522,067. *Id.* at 1159:16–23, July 8, 2015.

IV. **The *McMillan* Rule**

A. **Law**

1. **The Case**

*McMillan* ruled on the following question:

[W]hether . . . "racially" based statistics and other compilations may be relied upon to find a shorter life expectancy for a person characterized as an "African-American," than for one in the general American population of [multiracial] backgrounds.

*McMillan*, 253 F.R.D. at 248. The court held:

"Racially" based life expectancy and related data may not be utilized to find a reduced life expectancy for a claimant in computing damages based on predictions of life expectancy.

*Id.*

14

The case involved a claim by an "African-American" man injured in the 2003 Staten Island Ferry crash. *Id.* "[S]tatistical evidence [had been] introduced suggesting that a spinal cord-injured African-American was likely to survive for fewer years than persons of other races with similar injuries." *Id.* (citation omitted). Three arguments were made by the court in support of its decision to exclude race-based actuarial tables. *Id. First*, it pointed out that the tables were inadequate as a matter of actuarial science because race is a biological fiction. *Id.* at 249–50. *Second*, it found that lifespan variations among races were attributable largely to socioeconomic status, not biology. *Id.* at 251–52. *Third*, it held that race-based actuarial tables violated the equal protection and due process clauses of the United States Constitution. *Id.* at 255–56.

*McMillan*'s full analysis is set out below because the "ethnicity" factor in the present case is treated in the same way as the "race" issue in *McMillan*.

## II. Factual Unreliability of "Race"-Based Statistics

. . . Reliance on "race"-based statistics in estimating life expectancy of individuals for purposes of calculating damages is not scientifically acceptable in our current heterogeneous population. . . . "[R]ace" is largely a social construct inappropriate in assessing damages in a negligence suit.

### A. "Race" as Biological Fiction

Franz Boas, [a] Columbia University [a]nthropologist, pointed out that "every classification of [human]kind must be more or less artificial;" he exposed much of the false cant of "racial" homogeneity when he declared that "no racial group is genetically pure."
. . .

The ideology of race arose as a rationalization and justification for human slavery at a time when Western European societies were embracing philosophies promoting individual and human rights, liberty, democracy, justice, brotherhood, and equality. . . . Alexis de Tocqueville, . . . an early observer of American life[,] was among the first to recognize this conception of race, writing that "the existence of innate and immutable racial characteristics is to be regarded with skepticism and theories founded upon such

doctrine are mere rationalizations for slavery and other forms of racial oppression."

. . .

[An] emphasis on identifying immutable differences between "racial" groups[] can be expected only to maintain and reinforce existing racial inequality, in that [] adherents [to classifications based on race] indirectly argue that no degree of government intervention or social change will alter the skills and abilities of different racial groups. The disproportionate representation of some "racial" groups . . . among lower socioeconomic tiers can therefore be explained as an unavoidable byproduct of human evolution. Yet reinforcing this widely held social stereotype of racial inferiority risks limiting individual human potential, in that individuals' abilities and opportunities would likely be assessed in relation to their racial group.

. . . [I]t is difficult to pinpoint any "racial identity" of an individual through his or her genes. International gene mapping projects have only revealed variations in strings of DNA that correlate with geographic differences in phenotypes among humans around the world, the reality being that the diversity of human biology has little in common with socially constructed "racial" categories.

While "race" may be a social construct, many policymakers and courts insist that it remains a significant predictor of access to societal goods and resources. "Racial" and "ethnic" disparities in quality of health care, for example, remain substantial across a broad range of medical services. But those disparities are associated with socioeconomic differences and tend to diminish significantly and, in a few cases, to disappear altogether when socioeconomic factors are controlled. *By allowing the use of "race"-based life expectancy tables, which are based on historical data, courts are essentially reinforcing the underlying social inequalities of our society rather than describing a significant biological difference.*

## B. Unreliability of "Racial" Categories

In 1977, the Office of Management and Budget (OMB) issued Statistical Policy Directive Number 15, "Race and Ethnic Standards for Federal Statistics and Administrative Reporting." The directive established four "racial" categories ("American Indian or Alaskan Native," "Asian or Pacific Islander," "Black," and "White") for federal legislative, programmatic and administrative purposes. The OMB revised these standards in October of 1997, creating five groups instead of four by splitting

"Asian" and "Native Hawaiian or Other Pacific Islander." The 2000 census also added a sixth "racial" set, "Some Other Race," and allowed responders to choose more than one category. . . .

Despite the 2000 census' more detailed self-categorization system, demographic studies that use pre–2000 census data continue to define "race" by using the 1977 OMB directive.

Life expectancy tables are based on historical data and thus largely rely on the OMB's former archaic "racial" analysis. This means that the tables frequently employed by courts in determining tort damages fail to account for the [United States' multiracial society]. . . .

**C. Socio–Economic Status and "Race"**

. . . While many sociologists, epidemiologists, and other researchers have noted the broad influence of race/ethnicity and socioeconomic position on functional status, active life expectancy, and mortality, the influence of socio-economic factors is often masked by "race." Reliable studies have found that the relationships between socioeconomic position or race/ethnicity and health may be modified by geographic influence and community conditions that contextualize and structure these relationships. . . . [W]hile race-based mortality ratios and absolute risks are important, there are clear limitations to their use as indicators of health, including the appropriateness and reliability of the "racial" and "ethnic" categories used in statistical analysis.

The impact of socio-economic status (SES) on life expectancy has long been recognized. Aside from baseline health, the next dominant explanation for the worse health outcomes for "Blacks" and "Hispanics" was SES. In contrast, health insurance and health behaviors explained little of the racial/ethnic differences in health outcomes.

More detailed investigations into the life expectancy gap between "White" and "Black" Americans have shown that life expectancy varies within "racial" groups by economic characteristics and geography. Given the significant impact of socio-economic factors, it is natural for courts to be concerned with the use of life expectancy tables that ignore important distinctions such as education, place of residency, and employment, collapsing all members of a "racial" group into a single number. Gross statistical tables do not answer the question: [for example] how does the life expectancy of well-off or middle-class "African-Americans" compare to that of poor "African-Americans?"

In a national study of twenty-three local areas, researchers found that "African-American" residents of advantaged urban areas have substantially higher life expectancies than their poor urban counterparts; in some cases their life expectancies approach the white national average. That study also found that "White" residents of urban poor areas have mortality profiles comparable to those of "Black" residents of poor rural areas and "Blacks" nationwide, and somewhat worse than residents of relatively advantaged "Black" urban areas. In fact, "African-Americans" residing in the advantaged population of New York City fare as well as "Whites" nationwide.
. . .

When determining tort damages based upon an injured individual's future life span and potential needs, consideration must be given to the fact that changing a person's socio-economic status may have an impact upon his or her life expectancy. While studies have found that expanding health insurance alone would not greatly impact the life expectancy or morbidity of individuals, it may well be that elevating a group of individuals from a lower socio-economic class to a higher one would change their overall cause-of-death structure and enhance their health and lifespan. . . .

The findings of the studies cited above reinforce the conclusion that despite a documented gap in life expectancy between "Black" and "White" Americans, the simple characterization of individuals as "Black" or "White" is not only misleading, it risks masking the complex interactions between a host of . . . socio-economic [and other] factors. . . .

**D. Legal Decisions on "Race"**

A 1905 decision by a federal court in New York relied on "race"-based statistics and "racial" categories in reducing damages in an admiralty case. [*See The Saginaw and The Hamilton*, 139 F. 906 (S.D.N.Y.1905)]. Two steamships collided, resulting in the deaths of some passengers and crewmembers. Wrongful death actions were brought for six "Colored" and two "White" persons killed in the accident. Rejecting the use of standard mortality tables to predict the life expectancies of all the deceased, the court cited census data summarizing differences in "White" and "Colored" life expectancies in justifying its reduction of awards. At that time census respondents did not have the option of selecting more than one "race" to identify themselves. [O]n average *The Saginaw* court lowered the awards for the deaths of blacks ten percent more than the awards for the deaths of whites and the court slashed three of the awards for blacks by forty percent or more.

It should be noted in assessing [this case] that [it] was decided shortly after *Plessy*, approving "racial" segregation of "African–Americans." *Plessy's* "racial" basis was entirely rejected by *Brown v. Board of Education* . . .

