1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

G.M.M., ET AL,                 :    13-CV-5059(JBW)
                               :
        Plaintiffs,            :    U.S. Courthouse
                               :    Brooklyn, New York
                               :
                               :    TRANSCRIPT OF
    -against-                  :    CIVIL CAUSE FOR MOTION
                               :
                               :
                               :    March 19, 2015
                               :    10:00 a.m.
MARK KIMPSON,                  :
                               :
        Defendant.
- - - - - - - - - - - - - - X

BEFORE:
            HONORABLE JACK B. WEINSTEIN, U.S.D.J.

APPEARANCES:

For the Plaintiffs:     STEPHEN M. CANTOR, ESQ.
                        STEVEN K. FRANKEL, ESQ.




For the Defendant:      ROGER ARCHIBALD, ESQ.




Court Reporter:     Holly Driscoll, CSR
                    Official Court Reporter
                    225 Cadman Plaza East
                    Brooklyn, New York 11201
                    (718) 613-2274

Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcript.

1          THE COURTROOM DEPUTY:  Civil cause for motion,

2   G.M.M., et al versus Kimpson

3          Counsel, note your appearances please, for the

4   plaintiff.

5          MR. CANTOR:  Yes, Stephen M. Cantor, PC, attorney at

6   law.

7          THE COURT:  Good morning.

8          MR. FRANKEL:  And Steven Frankel, of counsel to

9   Mr. Cantor, for the plaintiffs, Your Honor.

10          THE COURT:  Good morning.

11          MR. ARCHIBALD:  Good morning, Your Honor, for the

12   defendant, Roger Archibald.

13          THE COURT:  You don't have to stand.

14          Yes.

15          MR. KIMPSON:  Mark Kimpson.

16          THE COURT:  There's nobody here from the plaintiff;

17   they're in Texas, are they?

18          MR. CANTOR:  Yes, Judge.

19          THE COURT:  And not on the phone?

20          MR. CANTOR:  We can get them on the phone.

21          THE COURT:  All right.  If we need them, we'll get

22   them.

23          It's the plaintiff's motion.

24          MR. FRANKEL:  Yes, Your Honor.

25          THE COURT:  I'll be happy to hear you.

3

1      MR. FRANKEL:  Judge, very simply, as the Court

2 knows, this is a motion for summary judgment.  In our

3 complaint we set forth each of the regulations and codes which

4 govern lead paint in apartments in New York.  In this case

5 specifically the plaintiff is the -- I'm sorry, the defendant,

6 who is here today, the defendant is the landlord of the

7 building in which the infant plaintiff lived with his parents.

8 He was born in that apartment.  The defendant in his

9 deposition testified that he was aware the day the child was

10 born.

11      The statutes, Your Honor, we set forth in our

12 complaint, the regulations, the Administrative Code for the

13 City of New York specifically, Judge -- well, I think most

14 compelling is the defendant in his deposition basically

15 admitted we believe liability in that, one, he'd been a

16 landlord for 20 years, was not aware that lead paint posed a

17 threat to anyone, children under the age of six and more so

18 toddlers and infants; secondly, he was not aware that there

19 were any codes or regulations which govern the responsibility

20 of a landlord to either abate or encapsulate lead paint.  The

21 building in question certainly under the code qualifies, it

22 was a pre-1900 building.  Secondly, he knew there was an

23 infant in the apartment and, thirdly, because he never was

24 aware of the dangers of lead paint when he testified that he

25 gutted the apartment so there couldn't possibly be any lead

4

1    paint, he had no idea, had never had the apartment tested

2    either before renovation, during renovation, after renovation

3    or even during the year that the infant plaintiff was exposed.

4            When the child reached one year of age and was

5    examined by the doctor, he had a blood lead level of 9.  The

6    doctor immediately directed the parents to notify the City of

7    New York, which they did.  The tests were performed within the

8    apartment and 23 different violations were found.

9            It was the defendant's position at the deposition

10   that it could not possibly be because he gutted the building,

11   and at this point, Judge, I'd like to, if necessary, reserve

12   for the reply.  Their response was they hired an expert in

13   2015, this year, who claims that there was lead paint behind

14   the walls and that the City of New York's testing was done

15   with the wrong equipment and that's how they found all of

16   these instances of lead paint.  However, the tests that were

17   performed by the City of New York were not within the walls,

18   they were on the floor, in the ceiling, closets, cabinets and

19   in every room of the apartment.

20           It is not a defense, as the Court is aware, that you

21   didn't know lead was dangerous as a landlord and that you were

22   unaware that there were regulations which govern how lead

23   paint should be handled in buildings, particularly pre-1960.

24   There's a different standard between 1960 and 1978 but that

25   doesn't govern in this case.