## 1. Future Earnings

Courts are increasingly troubled by "race"- and gender-based figures for calculating loss of future income. [In 2004,] [t]he district court [of Utah] . . . noted that surprisingly the reported cases have almost completely neglected the question of whether to use sex- and "race"-neutral statistics. [*See United States v. Bedonie*, 317 F. Supp. 2d 1285, 1315 (D. Utah 2004), *aff'd sub nom*, *United States v. Serawop*, 505 F.3d 1112 (10th Cir. 2007).] After receiving an expert report (for restitution purposes) that reduced the estimate of lost income based on the fact that a victim was "Native American," that court directed recalculation without regard to "race" or gender. Avoiding reaching any constitutional questions, the court chose to exercise its discretion in favor of victims of violent crime and against the possible perpetuation of inappropriate stereotypes, especially where the defendants have deprived their victims of the chance to excel in life beyond predicted statistical averages. The court ultimately utilized gender- and "race"-neutral figures in its findings.

[In 1991, the district court of the District of Columbia] refused to use "racial" statistics in calculating tort damages for loss of future income when the plaintiff was half "Black" and half "White." [*See Wheeler Tarpeh–Doe v. United States*, 771 F. Supp. 427 (D.D.C. 1991)]. The defendant argued that the wage earnings projections for "Black" men were the appropriate figures for the plaintiff, whose mother was "White" and father was "Black." Apparently "race"-based life expectancy figures were not introduced in the case. The court held it inappropriate to incorporate current discrimination resulting in wage differences between the sexes and races or the potential for any future such discrimination into a calculation for damages resulting from lost wages. It used the average earnings of all persons.
. . .

## 2. Work–Life Expectancy

In an action for damages [brought] by an injured seaman [in the Western District of Louisiana], the plaintiff presented statistics on work-life expectancy modified to exclude "race" as a factor; the defendant challenged the increased work-life expectancy that

resulted. [*See Theodile v. Delmar Systems, Inc.*, No. 03-CV-1844, 2007 WL 2491808, at *8 (W.D. La. 2007)]. The district court refused to upset the jury's award in the "race"-neutral amount suggested by plaintiff's expert. [In 1987,] a[] district court [in Rhode Island] rejected an expert calculation that reduced a female tort victim's estimated working life by 40% based on a historical statistic about the number of years females average in the workforce.

In administering the September 11th Victim Compensation Fund, Special Master Kenneth R. Feinberg based estimations of remaining years of work-life on the victim's age, using statistics for the general population of active males in the United States for all claimants and ignoring "racial" differences.

### 3. Life Expectancy

In the context of Title VII, the Supreme Court noted that while actuarial studies could unquestionably identify differences in life expectancy based on race or national origin, as well as sex, Congress has outlawed classifications based on "race," national origin, and sex. Thus, even a true generalization about the class is an insufficient reason for disqualifying an individual to whom the generalization does not apply. "Racial" statistics present an especially strong argument for exclusion, since, as already noted, the question of "race" is ambiguous, whereas gender is generally conceded.

### III. Unconstitutionality of "Race" as a Criterion for Assessing Damages

### A. Equal Protection

For half a century the Supreme Court has rejected on equal protection grounds "race"-based discrimination.

[W]hen experts rely on race or gender-based statistics to calculate tort damages, we tend not to notice the discrimination and to accept it as natural and unproblematic. "Racial" classifications of individuals are suspect categories, meaning that state action in reliance on "race"-based statistics triggers strict scrutiny. Judicial reliance on "racial" classifications constitutes state action. Equal protection in this context demands that the claimant not be subjected to a disadvantageous life expectancy estimate solely on the basis of a "racial" classification.

### B. Due Process

There is a right—in effect a property right—to compensation in cases of negligently caused damage to the person under state and federal law.

By allowing use of "race"-based statistics at trial, a court would be creating arbitrary and irrational state action. [T]he form and content of statistical evidence is shaped by the requirements of the substantive law. Were the court to apply an ill-founded assumption, automatically burdening on "racial" grounds a class of litigants who seek compensation, there would be a denial of due process.

The legal system does not work fairly and with due process if one class of litigants is unduly burdened in litigation through the application of inappropriate "race"-based statistics. . . .
. . .

Any decision to use a group-based projection into the future as a basis for a damage remedy also involves normative judgments about the relevant frame of reference and the rate of future change.
. . .

*Id.* at 249–256 (citations omitted).

### 2. Scholarship

#### a. Use of Minority-Specific Data in Tort Cases

Race-based statistics and other race-centric data cannot be relied upon to find a reduced life expectancy for a claimant in computing tort damages. *See, e.g.*, Anita Bernstein, *What's Wrong With Stereotyping*, 55 Ariz. L. Rev. 655, 711 (2013) (citing *McMillan* for proposition that use of race-neutral data in courts has been given legal effect); *see also* Deirdre M. Smith*, The Disordered and Discredited Plaintiff: Psychiatric Evidence in Civil Litigation*, 31 Cardozo L. Rev. 749, 821 (2010) (citing *McMillan* to support argument that use of race-based statistics should be discontinued); *cf.* Michael I. Meyerson & William Meyerson*, Significant Statistics: The Unwitting Policy Making of Mathematically Ignorant Judges*, 37 Pepp. L. Rev. 771, 797

(2010) (finding that "the introduction of racially-based DNA numbers into a courtroom proceeding is fundamentally misleading").

In neither the instant case nor *McMillan* has the court reached the issue of how life, worklife, and educational expectancy tables negatively affect other disadvantaged groups, such as women, lesbians, gays, bisexuals, transgender persons, and those with disabilities.  Professor Sebok notes:

> If [we] truly want[] to articulate a principle that would remove impermissible discrimination from the calculation of tort damages, I believe it is incumbent . . . to anticipate and answer the obvious question:  If race cannot be used, what about gender?  Statistically, both are correlated with dramatic differences in lifespan and earnings.

Anthony J. Sebok, *Ruling Barring the Use of Race in Calculating the Expected Lifespan of a Man Seeking Tort Damages: An Isolated Decision, or the Beginning of a Legal Revolution?*, Oct. 22, 2008, http://writ.news.findlaw.com/sebok/20081022.html (last visited July 28, 2015); *cf. Roberts v. United States Parcel Service*, Inc., No. 13-CV-6161, 2015 WL 4509994 (E.D.N.Y. July 27, 2015) (surveying the lack of federal protections for gays and lesbian in the workplace); Mark L. Hatzenbuehler *et al.*, *Structural Stigma and All-Cause Mortality in Sexual Minority Populations*, 103 Soc. Sci. & Med. 33 (2014) (finding in study with small sample size that life expectancy of lesbians, gays, and bisexuals living in communities with high levels of anti-gay prejudice is twelve years shorter than for those living in low prejudice communities); Center for American Progress, *et al.*, *A Broken Bargain: Discrimination, Fewer Benefits and More Taxes for LGBT Workers* 7, 34 (June 2013) (finding "gay and bisexual men experience a 'wage penalty' relative to heterosexual men[,]" and "[l]esbian and bisexual women actually fare better than heterosexual women, but still experience the gender-based wage gap relative to all men"); Amicus Brief of Services and Advocacy for Gay, Lesbian, Bisexual and Transgender Elders in

Support of Petitioners at 26–27, *Obergefell v. Hodges*, 135 S. Ct. 2584 ("LBGT people are under-represented at the top of the income pyramid and over-represented at the bottom." (citations omitted)); Amicus Brief of Organization of American Historians at 23, *Obergefell*, 135 S. Ct. 2584, ("A 2012 survey of homeless youth providers discovered that almost [forty] percent of the homeless youth they serve identify as lesbian, gay, bisexual, or transgender." (citing Laura E. Durso & Gary J. Gates, *Serving Our Youth: Findings from a National Survey of Service Providers Working with Lesbian, Gay, Bisexual and Transgender Youth Who Are Homeless or At Risk of Becoming Homeless*, The Williams Institute (2012))).

Economic data that is minority-specific saddles those who do not conform to the data with adverse generalizations about their group, "the very kind of stereotyping that anti-discrimination laws were meant to prohibit." Martha Chamallas, *Civil Rights in Ordinary Tort Cases: Race, Gender, and the Calculation of Economic Loss*, 38 Loy. L.A. L. Rev. 1435, 1439 (2005) ("Chamallas I"); *see also* Elizabeth Adjin-Tettey, *Replicating and Perpetuating Inequalities in Personal Injury Claims Through Female-Specific Contingencies*, 49 McGill L.J. 309, 311 (2004) (arguing that, when judges sanction the awarding of depressed damages to tort claimants from historically disadvantaged groups, they reinforce the marginalization of minorities in society).

"[W]hen damages for injuring members of minority groups are lowered, the legal regimen [has] the perverse result of encouraging torts against them." Meyerson & Meyerson, *supra* at 808 (citation omitted). Seemingly "neutral tort rules" become a mechanism for replicating the "unequal status quo," making it "more difficult for disadvantaged social groups to bring about social change." Chamallas I, *supra* at 1458.