5

1          At his deposition the defendant speculated, well,

2    the dogs were scratching the door and that's probably where

3    the lead paint came from.  Number one, it is mere speculation,

4    and that was last year when we did the deposition in 2014 so

5    that was two years after the child was diagnosed with lead

6    poisoning.  Secondly, mere speculation certainly is not a

7    basis to defeat summary judgment.  And, in any event, had he

8    abated lead paint, which he was not aware of existing in the

9    first place, it wouldn't have been scratchable, with all due

10   respect if I can use that word, no way that sufficient amounts

11   could have -- shouldn't have been there in any event and that

12   sufficient amounts could get to the ceiling, to the higher

13   walls inside of closets, inside cabinets.

14         The defendant testified at his deposition that the

15   people who did the renovation were street workers that he

16   found on the street through someone in the neighborhood, he

17   didn't know their names, he didn't have the name of a company,

18   they weren't licensed; since he knew nothing about lead or its

19   dangers or, excuse me, its existence, he could not have had

20   these people even if they were qualified and licensed to do

21   proper lead abatement.

22         So, his position that there was no lead, his own

23   expert years later and, again, it is four years later, defeats

24   that argument but, secondly, the child suffered lead poisoning

25   living only in that apartment for the first year of his life.

1  The City of New York, the second expert found lead everywhere

2  in the apartment.

3          And then there's the question of the pamphlet,

4  Judge.  There's a pamphlet which the landlord is obligated to

5  give to each and every tenant.  The plaintiff parents were not

6  given a pamphlet.  They were told by the defendant at the time

7  they signed the lease lead is not an issue.  The broker

8  presented a form which discussed lead and the defendant told

9  them not an issue, not here and checked off he wasn't aware of

10  any lead in the apartment, lead paint.

11          That's not a defense.  He never checked for it,

12  never abated it and so the plaintiff parents felt perfectly

13  safe and comfortable because lead was not an issue.  Without

14  the pamphlet, which is an obligation under the federal

15  statute, there were not other things that might have been

16  discussed.  These are people who lived in the south most of

17  their lives, they weren't living in hundred year old tenement

18  buildings, they had no reason to believe that they or their

19  child would be in any danger.

20          So, Judge, I would certainly after counsel makes

21  their presentation -- the defendant never addressed even one

22  of the code violations.  In his response it is as if our

23  various codes didn't exist and so, again, there's certainly no

24  question of fact, there's no material question of fact to

25  defeat summary judgment.  The only thing he offers at all is

1  his speculation in a deposition years later with no expert, no

2  one ever examining the apartment, nobody running tests for him

3  before, during or after, so there simply, Judge, is no basis

4  for him to defend successfully against our motion.

5       Thank you.

6       THE COURT:  Well, you certainly make a strong

7  argument.  Of course, it's highly unusual that a plaintiff

8  receives summary judgment, as we all know.

9       Has discovery been completed now?

10      MR. FRANKEL:  It has, Your Honor.  I'm sorry, in

11  that regard, if I may, I don't mean to interrupt; the

12  defendant has no invoices, no paid bills, no checks, no

13  nothing, no test results.  Yes, discovery has been fully

14  completed.

15      THE COURT:  Have you exchanged fully your Rule 26

16  expert reports?

17      MR. FRANKEL:  Well, we have ours, Judge, we've

18  presented them to the defense.

19      THE COURT:  Have you gotten from them?

20      MR. FRANKEL:  They only gave us one, Judge, which is

21  in their response.

22      THE COURT:  I take it the case is ready for trial.

23      MR. FRANKEL:  It is, Your Honor.

24      THE COURT:  Yes, I'll be happy to hear you.

25      MR. ARCHIBALD:  Good morning, Your Honor.

8

1          THE COURT:  Good morning.

2          MR. ARCHIBALD:  As the Court is aware, on a motion

3   for summary judgment the burden lies on the movant and in this

4   case, Your Honor, the movant has not been able to come forward

5   with a clear cut case for summary judgment and I'll enlighten

6   the Court where I'm going.

7          Your Honor, notwithstanding these code violations,

8   the code violations in and of themselves do not guarantee the

9   movant a positive response on a summary judgment motion.  It

10  has to be more than that, Your Honor, because, as the Court is

11  aware, he has to demonstrate that there is no issue of

12  material fact and these are the issues of material fact that

13  even in their response they neglected to respond to:

14         For example, Your Honor, they rely heavily on the

15  fact that renovations were done and they were done supposedly

16  in a slipshod manner by day workers who were unqualified.

17  Let's suppose we take them at face value where that's

18  concerned, Your Honor, when my expert went in, and the Court

19  should have -- he took over 50 photographs of the work that

20  was done, Your Honor, that's attached to my moving papers, the

21  Court can see the quality of the work that was done, as well

22  as when both plaintiff parents, mother and father testified,

23  they testified to how effective the work was done, how

24  professional the work was done; notwithstanding, they found

25  lead paint or lead dust -- and/or lead dust on the premises.