> *Sometimes, the problem with numbers is not that they induce prejudice in others, but that the very use of numbers is unknowingly bigoted* . . . . [T]o the extent the differences reflected in [economic data] . . . are caused by ongoing discrimination, using [it] reinforces the harm caused by wrongful discrimination . . . . *Because of a long history of discriminatory treatment, the explicit use of [bigoted numbers] dramatically reduces some damage awards for . . . Hispanic men.*

Meyerson & Meyerson, *supra* at 801–07 (emphasis added).

> The position of litigants as full citizens is undermined to the extent we allow legal decisions to be based upon evidence that expressly links them to groups that are traditionally disfavored, disempowered, and discredited.  When a court permits a plaintiff to be labeled . . . for purposes . . . of [determining] entitlement to compensation for injuries, it serves as an endorsement by our legal system of discounting plaintiffs, and others [subjected to these labels].  The validation of this practice by the very institution charged with ensuring justice necessarily undermines attempts to reverse the stigmatization of [labels] in our society and, indeed serves to reinforce the stigma [associated with the labelling].

Smith, *supra* at 822; *see also* Joanna Shepherd & Paul H. Rubin, *The Demographics of Tort Reform: Winners and Losers* 1–8 (2007), https://www.law.umich.edu/centersandprograms/ lawandeconomics/workshops/Documents/Winter2007/shepherd.pdf (last visited July 28, 2015) ("By limiting certain types of damages relative to other damages, tort reform may disproportionately reduce damage payments to specific segments of the population[, including] women, children, the elderly, and less affluent members of society . . . [and] many disadvantaged minorities."); Joanne Doroshow & Amy Widman, *The Racial Implications of Tort Reform*, 25 Wash. U. J.L. & Pol'y 169 (2007) (stating that tort reforms, such as monetary caps on damages or removing access to juries in medical practice cases, will have a greater adverse impact on minority communities).

### b. Use of Minority-Specific Data in Lead-Based Paint Cases

Economists and rehabilitation experts generally rely on gender-, race-, and ethnicity-based statistics to determine loss of earning capacity in lead paint cases to the detriment of racial and ethnic minorities. *See, e.g.*, Greenberg, *supra* at 430 ("Using race-based statistics reinforces the current racial discrimination in the workforce, ignoring the possibility and the social value of upward mobility."); *see also supra* Part III.B (recording the expert testimony in the instant case). The use of such data results in significantly lower awards for "Hispanics," replicating historical patterns of discrimination in tort awards. Greenberg, *supra* at 430 ("Lead paint plaintiffs—young, poor and often African-American or Hispanic—are disadvantaged by the traditional determinations of loss of earning capacity."). Professor Martha Chamallas has described the phenomenon as follows:

> Depressed awards for plaintiffs derive from the fact that the population of lead paint victims is disproportionately young children, typically poor, African-American or Hispanic children. This means that, in making assessments of the lost future earning capacity of these children, there is often a lack of individualized evidence that indicates what career path the plaintiff would have taken and what he or she would likely have earned over a lifetime. In such cases, resort to statistics may well be the best available method of prediction. When lost earnings are calculated using race- [or ethnicity-] based tables, however, whether to measure average earnings or worklife expectancy, the awards are considerably lower than they would be for comparably injured white victims. Defendants in such cases, typically landlords or government housing authorities, thus pay far less than they would if their victims were predominantly white, middle-class children.

Chamallas I, *supra* at 1440–41. The unacceptable result is: "*[B]ecause it is cheaper to injure poor minority children, there is less incentive for defendants to take measures to clean up toxic hazards in the neighborhoods most affected by lead paint.*" *Id.* at 1441 (emphasis added).

### 3. Race and Ethnicity

#### a. United States Census

The history of the classifications used by the United States Census Bureau ("Census Bureau") and the geopolitical landscape of the mid-twentieth century show how and why ethnicity generally, and the term "Hispanic" specifically, is a social and fluid concept, similar to race.

The United States conducted its first census in 1790. *See* Census Bureau, *History - 1790*, http://www.census.gov/history/www/through_the_decades/index_of_questions/1790_1.html (last visited July 28, 2015). Although questions concerning the conducting of the census persisted throughout the mid-eighteenth and nineteenth centuries, it was not until 1930 that individuals of Latino origin were separately considered. *See* Census Bureau, *History - 1930*, http://www.census.gov/history/www/through_the_decades/index_of_questions/1930_1.html. In 1930, the option of "Mexican" as a "race" was made available for selection. *Id.*

Then, in 1935, the District Court for the Western District of New York denied citizenship to an individual of Mexican heritage. *In Re Timoteo Andrade*, No. 2272-P-24049, slip op. at 2 (W.D.N.Y. Dec. 11, 1935). Following the district court's decision, the United States Department of State, the Mexican government, and Mexican-American civil rights activists worked together to neutralize the ruling pursuant to the recently-adopted "Good Neighbor Policy." *See* Patrick D. Lukens, *A Quiet Victory for Latino Rights: FDR and the Controversy over "Whiteness"* (2012); *see also* Department of State, *Good Neighbor Policy* (1993), https://history.state.gov/milestones/ 1921-1936/good-neighbor (last visited July 28, 2015) ("Good Neighbor Policy" provided that "No state shall intervene in the internal or external affairs of another[,]" and was designed to improve relations among countries in the Western Hemisphere). Implemented was an administrative policy whereby Mexicans and Mexican-Americans would, from that point

forward, be classified as "White." *Id.* The notion of Latino or Hispanic as an ethnicity was born. *Id.*; *cf.* Jenny Rivera*, An Equal Protection Standard for National Origin Subclassifications: The Context That Matters*, 82 Wash. L. Rev. 897, 901 n.20 (2007) ("The term 'Latino' represents the experiences and histories of persons of Latin American and Latino Caribbean descent. The term 'Hispanic' is representative of Latin America's connections and history as it relates to Spain and Europe exclusively[.]").

Today, both race and ethnicity appear in the United States Census. The terms are defined as "self-identification data items." *See* Census Bureau, *Race*, http://www.census.gov/topics/ population/race/about.html (last visited July 28, 2015). In a census survey, participants are asked to identify themselves by race or races and to indicate whether they are of "Hispanic or Latino" origin or of "non-Hispanic or Latino origin," the only two ethnic categories provided. *See* Elizabeth M. Grieco & Rachel C. Cassidy*, Overview of Race and Hispanic Origin,* Census 2000 Brief 3 (Mar. 2001), http://www.census.gov/prod/2001pubs/cenbr01-1.pdf (last visited July 28, 2015).

The federal government treats race and ethnicity for statistical purposes to be two separate and distinct concepts. *Id.* at 1. The Merriam-Webster Dictionary defines race as "a category of humankind that shares certain distinctive characteristics," and ethnicity as a "particular ethnic affiliation or group," where ethnic is defined as "of or relating to large groups of people classed according to common racial, national, tribal, religious, linguistic, or cultural origin or background." Merriam-Webster Dictionary, http://www.merriam-webster.com/ (last visited July 28, 2015).

The Office of Management and Budget ("OMB") defines Hispanic or Latino as "a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin

regardless of race." Grieco & Cassidy, *supra* at 2. In data collection and presentation, "federal agencies are required to use a minimum of two ethnicities: 'Hispanic or Latino' and 'Not Hispanic or Latino.'" *Id.* The racial categories identified by OMB are: "White"; "Black, African American, or Negro"; "American Indian or Alaskan Native"; "Asian Indian"; "Chinese"; "Filipino"; "Japanese"; "Korean"; "Vietnamese"; Native Hawaiian"; "Guamanian or Chamorro"; "Samoan"; "Other Pacific Islander"; "Other Asian"; and "Some other race." *Id.*

Using life, worklife, and educational attainment tables premised on OMB's racial and ethnic distinctions has the capacity to disadvantage a plaintiff, such as the child in the instant case, by assuming he would be in a socio-economic group lower than would be predicted by analyzing his real-life background. The below graphics produced by the Census Bureau demonstrate that restricting use of race- and ethnicity-based tables in reducing damages does make a difference:

### Education and Synthetic Work-Life Earnings Estimates
*American Community Survey Reports*
**Issued September 2011**

These estimates are "synthetic," that is, they are not the actual dollars people earned over the complete working life of the person (which would require us to have retrospective earnings data for the 40 years of their work-life). Instead, they are estimated using data from a one point-in-time cross-sectional survey . . . . Synthetic work-life earnings represent expected earnings over a 40-year time period for the population aged 25–64 based on annual earnings from a single (cross-sectional) point in time. The estimate was calculated by adding median earnings for eight 5-year age groups, multiplied by five.