9

1  The work wasn't done in a slipshod manner.

2          My expert, a professional engineer, went in and he

3  attests to the fact that the work was done in accordance with

4  appropriate building code standards and the like and he's the

5  one that took the pictures.  We also had a lead paint expert

6  that went and conducted tests.

7          THE COURT:  Are both those experts going to testify?

8          MR. ARCHIBALD:  Absolutely, Your Honor.

9          THE COURT:  Have you filed and exchanged Rule 26

10  expert reports?

11          MR. ARCHIBALD:  Well, they are attached to my moving

12  papers, so the answer to that would have to be, yes, they have

13  both of the expert reports, along with their CVs and

14  everything else, Your Honor.  So, clearly these two are

15  qualified experts that will testify in the event this case

16  goes to trial.

17          So, Your Honor, the lead paint expert testified that

18  the type of equipment that's used has a tendency of giving

19  false positives, they weren't able to counteract that, and he

20  indicated that what this testing device does is that it reads

21  through the sheetrock and it goes behind and would pick up any

22  old lead paint that's there.

23          Even the tests that they submitted, I don't believe

24  those tests are in admissible form, they're not authenticated

25  or certified in any way and if they are to be relied on by

1  this Court, I would say that that would be error because it's

2  not in proper admissible form under the Federal Rules of

3  Evidence, Your Honor.

4          THE COURT:  You want a Daubert hearing?

5          MR. ARCHIBALD:  Certainly, Your Honor.

6          THE COURT:  All right.  Set it down for a Daubert

7  hearing in two weeks on all experts.

8          MR. ARCHIBALD:  Okay, Your Honor.  Now --

9          THE COURT:  Excuse me, I'll give you the date and

10  time.

11          MR. FRANKEL:  If I may -- I'm sorry, Judge.

12          THE COURTROOM DEPUTY:  April 2nd.

13          THE COURT:  April 2nd, ten a.m., we'll have a

14  Daubert hearing.  Have them all here.

15          MR. ARCHIBALD:  Sorry, Your Honor, April 2nd I'm

16  actually going to be out of the jurisdiction.  I will be back

17  the week of April 6th is good, the 7th, the 8th --

18          THE COURT:  Excuse me.

19          MR. ARCHIBALD:  The 9th.

20          MR. FRANKEL:  Can I see my calendar?  Excuse me.

21          THE COURTROOM DEPUTY:  April 6th at 11.

22          THE COURT:  Is that appropriate for both parties?

23          MR. ARCHIBALD:  The 7th or the 9th?

24          THE COURT:  I have April 6th at 11.

25          MR. ARCHIBALD:  It's still no good, Your Honor.  The

1    7th?

2            THE COURT:  What is your date?

3            MR. ARCHIBALD:  The 7th or the 9th --

4            THE COURT:  April 7th.

5            MR. ARCHIBALD:  -- is wide open.

6            THE COURT:  April 7th.

7            MR. FRANKEL:  I'm not available the 7th or the 9th,

8    those are my two days that week I'm not available.

9            THE COURT:  What is the next date?

10           MR. ARCHIBALD:  What about the 10th?

11           THE COURT:  Is the 10th okay?

12           MR. FRANKEL:  It is fine with us, Judge.

13           THE COURT:  April 10th.

14           MR. FRANKEL:  Judge, before we --

15           THE COURT:  Excuse me, I haven't finished yet.  I'll

16   give you a chance.

17           At what time?

18           THE COURTROOM DEPUTY:  10:30, Judge.

19           THE COURT:  10:30, April 10th.  Have your experts

20   here or by telephone --

21           MR. ARCHIBALD:  May I continue, Your Honor?

22           THE COURT:  -- with all their reports.

23           Yes, please.

24           MR. ARCHIBALD:  Yes.  Then the other issue that we

25   have of material fact relates to the plaintiff's two dogs in

1   the apartment.  According to my client, the dogs scratched at

2   the door that had to be replaced because it was so severely

3   damaged, scratched at the moldings and scratched at the walls

4   and in so doing, Your Honor, the scratching, in our view,

5   released lead paint dust into the atmosphere.  There's no

6   other explanation, Your Honor, because even the expert said

7   the walls that they inspected were coated with one coat of

8   primer and two coats of paint, paint that was purchased in

9   2011.  There's no lead paint anymore, Your Honor, my client is

10  incapable of purchasing lead paint because lead paint simply

11  isn't on the market, so it was lead-free paint.

12          So, any lead paint that was found in the apartment

13  is from the old stuff that was disturbed by the animals.

14  Clearly that's an issue of fact for a jury to determine, Your

15  Honor.  A court wouldn't be in a position to determine on a

16  motion for summary judgment whether or not the dogs disturbed

17  encapsulated paint.  And the expert testified that the method

18  of encapsulation is appropriate, that once lead paint is

19  properly encapsulated, it is safe and that's what we have and

20  the plaintiffs didn't provide any evidence to the contrary

21  that lead paint that's encapsulated is safe.