Table 2-A.
**Median Synthetic Work-Life Earnings by Education, Race/Ethnicity, and Gender:**
**Full-Time, Year-Round Workers**

| Characteristic | Male | | Female | |
|---|---|---|---|---|
| | Synthetic work-life earnings | Standard error | Synthetic work-life earnings | Standard error |
| **Hispanic** | | | | |
| None–8th grade................. | $976,727 | $3,152 | $704,005 | $3,573 |
| 9th–12th grade ............... | $1,136,694 | $5,576 | $811,885 | $4,993 |
| High school graduate........... | $1,306,747 | $6,144 | $1,021,242 | $4,202 |
| Some college.................. | $1,679,364 | $7,618 | $1,301,068 | $7,222 |
| Associate's degree ........... | $1,837,607 | $14,849 | $1,446,134 | $11,693 |
| Bachelor's degree ............ | $2,080,558 | $14,046 | $1,701,767 | $11,850 |
| Master's degree .............. | $2,791,370 | $31,625 | $2,255,883 | $22,522 |
| Professional degree........... | $3,120,466 | $107,267 | $2,334,295 | $67,399 |
| Doctorate degree.............. | $3,109,666 | $121,372 | $2,624,329 | $94,510 |
| **White Alone, Not Hispanic** | | | | |
| None–8th grade................. | $1,351,121 | $9,733 | $932,641 | $11,554 |
| 9th–12th grade ............... | $1,443,984 | $4,354 | $947,568 | $4,205 |
| High school graduate........... | $1,690,285 | $1,993 | $1,183,917 | $1,304 |
| Some college.................. | $1,985,967 | $2,080 | $1,406,249 | $1,940 |
| Associate's degree ........... | $2,086,488 | $4,038 | $1,607,609 | $3,052 |
| Bachelor's degree ............ | $2,827,953 | $3,827 | $2,028,096 | $2,958 |
| Master's degree .............. | $3,318,658 | $6,793 | $2,366,374 | $4,053 |
| Professional degree........... | $4,754,930 | $24,973 | $3,200,311 | $18,546 |
| Doctorate degree.............. | $3,692,684 | $19,536 | $2,967,826 | $18,805 |
| **Black Alone, Not Hispanic** | | | | |
| None–8th grade................. | $1,045,580 | $19,926 | $863,231 | $16,216 |
| 9th–12th grade ............... | $1,124,778 | $9,985 | $861,353 | $5,715 |
| High school graduate........... | $1,340,407 | $5,031 | $1,070,827 | $3,720 |
| Some college.................. | $1,601,729 | $7,010 | $1,308,183 | $4,590 |
| Associate's degree ........... | $1,724,599 | $12,357 | $1,463,652 | $9,495 |
| Bachelor's degree ............ | $2,107,728 | $12,238 | $1,859,380 | $8,642 |
| Master's degree .............. | $2,530,574 | $25,295 | $2,310,171 | $12,090 |
| Professional degree........... | $3,521,784 | $77,518 | $2,847,709 | $53,871 |
| Doctorate degree.............. | $2,912,750 | $69,795 | $2,881,587 | $67,031 |
| **Asian Alone, Not Hispanic** | | | | |
| None–8th grade................. | $1,003,783 | $19,132 | $864,579 | $16,235 |
| 9th–12th grade ............... | $1,159,638 | $16,524 | $942,418 | $14,461 |
| High school graduate........... | $1,292,822 | $10,420 | $1,059,678 | $7,315 |
| Some college.................. | $1,678,196 | $14,528 | $1,394,305 | $11,002 |
| Associate's degree ........... | $1,843,014 | $18,282 | $1,600,797 | $17,984 |
| Bachelor's degree ............ | $2,437,516 | $15,225 | $2,061,186 | $11,656 |
| Master's degree .............. | $3,454,087 | $18,621 | $2,735,465 | $26,871 |
| Professional degree........... | $4,700,782 | $91,225 | $3,680,543 | $106,135 |
| Doctorate degree.............. | $3,601,577 | $40,889 | $3,134,482 | $87,894 |
| **Other, Not Hispanic** | | | | |
| None–8th grade................. | $1,228,762 | $32,412 | $848,544 | $28,385 |
| 9th–12th grade ............... | $1,320,118 | $27,908 | $902,420 | $19,700 |
| High school graduate........... | $1,478,622 | $12,851 | $1,135,015 | $10,849 |
| Some college.................. | $1,757,852 | $21,149 | $1,321,789 | $10,330 |
| Associate's degree ........... | $1,857,056 | $26,447 | $1,513,536 | $18,165 |
| Bachelor's degree ............ | $2,381,770 | $25,746 | $1,866,935 | $20,691 |
| Master's degree .............. | $2,954,449 | $53,872 | $2,217,916 | $49,229 |
| Professional degree........... | $4,086,575 | $246,403 | $2,889,210 | $160,628 |
| Doctorate degree.............. | $3,318,995 | $160,809 | $2,678,873 | $151,809 |

Note: Synthetic work-life earnings represent expected earnings over a 40-year time period for the population aged 25–64 based on annual earnings from a single (cross-sectional) point in time. The estimate was calculated by adding median earnings for eight 5-year age groups, multiplied by five.

Source: U.S. Census Bureau, American Community Survey, 2006–2008.



Figure 4.

**Synthetic Work-Life Earnings for Gender/Race-Ethnicity Groups by Education Level**

(Full-time, year-round workers)

Median SWE in millions of dollars

Source: U.S. Census Bureau, American Community Survey, 2006–2008.

In Figure 4, colors represent different race/ethnicity groups while the dotted and solid lines represent females and males, respectively. The general pattern is that the dotted lines are often below the solid lines. What this tells us is that, particularly at lower levels of education, even women in the most advantaged race groups usually earn less than men in the most disadvantaged race groups. Asian women with at least a bachelor's degree are competitive with some male groups, but at no point do women's earnings come close to White or Asian men's earnings at the same education level.

Tiffany Julian & Robert Kominski, *Education and Synthetic Work-Life Earnings Estimates*, United States Census Bureau 1, 6, 9 (September 2011), https://www.census.gov/prod/2011pubs/acs-14.pdf (last visited July 28, 2015).

### b. Critiques of Census Practices

The American Anthropological Association has criticized OMB's practice of separating "race" and "ethnicity":

> *First*, by treating race and ethnicity as fundamentally different kinds of identity, the historical evolution of these category types is largely ignored. For example, *today's ethnicities are yesterday's races.* In the early 20th century in the US, Italians, the Irish, and Jews were all thought to be racial (not ethnic) groups whose members were inherently and irredeemably distinct from the majority white population. Today, of course, the situation has changed considerably. Italians, Irish, and Jews are now seen as ethnic groups that are included in the majority white population. The notion that they are racially distinct from whites seems far-fetched, possibly "racist." Earlier in the 20th century, the categories of Hindu and Mexican were included as racial categories in the Census. Today, however, neither would be considered racial categories.
>
> Knowing the history of how these groups "became white" is an integral part of how race and ethnicity are conceptualized in contemporary America. *The aggregated category of "white" begs scrutiny.* It is important to keep in mind that the American system of categorizing groups of people on the basis of race and ethnicity, developed initially by a then-dominant white, European-descended population, served as a means to distinguish and control other "non-white" populations in various ways.
>
> *Second*, by treating race and ethnicity as an enduring and unchanging part of an individual's identity, OMB and the Census *ignore a fundamental tension and ambiguity in racial and ethnic thinking*. While both race and ethnicity are conceptualized as fixed categories, research demonstrates that *individuals perceive of their identities as fluid*, changing according to specific contexts in which they find themselves.
>
> *Third*, OMB Directive 15, [the] Census and common sense treat race and ethnicity as properties of an individual, ignoring the extent to which both are defined by the individual's relation to the

society at large. Consider, for example, the way that racial and ethnic identity supposedly "predict" a range of social outcomes. *The typical correlation is that by virtue of being a member of a particular racial or ethnic group, imprisonment, poor health, poverty, and academic failure are more likely. Such an interpretation, while perhaps statistically robust, is structurally and substantively incomplete because it is not the individual's association with a particular racial or ethnic group that predicts these various outcomes but the attribution of that relationship by others that underlies these outcomes.* For instance, a person is not more likely to be denied a mortgage because he or she is black (or Hispanic or Chinese), but because another person believes that he or she is black (or Hispanic or Chinese) and ascribes particular behaviors with that racial or ethnic category.