22          So, you know, notwithstanding all of the statutory

23  violations that's alleged here, none of that goes to the heart

24  of what happened here, Your Honor.  This case is not ready for

25  summary judgment.  Summary judgment is inappropriate under the

1    circumstances.  So, the three issues of fact that we

2    presented, the issues with the dog, the issues with the

3    improper reading of the equipment that's used to detect lead

4    paint and the quality of the demolition/renovation work that

5    was done, we have experts saying it was done appropriately,

6    Your Honor, so if it was done appropriately, where did the

7    lead paint come from, it had to come from somewhere and we're

8    saying that's the issue for the jury to decide, not for Your

9    Honor, with all due respect, to decide.

10                MR. FRANKEL:  If I may, Your Honor?

11                THE COURT:  No, I'm not finished yet.

12                MR. FRANKEL:  I'm sorry.

13                THE COURT:  I'll hear you.

14                Now, is it true that the individual defendant here

15   had been a landlord for some 20 years before?

16                MR. ARCHIBALD:  Yes, it is true, he had been a

17   landlord and it's also true --

18                THE COURT:  Excuse me, that's all.

19                MR. ARCHIBALD:  Sorry.

20                THE COURT:  Are you still relying on the fact that

21   the cause of the child's difficulties may have been due to the

22   operation that the mother had during the pregnancy?

23                MR. ARCHIBALD:  We're saying in part, yes, Your

24   Honor.

25                THE COURT:  In part?

1          MR. ARCHIBALD:  In part, yes.

2          THE COURT:  That's not a total defense but just a

3   question of damages?

4          MR. ARCHIBALD:  A question of damages, Your Honor.

5          THE COURT:  Okay.  So, that's not a total defense.

6          MR. ARCHIBALD:  I'm not saying it is a total defense

7   but in part I would say, yes, that's part of it.

8          THE COURT:  I just want to get the position.

9          MR. ARCHIBALD:  Okay.

10         THE COURT:  Is this case covered by insurance?

11         MR. ARCHIBALD:  No, it is not, Your Honor.  There's

12   a lead paint exclusion in his homeowners policy.

13         THE COURT:  Yes, I'll hear you.

14         MR. FRANKEL:  If I may, Judge, I don't believe a

15   Daubert hearing is necessary in this case for the following

16   reasons; the City of New York tested, and we have the report,

17   we can get a certified report if counsel for some reason

18   believes that the agency in the City of New York didn't

19   produce the report; after that there were two additional tests

20   by different agencies, private, and they found lead dust and

21   paint in the apartment.  So, whether or not it existed is not

22   a question.

23         Their expert, with all due respect, first comes in

24   in 2015 and he's going to testify how the work was done.

25   Number one, it's four years later; number two, he didn't even

1   test for the presence of lead then; number three, his

2   speculation is based upon the defendant saying to him, oh, the

3   dogs scratched the doors and walls.  He wasn't there.  No

4   tests were done to show that's where it came from.

5           And, in addition, this expert saying that the wrong

6   equipment was used by the City of New York, doesn't produce a

7   document, mechanical, expert, it's his opinion that they used

8   the wrong equipment four years earlier.  That's not a question

9   of fact, there's no material question of fact and the fact

10  that it is four years later, how can he even speculate --

11  excuse me, he can speculate but how could he testify as to

12  what the condition was in 2011 when the defendant did the

13  renovation; but what I find most interesting about counsel's

14  argument is the dogs released the lead paint from somewhere,

15  the defendant testified under oath at his deposition that he

16  fully removed everything down to the studs, everything.  Now

17  his expert comes in four years later and says this equipment

18  the City uses only goes through walls to find lead.  The test

19  results show lead dust and paint chips all throughout the

20  apartment.

21           THE COURT:  Well, there's no proof --

22           MR. FRANKEL:  And on the walls.

23           THE COURT:  Excuse me.

24           MR. FRANKEL:  On the --

25           THE COURT:  Excuse me.

1            MR. FRANKEL:  I'm sorry, Judge.

2            THE COURT:  There's no proof with respect to

3    replacement of moldings and other things like that.  That was

4    apparently, as I understand it from reading the papers, merely

5    painted over.

6            MR. ARCHIBALD:  Correct, Your Honor.

7            MR. FRANKEL:  That is not proper, Judge, that's not

8    the law.

9            THE COURT:  Well, I'm not so sure of that.

10           MR. FRANKEL:  The code is very clear that they have

11   to prevent lead paint and dust from getting into the

12   apartment.  By painting over a molding -- people move

13   furniture, you could chip the paint.