*See* American Anthropological Association Response to OMB Directive 15, *Race and Ethnic Standards for Federal Statistics and Administrative Reporting* (emphasis added); *see also* Ruth B. McKay & Manuel de la Puente, *Cognitive Research in Designing the CPS Supplement on Race and Ethnicity*, Proceedings of the Bureau of the Census' 1995 Annual Research Conference 435–45 (1995) (determining that respondents were unaware of the difference between "race" and "ethnicity"); E. Kissim, *et al.*, *Hispanic Responses to Census Enumeration Forms and Procedures*, Report Prepared for the Bureau of the Census (1993) (concluding that Hispanic respondents view "Hispanic" as a race and look for this category when asked on documents or surveys for their "race"); C.E. Rodriquez & J.M. Cordero-Guzman, *Place Race in Context*, 15 Ethnic Racial Stud. 523–43 (1992) (same).

The United States Commission on Civil Rights has echoed the criticisms lodged by the American Anthropological Association: "[S]ome people regard 'Hispanic' as a race and some do not. Some may refer to a particular individual's Hispanic background as his 'ethnicity' and others may reject the term on the ground that it implies something untrue about the individual's cultural traits . . . ." U.S. Comm'n on Civil Rights, *Racial Categorization in the 2010 Census* 39 (March 2009).

Ethnicity, like race, as discussed in *McMillan*, is a fictitious, changing, and unreliable social construct. *See, e.g.*, Ian Haney Lopez, *White by Law: The Legal Construction of Race* 7–14 (2006) (tracing legal construction of race and ethnicity through America's legal system); Camille Gear Rich, *Angela Harris and the Racial Politics of Masculinity: Trayvon Martin, George Zimmerman, and the Dilemmas of Desiring Whiteness*, 102 Cal. L. Rev. 1027, 1028 n.3 (2014) ("Latinos/Hispanics occupy a liminal space in America's racial paradigm, as many Latinos believe that the term Latino refers to a racial group, and other Latinos treat Latino or Hispanic background as a kind of ethnic designation."); Wendy D. Roth, *Race Migrations: Latinos and the Cultural Transformation of Race* 4–8 (2012) (examining traditional black and white racial dichotomy in America and how that dichotomy is challenged by considering Latinos as a separate racial category as opposed to an ethnic group).

> Defining Latino as a race shares a different experience than defining Latino as a concept of ethnicity, which is used to describe the belief that all ethnic groups will assimilate into white American society. The category of ethnicity, therefore, fails to recognize the nonwhite and inferior status that Latinos held and continue to hold in the United States.

Yolanda Vazquez, *Constructing Crimmigration: Latino Subordination in a "Post-Racial" World*, 76 Ohio St. L. J. 599, 657 (2015); *see also* Anthony V. Alfieri, *Objecting to Race*, 27 Geo. J. Legal Ethics 1129, 1133–34 (2014) ("Rooted in conscious, unconscious, or implicit bias, race talk often intersects with other categories of bias, including ethnicity and gender. The intersection of multiple kinds of bias in civil rights and criminal cases exacerbates common stereotypes and reinforces long-held prejudices."); Laura E. Gomez, *Manifest Destinies: The Making of the Mexican American Race* 1–3 (2007) (explaining that the use of the term ethnicity with respect to Latinos masks the historically discriminatory treatment that Mexican Americans have faced as a racial group); Elizabeth Vaquera & Grace Kao, *The Implications of Choosing*

*"No Race" on the Salience of Hispanic Identity: How Racial and Ethnic Backgrounds Intersect Among Hispanic Adolescents*, 47 Soc. Q. 375, 389 (2006) (noting two-thirds of Latinos in a sample regarded Latino as a racial category); Clara E. Rodriguez, *Changing Race: Latinos, the Census, and the History of Ethnicity* 16 (2000) (finding that many Hispanics claim "a multiple racial ancestry").

### B. Application

The issue of the plaintiff-child's ethnicity first arose at the trial during the cross-examination of one of plaintiffs' experts. *See supra* Part III.B.1. The court cut off an attempt to use the child's ethnicity as a projection point for his education, life and worklife expectancies as it related to limiting damages:

> [A]s a matter of constitutional and federal law[,] it is inappropriate where there is a case involving an individual with a Hispanic background . . . to rely upon a table . . . which is undifferentiated as to Hispanic individuals.
>
> You cannot treat the child as an average Hispanic . . . . [Y]ou cannot say that, for example, Hispanics generally go to college less than others and therefore use that statistic or that analysis or that chart.

Trial Tr. 576:20–577:8, July 6, 2015.

It is unconstitutional in a tort trial to premise projected societal and educational achievements on race or ethnicity to reduce tort damages. *See supra* Part IV.A. The state itself discriminates by enforcing a substantive rule of discrimination—damages—based on race or ethnicity in reducing damages in tort cases. Such an illegal standard cannot be enforced by the courts. *See Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect. 'Public officials[,] [including judges] sworn to uphold the Constitution may not avoid a constitutional duty by

bowing to the hypothetical effects of private racial prejudice that they assume to be both widely and deeply held.'" (citation omitted)).

The court did not have to confront the issue of the applicability of gender worklife expectancy tables because the plaintiff-mother was not physically injured, nor was she in jeopardy of experiencing future economic loss based on any status attributed to herself.

## V.    Life, Worklife, and Educational Attainment Expectancy Tables

### A.    History

Before 1950, judges generally made "intuitive" judgments about damage awards, allowing "race and racism to have tremendous influence in ways that are nearly impossible to provide." Jennifer B. Wriggins, *Damages in Tort Litigation: Thoughts on Race and Remedies, 1865–2007*, 27 Rev. Litig. 37, 56 (2007).

A tidal shift started in 1950, when the United States Bureau of Labor Statistics published its worklife tables. *See* Bureau of Labor Statistics, U.S. Dep't of Labor, Bulletin No. 1001, *Tables of Working Life: Length of Working Life for Men* (1950); Bureau of Labor Statistics, U.S. Dep't of Labor, Bulletin No. 1204, *Tables of Working Life: Length of Working Life for Women* (1957). These tables calculated worklife duration "as if it were a simple function of sex and age." Shirley J. Smith, Bureau of Labor Statistics, U.S. Dep't of Labor, Bulletin No. 2254, *Worklife Estimates: Effects of Race and Education* 2 (1986) ("Bulletin 2254").

Three decades later, in 1982, after completing a comprehensive survey of worklife methodology calculations, the Bureau of Labor Statistics modified its life and worklife expectancy tables. *See* Bureau of Labor Statistics, U.S. Dep't of Labor, Bulletin No. 2135, *Tables of Working Life: The Increment-Decrement Model* (1982). As was the case in 1950, "[t]ables were prepared separately for men and women, giving no additional demographic or functional detail by race, educational attainment, occupation, or other characteristics that might

distinguish high from low turnover groups." Bulletin 2254 at 2. Innovative was the fact that the 1982 tables "for the first time quantified the impact of midlife labor force withdrawal and reentry on worklife duration," based on observed rates of labor force entry and exit at all ages. *Id.* at 1.

Publication of the 1982 tables "drew responses from many economists involved in litigation of wrongful injury or death cases." *Id.* at 1. Several of these responses appeared in the *Monthly Labor Review*, a publication composed of economists and statisticians, which researches and analyzes a myriad of fields, including the economy and the labor force. *Id.* at 1, 7 n.2. The responses led to refinements that were implemented in the Bureau of Labor Statistic's 1986 revisions to the life and worklife expectancy tables. *Id.* at 1, 7 n.3.

The Bureau's 1986 tables, Bulletin 2254, presented a new set of official worklife estimates based on data collected between 1979 and 1980. *Id.* at 1. As with the previous tables issued, the new figures were calculated using information collected from a nationwide monthly household survey conducted by the Census Bureau on behalf of the Bureau of Labor Statistics. *Id.* The difficulty of controlling for relevant details of family life was explained:

> In reality, labor force attachments are influenced by a variety of factors, including training, health, marital and family responsibilities, economic opportunity, and additional sources of income. However, it is not feasible to control for all these factors in computing worklife expectancy. . . . Nonetheless, this study does add two new dimensions to the estimation of worklife: race and education. Tables are presented separately for each of these two variables. However, *the combined impact of race and education has not been computed because the present matched sample is too limited to develop reliable joint probabilities*. . . . Tables by race incorporate the effects of sex- and race-specific rates mortality. Those focusing on education employ only sex-specific rates, because there are no comparable mortality tables by education. Of course, access to health care is apt to be correlated with schooling. If it were possible to quantify this relationship, the tables would probably show still wider discrepancies between the worklives of the less and more educated.

*Id.* at 2 (emphasis added).  These tables explored, for the "first time," the relationship between "race and educational background," and their effect on "lifetime labor force behavior."  *Id.* at 1.