14           THE COURT:  I understand your position.

15           MR. FRANKEL:  Which exposed our child to the danger.

16           THE COURT:  I understand.

17           MR. ARCHIBALD:  Your Honor, if I may, under the

18   law --

19           THE COURT:  Excuse me.

20           Are you finished?

21           MR. FRANKEL:  No, Judge.

22           All we can produce, I don't believe more is

23   necessary, is what the experts did at the time and what they

24   found.  They cannot produce an expert, since the defendant

25   didn't hire one, to show he did anything correctly.  His own

1    testimony is that he did this in a slipshod way but it is

2    irrelevant if he did a terrific renovation but didn't protect

3    against lead paint, lead dust, lead chips, he's still liable

4    under the statute.  The statute doesn't say you make your best

5    effort and hope for the best.  You must either abate it or

6    fully encapsulate it.

7          How could the defendant benefit from testifying that

8    he removed every wall, every ceiling, every floor so there

9    couldn't possibly be lead and then rely on an expert four

10   years later to come in and say, oh, yeah, there's lead but it

11   is because dogs were scratching molding and because, well,

12   this machinery that the City of New York used was the wrong

13   equipment without providing any scientific backup.  This is

14   just a red herring, Judge.  There's no material question of

15   fact.  Their expert didn't produce something to show that

16   anyone agreed with him, nor does the defendant explain why he

17   waited four years to find somebody to come in who will back up

18   his position.

19         THE COURT:  I have some questions I'd like answered.

20         Who is the building purchased from?

21         MR. KIMPSON:  At a New York City public

22   administrative auction.

23         THE COURT:  New York City sold it on an auction?

24         MR. KIMPSON:  Yes.

25         THE COURT:  On what date, do you remember

1  approximately?

2          MR. KIMPSON:  December.

3          THE COURT:  Of what year?

4          MR. KIMPSON:  2011 I think it was.

5          MR. ARCHIBALD:  It couldn't have been.

6          MR. KIMPSON:  2010.

7          THE COURT:  There's no question that this building

8  was erected approximately in 1899, is there?

9          MR. KIMPSON:  I don't know when it was erected.

10          THE COURT:  Well, it was a very old building?

11          MR. KIMPSON:  Yes.

12          THE COURT:  We can assume it is 1899.

13          You used the term "gut renovation," is that a

14  technical term?  I'm asking you as defendant.

15          MR. KIMPSON:  Yes.

16          THE COURT:  Is that used in the papers by any of the

17  experts?

18          MR. FRANKEL:  I don't believe he said gut, he said

19  he gutted the apartment, took everything out.

20          THE COURT:  You used the word "gut renovation"

21  didn't you?

22          MR. KIMPSON:  Yes.

23          THE COURT:  Is that a technical term in the statute?

24  I don't remember it.

25          MR. ARCHIBALD:  Not that I saw, Your Honor.

1          THE COURT:  Okay.  What do you mean by "gut

2     renovation"?

3          MR. KIMPSON:  You break down the old walls and you

4     put up new sheetrock, you tear out --

5          THE COURT:  What about the molding around the --

6          MR. KIMPSON:  The moldings, I left all the moldings.

7     All the moldings was intact.

8          THE COURT:  You left the molding?

9          MR. KIMPSON:  Right.

10         THE COURT:  How many coats did you put on top of the

11    molding?

12         MR. KIMPSON:  One coat of primer, two coats of

13    paint.

14         THE COURT:  Were any of the walls broken down or you

15    used the old internal walls?

16         MR. KIMPSON:  Well, the walls is broken down but

17    behind the walls is like slats.

18         THE COURT:  Yes.  Did you change the nature of the

19    rooms increasing them or changing the space in any way or did

20    you leave the walls as they were?

21         MR. KIMPSON:  Pretty much as they were.

22         THE COURT:  Yes.

23         MR. ARCHIBALD:  If I may, Your Honor?

24         THE COURT:  I have a few other questions.

25         MR. ARCHIBALD:  Okay.

20

1          THE COURT:  Who is Randy?

2          MR. KIMPSON:  Randy is a contractor that does work

3    in the neighborhood.

4          THE COURT:  Is he still around?

5          MR. KIMPSON:  No, he isn't.

6          THE COURT:  Where is he?

7          MR. KIMPSON:  I don't know.  I looked for him when

8    they told me to look for him.

9          THE COURT:  When did the work actually start?

10          MR. KIMPSON:  I don't know the exact date but say a

11    month and a half after I purchased the house.

12          THE COURT:  About when?

13          MR. KIMPSON:  If I purchased the house in December,

14    which I think I did, so January.

15          THE COURT:  January, February.  How long did the

16    renovation take?

17          MR. KIMPSON:  About three months.

18          THE COURT:  Now, is that apartment occupied now?

19          MR. KIMPSON:  No, it isn't.

20          THE COURT:  Have you renovated it since to take care

21    of the lead?

22          MR. KIMPSON:  Oh, yes.

23          THE COURT:  You have?

24          MR. KIMPSON:  Yes.

25          THE COURT:  Well, that kind of evidence would not

1   come in under the Federal Rules because of post-event

2   cautionary measures.