The tables presented in Bulletin 2254 were subdivided by sex, race, and educational attainment.  *Id.* at 4, 5, 6.  The two racial categories displayed were "white (88 percent of the sample) and blacks and others (12 percent)."  *Id.* at 4.  "A separate set of tables detail[ed] years of schooling completed, using the categories of less than high school (about 20 percent of the sample), high school graduate to 14 years (about 52 percent of the sample), and 15 years or more (about 28 percent)."  *Id.*  The new tables quantified the lifetime relationship between race and labor force involvement.  *Id.*  From it the conclusion could be drawn that,

> whites are more likely to enter [the labor force] than their minority
> counterparts. . . .   [T]he worklife expectancy of blacks . . . was
> nearly 7 years shorter than that of whites. . . .   Minority men spent
> an average of just 50 percent of their lives in labor force activity,
> compared with 56 percent for whites . . .   [T]he average man with
> 15 years of schooling or more can expect to work 6.5 years longer
> than his classmate who left high school before graduation . . . .

*Id.* at 4–6.

In the past three decades, the Bureau of Labor Statistics has not revised these still widely circulated life, worklife, and educational attainment tables, reflective of data collected in 1979 and 1980.  *See, e.g.*, Lawrence M. Spizman, *Bulletin 2254 Worklife Expectancy Tables and Tort Gender Inequality*, 12 The Earnings Analyst 1 (2012) (arguing that *Bulletin 2254 should not be used because structural changes in the labor market for females have dramatically changed since its publication*).  According to a 2012 survey of forensic economists, only 4.8 percent of forensic economists use the Bulletin 2254 tables.  *See* Brookshire, *et. al.*, *A 2012 Survey of Forensic Economists: Their Methods, Estimates, and Perspectives*, 24 J. of Forensic Econ. 67,

86 (2013). This is down from 72.6 percent in the 1991 survey. *Id. But see infra* Part V.B

(discussing New York State's endorsement of Bulletin 2254).

The Department of Labor no longer publishes life, worklife, and educational attainment

tables, but it continues to provide the data on which the tables were based, leaving it to the public

to use the data as it deems fit. *Id.* at 1.

## B. Law

New York law incorporates Bulletin 2254 in deciding damages in tort cases. *See, e.g.*,

N.Y. Pattern Jury Instr. Civil Appendix B (2014) ("Tables 1 through 8 in Appendix B are

extracted from a report published by the United States Bureau of Labor Statistics, United States

Department of Labor, entitled 'Report: Worklife Estimates: Effects of Race and Education'

(February 1986)."). The state's pattern jury instructions ("PJI") include tables from Bulletin

2254 for use in determining worklife expectancy. *Id.*; *see also* Spizman, *supra* at 2. Appendix

A, which provides for life expectancy data, is periodically updated but lags behind the most

current life expectancy tables published by Drs. Skoog, Ciecka and Krueger in 2011. *See*

Spizman, *supra* at 2–3, n.3 ("Appendix A in the 2012 PJI used [the] U.S. Life Tables from 1999

Vol. 47, No 28 (December 13, 1999)."); *see also* N.Y. Pattern Jury Instr. Civil Appendix A

(2014).

New York's pattern jury instructions contain the following warning regarding the use of

Bulletin 2254:

> Although as official compilations, the Department of Labor tables
> may be judicially noticed, the preparation of any such tables
> involves judgment in the gathering of the underlying statistics that
> may affect the reliability of the table in relation to the fact situation
> before the court. Expert testimony concerning the reliability of the
> Department of Labor table, may, therefore be offered, and with
> respect to a privately prepared table, expert testimony would be
> required to allow the table to be used as a basis for an opinion.

N.Y. Pattern Jury Instr. Civil 2:290 (2014). This statement recognizes the Bulletin's use of outdated data, signaling to parties that they can rely upon damage experts to question the Bulletin's reliability.

The Final Report of the Special Master, Kenneth R. Feinberg, for the September 11 Victim Compensation Fund of 2001 indicated Feinberg's reluctance to rely on gender- and race-based life and worklife tables. *See* Kenneth Feinberg, Dep't of Justice, Volume 1, *Final Report of The Special Master for the September 11th Victim Compensation Fund of 2001* 33, n. 109 (2004) (citing James Ciecka, Thomas Donley & Jerry Goldman, *A Markov Process Model of Work-Life Expectancies Based on Labor Market Activity 1997–98*, 10, 2 J. of Legal Econ. 27 (2000)); *see also* Chamallas & Wiggins, *supra* at 155–83 (discussing Special Master Feinberg's refusal to take into account race and gender based statistics when computing damages in the interest of "public policy and equity").

Courts, and the experts testifying before them regarding future economic loss, are less discomforted and careful than Mr. Feinberg, relying daily on race-, ethnicity-, and gender-based statistics, reminiscent of Bulletin 2254, to determine loss of future earning capacity. *See supra* Part III.B (highlighting testimony of experts in this case); Kurt V. Krueger & Frank Slesnick, *Total Worklife Expectancy*, 25 J. of Forensic Econ. 51, 53 (2014) ("While gender-based and labor force-based worklife expectancy tables have such discriminatory features, courts and economists have developed a habit of using them."); *see also generally* Dan B. Dobbs, Paul T. Hayden, & Ellen M. Bulbick, *The Law of Torts*, § 479 (2d ed. 2015) (collecting cases and sources that have questioned or rejected statistical tables predicated on race and gender differences). *But see supra* Part IV (discussing this court's application of the *McMillan* rule). As a result, minority plaintiffs often receive lower awards of damages. *See* Martha Chamallas,

*The Architecture of Bias: Deep Structures in Tort Law*, 146 U. Pa. L. Rev. 463, 482 (1998) ("Chamallas II").

"[T]he willingness of economists and judges to rely on sex and race as a measure of an individual's future earning potential may have as much to do with habit as it does with strict fidelity . . . ." to appropriate economic analysis.  *See* Chamallas & Wiggins, *supra* at 168.

> [I]n the realm of torts a higher value is placed upon the lives of white men and[, problematically, the] injuries suffered by this group are worth more than injuries suffered by other less privileged groups in society. . . .   [C]ontemporary tort law devalues or undervalues the lives, activities, and potential of women and people of color.

Chamallas II, *supra* at 465, 467.  For many tort cases, and particularly for lead paint cases, *loss of earning potential is the big ticket item of damages*, which can make the difference between a modest and sizeable award.  *See* Martha Chamallas, *Questioning the Use of Race-Specific and Gender-Specific Economic Date in Tort Litigation: A Constitutional Argument*, 63 Fordham L. Rev. 73, 75 ("Chamallas III") (collecting cases).

## C.  Application

The use of race-based statistics to obtain a reduced damage award—which is now extended to the use of ethnicity-based statistics, to calculate future economic loss—is unconstitutional.  *See supra* Part IV (discussing *McMillan* rule and its application).  It violates due process because it creates arbitrary and irrational state action, and equal protection, because it subjects the claimant to a "disadvantageous estimate" of damages "solely on the basis" of ethnic classification.  *Id.*

Race and ethnicity are not, *and* should not, be a determinant of individual achievement.  To support such a proposition distorts the American dream, denigrating minorities' chances of climbing the socio-economic ladder.  Using these statistics to calculate future economic loss

reinforces the rigid racial and ethnic barriers that our society strives to abolish. *See infra* Part VI.A (discussing affirmative action). Basing an individual's earning capacity on his or her race or ethnicity is "problematic for poor minority plaintiffs because it assumes that racism and classism will exhaust their opportunities in the same way that it may have adversely affected their relatives." Greenberg, *supra* at 430; *see also* Patrick Sharkey, *Neighborhoods and the Black-White Mobility Gap*, The PEW Charitable Trusts: Economic Mobility Project (2009), http://www.pewtrusts.org/~/media/legacy/uploadedfiles/wwwpewtrustsorg/reports/economic_mo bility/PEWSHARKEYv12pdf.pdf (last visited July 28, 2015) (exploring the impact of neighborhood poverty rates experienced during childhood as an important factor affecting the mobility gap).

Propelling race and ethnicity to the forefront of predictions about an individual's future achievement ignores the myriad factors affecting an individual's capacity to fulfill his or her potential. *See, e.g.*, Bulletin 2254 at 2, 6–7 (indicating that access to healthcare likely has a disproportionate impact on minorities and may be a factor affecting worklife duration); Jonathan Kozol, *The Shame of the Nation: The Restoration of Apartheid Schooling in America* (2005) (examining the negative social and educational outcomes that stem from the racial segregation prevalent in America's public schools).

Race- and ethnicity-based statistics "assum[e] that the current . . . racial pay gap will continue in the future, despite ongoing legal and institutional efforts to make the workplace more diverse and less discriminatory." Chamallas III, *supra* at 75.