3           MR. FRANKEL:  If I may, one thing?

4           THE COURT:  Excuse me.

5           MR. FRANKEL:  Sorry, Judge.

6           THE COURT:  If I may, I'd like to continue.

7           Do you remember when the lease was signed?  Do we

8   have the lease in evidence?

9           MR. FRANKEL:  Yes, we have the lease.

10          THE COURT:  Okay.  Was the work completely done when

11  the family moved in?

12          MR. KIMPSON:  Yes.

13          THE COURT:  You didn't do anything after they moved

14  in?

15          MR. KIMPSON:  No.

16          THE COURT:  What was it, a year's lease?

17          MR. KIMPSON:  Yes.

18          THE COURT:  They lived there about 14 months, didn't

19  they?

20          MR. KIMPSON:  Their lease was expired actually at

21  the time when they was there.

22          THE COURT:  But you let them stay another two

23  months?

24          MR. KIMPSON:  Well, they didn't -- they stayed.

25          THE COURT:  They stayed, they paid their rent?

1           MR. KIMPSON:  Yes.

2           THE COURT:  You never gave them that pamphlet,

3   Disclosure of Information on Lead-Based Paint and/or

4   Lead-Based Hazards, did you?

5           MR. KIMPSON:  No, I wasn't aware that I had to give

6   it to them.  That was the first time I ever seen the form when

7   the broker pulled it out.

8           THE COURT:  Were these Spanish speaking people or

9   English speaking?

10          MR. KIMPSON:  Both, they spoke Spanish and --

11          THE COURT:  Is there a Spanish version of the

12  pamphlet?

13          MR. FRANKEL:  There is, Judge.  It wasn't given

14  either, but they're fluent in English.

15          THE COURT:  Excuse me.

16          MR. FRANKEL:  Sorry.

17          THE COURT:  Now, I'm directing this to you, when did

18  the pediatrician contact the mother?

19          MR. FRANKEL:  Right after the first test at the

20  first birthday.

21          THE COURT:  While the child was still living there?

22          MR. FRANKEL:  Yes, they were still living in the

23  apartment and only after the testing the father stayed behind

24  but the mother and child left.

25          THE COURT:  I see.  You're not contesting the fact

1   that she did get hydrocodone during her operation, are you?

2          MR. FRANKEL:  We don't know that for sure.

3          THE COURT:  You don't?

4          MR. FRANKEL:  They haven't presented anything.

5          THE COURT:  How are you going to prove that?

6          MR. ARCHIBALD:  Your Honor, I got that from her

7   physician's information.

8          THE COURT:  I see.

9          MR. ARCHIBALD:  In terms of what she took for the

10  operation.

11         THE COURT:  In the deposition?

12         MR. ARCHIBALD:  No, not in depositions, that was

13  from -- oh, God, what's the name, let me see -- that was in

14  information that was supplied to us by them.

15         MR. FRANKEL:  Not by us, Judge.

16         MR. ARCHIBALD:  Hold on.

17         MR. FRANKEL:  No authorization --

18         MR. ARCHIBALD:  Hold on please.

19         There is a notation in the notes of a Dr. Amy

20  Glasser of Slope Pediatrics and in that entry, it is from

21  August the 4th, 2011, that she underwent knee surgery at six

22  weeks of pregnancy and they indicate in there that she was

23  administered hydrocodone, it was prescribed after she had

24  anesthesia and that was --

25         THE COURT:  You have the document?

24

1          MR. ARCHIBALD:  Yes, I do, Your Honor.

2          THE COURT:  Are there any pictures of the damage the

3     dogs allegedly did?

4          MR. ARCHIBALD:  Did you take any?

5          MR. KIMPSON:  No.

6          MR. ARCHIBALD:  No.

7          THE COURT:  Has the apartment remained in the same

8     condition?

9          MR. KIMPSON:  Well, the dogs' scratches, because

10    being that I had five days to do the repairs from the Health

11    Department, it was repaired.

12         THE COURT:  So, it's been covered up?

13         MR. KIMPSON:  Right.

14         THE COURT:  You couldn't go in and see it now?

15         MR. KIMPSON:  No.

16         THE COURT:  Okay.

17         We'll want the full transcripts, furnish them

18    please.  Do we have a copy of the blood work?