> The economic data clearly show that our nation—and, by extension, our workforce—will continue to become increasingly more diverse, as racial and ethnic minorities make up a larger portion of the population, as women continue to enter the workforce, and as gay and transgender individuals, as well as

people with disabilities, continue to play a vital role in growing our economy.

Crosby Burns, *et al.*, *The State of Diversity in Today's Workforce:  As Our Nation Becomes More Diverse So Too Does Our Workforce*, Center for American Progress, 6 (2012), https://cdn.americanprogress.org/wp-content/uploads/issues/2012/07/pdf/diversity_brief.pdf (last visited July 28, 2015); *see also, e.g.*, Nat'l Ctr. for Educ. Statistics, U.S. Census Bureau, Policy Alert, *Integrated Postsecondary Education Data System, The U.S. Workforce Is Becoming More Diverse*, (2005), http://www.highereducation.org/reports/pa_decline/decline-f1.shtml (last visited July 28, 2015) (maintaining that the minority portion of the workforce is projected to double from 18% to 37%, creating a more divorce working economy); Bureau of Labor and Statistics, U.S. Dep't of Labor, *Women's Earnings: 1979–2012*, TED: The Economics Daily Blog (Nov. 4, 2013), http://www.bls.gov/opub/ted/2013/ted_ 20131104.htm (last visited July 28, 2015) ("When adjusted for inflation, women's earnings since 1979 have increased considerably across the major race and Hispanic ethnicity categories.").

Psychologists have adopted an alternative to the use of race- or ethnicity-based statistics: the "resiliency theory" utilizes three distinct processes for evaluating loss of earning capacity.

> *First*, it identifies concrete factors—other than race [and ethnicity]—that indicate a likelihood of success despite adverse conditions.  *Second*, the multitude of resiliency literature confirms that predictions about what a child is likely to become are enormously speculative.  And *third*, resiliency theory provides a theoretical alternative to the devaluation of racial minorities by starting with the optimistic assumption that children are very much capable of succeeding beyond the averages and against the odds.

Greenberg, *supra* at 454; *see also* Marc A. Zimmerman, Editorial, *Resiliency Theory:  A Strengths-Based Approach to Research and Practice for Adolescent Health*, 40 Health Educ. Behavior 381, 381 (2013) ("Resiliency theory focuses attention on positive contextual, social,

and individual variables that interfere with or disrupt developmental trajectories from risk to problem behaviors, mental distress, and poor health outcomes.")  Unlike race- or ethnicity-based statistics, which do not acknowledge a child's ability to persevere through a difficult familial or social upbringing, resiliency theory "starts from the proposition and expectation that there are kids in families from very adverse situations who really do beautifully, and seem to rise to the top of their potential, even with everything else working against them."  Greenburg, *supra* at 454.

Another option that has been suggested is to "consider each person as equivalent to the average, unless evidence is produced which removes the plaintiff from the normal range."  Sherri Lamb, *Toward Gender-Neutral Data for Adjudicating Lost Future Earning Damages: An Evidentiary Perspective*, 72 Chi.-Kent L. Rev. 299, 338 (1996).

Absent the use of an alternative to race- or ethnicity-based statistics, lead poisoned children will continue to be "inadequately compensated" for their present and future injuries.  Greenberg, *supra* at 457.

> Their age—and the absence of any earnings history or defined career path— encourages courts to rely heavily on statistics and to judge the children within the context of the achievements of their family members.  For children from low-income and minority families, however, this reliance reinforces historical discrimination . . . .

*Id*.  Courts cannot accept a principle in awarding damages "that reflect subtle but pervasive racism and classism."  *Id*.

There is a need to revise the current expectancy tables as applied in prospective calculations to lower tort damages for specific communities.  *See supra* Part V.A (discussing history of tables).  Various sociological and vocational studies projecting life and earning capacities used by tort experts require review and recalculation.  *See supra* Part V.B (discussing

use of tables). A traditional, automatic, unthinking approach by experts in this field can no longer be tolerated. *See supra* Part III.B (discussing expert testimony in this case).

The reinterpretation of our constitution in recent years and statutory protections regarding minority social groups mandates rejection of bias by our judicial system towards members of such groups. *Cf. Obergefell*, 135 S. Ct. at 2588 (holding marriage is a fundamental right and declaring unconstitutional the laws of states that either ban same-sex marriage or refuse to recognize same-sex marriages performed out of state).

## VI. Categorical Advantages Afforded to Members of Historically Disadvantaged Minorities Not Inconsistent with Excluding Evidence of Race or Ethnicity Where Appropriate

Elimination of racial and ethnic differences used to reduce damages to members of minority groups is not inconsistent with using such groupings to overcome the adverse effects of prior discrimination or to assist in providing a more equal role for minorities in our society.

There is "a critical distinction between racial [and ethnic] references that subvert" the Constitution and "racial [and ethnic] references that actually enhance the rationality and fairness" of it. *See* Jody Armour, *Stereotypes and Prejudice: Helping Legal Decisionmakers Break the Prejudice Habit*, 83 Cal. L. Rev. 733, 735 (1995) (arguing that colorblind formalism advocated by courts is counterproductive in reducing discrimination).

Whatever the Supreme Court may decide in cases such as *Fisher v. Univ. of Texas at Austin* on admissions and aid discrimination in favor of minorities in school administration is not inconsistent with the instant decision. *See Fisher v. Univ. of Texas at Austin*, No. 14-981, 2015 WL 629286, at *1 (U.S. S .Ct. June 29, 2015) (granting *certiorari*). If the Supreme Court finds affirmative action constitutional in *Fisher* when affording advantages to minorities by category in a college or law school admissions process, it will be doing so based on policy and goals different from that applied to the damage issues present in the instant case. In the school cases,

the policy is to assist minorities. Diversity in schools is arguably a compelling state interest that (1) promotes better educational, occupational and business outcomes; and (2) improves the occupational spreads of specific career pipelines. *See infra* Part VI.A; *see also, e.g.*, Thomas Barta, *et. al.*, *Is There a Payoff From Top-Team Diversity?*, McKinsey Quarterly (2012), http://www.mckinsey.com/insights/organization/is_there_a_payoff_from_top-team_diversity (last visited July 28, 2015) ("companies with diverse executive boards enjoy significantly higher earnings and return on equity [than companies with non-diverse executive boards]"); Roy Y.J. Chua, *Innovating at the World's Crossroads: How Multicultural Networks Promote Creativity*, Vol. 11, No. 85 Harvard Business School Working Papers 1, 33 (2011), http://www.hbs.edu/ faculty/Publication%20Files/11-085.pdf (last visited July 28, 2015) ("The idea that cultural diversity can promote creativity in certain types of tasks has both theoretical and practical importance."); Ekaterin Walter, *Reaping the Benefits of Diversity for Modern Business Innovation*, Forbes (2014), http://www.forbes.com/sites/ekaterinawalter/ 2014/01/14/reaping-the-benefits-of-diversity-for-modern-business-innovation/(last visited July 28, 2015) ("Diversity is essential to growth and prosperity of any company: diversity of perspectives, experiences, cultures, genders, and age.").

In the case of damages, basing life, worklife, and education probabilities on ethnicity or race tables disadvantages some individual members of the group. Individuals in the group would do better if they were treated as individuals on the basis of their individualized characteristics.

## A. Law

In the past five decades, government and private "affirmative action" programs affording advantages to individuals in ethnic and racial groups have had a checkered constitutional history. *Compare* Anita Bernstein, *Diversity May Be Justified*, 64 Hastings L. J. 201 (2012) (concluding that affirmative action promotes the compelling interest of diversity within schools and

workplaces), *and* Reginald T. Shuford, *Why Affirmative Action Remains Essential in the Age of Obama*, 31 Campbell L. Rev. 503 (2009) (suggesting that affirmative action is necessary to combat the prevalence of minorities attending primarily segregated schools), *with* Douglass C. Lawrence, *Challenging Affirmative Action: Does Diversity Justify Race-Conscious Admissions Programs?*, 36 Suffolk U. L. Rev. 83 (2002) (opining that adoption of race-neutral alternatives may better achieve diversity because these policies result in a greater number of minority students on college campuses than race-based affirmative action policies (collecting sources)).

In 1978, the Supreme Court addressed affirmative action in school admissions based on race and ethnicity in *Bakke*. *See Regents of Univ. of California v. Bakke*, 438 U.S. 265, 270, 320 (1978) (holding "special admissions program" that denies "specific percentage" of seats in incoming class to white students unconstitutional). The court recognized that "the goal of achieving a diverse student body is sufficiently compelling to justify consideration[s] of race in admissions decisions under some circumstances[.]" *Id.* at 267.