19         MR. FRANKEL:  We do, Judge.

20         THE COURT:  Okay.  Have you furnished it?

21         MR. CANTOR:  Oh, yes.

22         MR. FRANKEL:  Yes.

23         THE COURT:  We have the reports I take it of

24    Dr. Gordon and Reagles and Mr. Hollenbeck.  Is he a doctor,

25    Albert Hollenbeck?

1          MR. ARCHIBALD:  I believe he is, Your Honor, yes.

2          MR. FRANKEL:  May I just say one thing?

3          THE COURT:  Yes, you can sum up.

4          MR. FRANKEL:  In answer to Your Honor's question --

5          THE COURT:  I'm sorry?

6          MR. FRANKEL:  In answer to Your Honor's question of

7   the defendant about how he did the work and what gutting was,

8   at his deposition he said, we took out everything, he didn't

9   say we left the molding, we left other -- he said it couldn't

10  have been lead, we took everything out, ceilings, floors,

11  walls; he didn't say, but we left the molding.  Now, today in

12  response to Your Honor --

13         THE COURT:  Excuse me, I understand the position.

14         MR. ARCHIBALD:  May I, Your Honor?

15         THE COURT:  Yes, just briefly sum up whatever you

16  want to say.

17         MR. ARCHIBALD:  Okay.  On the contrary, Your Honor,

18  in the deposition, contrary to the protestations of my

19  adversary, my client did indicate that the moldings were left

20  intact, okay.  Even the expert that went in saw --

21         THE COURT:  Well, I assume that they were left there

22  because --

23         MR. ARCHIBALD:  They weren't taken out.

24         THE COURT:  Excuse me.  He put in new drywall

25  apparently but he left the moldings around the doors and

1  windows, etc.

2          MR. ARCHIBALD:  Right, Your Honor.

3          THE COURT:  And just painted over.  Whether that was

4  sufficient, we don't know.

5          MR. ARCHIBALD:  Well, according to the experts, Your

6  Honor, encapsulation, that is exactly how you encapsulate.

7          THE COURT:  Well, all right.  I understand.

8          Are we going to have an expert on encapsulation?

9          MR. FRANKEL:  We will but it may take more than two

10 weeks then.  We didn't prepare anyone to testify, we didn't

11 know.

12         THE COURT:  You haven't gotten an expert yet?

13         MR. FRANKEL:  We had one who was --

14         THE COURT:  You haven't given us a report under 26?

15         MR. FRANKEL:  No, because it wasn't necessary.

16         THE COURT:  All right, that's all.

17         Do you have an expert on encapsulation?

18         MR. ARCHIBALD:  Absolutely, Your Honor.

19         THE COURT:  Have you given a Rule 26 report?

20         MR. ARCHIBALD:  It is attached to our moving papers

21 or to our responsive papers, rather.

22         THE COURT:  Well, you better get an expert on what

23 encapsulation means.  Try to get him in time for the hearing.

24 If not, I can hear him separately later.

25         MR. ARCHIBALD:  So, as to the summary judgment

1  motion, is Your Honor going to rule on that before the Daubert

2  hearing?

3          THE COURT:  I'm going to rule right now.

4          MR. ARCHIBALD:  Okay.

5          THE COURT:  And I'll issue an opinion.  It is a very

6  close case but I don't think it's ripe for a plaintiff's

7  summary judgment motion.  There are just too many unanswered

8  questions in this case.

9          MR. FRANKEL:  Judge, with regard to the pamphlet, if

10 I might, there's no issue at least with regard to that.  He

11 admits he didn't know it existed.

12         THE COURT:  Well, there's a causation problem as

13 well.

14         MR. FRANKEL:  We would ask for partial summary

15 judgment.

16         THE COURT:  Denied.  I'm going to deny summary

17 judgment.  It is going to trial.

18         Give me a trial date a month and a half from now --

19 about a month after the Daubert hearing.

20         MR. CANTOR:  Excuse me, Judge, I'm going to be out

21 of the country from May 16th until June 7th.

22         THE COURT:  Give me a date after June 7th.

23         I want copies of all of these reports, of course.

24         MR. FRANKEL:  Fine, Judge.

25         For the Daubert hearing, Your Honor, are you just

1   dealing with the issue of the lead paint or --

2           THE COURT:  Whatever they're going to testify to,

3   give their opinion on, I want to examine them on.

4           MR. FRANKEL:  Including the doctors at this point?

5           THE COURT:  Yes, because there is a causation

6   problem.

7           THE COURTROOM DEPUTY:  June 29th.

8           THE COURT:  Ten a.m.

9           MR. ARCHIBALD:  June 29th?

10          THE COURT:  Yes.  The magistrate judge will select

11  the jury.

12          Give me a date for an in limine a week before that

13  please.

14          THE COURTROOM DEPUTY:  June 22nd.

15          THE COURT:  June 22nd we'll have an in limine

16  hearing.  All motions with respect to evidence or trial issues

17  will be made returnable then.

18          I want from each side a complete charge including

19  the verdict sheet beginning to end.  I want a list of all of

20  your witnesses and a short summary of what they're going to

21  say and I want a list of all of your documents, all documents

22  to be premarked and exchanged and given to me at the in limine

23  hearing.  I'll issue an order today indicating what I want.

24          MR. FRANKEL:  Judge, may I just ask for a little

25  longer for the Daubert hearing only because we have at least

1    one or two doctors?