> An otherwise qualified medical student with a particular background—whether it be ethnic, geographic, culturally advantaged or disadvantaged—may bring to a professional school of medicine experiences, outlooks, and ideas that enrich the training of its student body and better equip its graduates to render with understanding their vital service to humanity.

*Id*. at 314.

In 1980, in *Fullilove v. Klutznick*, the Court held that the use of modest racial quotas was constitutional. *See Fullilove v. Klutznick*, 448 U.S. 448, 448–49 (1980). The Public Works Employment Act of 1977, requiring that fifteen percent of funds for public works be set aside for qualified minority contractors, was upheld. *Id.* at 492. The affirmative program, it was ruled, did not violate the equal rights of non-minority contractors. *Id*. at 484.

In 1986, an action was brought challenging a school board's policy of protecting minority employees by laying off non-minority teachers first despite their seniority. *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 271 (1986). The Court concluded that "layoffs impose the entire burden of achieving racial equality on particular individuals, often resulting in a serious disruption of their lives." *Id.* at 283.

> We have previously expressed concern over the burden that a preferential-layoff scheme imposes on innocent parties. In cases involving valid *hiring* goals, the burden to be borne by innocent individuals is diffused to a considerable extent among society generally. Though hiring goals may burden some innocent individuals, they simply do not impose the same kind of injury that layoffs impose. Denial of a future employment opportunity is not as intrusive as loss of an existing job.

*Id.* at 282–83 (emphasis in original) (citations omitted).

In 1987, in *United States v. Paradise*, the Court upheld the use of strict quotas to remedy the systematically discriminatory practices of the State of Alabama's Department of Public Safety. *See United States v. Paradise*, 480 U.S. 149, 185–86 (1987).

In 1989, ten years after *Bakke*, affirmative action was ruled "a highly suspect tool." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (holding state and local affirmative action programs in Richmond, Virginia that sought to set aside thirty percent of city construction funds for black-owned firms was not narrowly tailored to remedy effects of prior discrimination). Affirmative action, the Court found, was subject to "strict scrutiny." *Id.* at 493. "[T]he purpose of strict scrutiny is to 'smoke out' illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool." *Id.*

Applying the logic of *Croson* to federal affirmative action programs, in *Adarand Constructors, Inc. v Pena*, the Court remanded a case challenging the federal highway program, which gave contractors a financial bonus for awarding subcontracts to companies owned by

members of minority groups.  *See Adarand Constructors, Inc. v Pena*, 515 U.S. 200, 236–37 (1995) (holding that setting aside thirty percent of city construction funds for black-owned firms was not sufficiently "narrowly tailored to remedy prior discrimination since it [wa]s not linked to identified discrimination in any way").  The Court noted that "the unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country" justified the use of race- and ethnicity-based remedial measures in certain circumstances, should they pass strict scrutiny.  *Id.* at 237.

In 2003, the Supreme Court issued *Grutter v. Bollinger,* 539 U.S. 306 (2003).  It upheld the University of Michigan Law School's policy that used race as one of many factors considered in granting admission.  *Id*. at 343–44.  A "compelling interest" is obtained, the Court found, from "educational benefits that flow from a diverse student body."  *Id.* at 343.  By enrolling a "critical mass of underrepresented minority students," the Law School sought to ensure that racially and ethnically diverse students had the "ability to make unique contributions to the character of the Law School."  *Id.* at 316.  The Court pointed to "numerous studies [that show] student body diversity promotes learning outcomes, and better prepares students as professionals, and for an increasingly diverse workforce and society."  *Id*. at 330.  *But see Parents Involved in Community Schools v. Seattle School District # 1*, 551 U.S. 701, 743 (2007) (racial integration cannot be mandated by law); *Ricci v. DeSfeano*, 557 U.S. 557, 562 (2009) (disapproving of City's dispensation of test results used to fill superior positions within fire departments because white candidates had "outperformed" minority candidates).

Justice Kennedy's plurality opinion in *Parents Involved* emphasized that the promotion of racial and ethnic diversity was a compelling state interest:

> The Nation's schools strive to teach that our strength comes from people of different races, creeds, and cultures uniting in

commitment to the freedom of all.  In these cases two school districts in different parts of the country seek to teach that principle by having classrooms that reflect the racial makeup of the surrounding community.  That the school districts consider these plans to be necessary should remind us our highest aspirations are yet unfulfilled. . . . *This Nation has a moral and ethical obligation to fulfill its historic commitment to creating an integrated society that ensures equal opportunity for all of its children.*  A compelling interest exists in avoiding racial isolation, an interest that a school district, in its discretion and expertise, may choose to pursue.  Likewise, a district may consider it a compelling interest to achieve a diverse student population.  Race may be one component of that diversity[.]

*Id.* at 782, 788–89 (emphasis added) (Kennedy J., concurring); *see also Fisher v. Univ. of Texas*, 133 S. Ct. 2411, 2420  (2013) (finding universities may continue to use race as a factor in their admissions processes because diversity promoted educational benefits, "but . . . before turning to racial classifications" a university had to prove that "workable race-neutral alternatives [did] not suffice").

### B.   Application

The policy goals and problem recognized in affirmative action differs from the policy objective of using race- and ethnicity-based life, worklife, and education expectancy tables when computing fair tort damages.  The former seeks to promote diversity in educational and occupational spreads, while the latter seeks to project, as accurately as possible, the potential that a tort victim would have in adulthood (recognizing that to do so in an infant is largely guesswork) had he or she not been harmed by defendant's delict.

### VII.   Constitutional Requirements Supplementing Rule 403 of the Federal Rules of Evidence

Adjusting to this nation's continuing struggle for equal rights and effective equal opportunities for all will require subtle changes in reliance on race-, ethnicity-, or gender-based

statistics in individual cases. Each evidentiary ruling needs to be separately evaluated to avoid invidious discrimination. Sometimes, as in the present case, exclusion of arguably relevant evidence will be required to protect against stereotyping that unfairly reduces damages to members of disadvantaged minority groups. At other times, such evidence may be needed to further equalities.

Even when racially-, ethnically-, and gender-based tables have probative force and are therefore relevant, there are instances under Rule 403 of the Federal Rules of Evidence that they may be excluded. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

There is another factor that may justify exclusion: constitutional and general policy considerations may warrant excluding relevant evidence, as in the instant case with respect to a specific child. In such cases, Rule 403 sometimes needs to be supplemented by exclusions based on policy. *See, e.g.*, Jack B. Weinstein, *Some Difficulties in Devising Rules for Determining Truth in Judicial Trials*, 66 Colum. L. Rev. 223, 246 (1966) ("It is not possible to produce a system permitting facts to be found with any certitude. Nor is it possible to satisfy fully all the purposes served by our law of evidence since, in particular instances, a rule which aids one end will disserve another. In case of conflict, the court's truth-finding function should receive primary emphasis except when a constitutional limitation requires subservience to some extrinsic public policy.")

This memorandum deals only with the use of race- and ethnicity-based tables to *reduce* tort damages. It does not address the separate problem of advantaging particular groups or parties by the use of such tables. *Cf. supra* Part VI (discussing affirmative action cases).

There are instances where statistical life-expectancy tables based on race and ethnicity may be utilized. An obvious instance is in applying them to the rule that juveniles cannot be kept in prison for a non-homicide offense for their full life without parole. *See Graham v. Florida*, 560 U.S. 48, 50 (2010) (holding that eighth amendment prohibits the imposition of "life without parole" sentence on juvenile offenders who do not commit homicide); *see also* Adele Cummings & Stacie Nelson Colling, *There Is No Meaningful Opportunity in Meaningless Data: Why It Is Unconstitutional to Use Life Expectancy Tables in Post-Graham Sentences*, 18 U.C. Davis J. Juv. L. & Pol'y 267, 288, 292 (2014) (arguing that Colorado's practice of using race- and ethnicity-neutral life expectancy tables "should not be applied to the distinctive group of young people facing decades of incarceration, who are mostly poor and disproportionately black and Hispanic" because they "overestimate the length of life of the juveniles being sentenced"). Use of race-, ethnicity-, and gender-based life tables in such circumstances might benefit a juvenile offender by putting a cap on the sentence imposed. *Cf. United States v. Tocco*, 135 F.3d 116, 131–32 (2d Cir. 1998) (finding that imposition of 435-month sentence of imprisonment for arson homicide conviction, which exceeded defendant's life expectancy when good-time credits were not accounted for, but was slightly less than his life expectancy when good-time credits were considered, did not violate statute requiring jury recommendation for imposition of life sentence).

## VIII.    Conclusion

General ethnic characteristics of an injured person cannot be used to reduce damages in this case.

SO ORDERED,

Jack B. Weinstein
Senior United States District Judge

Dated: July 29, 2015
       Brooklyn, New York