2              THE COURT:  Okay, let's agree on a date.

3              MR. FRANKEL:  If you don't mind, Your Honor.

4              THE COURT:  What date do we have now?

5              THE COURTROOM DEPUTY:  May 10th.

6              THE COURT:  What date do you want?  We have to have

7    time before the --

8              MR. FRANKEL:  Is April 22nd possible for the Court?

9              THE COURTROOM DEPUTY:  It is.

10             THE COURT:  April 22nd.

11             Are you okay for the 22nd?

12             MR. ARCHIBALD:  Yes, I am.

13             THE COURT:  Okay, April 22nd.  If you have any new

14   experts, you better get his reports out or her reports out and

15   exchange under Rule 26.

16             What have you done to settle the case?

17             MR. ARCHIBALD:  Well, we have a settlement

18   conference scheduled immediately after we leave your part

19   today, Your Honor.

20             THE COURT:  Who is the magistrate judge?

21             MR. ARCHIBALD:  Gold.

22             THE COURT:  Well, he's very good.

23             No insurance?

24             MR. ARCHIBALD:  No insurance.

25             THE COURT:  How much assets does the defendant have?

1          MR. ARCHIBALD:  Not a lot, most of them are

2    buildings but they're encumbered by mortgages.

3          THE COURT:  What are his net assets?

4          (Pause.)

5          MR. ARCHIBALD:  About 700,000.

6          THE COURT:  Equity?

7          MR. ARCHIBALD:  Equity.

8          THE COURT:  How many apartments do you own -- all in

9    Brooklyn?

10          MR. KIMPSON:  Yes.

11          THE COURT:  How many?

12          MR. KIMPSON:  Apartments?

13          THE COURT:  Yes.

14          MR. KIMPSON:  13.

15          THE COURT:  13?

16          MR. KIMPSON:  Yes.

17          THE COURT:  And what is your monthly rent roll,

18    roughly?

19          (Pause.)

20          MR. ARCHIBALD:  Can you calculate it?

21          MR. KIMPSON:  I need a piece of paper.

22          MR. FRANKEL:  Judge, the plaintiff --

23          THE COURT:  Excuse me, would you allow me please.

24          (Pause.)

25          MR. ARCHIBALD:  Give me one second, Your Honor, I

31

1    want to go get my calculator.

2              (Pause.)

3              MR. ARCHIBALD:  10,000.

4              THE COURT:  10,000 a month.  And you're paying off

5    the mortgages?

6              MR. KIMPSON:  On some, yes.

7              THE COURT:  Do you have assets in addition to the

8    real estate?

9              MR. KIMPSON:  No.

10             THE COURT:  That's it?

11             MR. KIMPSON:  Yes.

12             THE COURT:  Are you working?

13             MR. KIMPSON:  No, I'm retired.

14             THE COURT:  Retired.  What were you doing?

15             MR. KIMPSON:  I was a police officer.

16             THE COURT:  A police officer?

17             MR. KIMPSON:  Yes.

18             THE COURT:  You've got a pension?

19             MR. KIMPSON:  Yes.

20             THE COURT:  How long were you a police officer?

21             MR. KIMPSON:  Ten years.

22             THE COURT:  Ten?

23             MR. KIMPSON:  Yes.

24             THE COURT:  And you retired on a pension after ten

25    years?

1          MR. KIMPSON:  Yeah, I got into a shoot-out.

2          MR. ARCHIBALD:  He was injured.

3          THE COURT:  Injured.

4          The case ought to be settled.  He's risking a huge

5   verdict but it's not going to do you any good.

6          MR. FRANKEL:  It will, Your Honor, with all due

7   respect, he sold a building recently for a million and a half

8   most of which was not encumbered by a mortgage.

9          THE COURT:  I see.

10          MR. FRANKEL:  What he just told the Court that it

11   was all mortgage, a million and a half, we have the records

12   and it was not mortgaged.

13          THE COURT:  I see.  He told me he has no other

14   assets.

15          MR. FRANKEL:  Right, that's what he told the Court.

16          MR. ARCHIBALD:  I think --

17          THE COURT:  But you're going to have a Texas person

18   come in here with a mixed jury, former police officer, middle

19   class member of the community.

20          How long have you lived in Brooklyn?

21          MR. KIMPSON:  All my life.

22          THE COURT:  The case can go either way but it's a

23   strong case.

24          Okay.  I'm denying the motion.  You've got a trial

25   date, you've got a Daubert date.  The parties will order the

1    minutes, share the cost of this hearing.

2           Anything further?

3           MR. ARCHIBALD:  No, Your Honor.

4           MR. FRANKEL:  No, thank you, Your Honor.

5           THE COURT:  Thank you.

6           You'll tell the magistrate judge what I said about

7    settlement.

8           MR. ARCHIBALD:  Yes, Your Honor.

9           (Time noted:  11:10 a.m.)

10          (End of proceedings.)