```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    ------------------------------------x
      G.M.M., a minor child by his mother and natural
 3    guardian, NIKI HERNANDEZ-ADAMS, and NIKI
      HERNANDEZ-ADAMS, individually,
 4
                          Plaintiffs,
 5
              versus                              13 CV 5059 (JBW)
 6
      MARK KIMPSON,
 7                                                U.S. Courthouse
                          Defendant.              Brooklyn, New York
 8    ------------------------------------x
                                                  July 9, 2015
 9                                                9:45 a.m.

10              Transcript of Civil Cause for Trial

11    Before:       HONORABLE JACK B. WEINSTEIN,
                               District Court Senior Judge
12              (and a jury.)

13                          APPEARANCES

14    Attorney for Plaintiff:
      STEPHEN M. CANTOR, P.C.
15    325 Broadway, Suite 502
      New York, New York 10007
16    BY:  STEPHEN M. CANTOR, ESQ.
           STEVEN K. FRANKEL, ESQ.
17
      Attorney for Defendant:
18    ROGER V. ARCHIBALD, ESQ.
      26 Court Street, Suite 711
19    Brooklyn, New York 11242

20    Also Present:
      DENISE FELIPE-ADAMS
21    MARK KIMPSON

22    Official Court Reporter:
      MICHELE NARDONE, CSR, RPR, CRR
23    Phone:  718-613-2601
      Email:  Mishrpr@aol.com
24
      Proceedings recorded by mechanical stenography.  Transcript
25    produced by computer-aided transcription.
```

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

                              G.M.M. v. Kimpson

1              (In open court.)

2              THE COURT:  Any applications?

3              MR. CANTOR:  Judge, I would just like to see the jury

4    instructions, the final copy.

5              THE LAW CLERK:  They were e-mailed last night to

6    everybody.

7              THE COURT:  You have them.

8              MR. CANTOR:  I don't have my e-mails.

9              THE LAW CLERK:  And hard copies were given last week.

10             THE COURT:  Well, we made some changes.  Do we have an

11   extra copy?

12             THE LAW CLERK:  We would have to go and make a copy.

13   You have the final copy, judge.  I don't have an additional

14   copy except what's on the computer.

15             THE COURT:  We will ask June to make another copy, and

16   we will give it to you.

17             The only problem your colleague raised was the verdict

18   sheet.

19             THE LAW CLERK:  Do you need a copy as well?

20             MR. ARCHIBALD:  No.  We have our copy.

21             THE COURT:  Do we have a jury?

22             THE LAW CLERK:  Yes, full jury.

23             THE COURT:  Bring in the jury.

24             (Jury enters.)

25             THE COURT:  Good morning, everybody.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid - Direct/Archibald

1              Do you have a witness, please?

2              MR. ARCHIBALD:  Yes, your Honor.

3              THE COURT:  Would you swear the witness, please.

4              THE LAW CLERK:  Please raise your right hand.

5    CHARLES KINCAID, called as a witness, having been

6         first duly sworn/affirmed, was examined and

7         proceeded to testify as follows:

8              THE LAW CLERK:  Please state your name and spell it

9    for the record.

10             THE WITNESS:  Charles Kincaid, C-H-A-R-L-E-S

11   K-I-N-C-A-I-D.

12             THE LAW CLERK:  Take a seat.

13             THE COURT:  Please be seated.

14             MR. ARCHIBALD:  May I inquire, your Honor?

15             THE COURT:  Please.

16   DIRECT EXAMINATION

17   BY MR. ARCHIBALD:

18   Q   Good morning, Dr. Kincaid.  How are you?

19   A   Good morning.  Fine, thank you.

20   Q   You were retained by my offices to do an evaluation on a

21   vocational basis for the infant plaintiff in this case, G.M.M.,

22   correct?

23   A   That's correct.

24   Q   Prior to my office contacting your office sometime in the

25   early spring of this year, had you ever done any work for my

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid - Direct/Archibald

1  firm?

2  A    No, I have not.

3  Q    And other than yesterday, when I met you -- when I met you

4  in the hallway, was that the first time we had met?

5  A    That's correct.

6  Q    But we had spoken on the phone prior to that, correct?

7  A    Yes.

8  Q    Now, in preparation for the report and evaluation that you

9  did, you reviewed certain documents, correct?

10  A    That's right, I did.

11  Q    Okay.  Did you review a report from plaintiffs' vocational

12  expert, a Dr. Kenneth Reagles?

13  A    Yes, I did.

14  Q    Did you also review a report from plaintiff's economist, a

15  Dr. Tinari?

16  A    Yes, I did.

17  Q    Now, before we get into the body of your testimony, I just

18  want you to tell the jury a little bit about your educational

19  background and professional activities.

20  A    Yes, I have a bachelor of arts in psychology from the

21  University of Wisconsin, Milwaukee; a certificate in

22  rehabilitation management from DePaul University; a master's

23  degree in of criminal justice administration from the

24  University of Wisconsin, Milwaukee; a Ph.D. in rehabilitation

25  counseling from Syracuse University; and a certificate in life

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid - Direct/Archibald

1    care planning from Capital University Law School.

2            I have been involved in the field for over 35 years.

3    I started actually in the criminal justice system, working with

4    offenders, developing vocational rehabilitation plans for

5    pretrial offenders, probationers, and parolees; and I have

6    worked also as a private rehabilitation counselor.  I have

7    worked with individuals with all types of disabilities.

8            And then an instructor, adjunct instructor and adjunct

9    professor teaching master's level students at Syracuse

10   University and later at William Patterson University,

11   principles and practices of rehabilitation counseling and

12   assistive technology.

13           I was a director of Sister Technology Regional Center

14   at New York City, for United Cerebral Palsy of New York City;

15   and I did that for about four years, where I taught individuals

16   about assistive technology and evaluated them for their needs,

17   both children and adults.

18           Most recently I have owned and operating my own

19   company, Kincaid Vocational Rehabilitative Services, where I

20   provide vocational evaluations, vocational counseling, and

21   assistive technology evaluations.

22   Q    Thank you, doctor.  In regards to your certificates in

23   life-care planning, when did you receive that?

24   A    That was in 2004.

25   Q    What does a life-care planner do in terms of evaluating

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid - Direct/Archibald

1  expenditures that an injured person might require?

2  A   Well, the life-care planner would first review medical

3  records, would typically speak with medical providers,

4  determine what the individual's medical needs are going to be

5  in the future; and then they would do costing research to

6  determine, depending on the area the person lives in, what

7  would be a reasonable cost for those services, equipment that

8  the individual is going to need.  And that's projected out over

9  their life expectancy, to arrive at a cost for medical care

10 related to an illness or injury.

11 Q   Okay.  So then you would go look to, as a life-care

12 planner, certain indexes to give you hard and fast0 estimates

13 of what certain things would cost?

14 A   Yes.  There are national databases that you can access.

15 Sometimes people will also contact providers, companies, for

16 costs as well.

17 Q   That's part of the research that you do in formulating your

18 opinions and reports?

19 A   That's right.

20 Q   Now in regards to your Ph.D., when did you get that?  When

21 were you awarded your Ph.D.?

22 A   1997.

23 Q   That Ph.D. was in rehabilitation counseling, correct?

24 A   That's correct.

25 Q   And without that Ph.D., would you be able to consider

Kincaid – Direct/Archibald

1   yourself or call yourself a rehabilitation or vocational

2   expert?

3   A   It's certainly -- it's very helpful, not absolutely

4   necessary, but it's a key ingredient to my knowledge base and

5   understanding of the field.

6   Q   Then your MS in criminal justice administration, you got

7   that from the University of Wisconsin, correct?

8   A   That's right.

9   Q   When did you get that degree?

10  A   1990.

11  Q   Then you also have a certificate in rehabilitation

12  management.

13          When did you receive that?

14  A   1987.

15  Q   Okay.  What's the difference between rehabilitation

16  management and rehabilitation counseling?  Is there a

17  difference?

18  A   Yes.  Management is you are trained to actually develop and

19  manage other people providing services.  So it's a training to

20  be a director, supervisor of others providing services.

21  Q   Then you have got your BA from the University of Wisconsin.

22          What year did you get that?

23  A   1975.

24  Q   Do you hold any professional licensures?

25  A   I'm licensed in the State of New Jersey as a rehabilitation

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid - Direct/Archibald

1    counselor.

2    Q    Do you hold any certifications?

3    A    Yes.  I'm a certified rehabilitation counselor, also a

4    fellow of the American Board of Vocational Experts.  I'm a

5    certified life-care planner, and I'm a certified assistive

6    technology professional.

7    Q    Now, do you have any academic credentials, such as have you

8    ever taught on a college level?

9    A    Yes, I have.  When I was at Syracuse University I was an

10   adjunct professor and teaching associate for about five years.

11   And I taught master's level students the principles and

12   practices of rehabilitation counseling as well as assistive

13   technology.

14   Q    What about at William Patterson University, did you hold

15   any position there is?

16   A    Yes.  I was an adjunct professor, and I taught education

17   teachers an introductory class in assistive technology and its

18   application in the classroom, how it can help students with

19   disabilities to improve their learning.

20   Q    In regards to coming up with a report similar to the one

21   that you did for this case, where you evaluate all of the

22   available records and make determinations in regards to the

23   attainment level of an individual, or lack thereof, how many of

24   those would you say you have done in the course of your career,

25   Dr. Kincaid?

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid - Direct/Archibald

1    A    Oh, my.  Thousands.  It would be hard to calculate, but

2    thousands of them.

3    Q    Over 5,000?

4    A    Probably.

5    Q    Now, you also reviewed in this case documents including the

6    complaint in this case, right?

7    A    Yes, I did.

8    Q    You also looked at the deposition transcripts of the

9    mother, Ms. Niki Hernandez-Adams, and the father, Mr. Joshua

10   Mendez; is that correct?

11   A    That's right.

12   Q    When you look at transcripts of the plaintiff's parents

13   what are you looking for in those transcripts?  What's the

14   purpose of reviewing those transcripts?

15   A    I'm looking for information about the family background, in

16   a case where there is a child involved, to find out what their

17   educational background is, their occupational history, any

18   information they are providing about the child's progress,

19   their deficits, their behavior.

20   Q    Were you able to glean any of that information by reviewing

21   the deposition transcripts of the parents of this young man?

22   A    Yes, I was.

23   Q    For example, you were able to glean that they had an

24   incident in Brooklyn, correct?

25   A    That's right.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid – Direct/Archibald

1  Q   That the child allegedly had a lead level of nine when he

2  was tested on his one year anniversary?

3  A   That's my understanding.

4  Q   And you were also able to glean that at some point in time

5  they left Brooklyn and they went to Florida and then they went

6  on to Dallas?  Were you able to glean that as well?

7  A   That's also my understanding.

8  Q   Okay.  Were you able to glean that the parents had formal

9  education?

10  A   Yes, I was.

11  Q   That the mother had a master's --

12  A   Yes.

13  Q   -- in fine arts, and the father had a bachelor's and a

14  certificate after a bachelor's -- not a master's but a

15  certificate -- in some form of performance art endeavor?  You

16  were able to glean that as well, correct?

17  A   That's also my understanding.

18  Q   Now, then you had an opportunity to look at a report by

19  Dr. Reagles, who is the plaintiffs' vocational expert.

20        Do you know Dr. Reagles?

21  A   Yes, I do.

22  Q   How long have you known him?

23  A   I have known him since 1992, I believe, the first time that

24  I met him.

25  Q   Have you ever worked together?

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid - Direct/Archibald

1    A    Well, in a sense we did.  I was the teaching assistant, and

2    he was the professor.  So I taught a class under his tutorship.

3    Q    Now, in his review of the records and his projections, he

4    indicated that this young man had the potential, based on his

5    calculations, of becoming or of attaining rather -- I'm

6    sorry -- a professional-level degree, like medical degree or

7    law degree or something like that.

8              Now, did you see that in his report?

9    A    Yes, I did.

10   Q    As a vocational specialist, isn't it true that you look to

11   a variety of factors in making such a determination?

12   A    That is correct.

13   Q    What would be some of those factors, Dr. Kincaid?

14   A    Well, I would being looking at the parental background, the

15   family background, for educational levels, to determine what

16   was common in that family, to determine how important, how

17   stressed education is for that family, because that's a good

18   indicator of the child's likely outcome for education.

19   Q    Would you also be looking at national averages for the

20   attainment of those degrees -- and we are not talking about

21   ethnicity because the court has already told us before you

22   testified that we are not going to go there so we won't.  We

23   are just talking in terms of the attainment by the general

24   American population.  So that's the focus, okay, Dr. Kincaid?

25   A    Yes.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid – Direct/Archibald

1    Q    So do you look at the general U.S. figures to ascertain

2    what percentage of the population attains master's degrees,

3    bachelor's degrees, and advanced degrees, professional degrees?

4    A    Yes, I do.  That would be one of the factors I would look

5    at.  The higher the degree, of course, the fewer people attain

6    that level.  It's a much lower percentage in the general

7    population.

8    Q    In coming up with your projections or your predictions, do

9    you then factor in -- withdrawn.

10        Do you look to see the percentage of the general

11   population, and do you do some type of comparison between the

12   general population and then the attainment of education in this

13   infant's familial background?  Do you look at that?

14   A    Yes, I do.

15   Q    What's the reason for doing that, Dr. Kincaid?

16   A    Well, to determine in general what's the likelihood of a

17   person obtaining different types of degrees, but then also the

18   family background is important because there is could be an

19   emphasis on education.  There is example, influence of parents,

20   aunts, and uncles, siblings.  So that's all part of the

21   factoring that I would go through.

22   Q    So you look at like a family tree, for lack of a better

23   word?

24   A    That's correct.

25   Q    And if in the family tree you see an absence of a

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid - Direct/Archibald

1    particular type of educational attainment and then you compare

2    that to the national average, do you then form an opinion as to

3    the probability or likelihood of this infant that has no

4    schooling whatsoever attaining that level of education?

5    A    Yes.  With no educational records for the child, those

6    would be important factors.  I would look at what would be the

7    likelihood, the probability that they would achieve higher

8    education degrees.

9    Q    So if you see in the familial background no professional

10   degree attainment, and then you look at the national average --

11   and it's relatively small, for example, based upon the records

12   that we have here, less than two percent of individuals attain

13   that professional-level education -- is that more or less in

14   accordance with your understanding?

15   A    Yes.  My -- I researched this subject quite often, and

16   that's been a consistent figure, two percent or less of the

17   population attain a professional degree.  So that's correct.

18   Q    Now, that being said, and the fact no one in this

19   individual's family tree has such a degree, what would you --

20   what type of probability quotient would you attach to this

21   individual attaining such an educational degree?

22   A    It's more likely than not that they would not be able to

23   attain that degree.  So it's not probable.

24   Q    So it would be highly improbable, in your view, that they

25   would attain that, correct?

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid - Direct/Archibald

1    A    That's correct.  It would be unlikely.

2    Q    Now, so in your report or your review, would you then

3    attach a lot of significance or any significance to them

4    attaining such a degree?

5    A    No.  I would, again, look at the family background.  That

6    would be more realistic in terms of the level of degree that

7    the individual would achieve.  Research shows that the highest

8    correlation is between fathers and sons.  So I would pay

9    particular attention to the level of educational attainment of

10   the father.

11   Q    Do you consider any risk factors that the individual who

12   you are analyzing may have or may bring to the table in coming

13   up with your projections or predictions?

14   A    Could you define what you mean by "risk factors"?  I'm not

15   quite sure.

16   Q    Absolutely.  For example, the reason why this young man

17   supposedly or allegedly has some type of impairment is as a

18   result of lead exposure, allegedly.  Right?

19   A    Yes.

20   Q    If there are additional risk factors that could have

21   contributed to the alleged impairment, would you look at those

22   too, in coming up with your overall analysis and predictions or

23   projections, would that be an important thing that you would

24   consider?

25   A    Yes.  I do consider some.  Oftentimes there are different

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid - Direct/Archibald

1  factors in terms of causation for a person's limitations or

2  deficits.  So I factor that in my reports.

3  Q   Now, you don't make a diagnosis or you don't offer an

4  opinion on causation, do you?

5  A   No, I do not.  I'm not qualified to do that.

6  Q   That would be outside your area of specialization, correct?

7  A   That's correct.

8  Q   But you use these causal -- withdrawn.  I'm sorry.

9      You use these risk factors in the analysis, correct?

10 A   That's right.

11 Q   Okay.  Now, would you consider your report or any

12 vocational specialist's report to be thorough and complete if

13 those risk factors were not considered?

14 A   I think if they are identified in the medical record they

15 bear discussion in the report and mentioned and, if they are

16 relevant, then further discussion.

17 Q   Have you ever heard of the research of a Dr. Lawrence

18 Spizman?

19 A   Yes, I have.

20 Q   Dr. Spizman developed a model, didn't he?

21 A   Yes, he did.

22 Q   Could you tell us a little bit about what that model does

23 or is supposed to do?

24 A   Predict vocational educational outcomes.

25 Q   Is Dr. Spizman's model still widely accepted in the field

Kincaid – Direct/Archibald

1    of vocational rehabilitation?

2    A    Not necessarily.  It's –– it's background, it's quoted,

3    it's foundation research; but there is additional research.

4    Q    But it's not discarded either, correct?

5    A    No, it's not.

6    Q    It's still a relevant piece of –– it's a relevant tool in

7    your analysis, correct?

8    A    Oh, yes.

9    Q    Now, using Dr. Spizman's model, initially Dr. Reagles

10   indicated that there was a likelihood of 60 to 70 percent

11   chance of attainment of a master's degree for this child,

12   G.M.M., and a better than 50 percent chance of attainment of a

13   professional degree.

14        Based on your understanding and knowledge of the

15   Spizman model, is that probable?

16   A    No.  In my opinion it's not probable.

17   Q    Then Dr. Reagles changed his testimony and indicated that

18   he is going to step away from Spizman and he is going to use

19   different qualifications.  He is not going to use percentages

20   any more.  He is going to use most probable, most likely,

21   moderately likely, things along that line.

22        Even stepping away from Spizman, Dr. Kincaid, is the

23   attainment of a professional degree for this young man most

24   probable, most likely, moderately likely, or any one of those

25   adjectives?

MICHELE NARDONE, CSR, RPR, CRR –– Official Court Reporter

Kincaid – Direct/Archibald

1    A    No, I would not attribute those adjectives to the child's

2    possibility of attaining that professional degree.

3    Q    Which adjectives would you be more comfortable with

4    attributing to this child's likelihood of attaining a

5    professional degree?

6    A    I would say unlikely.

7    Q    Unlikely.  Okay.

8              Then, for the master's, he says more probable, highly

9    probable.  He used additional adjectives, basically giving it a

10   higher possibility than the professional degree but still very

11   high on his scale of attainability.  Now, I want you to keep in

12   mind what the national average is of attaining a master's

13   degree.

14             You are familiar with those averages, doctor?

15   A    Yes.  Approximately in the 15 to 20 percent range.

16   Q    Right.  Would you consider 15 to 20 percent to be most,

17   moderately, or most probable, or any one of those types of

18   adjectives?

19   A    I wouldn't put it that high.  It's not out of the realm of

20   possibility for this child, but I wouldn't say it's highly

21   probable.

22   Q    Okay.  Now, his mother attained a master's, but his father

23   didn't.  According to your testimony, it's more -- it's usually

24   linked to the father more so than the mother?

25   A    Those are the highest correlations, between father and son.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid - Direct/Archibald

1  Q   Okay.  So in your professional opinion, based upon the

2  studies that you have read and your 35 years in this field,

3  would you say then that it's more likely than not that the

4  level of attainment this child will receive, or attain rather,

5  would be around a bachelor's degree level?

6  A   Yes, I think that would be more probable than not.

7  Q   Okay.  Now, in your field, doctor, you look at something we

8  would refer to as mitigating factors, don't you?

9  A   Yes, I do.

10  Q   Please tell the jury what are mitigating factors.

11  A   That could be, for a person with a disability, it could be

12  education, it could be therapies, surgeries.  Depending on the

13  nature of the disability, it could help them to improve their

14  functioning, their ability to be vocationally involved.

15  Q   Okay.  And that's important in your analysis, isn't it,

16  doctor?

17  A   Yes, it is.

18  Q   And why is that important?

19  A   Well, I'm looking at the long-term probable outcomes for

20  the individual vocationally.  So I'm looking at what their

21  level of functioning is now and what therapies, treatments,

22  even assistive technology can help that individual to improve

23  their ability to function and to perform work, earn money in

24  the labor market.

25  Q   So in coming up with your final opinion, do you include

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid – Direct/Archibald

1  that in terms of some type of a projection as to what the

2  outcome could be of this child?

3  A   Yes, I do.

4  Q   Why is that?

5  A   Well, I'm looking for what the best outcome for the child

6  could be in the future.  So I definitely would include any

7  therapies that could help them function better, improve their

8  level of functioning, ability to benefit from education and

9  eventually to work.

10  Q   Now, in Dr. Reagles' report, did you see him mention

11  anything about mitigation therapies, improvements, or did you

12  see him just accept the kid at whatever level he thinks the kid

13  is and that the kid would stay –– not the kid –– I should say

14  G.M.M. would stay at that level for his entire life.

15       Which one did Dr. Reagles do, Dr. Kincaid?

16  A   My understanding of reading of his report is that he

17  assumed the child would not improve, that he would stay at the

18  level identified in the medical records.

19  Q   Okay.  So then in your view, Dr. Reagles did not include

20  any mitigating factors?

21  A   Not that I could see in his report.

22  Q   Okay.  Now, if I told you that in the medical records it's

23  indicated that the parents didn't take the child to get

24  occupational therapy, would that be of concern to you?  Would

25  that cause you to change your calculus in any way?

MICHELE NARDONE, CSR, RPR, CRR –– Official Court Reporter

Kincaid – Direct/Archibald

1    A    Well, I certainly would have liked to have seen that take

2    place.  The occupational therapy may have helped.  It also

3    would have been another data point in terms of the analysis

4    from the occupational therapy, their testing, their report.  It

5    would give me more insight into the child.  So I would

6    definitely take it into consideration.

7    Q    Okay.  Now, there was some discussion and information

8    regarding the possibility of some form of hearing loss as a

9    result of an infection known as otitis media.

10   A    Yes.

11   Q    If I told you in the records there is no indication that

12   this child was -- hearing was ever tested by an audiologist --

13   you know what an audiologist does, right, Dr. Kincaid?

14   A    Yes.  They are going to test the person's ability for

15   hearing.

16   Q    Okay.  And that the child supposedly has certain language

17   deficits.

18          Now, the fact that they didn't take this child to be

19   formally tested by an audiologist, would that also factor in,

20   in terms of your mitigation analysis?

21   A    Yes.  If there had been problems identified, it would need

22   to be treated, and that may have helped the child's functioning

23   and ability to perform in school later.  So I definitely would

24   have considered that.

25   Q    Also, there is information in the medical records that the

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid - Direct/Archibald

1  doctors recommended or prescribed multivitamins with iron for

2  the treatment of the alleged lead poisoning, and that was the

3  appropriate treatment.  Just assume that's correct for the

4  purposes of my question.

5       Then we have testimony from -- not testimony.  We have

6  records that indicate that they didn't give the child the

7  vitamins, in according to the recommendation; and the parent is

8  quoted assaying, yes, I know, we can do better.

9       Now, the fact that those multivitamins wasn't given as

10  recommended, would that also factor into your analysis of,

11  well, mitigation again?

12  A   It would be a factor in mitigation.  I couldn't speak to

13  the medical part of that, but it would be something I would

14  consider.

15  Q   Now, with the lead poisoning allegation, at some point in

16  time the child was removed from the Brooklyn location, where

17  supposedly the lead poisoning took place, and went to another

18  location in Dallas.  While in Dallas, the doctor out there

19  recommended that they test their environment, their new living

20  quarters, to see if it contained lead; and the reason the

21  doctor made that recommendation was because the child's levels

22  had spiked.

23       Now, would that information be something that you

24  would want to consider also, in regards to mitigation?

25  A   In regards to mitigation, yes, that's true.

Kincaid - Direct/Archibald

1   Q    Also, you are aware that while in Dallas they were given

2   another referral to go to early childhood intervention

3   services.

4        You are aware of that, correct?

5   A    Yes, I am.

6   Q    Could you tell us what that is?

7   A    Early intervention services are offered to children who

8   have developmental delays in one or more areas.  Usually,

9   25 percent or more.  They will institute intervention services

10  that could be speech therapy, occupational therapy,

11  psychological play therapies, to help that child to develop, to

12  reach their milestones, and to mitigate any functional deficits

13  they may have; and it's offered in every state to children who

14  qualify either because of developmental delays or they may have

15  a diagnosis which is associated with developmental delays, like

16  cerebral palsy or Down syndrome, and they are automatically

17  eligible for it.  It occurs between the ages of one and three,

18  or actually from birth to age three, the services are offered

19  to parents.  They are given an individual family service plan

20  to implement those services and manage them.

21  Q    Okay.  You indicated that they need to be at least

22  25 percent of developmental delays which affect functioning,

23  correct?

24  A    That's right.

25  Q    That's a national standard, correct?

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

1203
Kincaid - Direct/Archibald

1  A    Yes, for the most part.  It's definitely in Dallas, in

2  Texas, where they were living that is the standard.

3  Q    How did you ascertain that level for Texas, Dr. Kincaid?

4  A    Well, I researched what the qualifications were in Texas,

5  what their department of rehabilitation and assistive services

6  designate as the appropriate levels.

7  Q    Okay.  And in the event you are not qualified or you are

8  not accepted, does that by and large, based upon your

9  experience in this field for 35 years, does that by and large

10 indicate that you don't meet the 25 percent threshold?

11 A    That's correct.  So in all the various areas, cognition,

12 speech, behavioral, you are meeting -- you may be slightly

13 delayed in your developmental milestones but you don't meet the

14 criteria for early intervention services.

15 Q    And in this particular case, when you review the records,

16 did you see any indication or notation anywhere in the file

17 that indicated that he was recommended -- "he" being G.M.M. --

18 for these services but he wasn't accepted in the Dallas

19 program?

20 A    My understanding is that he was evaluated but not accepted.

21 Q    And what did that tell you as a professional in this field?

22 A    Well, that his developmental delays were not as high as the

23 25th percentile level.  So that they didn't meet the criteria,

24 not -- wouldn't be considered severe.

25 Q    Did you also have an opportunity to review the testing

Kincaid - Direct/Archibald

1    scores and testing results of this young man?

2    A    Yes, I did.

3    Q    And did you see those scores in the reports of a

4    Dr. Gordon?

5    A    Yes, Dr. Robert Gordon.

6    Q    Yes.  Are you familiar with Dr. Gordon?

7    A    I believe I have seen some of his other reports, but I

8    don't have -- haven't met him personally.

9    Q    And what's the worker trait profile?

10   A    The worker trait profile is based on the department of

11   labor's designation of jobs.  They are defined in terms of the

12   cognitive abilities that are required, physical, various

13   aptitudes that are required to perform jobs; and you can match

14   a worker with the trait factors that are required in jobs.  So

15   if you know what level a person is functioning at, you can

16   compare him to the demands of jobs, to determine what types of

17   jobs they might be suitable for or capable of performing.

18   Q    At the age of two and a half to three, would you be able to

19   make any prediction with any degree of vocational

20   rehabilitation certainty that a two to three year old will or

21   will not be able to do any particular type of job?

22   A    Well, what we do is we use a substitute.  We look at

23   average workers and we look at the parental occupational

24   profile to match those against the demands of jobs and then

25   make adjustments for any limitations that are identified in the

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid - Direct/Archibald

1  medical records.

2          So it's a projection based on those two factors, but

3  you would not be able to -- that particular child, they are

4  not -- they haven't been to school yet, they haven't shown

5  their full capability.  So it would be impossible for that

6  child, but you can use substitutes to arrive at a reasonable

7  projection.

8  Q   But again, those projections would be somewhat speculative

9  in light of the fact the child hasn't been in school yet,

10  hasn't been properly evaluated yet, hasn't performed on any

11  academic type tests yet, wouldn't you agree with that?

12  A   That's right.  You would like, to be more accurate you

13  would want to see how the child has been performing in school,

14  what -- their beginning evaluations for speech therapy,

15  occupational therapy, what those professionals are identifying

16  as their strengths, how they are progressing.  Also, testing

17  under the No Child Left Behind Act, would start at third grade

18  through eighth grade.  So you would have a much better

19  understanding of where that child is progressing and what their

20  level of abilities are.

21  Q   So at this stage, at two and a half, three, or even four,

22  it would be similar to a weatherman's type of prediction?

23          MR. FRANKEL:  Objection.

24          THE COURT:  Do you object?  Are you objecting?

25          MR. FRANKEL:  Yes, judge.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid – Direct/Archibald

1        THE COURT:  Sustained.

2    Q   Now, when Dr. Reagles was on the stand and he made his

3    conclusions in terms of his projections, I asked him whether or

4    not there was any degree of certainty to which he could predict

5    or project; and he says, no, however; and then I went on to ask

6    him whether or not his projections then are similar to that of

7    a meteorologist, and at the end of the day he had to say yes

8    and he did say yes.

9        MR. FRANKEL:  Objection.  That's not the testimony.

10        THE COURT:  Well, you may, if that's part of the

11    record, the jury will recollect it.  You may inquire.

12    Q   So then my question to you then, Dr. Kincaid, is:  In

13    regards to attempting to predict for this young man, who at the

14    time was between two and a half and three and a half, wasn't in

15    school yet, hasn't had any real academic testing to determine

16    his true level of functioning, so to predict or project at the

17    age of two and a half or three and a half, would you agree then

18    that that was similar in nature to a meteorologist making a

19    projection?

20        THE COURT:  Are you objecting to that?

21        MR. FRANKEL:  Yes, judge.

22        THE COURT:  Sustained.

23    Q   How would you characterize, Dr. Kincaid, the projection

24    that's made for a two-and-a-half year old to a three-and-a-half

25    year old as opposed to an individual or even a youngster that

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

1207

Kincaid - Direct/Archibald

1    maybe is in third or fourth or fifth grade, where you have had

2    an opportunity to test and review how they are performing

3    academically, how would you characterize that?

4    A    Very speculative.  We really need more data points.  We

5    need to see what the impact of therapy is going to be, how they

6    do perform educationally, what their teachers are saying, how

7    they are scoring on national standardized tests.  So we really

8    need a lot more information, otherwise it's speculative at this

9    point.

10   Q    What's involved in your analysis of the transferable skills

11   of an individual?

12   A    Well, where there is a child who hasn't had any work

13   experience, I look at two -- I do two analyses.  One, I take an

14   average worker, who is average across all traits, their

15   cognitive abilities, physical, and all of their aptitudes, and

16   I compare that person, that hypothetical person, to the demands

17   of jobs in the labor market to see how many jobs they might be,

18   you know, have transferable skills for.

19        Then I take a look at the parents, what jobs have they

20   done in the past, and I compare the traits, abilities necessary

21   to perform those jobs against the demands in the labor market.

22   Then I would see how many jobs would match their background,

23   their experience, their abilities in the labor market.

24        So that gives me a sense of here is the average worker

25   but here are the parents and based on their experience what

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

1208

Kincaid – Direct/Archibald

1    kinds of jobs, what types of jobs would match.

2    Q    And did you find matches as it relates to this case?

3    A    Yes, I did, for both scenarios.

4    Q    So you found matches where the child G.M.M. would work in

5    the field of his parents, correct?

6    A    Yes, that's right.

7    Q    And you found matches where G.M.M. would just perform as

8    any other U.S. citizen in the workforce?

9    A    With average abilities.

10   Q    With average abilities?

11   A    Yes.

12   Q    Now, Dr. Reagles opined that at best G.M.M. would only

13   attain special ed high school diploma or GED.

14         Did you see that in his report?

15   A    Yes, I did.

16   Q    Are you in agreement with that?

17   A    No, I'm not.  I think it's, again, speculative, premature

18   because we don't know what the impact of therapies are going to

19   be, how he is going to perform in school with special -- if he

20   has enrichment tutors, special accommodations.  So we really

21   don't know at this point.

22         I think that's very speculative and unlikely.  The

23   deficits identified could be remediated with therapies.

24   Q    Additionally, Dr. Reagles opined on G.M.M.'s work life

25   expectancy.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid - Direct/Archibald

1    Did you read that part of his report?

2    A    Yes, I did.

3    Q    Could you tell the jury what your understanding of work

4    life expectancy is?

5    A    Yes.  It's the probability that an individual is going to

6    be involved in the labor market, alive and involved in the

7    labor market; and that varies by age that the person enters the

8    labor market, the age they are now, their educational

9    background.  The higher your educational background the more

10   likely you are to stay engaged in the labor market, to work

11   more years.  The lower your educational background, of course

12   it would be considerably lower for someone less than a high

13   school education.

14   Q    So he concluded that G.M.M. will have a truncated or a

15   reduced work life expectancy because of this special ed diploma

16   that he is going to get, correct?

17   A    Yes.

18   Q    Do you agree with that?

19   A    Well, if that was actually the case, he would be right, but

20   I don't agree with him that that would necessarily be the

21   outcome for G.M.M.  Again, we haven't seen the impact of

22   therapies, of enriched education.  He could overcome some of

23   those early deficits.

24        So I don't agree with assigning just a special

25   education degree.  It is premature.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid - Direct/Archibald

1    Q    There are studies -- correct me if I'm wrong,

2    Dr. Kincaid -- that strongly support your position that with

3    enrichment and with further educational opportunities that he

4    will improve, if he is in fact at the level that he appears to

5    be at right now, correct?

6    A    Yes.  Therapies are very effective in terms of improving

7    ability with expressive speech and attention concentration,

8    working memory, the areas that were identified as low for him.

9    Therapies and educational enrichment could help him in those

10   areas.

11   Q    Did you see in the records, Dr. Kincaid, that when he did

12   receive a small amount of speech therapy that he did improve in

13   that area?  Did you see that in the records as well?

14   A    I don't believe I had that record.

15   Q    Okay.  But if you did have that record --

16            MR. FRANKEL:  Objection.

17            THE COURT:  I haven't heard the question.

18            MR. FRANKEL:  Sorry.

19   Q    If you did have such a record, would that then be in

20   accordance with your position that enrichment improves the

21   individual's functional level?

22   A    Yes, absolutely.

23            MR. FRANKEL:  Objection.

24            THE COURT:  Overruled.  You may answer.

25            THE WITNESS:  Oh, I'm sorry, your Honor.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid – Direct/Archibald

1   A   (Continuing) Yes, it would buttress my opinion that that in

2   fact therapies do have a positive impact.

3   Q   You did an analysis of future opportunities and earning

4   capacities, correct?

5   A   Yes.

6   Q   Could you tell us what that is?

7   A   Well, I look at an individual's ability in the future to

8   earn, and that's based on educational attainment.  A person not

9   only will be in the workforce longer, but they will earn higher

10  salaries, wages, depending on their educational background.  So

11  depending on what would be reasonably predicted for the

12  individual, you can find correlating -- corollary wage rates,

13  salaries for those educational degrees.

14  Q   So and you did do that analysis for G.M.M. as well?

15  A   Yes, I did.  I looked at for the future for him,

16  considering that he is likely to benefit from therapies and

17  enriched education, that bachelor's degree is not out of the

18  realm of possibilities for him.  It would be probable with

19  improvement in those areas.

20  Q   So to conclude, doctor, you opined that as a result of all

21  of the analyses that you did in looking at this record of this

22  young man, G.M.M., that he can attain a bachelor's degree,

23  correct?

24  A   It would be likely -- if he obtains the appropriate

25  therapies and educational enrichment, it would be a probability

Kincaid - Direct/Archibald

1    for him, with improvement in those areas where he now has

2    deficits, which would be more likely with treatment and

3    enriched education.

4    Q    You also opined that his ability to attain a professional

5    degree is highly probable, correct?

6    A    I like highly unprobable.

7    Q    Right.  Highly improbable.

8    A    Improbable.

9    Q    Highly improbable.  It's more likely than not that it's not

10   going to happen?

11   A    That's correct.

12   Q    And that was predicated upon the fact that less than

13   two percent of the general population have those degrees in the

14   first place, correct?

15   A    That's right.

16   Q    And the fact that no one in his extensive family tree has

17   any professional training either?

18   A    That's right.  The combination of the two would make it

19   very unlikely.

20        MR. ARCHIBALD:  Thank you, Dr. Kincaid.  I have

21   nothing further on direct.

22        THE COURT:  Thank you.  Cross-examination, please.

23        MR. FRANKEL:  Thank you, judge.

24

25

Kincaid - Cross/Frankel

1    CROSS-EXAMINATION

2    BY MR. FRANKEL:

3    Q    Good morning, Dr. Kincaid.

4    A    Good morning.

5    Q    My name is Steven Frankel, and Stephen Cantor and I

6    together, we are representing the plaintiffs in this case, the

7    mother as well as the child.

8    A    I see.

9    Q    Doctor, do you have your file with you?

10   A    Yes, I do.

11   Q    Could you take out the page that shows information

12   requested.  I think it's the cover page, but it might be in a

13   different place in your file.

14   A    I don't see it in my file.  Usually it's in the front, but

15   I didn't see it.

16   Q    Okay.  But you do have such a cover page.  You sent it to

17   Mr. Archibald.

18   A    I do have, yes.  I do have a page as listed I would send to

19   an attorney who is retaining me.

20   Q    So if we could go through the items, please, one at a time.

21   The first is hospital medical records, admission sheet.

22         Did you get such a document?

23   A    No.

24   Q    Discharge summary, did you get that document?

25   A    No.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid – Cross/Frankel

1    Q   Operative reports, did you get operative reports?

2    A   No.  There were none in this case.

3    Q   Well, relating to the mother.

4    A   Oh, oh, I see.

5    Q   An issue that Mr. Archibald continues to raise.

6            You didn't get anything regarding her surgery?

7    A   No, not -- no.

8    Q   You do request it, however?

9    A   If it's pertinent I do put it in my list of documents.  So

10   if it's pertinent I ask the attorney to send it to me.

11   Q   Physician's narrative, you didn't get that?

12   A   Well, I did get notes and I did get reports.

13   Q   From the pediatricians, correct?

14   A   Yes, the pediatricians.

15   Q   Not anything to do with her surgery?

16   A   No.

17   Q   Diagnostic tests, like MRIs, CAT scans, not relevant,

18   didn't get those?

19   A   No, not relevant.

20   Q   Functional capacity evaluations?

21   A   Not relevant in a child.

22   Q   Now, employment records.  He is an infant, so I take it

23   that's the parents.

24   A   Yes, or employment history.

25   Q   Okay.  So earnings records, did you get those for the

1215

Kincaid – Cross/Frankel

1    mother and father?

2    A    No.

3    Q    Tax returns and W-2s, mother and father?

4    A    No.

5    Q    Social Security Administration earnings statement, mother

6    and father?

7    A    No.

8    Q    No means not either?

9    A    That's correct, neither.

10   Q    Job descriptions?

11   A    No, other than what they described in their deposition.

12   Q    Performance evaluations, meaning at their jobs?

13   A    Yes.

14   Q    You got those?

15   A    No.  I might add that listing encompasses child cases plus

16   adult cases so some of those items would be more related to

17   adults than children.  It's kind of a broad list.  So it's only

18   what applies to the case.

19   Q    Education records, like transcripts?

20   A    In this case the child hasn't been in school yet, so it

21   wouldn't be applicable.

22   Q    But, doctor, you are commenting quite often about the

23   parents' careers, the parents' degree of education that impacts

24   on the child.

25          Wouldn't it benefit you to know how well the parents

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid - Cross/Frankel

1  did in school, in graduating with a bachelor's and the mother

2  with a master's?

3  A   I certainly would have considered it if it had been given

4  to me.

5  Q   You would have considered it though?

6  A   Oh, yes.

7  Q   So that's not something that factored into any of your

8  projections?

9  A   No.  I just looked at the fact that they had attained those

10  degrees.

11  Q   And other expert reports, which ones did you actually have

12  copies of?

13  A   Dr. Reagles' report and Dr. Tinari, so both economics

14  reports, and of course medical records.

15  Q   Do you know who Dr. Auciello is?

16  A   No, I don't.

17  Q   Have you heard his name?

18  A   I don't recall that name.  I can look at my --

19  Q   Please, by all means.

20  A   See if that was.  No, I have no records from that doctor.

21  Q   If I tell you that Dr. Auciello is the defendant's

22  neuropsychologist who tested this child, issued a report, and

23  testified before this jury about various aspects of his

24  findings with regard to the child, the deficits, things of that

25  nature, now, taking that as a given, would it not have helped

1217

Kincaid – Cross/Frankel

1  you in forming your conclusions and opinions to have heard from

2  their neuropsychologist, who tested the child, spoke at length

3  about the child's behavioral issues, complicated problems, the

4  child's future, would that not have been important for you to

5  have, Dr. Kincaid?

6  A   I certainly would have considered it, if it had been

7  provided to me.

8  Q   But Mr. Archibald never even mentioned the name of this

9  man, did he?

10  A   Not that I recollect.

11          MR. ARCHIBALD:  Objection, your Honor.

12          THE COURT:  You may ask answer.

13  Q   What experience, doctor, you said you do special ed, was it

14  teacher?  I'm not sure exactly.

15  A   I was adjunct professor teaching master's level special

16  education teachers about how assistive technology helps

17  individuals to learn.

18  Q   Did part of that teaching and training cover children who

19  had lead poisoning?

20  A   It covers children who have various deficits, learning

21  deficits.  So they may have that.  That may be the

22  precipitating cause, but there are learning deficits you

23  ameliorate with technology.

24  Q   Now, in terms of deficits in general, there are some

25  deficits that are not permanent, correct?

Kincaid - Cross/Frankel

1   A    That's true.  That can be improved over time, physical or

2   cognitive.

3   Q    I'm sorry.

4   A    Physical or cognitive, yes.

5   Q    They can be improved.  Some can be improved over time, and

6   some that are not physiological, so to speak, can be more

7   likely improved over time?

8   A    Could you be more specific?  I'm not sure.

9   Q    How about -- what's your background in understanding

10  children who have suffered lead poisoning?

11  A    I understand that there are cognitive neurological

12  consequences to it.

13  Q    Are you aware that brain damage is a result of lead

14  poisoning, especially with newborns, infants, and toddlers?

15  A    Yes, I'm aware of that.

16  Q    Are you not also aware that it's permanent?

17  A    I would leave that to a medical diagnosis.  It depends on

18  the level, severity, and length of time.  So, you know, I think

19  that would be a medical decision.

20  Q    Thank you.  So two doctors -- well, Dr. Auciello,

21  neuropsychologist, and a Dr. Klein, who is a pediatrician, both

22  testified here in this court and both of them said it's

23  permanent, not reversible, and the child will have that for the

24  rest of their life.

25       You didn't consider that in any of your computations,

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid - Cross/Frankel

1   did you?

2   A   Well, I did consider the functional limitations that were

3   identify for the child, so.

4   Q   But isn't it true, doctor, the functional limitations

5   change sometimes, as you just said.

6       If a child has behavioral issues they may outgrow

7   certain other things, but permanent brain damage is different?

8   A   That's different, but they can still benefit from therapies

9   to help them utilize, improve the other parts of their brain

10  that aren't damaged.  So therapies can help it greatly.

11  Q   That in and of itself, as you say, is a maybe; hopefully

12  they will benefit, but you don't know?

13  A   Without having had the child go through the therapies and

14  to determine to be evaluated by therapeutic specialists, it

15  remains to be seen, but it is -- could be definitely a

16  possibility for the child.  Therapies do help.

17  Q   Now, you didn't read -- did you read Dr. Gordon's report,

18  the neuropsychologist report for the plaintiff?

19  A   Yes, I did.

20  Q   That you did.  Did you see where Dr. Gordon spoke about the

21  behavioral issues that are a great concern for the child's

22  future learning ability.  Being in a classroom he didn't sit

23  still, he is aggressive, he has violent outbursts, he hits

24  other children, bites other children.  That's not only from

25  Dr. Gordon, it's also from Dr. Auciello.  Both of them talked

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid — Cross/Frankel

1   about that, and it's documented.

2          Now, it's coming from records in the school as well as

3   from the mother.  Now, did you factor that into the

4   consideration of how well this child is going to do likely in a

5   regular school in the future?

6   A   Yes.  I also noted that Dr. Gordon recommended play therapy

7   for G.M.M., to assist with coping behaviors, and that in the

8   records it also indicated that with a structured environment he

9   performed better in preschool.  So I did look at that as that

10  he could probably benefit from therapies, that it was a problem

11  for him, but he hasn't had the therapies yet.

12  Q   Can we go back to the question, please?

13  A   Sure.

14  Q   Those issues, he may benefit from therapies, but if he

15  doesn't improve his behavior and cannot sit in a classroom and

16  never be a regular student in a regular school, would that

17  impact upon your testimony and your conclusions?

18  A   Assuming that was correct, yes, it would, if that was

19  actually true.  Then it would.

20  Q   But you didn't know Dr. Auciello, their neuropsychologist,

21  spoke about that and the concerns he has?

22  A   I was not aware of his testimony so I can't really comment

23  on it.

24  Q   Or his conclusions?

25  A   That's correct.

MICHELE NARDONE, CSR, RPR, CRR —— Official Court Reporter

Kincaid – Cross/Frankel

1   Q   So when you said, doctor, I believe -- and, please, I don't

2   want to put words in your mouth -- you said in substance you

3   think there is a potential for this child to get a master's

4   degree but certainly to graduate with a bachelor's degree, you

5   said something like that?

6   A   A bachelor's degree, I said there was a potential for him,

7   with the proper therapies and improvement in education, with

8   educational enrichment, to overcome his deficits.

9   Q   And when Dr. Auciello disagrees and thinks that perhaps a

10  special type of training or schooling might be possible but not

11  a regular BA in a college, very unlikely, you don't agree with

12  that?

13  A   Well, I'm not aware of his opinion, but in my experience

14  those therapies and educational enrichment do help children

15  with the types of deficits that he has, to improve their

16  ability to benefit from education and to progress farther in

17  the educational system.

18  Q   So although you are not a neuropsychologist, are you

19  discounting what both Dr. Gordon and Dr. Auciello both found

20  after examining and testing this child?  You are discounting

21  their opinions or disagreeing with their opinions?

22  A   Well, I did take into account Dr. Gordon's opinion when I

23  wrote my report and his recommendations for speech therapy and

24  play therapy to improve his functioning, his behavior.  So,

25  yeah, I definitely took those opinions.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid – Cross/Frankel

1    I'm not aware of Dr. Auciello or what he testified to.

2  Q   There is no question everyone is recommending every kind of

3  therapy for this child, occupational, speech; and hopefully he

4  will be able to get all of those things.

5    But with these other behavioral issues, you have no

6  idea what the neuropsychologist testified to as to the impact

7  that might have on his ability to go to a school and to learn?

8  A   It would.  A child that would have those types, if he was

9  still exhibiting those, we don't know what therapy would do to

10  alleviate some of those at this point, but he would probably

11  need some -- he would need special assistance in school to

12  participate.

13  Q   How about things like short attention span, acting out,

14  angry outbursts, if those things continue, and speech therapy

15  and intervention won't necessarily impact on those things; is

16  that correct?

17  A   Not necessarily behavioral issues, but the child would be

18  eligible for a paraprofessional, who would be with him through

19  the day to try to circumvent those outbursts and to redirect

20  him, for their attention so they can participate in school.  So

21  if those were actually still occurring, he would be a candidate

22  for that special assistances.

23  Q   So let's talk about that.  The mother testified that the

24  school he was in he liked.  It's like a pre-K.  He enjoyed

25  going there, and she felt he was benefiting; but they told

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid – Cross/Frankel

1    them, the family, that he has to have a shadow, a

2    paraprofessional, as you mention, if he is going to continue in

3    the school.

4          But where they are in Dallas, the family would have to

5    pay for the paraprofessional through the school system; and

6    they have no insurance for it.  The insurance company doesn't

7    cover it, and they don't have the money to pay for that.  So he

8    can't go to a school already that could benefit him because

9    they are not equipped to pay for it or cover it.

10         Does that change anything which you just testified

11   about?

12   A    Yeah.  I don't know what process they have gone through,

13   but I do know the special education system, that they could

14   apply for special education services for their child.  I don't

15   know if they have actually gone through that process, but

16   that's across the United States.  Those services are available

17   to children with developmental delays or behavioral problems.

18         So I'm surprised that they don't have it because they

19   would be eligible for it.

20   Q    So you know for sure that they could get all of this stuff?

21   A    I know they would be eligible.  I don't know what process

22   they have gone through because I haven't seen that --

23   Q    It's a state-by-state issue?

24         THE COURT:  Excuse me.  Let him finish.

25   Q    They can do whatever they want to do.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid – Cross/Frankel

1    THE COURT:  Excuse me.  Let him finish his answer.

2    Do you have something you want to add?

3    A   Each state has their criteria, but children with these

4    types of deficits are eligible for special education services.

5    Q   But you also testified that he didn't meet the level to get

6    that kind of assistance, and you researched it, correct?

7    A   We were talking about early intervention, which is

8    developmental delays at the 25th percentile level.

9        If he is having behavioral problems, he would be

10   eligible for special education services.

11   Q   But you didn't examine whether or not he definitely would

12   be eligible, qualified, and he could have all of these things

13   done?

14   A   I think he needs more evaluations from specialists in the

15   school system to arrive at that decision; and, as I said, there

16   are not enough data points to really predict that, his outcome.

17   Q   Now, doctor, you are aware of the Centers for Disease

18   Control?

19   A   Yes.

20   Q   Is there any question about their importance and

21   qualification in studying things like toxins and poisons that

22   may impact on children?

23   A   No.  They are a national authority.

24   Q   And they have spoken and tested -- I'm sorry.  Withdrawn.

25       They have studied and spoken and filed reports about

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid — Cross/Frankel

1    the impact of lead at the earliest stages with a child?

2    A    That's correct.

3    Q    Are you aware that the Centers for Disease Control has

4    found in surveys —— and it's Dr. Needleman.

5         Have you ever heard that name, Dr. Needleman?

6    A    Yes, I have.

7    Q    He is well respected, is he not?

8    A    He is published, yes, he is an expert in this area.

9    Q    And both neuropsychologists acknowledge he is one of the

10   preeminent people in the field?

11   A    That's correct.

12   Q    And when I asked both of them, either one, first one and

13   then the other, first Dr. Gordon and then Dr. Auciello, were

14   they aware of Dr. Needleman's findings that children who were

15   exposed to toxic lead paint byproducts at the earliest ages

16   tend to go through life later on and be aggressive and vital.

17        Are you aware of that?

18   A    Yes.

19   Q    And those children, when they get older, very often are

20   involved in criminal behavior.

21        Are you aware of that?

22   A    Yes, and it varies by level of exposure.  I understand that

23   as well.

24   Q    Now, if I just —— excuse me.  Now, you were giving us

25   numbers, percentages, where general population for this and

MICHELE NARDONE, CSR, RPR, CRR —— Official Court Reporter

Kincaid - Cross/Frankel

1    that.

2            When you talk about the general population for

3    children who end up completing a bachelor's degree what's that

4    number, percentage?

5    A    It's above 50 percent.

6    Q    Fifteen?

7    A    No, 50 percent.

8    Q    Five, zero?

9    A    Yes.

10   Q    Okay.  Does that increase where the parents both have

11   bachelor's degrees and the mother has a master's degree as

12   well?

13   A    Yes.  More likely to see the children be attaining

14   bachelor's level degrees.

15   Q    So what percentage might that be?

16   A    I don't recall the exact for that group, but it increases.

17   The more education in your family background, the more likely

18   you will also have similar education.

19   Q    Dr. Reagles testified about the parents' educational level

20   and that the child and children growing up with parents who are

21   educated and have achieved bachelor's and master's degrees

22   generally go as far, if not farther, than the parents.  They

23   are not often limited by the parents' education.

24           Do you agree with that?

25   A    They wouldn't necessarily be limited, but it's not

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Kincaid – Cross/Frankel

1   necessarily probable also that they will exceed.

2   Q   Now, what other risk factors did you ascertain for G.M.M.?

3   A   Could you be more specific about risk factors?

4   Q   With what he is suffering from now, with the injury he

5   suffered, and the resulting issues that he faces going forward.

6   A   In the neuropsychological testing, there were deficits

7   identified for working memory, for, if I recall, he also had

8   problems with attention, and concentration and expressive

9   language were the areas that were the most problematic as well

10  as the behavioral problems.  So those were the four areas that

11  were of concern to Dr. Gordon, and he recommended that therapy

12  be instituted.

13  Q   Now, doctor, what was the fee you charged for preparing

14  your report for Mr. Archibald?

15  A   $3,900.

16  Q   And to testify today?

17  A   $3,500.

18  Q   So, doctor, if a forensic economist testified here the

19  other day that despite the parents' bachelor's degrees and the

20  mother's master's, that it was only 35 percent likely that the

21  child would attain a bachelor's degree, do you agree with that?

22  A   Well, I don't know what they are referring to with studies.

23  I wouldn't disagree, but I would like to know what they are

24  referring to, what they are, what they base their opinion on.

25          MR. FRANKEL:  One second.

MICHELE NARDONE, CSR, RPR, CRR –- Official Court Reporter

Kincaid – Cross/Frankel

1        (Pause.)

2   Q   Doctor, Mr. Archibald asked you about things like hearing

3   problems, otitis media; and clearly everyone agrees that if

4   some child has hearing problems that will impact on speech,

5   learning and other things.

6   A   Yes, that's correct.

7   Q   And those are things you considered when you were writing

8   your report?

9   A   I did note them.  So I did look at the medical records, and

10  it was identified as a problem.

11  Q   Before you testified today did Mr. Archibald tell you that

12  the child's pediatrician, Dr. Frank, testified here in this

13  court and she addressed that and told the jury that the hearing

14  was just a one-time thing.  It was resolved.  The child never

15  had a problem hearing after that; and so no clinician, no

16  pediatrician here or in Dallas, ever once indicated in a record

17  that this child has any issues with hearing but Mr. Archibald

18  didn't tell you that did he?

19  A   I was not aware of that.

20        MR. FRANKEL:  Okay.  Thank you.  I have nothing

21  further.

22        THE COURT:  Redirect?

23        MR. ARCHIBALD:  May I from here?

24        THE COURT:  Yes, you may.

25

MICHELE NARDONE, CSR, RPR, CRR –– Official Court Reporter

Kincaid – Redirect/Archibald

1    REDIRECT EXAMINATION

2    BY MR. ARCHIBALD:

3    Q   Dr. Kincaid, earlier Mr. Frankel asked you about

4    transcripts and the grades that the parents may have attained.

5            How relevant is that in your calculus of any

6    vocational expert's calculus as to the attainment level of a

7    child?

8    A   It's not that relevant.  If it was available, I would look

9    at it, but the most important factors are they did attain a

10   bachelor's degree or master's, the level of educational

11   attainment would be important.

12   Q   When you are looking or any vocational expert is looking,

13   they are looking across professions and degrees, right, not

14   whether the person graduated with a 2.0 or a 3.0.  That's not

15   what you are looking at, correct?

16   A   I'm looking at level of attainment is the most important

17   factor.

18   Q   Right, that is it.  So the fact that you didn't look at the

19   grades, how material is that in coming up your opinion?

20   A   It did not -- it would not impact my opinion.

21   Q   So it's immaterial?

22   A   That's correct.

23   Q   Okay.  Now, counsel asked you about retention fees, what

24   you were paid.

25           In your industry, when an expert like yourself

Kincaid - Redirect/Archibald

1   testifies, you are always paid for your time away from your

2   practice to come to court and testify, correct?

3   A    That's correct.

4   Q    It's standard in the industry, correct?

5   A    Yes.

6   Q    Okay.  So, for example, Dr. Reagles appeared and testified.

7        Would it be fair to assume that Dr. Reagles was also

8   paid to testify?

9   A    I would imagine so, yes.

10  Q    And to prepare his report as well?

11  A    Yes.

12       MR. ARCHIBALD:  Thank you.

13       THE COURT:  You may step down.  Thank you, doctor.

14       THE WITNESS:  Thank you.

15       THE COURT:  Do you have another witness?

16       MR. ARCHIBALD:  No, your Honor, I rest.

17       THE COURT:  Is there any rebuttal?

18       MR. FRANKEL:  Nothing further, judge.

19       THE COURT:  Both sides rest.  Why don't you give us

20  about 15 minutes, ladies and gentlemen.  Do not discuss the

21  case, please.

22       (Jury exits.)

23       THE COURT:  Does the defendant wish or plaintiff wish

24  to make any motions?

25       MR. ARCHIBALD:  Defense will have a few.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

1231

G.M.M. v. Kimpson

1    THE COURT:  All right.  I will be happy to hear you.

2    MR. ARCHIBALD:  Your Honor, I renew my motion from

3    yesterday, in regards to those two witnesses that testified,

4    who in my view are incompetent to have so done.  It is my hope

5    that the court had an opportunity to recalibrate its position

6    and would rule in favor of the defense because it's highly

7    prejudicial to permit those testimonies that went in to go to

8    the jury.

9    I move that those two witnesses, Mr. Eweke and

10   Ms. Kogan, that their testimonies be stricken, your Honor.

11   THE COURT:  Denied.  I have read your brief, which is

12   very good, and I am aware of the Supreme Court and lower court

13   decisions supporting your view.

14   My opinion, given the seriousness of the case and the

15   policies and the various rules, and the obligations of a

16   district judge, having now determined that the testimony

17   indicated substantial reliability in the tests, it would be a

18   miscarriage of justice to exclude them, because without their

19   introduction it's doubtful that a verdict would stand.  So I

20   believe that I have satisfied the rules and the policy in

21   allowing them in under hearsay and relevancy and general

22   policy.

23   But it's an interesting point and you can take it up,

24   as I believe you will.

25   MR. ARCHIBALD:  Indeed, your Honor.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

G.M.M. v. Kimpson

1     My second motion is in regards to the jury charges,

2  your Honor.

3          THE COURT:  Yes?

4          MR. ARCHIBALD:  I did brief it as well.  You should

5  have the brief on ECF.

6          Your Honor, the inclusion of compensatory damage in

7  this case is unfounded.  It's not supported in fact or in law.

8  For example, your Honor, you indicated that under Rule 15 you

9  have the authority as the district judge to make the

10  appropriate amendment to their pleading.  Correct, your Honor?

11  And they didn't plead it, and that's a fact.  So we can move

12  away from that.

13          Now, in looking at whether or not punitive damages

14  should be awarded in a case, the authority is clear.  You need

15  to look to the testimony to see whether or not there is

16  exemplary malicious, wanton behavior or conduct on the part of

17  the defendant.  Let's look at the witnesses who testified.

18          Mrs. Hernandez.  Okay.  Mr. Kimpson was a very nice

19  landlord.  He was responsive.  She testified that the place was

20  in pristine condition, save and except some of the painted

21  molding.  She claims they were chipped, some of them.  When

22  asked did you tell my client, did you complain about it?  Her

23  testimony was no, she did not.  Yet anything she complained to

24  him about, boom, he was there.  He took care of it.  So then

25  how can you say what Mr. Kimpson did was wanton, malicious,

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

G.M.M. v. Kimpson

1    reckless, and the like.

2            Let's talk about the renovations.  Counsel threw in

3    all the red herrings he could find.  No pay stub.  No tax

4    return, no of this, all of which is immaterial, your Honor.

5    They are immaterial.  What's material here is the quality of

6    the work he did.  We had a professional engineer, Mr. Flynn.

7    Mr. Flynn said the walls are perfect, the floor is perfect,

8    it's done in accordance with building industry standards.

9            Then there was an issue.  Okay.  Let's see the issue.

10   We have an issue here that deals with whether or not the

11   condition of the property in 2015 was similar to the condition

12   of the property in 2012 or 2011.  Their witnesses helped prove

13   that for us, your Honor.

14           THE COURT:  Say that again.

15           MR. ARCHIBALD:  Their witnesses helped prove that the

16   place was in pristine condition.  Mr. Eweke, less than

17   credible, less than credible in all his iterations of the

18   story, whether they can read through the Sheetrock, whether

19   they can't.  He was incredible in his testimony, but he did say

20   the following, because he had to, your Honor.  The condition of

21   the property, all the paint, fair.  Then he wanted to obfuscate

22   and say fair could be poor, it's subjective.  Nonsense.  Fair

23   means it was in good continue condition and there was nothing

24   wrong with it.

25           Then he read the comment section.  Every single room

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

G.M.M. v. Kimpson

1  in the comment section was intact, good contact, intact, good

2  condition.

3       Then when asked, okay, the 23 violations that you

4  found, where were they?  They were primarily, if not

5  exclusively, on the moldings; and we know what happened to the

6  moldings, don't we?  They were scratched by that ill-tempered

7  beagle, by that beagle that suffered from a neurological

8  deficit, if you will.  She testified that the dog scratched up

9  the door and scratched it up so bad they had to come in and put

10  up Plexiglas.  Her testimony.  Then she said, you know what, he

11  only scratched that one door.  How plausible is that, your

12  Honor?

13       Then we had the testimony again of Mr. Flynn and

14  Mr. Kimpson showing, yeah, look at the pet marks all over the

15  place.  There were several doors, doors jambs, window jambs,

16  moldings and the like that was violently scratched away, and

17  guess what your Honor, we must say, like I said, the areas that

18  we checked, that the paint wasn't -- that the paint may have

19  been disturbed or peeling on, was in the wooden areas,

20  corroborating the story, your Honor.  It corroborates what

21  Mr. Kimpson said, it corroborates what Mr. Flynn testified to,

22  the condition he saw the place in, it also corroborates the

23  story of their own witness, their star witness,

24  Ms. Hernandez-Adams.  She said the place was in beautiful,

25  pristine condition.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

G.M.M. v. Kimpson

1    We asked the realtor, discuss for us the condition of

2    that place.  Beautiful.  You saw the pictures, too, your Honor.

3    The place was beautiful.  Mr. Kimpson did a meticulous job in

4    restoring that place.  Everybody spoke of the beauty of the

5    woodwork.  That's the charm of a brownstone, and that's what

6    was done here.

7        So show me, show me where there is any indication that

8    my client did anything that was reckless, that was malicious,

9    that was wanton, or anything; and that's the standard for

10   punitive damages.  We don't have it in this case, your Honor.

11       So although you have a right under rule 15 to make the

12   amendments sua sponte, you can't do so without the requisite

13   factual basis for so doing, and for that reason I say this has

14   to be stricken, your Honor.

15       THE COURT:  Well, you make an interesting argument.  I

16   want to say first, that in making the decision I am not going

17   to rely on the renting by the defendant of these premises after

18   charges of lead dust had been made and apparently without

19   further repairs --

20       MR. ARCHIBALD:  Your Honor, that's incorrect, your

21   Honor.

22       THE COURT:  May I finish?

23       MR. ARCHIBALD:  Yes, you may.

24       THE COURT:  -- to another woman, who was pregnant and

25   delivered apparently in or at least took the infant to the

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

G.M.M. v. Kimpson

1   premises.  As I read the testimony, the jury could conclude

2   that no further changes were made after the defendant -- the

3   plaintiff left.  So I'm not basing my decision with respect to

4   punitive damages on those issues, which were post-departure

5   from the premises by the plaintiff.

6        But I do think that even on the basis of what the

7   defendant testified to, the jury could conclude that he was

8   reckless.  I must say he showed an amazing degree of lack of

9   recollection or lack of knowledge for what was going on in this

10  apartment and the dangers of dust.  And the jury can take that

11  into consideration in deciding credibility.

12       Whether I will allow a punitive damage award to stand

13  is another question.  I'm dubious about it, and I reserve the

14  right to set it aside by the evidence; but I'm allowing it to

15  go to the jury.  If this goes up on appeal I don't want to have

16  to retry it on the grounds that we should have granted it.

17  That is granted, that damage award issue.

18       Do you have another point?

19       MR. ARCHIBALD:  I think the court was unclear on one

20  point.  In regards to the post-remedial repairs, I think the

21  court was suggesting that my client showed wanton behavior by

22  not doing anything to the apartment he rented.

23       THE COURT:  I'm not suggesting anything.  I'm not

24  taking it into account.  Whatever the evidence is in the case

25  without objection on that point goes in before the jury and

G.M.M. v. Kimpson

1  would be relevant in any event independently on the credibility

2  of the defendant; but, as I recall the testimony, there was no

3  request for such a decision and statement to the jury on

4  limited use.

5        MR. ARCHIBALD:  But, your Honor, to just clarify the

6  record, though, because it still seems as though the record is

7  not clear, or maybe I'm misinterpreting what the judge -- what

8  you are saying, your Honor, is that the testimony from my

9  client is after the board of health came in and they say, well,

10 these are the areas, it was all to the moldings, and those

11 repairs were effected before anybody else moved in because they

12 came back and retested.

13       THE COURT:  I didn't read that from the evidence.

14       MR. ARCHIBALD:  That was --

15       THE COURT:  Any changes were made by the defendant

16 after the plaintiff left.  If you show it to me, I will be

17 happy to hear it.

18       MR. ARCHIBALD:  Your Honor, let me show you this

19 exhibit.

20       THE COURT:  Let me see it in the testimony.  The

21 pictures I allowed in --

22       MR. ARCHIBALD:  I understand that.

23       THE COURT:  Excuse me.

24       -- as a matter of grace to the defendant.

25       MR. ARCHIBALD:  Yes?

G.M.M. v. Kimpson

1    THE COURT:  But I don't find them, having reviewed

2    them carefully, as necessarily supporting your view.  I cannot

3    read from those pictures the dog bites or scratches.  There are

4    different colors, but I just can't read them.  I have allowed

5    them to go in, and I assisted you in putting them in by

6    extending the rules of evidence to permit your client to say

7    that this is what it looked like when they left.  You recall

8    that.

9    MR. ARCHIBALD:  I recall that, your Honor.

10   THE COURT:  Those photos were taken many years after

11   the event, when there was an intervening occupation by another

12   tenant.  So they could have been left -- they could have been

13   excluded.  But I understood the limits that the defendant had,

14   since he didn't take pictures concurrently with the plaintiffs

15   leaving.  But I can't read what you are reading into those

16   pictures.  The jury may be able to, but I can't.

17   MR. ARCHIBALD:  May I speak, your Honor?

18   THE COURT:  You may.

19   MR. ARCHIBALD:  This is what I'm saying to you, your

20   Honor.

21   THE COURT:  We are talking about exhibits number?

22   MR. ARCHIBALD:  This is Exhibit O1.

23   THE COURT:  There are numbers annexed to it?

24   MR. ARCHIBALD:  Right.  Your Honor, the basic tenets

25   of evidence when it comes to photographs of a location, you

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

G.M.M. v. Kimpson

1 introduce a photograph and you ask the person who has

2 knowledge, is this the way it looked back when it was taken?

3 Yes.  Has anything changed?  For example, your Honor, if there

4 is natural wear and tear to something, that's not the way it

5 would have looked two or three years ago.

6         THE COURT:  Excuse me?  I have allowed it in.

7         MR. ARCHIBALD:  I know you have, your Honor.

8         THE COURT:  I disagree with you with respect to the

9 power of the judge to have kept those photographs out.  I have

10 let them in.  So there is no point in arguing about exclusion

11 of the photographs.  They are in before the jury, and you can

12 argue anything you would like.  I do not read those pictures as

13 showing dog scratches or bites.

14         MR. ARCHIBALD:  But my experts do.

15         THE COURT:  Excuse me.  If you can convince the jury,

16 fine, I'm permitting you to argue it.  So I don't understand

17 why the pictures are being discussed now.

18         MR. ARCHIBALD:  Well, they were being discussed, your

19 Honor, because you were saying that you are not convinced that

20 the condition of the premises, in terms of the repair that was

21 done, was effected after my client -- after the plaintiffs move

22 out and there was a subsequent occupancy.  Correct, your Honor?

23         (Continued on the next page.)

24 Certified to be a true and accurate transcript.
   /s/ Michele Nardone
25 MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

G.M.M. v. Kimpson

1   (In open court, outside the presence of the jury.)

2       THE COURT:  But I'm saying I am not considering his

3   subsequent rental.

4       MR. ARCHIBALD:  As you shouldn't, under the

5   circumstance.

6       THE COURT:  The main issue, however, with respect to

7   the period after the plaintiff left some years, when there was

8   at least one other occupancy, and whether any of those damages

9   that you assert are shown by the pictures occurred during that

10  period.  That's for you to argue and the plaintiffs to argue.

11  I will consider that factor and all other factors in the case

12  when and if there is a punitive damage award, which I will then

13  consider when you move to set it aside.

14      MR. ARCHIBALD:  Fair enough, Your Honor.

15      THE COURT:  Do you have another argument?

16      MR. ARCHIBALD:  No, I do not, Your Honor.

17      THE COURT:  Does the plaintiff have an argument?

18      MR. FRANKEL:  No, Judge.  I just need some time to set

19  my stuff out and go to the men's room.

20      THE COURT:  How much time will the plaintiff require

21  for argument?

22      MR. FRANKEL:  I'm sorry -- no argument?  How much

23  time?  I'm guessing, I think maybe an hour and-a-half, Judge.

24      THE COURT:  An hour and-a-half?

25      MR. FRANKEL:  There's testimony of so many witnesses.

LISA SCHMID, CCR, RMR

G.M.M. v. Kimpson

1      THE COURT:  I'll allow it.

2      And how much argument --

3      I'll give you ten minutes for rebuttal.

4      MR. FRANKEL:  Ten minutes for rebuttal?

5      THE COURT:  Yes.

6      MR. FRANKEL:  Thank you, Judge.

7      THE COURT:  How time will the defendant require?

8      MR. ARCHIBALD:  Half an hour, 40 minutes, Your Honor.

9      THE COURT:  Then I think what we ought to do is bring

10  back the jury.  It's now 11:30.  And you can go until one,

11  although I think myself such a long argument is self-defeating,

12  but if you want to take an argument of an hour and-a-half, I'll

13  give it to you.  Then we'll break for lunch, and we'll have the

14  defendant's arguing and then rebuttal of an hour.  So that will

15  get us to three o'clock.

16      That will mean I can charge today, and the charge will

17  take quite sometime to give, because the plaintiff has asked

18  for all of these provisions to be inserted and I inserted them.

19      Now, we may have a half-an-hour or so of deliberations

20  at the end of the day, and then we'll start again tomorrow

21  early, at 9:30.  Does that seem satisfactory?

22      MR. CANTOR:  Yes, Judge.

23      MR. ARCHIBALD:  Yes.  That's fine.

24      THE COURT:  All right, then.  Bring in the jury.

25      MR. FRANKEL:  Of course, Judge.  That's fine.

LISA SCHMID, CCR, RMR

G.M.M. v. Kimpson

1     THE COURT:  Take a few minutes.

2     MR. FRANKEL:  Yeah.  If I can, Judge?  Thank you.

3     THE CLERK:  Judge, these are the copies that were

4  requested this morning. (Handing.)

5     THE COURT:  Yes.  Is there anybody objecting now to

6  the charge that was approved yesterday?

7     MR. FRANKEL:  Not the charge, Judge.  I think just the

8  verdict sheet, we had some issue.

9     THE COURT:  What is the objection?

10     MR. FRANKEL:  Did you make notes.

11     THE COURT:  Page?  What are you objecting to?

12     MR. CANTOR:  Nothing yet, Judge.

13     MR. FRANKEL:  No, I just want to make sure.  I think

14  the Court made some changes.  So I want to make sure there's no

15  issue.  I'm going to start setting up if I can, Judge.

16     THE COURT:  Excuse me.  I'm waiting for your answer.

17     MR. FRANKEL:  Oh.  I'm sorry.

18     Counsel?

19     MR. CANTOR:  Judge, it looks fine so far.  I haven't

20  completed it, but it looks fine.

21     THE COURT:  Then you're not objecting?

22     MR. CANTOR:  No, I'm not.

23     THE COURT:  You're ready to go forward with your

24  argument --

25     MR. CANTOR:  Yes.

LISA SCHMID, CCR, RMR

G.M.M. v. Kimpson

1     THE COURT:  -- based on this charge?

2     MR. FRANKEL:  Yes, Judge, based on this, yes.

3     THE COURT:  Do you have any objection to the --

4  defendant -- on the charge?

5     MR. ARCHIBALD:  No.  Other than my previous arguments

6  on compensatory damages, no.

7     THE COURT:  All right.  Then come back in ten minutes

8  and we'll go forward with your argument.

9     MR. FRANKEL:  Can we have ten of, Judge?  Can I can

10  get to the men's room, Judge?

11     MR. CANTOR:  He just said ten minutes.

12     MR. FRANKEL:  Ten of?  It's 15 minutes.

13     THE COURT:  Get back in ten minutes.  I can't keep the

14  jury through a long lunch hour.  I don't know why you need an

15  hour and-a-half, but if you do, I'll give it to you.

16     (Recess.)

17     THE COURT:  Bring our jury in.

18     Get yourself set up, please, if you can.

19     MR. FRANKEL:  We were speaking about possibilities.

20     THE COURT:  Bring in the jury, please.

21     (Jury enters.)

22     THE COURT:  Now, you have heard all of evidence.  In

23  this phase of the trial, the attorneys will try to assist you

24  in analyzing the evidence that you've heard.  Plaintiff has the

25  burden of proof, so plaintiff will go first in arguing, and

LISA SCHMID, CCR, RMR

Summation - Frankel

1  then the defendant will argue, and then the plaintiff will have

2  a brief rebuttal, and then I'll charge you and tell you what

3  the law is, and then you begin deliberations.

4       Now, what the attorneys say is not evidence.  So this

5  will not be read back to you if you should want to hear it.  Is

6  that clear?

7       JURORS:  (All jurors answered affirmatively.)

8       THE COURT:  The testimony, we will be able to send in

9  and we'll send in whatever documents that were introduced if

10 you'd like.  If you want more, we can do that.

11      So we'll go right through the plaintiff's summation,

12 and we'll go to lunch, then we'll have the defendant and I

13 should be able to charge you, so that you can deliberate for a

14 half-an-hour or an hour before you go home, and then come in

15 tomorrow, which I assume will be required.

16      Proceed, please.

17      MR. FRANKEL:  Thank you, Your Honor.

18      Good morning.  We got to speak -- I got to speak early

19 on.  The Judge will allot me ten minutes after Mr. Archibald

20 completes his summation, at which time I will address some of

21 the issues, but right now, you folks become the jury but also

22 the judges.  You become the judges of the facts.

23      The Judge, after you hear our summations, the Judge

24 will tell you -- you folks run the show -- how you deliberate.

25 The process you want to follow is totally up to the 12 of you.

Summation - Frankel

1  The way in which you want to discuss things also, we will never

2  know what that is unless and until you send a question out to

3  the Court asking for either guidance, information or as His

4  Honor told you.  So very soon after the Judge gives you his

5  instruction, pretty much he'll be sitting and waiting with us

6  until you tell us if you've reached a verdict and what that is.

7        But I should have begun by saying thank you, and I

8  mean that genuinely.  Jury service is -- yes, it's a civic

9  responsibility, but it's a bit of an inconvenience, to say the

10 least, and this was the Fourth of July week in between.  Most

11 people have plans.  A lot of people take off of from work.  The

12 kids are off from school.  But you came every day.  You

13 listened to everything we had to say, even if we were boring

14 you and you were hearing it over and over again.  Thank for

15 your patience and particularly on behalf of Mr. and

16 Mrs. Mendez.

17       Niki Hernandez Adams, I will be referring to, if you

18 don't mind, as Mrs. Mendez or Niki Mendez, because it's easier

19 to get that out -- and Joshua -- but most importantly, Geronimo

20 Mendez.

21       His pictures are in evidence.  I will show them to

22 you.  The Judge will tell you sympathy, that's not to be

23 considered.  That's not why the pictures are here.  It puts a

24 person, a face with a name, because so far, you've heard a

25 million things about this little boy and if he was walking into

LISA SCHMID, CCR, RMR

Summation - Frankel

1246

1   the courtroom now, except for the pictures, you would have no

2   idea who he is or if he's the same person, but --

3          This is a very, very serious case.  As you know, and

4   as you've heard, this is the one chance that Geronimo Mendez

5   and his family have to get something for his future, something

6   for what they've gone through so far and what they're going to

7   go through in the future, based upon what the witnesses have

8   told you, based upon the records and the reports -- and again,

9   anything I say is not evidence, and if I say something that you

10  think is inaccurate, by all means it's what you think and hear

11  governs, and you will be able to speak together and if it's not

12  clear, that's why this young lady takes the testimony and can

13  read back to you if needed.

14         But why are we here?  We're here, it seems obvious.

15  We're here because that man, Mr. Kimpson, allowed poison to be

16  present in his facility in his 490 Macdonough Street, and he

17  knew it was there -- although we'll talk about certain aspects

18  of requirements of the law where he didn't have to know.

19         And as a result of his bringing these parents in and

20  other tenants to rent out the premises, that little boy who

21  otherwise had every opportunity in the world to have a normal

22  healthy life ended up where he will never be normal.

23         He has permanent brain damage.  He has all sorts of

24  disfunctional problems, cognitive deficits, behavioral issues,

25  biting other kids, hitting.  And when the last witness for the

LISA SCHMID, CCR, RMR

Summation - Frankel

1  defendant said, well, there's all sorts of interventions and

2  programs.

3        Do you think for one second that these parents are not

4  hopeful that those interventions will make a big difference?

5  But realistically, from what the doctors, including the

6  plaintiffs' -- the defendant's witnesses have said, there's

7  that not much of a great chance that this child's ever going to

8  have a normal healthy life, and the downside is so horrendous,

9  they don't even think about that.

10        But I've asked each one of the defendant's

11  witnesses -- they're doctors.  They're neuro-psychs.  They're

12  specialists -- about the Needleman survey and study with the

13  Center for Disease Control, and every one of them said that

14  children who are exposed to lead paint byproducts, dust, chips,

15  whatever -- at the earliest ages are prone to end up being

16  violent and aggressive later in life, and to criminal behavior.

17  Now, notwithstanding that their witnesses, not one of those

18  witnesses -- not Dr. Auciello, not the gentleman who just

19  testified, not Dr. Klein, who testified for them yesterday and

20  the day before -- not one of them said that that wasn't true.

21  Now, heaven, that's not going to be an issue, we don't know,

22  but it's possible.  But what we do know is this child is never

23  going to have chances that he could have had.

24        First question is, obviously, for any jury and

25  especially I think most so in this case but in every case,

Summation – Frankel

1   credibility.  Who do you believe?  Who do you believe based

2   upon nothing that the lawyers or the Judge or anyone would say?

3         It's like every day in life.  You go out to buy a

4   suit.  You go out to buy a car.  Somebody says, that's the

5   best-looking dress you have.  Oh, you look terrific."  And you

6   know they're trying to sell you or you think, hey, they're

7   being honest and maybe, you know, they're trying to help me.

8   That's credibility.  Do you believe them or are you

9   comfortable?

10        And I submit that when we review the evidence together

11  now, you will recognize -- if you already haven't, and we

12  suspect you know already -- that this man is not only not

13  honest, he doesn't care one bit about --

14        MR. ARCHIBALD:  Objection, Your Honor.

15        THE COURT:  I'll permit the argument.  The jury will

16  decide on credibility.

17        You will decide it.  Do you understand that?

18        JURORS:  (All answer affirmatively.)

19        MR. FRANKEL:  Regulations and laws that he admits he's

20  violated don't seem to matter.  So when he testifies and wants

21  you to believe certain things, you'll need to consider all of

22  those things.

23        During my first opportunity to speak with you, I said

24  there's ways to present cases and we're going to ask you just

25  to look at the evidence.  And then when you have a strong case

Summation - Frankel

1   and you have a victim who's been hurt and the victim is hurt by

2   someone who did something wrong, terrible, you present the

3   evidence, as we have, and you push the evidence and push the

4   evidence -- and I know it took a long time, and I know some of

5   it was so repetitive, but we needed to get the documents in

6   evidence.  The witnesses before you.

7        On the other hand, when you don't have a defensible

8   case and your client has done something that hurts somebody,

9   deeply seriously and permanently, distract.  Red hearings is

10  something that was said recently by Mr. Archibald.  Make sure

11  the jury does anything you can get them to do except pay

12  attention to the defendant to the evidence, because if you can

13  confuse them enough and get them thinking about all these other

14  things, then all of that good evidence you have that's

15  compelling, some or a bunch of the jurors might say, you know,

16  maybe there's something to that.  Maybe we ought to consider

17  it.  That's the job.  That's the job.  And in this case, as

18  much as if any case, it's been done and what are those things

19  now?

20       Indisputable evidence.  The family moved into this

21  apartment because this was the dream.  She was pregnant.  She

22  was going to have a baby within three months.  That were

23  excited.  They asked Ms. Cosby for a garden apartment.  This

24  was the one and Ms. Cosby -- honest woman, came in with no

25  agenda, testified truthfully.  Again, it's always you who will

LISA SCHMID, CCR, RMR

Summation - Frankel

1   decide -- but she is the real estate broker.  She helped these

2   people.  She knew what they wanted.  She found this.  They came

3   in.  They saw it.  And she said -- withdrawn.

4           Mr. Kimpson said when I asked him, long before Ms.

5   Cosby testify, well, you have known that Niki Mendez was

6   pregnant because she's a thin lady and she's six months, and

7   I'm sure they told you that, since there's nothing in the lease

8   that says you can't have kids or dogs, by the way.  And he

9   said, I had no idea she was pregnant and nobody mentioned it to

10  me.  Niki Mendez testified not only did we tell him I just had

11  my baby shower and I was sticking out like a medicine ball.

12          So now their witness, although she was -- again, up to

13  you -- an honesty, decent witness who testified.  You'll decide

14  truthfully.  She said not only was it obvious that she was

15  pregnant, she had had a conversation with Mr. Kimpson about why

16  these tenants were so eager for the garden apartment and why

17  it's such a nice place and that the pregnancy and the dogs,

18  which also were permitted, were the reasons they were so

19  excited about having this apartment, the garden apartment.

20          He testified before you, I had no idea she was

21  pregnant.  But if she's allowed to have children there, why is

22  that?  Because he believes that he's covered under some statute

23  that says, you only have to abate lead and get rid of it or

24  cover it if you think there are no small -- there either are

25  small children living there or you know there's a likelihood

Summation – Frankel

1    under certain circumstances.  Why else?  Do you think that Ms.

2    Cosby wasn't telling?  That Micky wasn't telling the truth?  So

3    that's one of the things that you need to consider,

4    respectfully.

5            Now, certain undisputable -- indisputable,

6    undisputable -- I apologize.  I'm not sure.  But the child

7    developed a 9 blood lead level when he was tested for his first

8    birthday, blood test.  He only lived in that apartment.  After

9    they discovered that, the pediatrician discovered that, they

10   had the apartment tested.  The New York City -- that's the

11   regulation and I'll show you in a minute, if I can, the New

12   York City reports, they come in as soon as the pediatrician or

13   the laboratory -- I think the pediatrician, Dr. Frank said,

14   either they or the laboratory has to call.  It's a legal

15   requirement, and then they come and they test and guess what?

16   They found lead.

17           Now, if you remember the gentleman who testified,

18   Mr. Eweke.  He's the supervisor of the woman who took the test.

19   And they found lead in the apartment in -- I think there were

20   24 violations, but we'll go back to the report.

21           But what did he say that was really most significant?

22   They don't inspect with that machine that they're all saying

23   the machine is going through the wall.  They don't inspect

24   until there's peeling and chipping paint that tests positive

25   for lead.  And so he said that's how she was trained.  That's

LISA SCHMID, CCR, RMR

Summation – Frankel

1  how we're all trained and if she goes and there's paint peeling

2  or chipping, they don't do an inspection -- a further

3  inspection with the machine.  So then she did do it, and found

4  24 -- I believe 23 or 24 violations.

5       That's solidly in the record.  One more and I'll just

6  call them distractions or red hearings.  You going to hear,

7  well it was through the wall and we had the guy and it wasn't

8  really anything.  So any of this stuff that was there, they

9  were just using the machine wrong.  And any of the stuff on the

10  ground and on the floor is because of the dogs, dogs, dogs,

11  dogs, dogs -- another red herring.

12       Indisputable, lead paint byproducts are toxic, are

13  poisonous and permanent.  Not a single witness -- one of them I

14  think, well, maybe it could be, every one of the defendant's

15  witnesses as well as our witnesses said that's absolutely a

16  fact.  Does permanent brain damage.

17       What else happens?  It hides in the brain.  It hides

18  in the bones and it hides in the tissues of the infant's body.

19  And it leeches out.  So when Mr. Archibald asked the last

20  witness -- another red herring -- well, the blood count --

21  blood lead level went down and then it went up a little bit.

22  Doesn't that seem to indicate that in Dallas, they're living in

23  a place that has lead?  Well, it's always possible.

24       But the second part of that, as our witnesses and his

25  witnesses testified and agreed is call leaching.  It leaching

LISA SCHMID, CCR, RMR

Summation - Frankel

1   out.  It hides in the bones.  And I believe it was either

2   Dr. Auciello -- I think was Dr. Auciello who said, well, the

3   witness who testified yesterday -- I apologize -- it never

4   leaves.  It could be there for ten, 20, 30 years, but sooner or

5   later as it goes down, hopefully it's not a problem.  But

6   damage done is damage done.

7        Mr. Kimpson will have you believe that he not didn't

8   know whether there was any lead in his building, in his

9   apartment, but he never heard of lead.  He had no idea lead

10  could be an issue and more than that, he had no idea that lead

11  was a toxin poison that could do those things kind of things to

12  children.

13       Now, Mr. Kimpson has been a landlord for 20 years in

14  Bedford Stuyvesant area, where those beautiful brownstones are

15  like this one and in adjoining neighborhoods, and he's been

16  buying and selling buildings for those 20 years and renting

17  them out and that's from his testimony.

18       Now, at some point in a few minutes, I'm going to go

19  through the lead disclosure form, but if remember what Ms.

20  Cosby testified to, she said you have to always give that form

21  whether you're renting, whether you're buying.  It's got to be

22  part of the package to the person who's buying, renting,

23  whether it's an apartment, whether it's a house.  Even if it's

24  new, it's a law that that form has to be given to the people

25  even if you don't have kids.

LISA SCHMID, CCR, RMR

1254

Summation – Frankel

1   It could be a ninety-year-old couple moving in and

2   they're not going to have children.  That form has to be part

3   of the package.  And she said that's her training.  It's a

4   requirement, and it's done every time.  Not only she does it

5   every time, she was the directed to do it every time, and

6   everyone who works in the industry does that to protect their

7   company, as well as to protect the people who are coming into

8   the apartments.

9   So you have a man who for 20 years has been buying and

10  selling these buildings, and he never saw the form and he never

11  heard about lead.  And the question is for you, is that

12  believable?  Is that possible?  Well, I think in part, you have

13  to judge this by what other things that we know about Mr.

14  Kimpson and about this building.

15  Well, start out with he bought the building.  And how

16  did he do his demolition and renovation?  Pick up some guy off

17  the street with a bunch of other guys.  Now, it's not that

18  people can't do the work and aren't handy, but he paid cash to

19  everybody.

20  He has no records.  And I'll go through something

21  that's very important in that area.  And he can't tell you the

22  last name of his contractor, anyone who worked for him, whether

23  the guy had a company, whether there were any permits -- which

24  would even include dumpsters because you can't just put a

25  dumpster on the street -- would include renovations.  Didn't

LISA SCHMID, CCR, RMR

Summation - Frankel

1  know any of that stuff.

2        And what's really, with all due respect, offensive is

3  he still claims and testified and has his witnesses testify he

4  did perfect lead paint encapsulation.  Just got lucky.  But he

5  admitted he never discussed it with the guy who was doing the

6  work.  The guy with the work never said anything about it.  He

7  never saw anything unusual being done.  So he did everything

8  right just by luck, without knowing any of the dangers and in

9  addition to that, when all this lead show up later on, it's the

10  dogs.

11        So what's the most pressing part of that part of the

12  red herring?  You'll hear in the Judge's instructions that one

13  of the questions you folks have to decide is first whether

14  Mr. Kimpson was liable, responsible, and if so, was the mother,

15  Micky Hernandez Adams, comparatively negligent or liable for

16  her son's sickness, injuries that he sustained as a result of

17  exposure to lead.  Now, that's in the instruction, and I

18  believe you're going to hear Mr. Archibald speak about that.

19        Well, here's the question.  Mr. Kimpson said, never

20  knew there was lead.  Said in the form -- which we'll go

21  through -- no lead.  Spoke in front of the couple as well as

22  Ms. Cosby.  And so, now the dogs exposed lead and she's

23  responsible for her son being poisoned and having these

24  injuries and damages because the dogs are one whose brought

25  that lead paint out.  Just think about that, please, with all

LISA SCHMID, CCR, RMR

Summation - Frankel

1    due respect.

2            So when you read those questions, think about how in

3    the world could she be responsible?  It would have been dust,

4    dirt, other paint -- not damaging, not toxic, not poison, but

5    still, they'll have you consider that.

6            Now, I guess the biggest part of what I call the

7    distractions or red hearings, you've heard it 20, 30 times.

8    Bilirubin jaundice, anesthesia and hydrocodone and otitis

9    media.  Sounds pretty scary -- and these are the reasons four

10   of his witnesses -- the defendant's witnesses -- projected that

11   it wasn't lead, but it could have been any one or a combination

12   of these things that caused the problem for this child.

13           So I asked each one of them the standard -- and you

14   have heard all the witnesses testify in their specialities --

15   within a reasonable degree of medical certainty, whether a

16   reasonable degree of economics certainty.  I asked each one of

17   them, Dr. Auciello, Dr. Klein -- can you say with any

18   reasonable degree of medical certainty that any of these things

19   did any harm to this little boy?  And they say, well, it's

20   possible.  The studies show -- because if they get you thinking

21   about bilirubin and they get you thinking about otitis media,

22   you're not going to think about the fact that the pediatrician

23   testified here, Dr. Frank, the person who knew better than

24   anybody else.

25           Did you not find her credible?  We subpoenaed her to

Summation – Frankel

1    come here.  But did she not testify about what she did and each

2    one of these conditions?  Did she not seem like a very

3    competent, very involved, very concerned doctor?  And she put

4    to rest every one of those things.  Gone.  Not an issue.  Why?

5    Because we took her to the hospital.  I met the specialist at

6    Long Island College Hospital.  They put him under the lamp.

7    They waited 'til his bilirubin numbers went down.  He was no

8    longer yellow he came home.

9            But every witness that Mr. Archibald put on the stand,

10   what could otitis media, what could bilirubin elevated have

11   done to this child?  And they talk about permanent brain damage

12   and how it could do -- and here's what I'll ask you to

13   consider, if you will.  When Mr. Archibald does his

14   presentation in the summation, I have asked each one of those

15   witnesses and in your mind, let's hear what he tells you about

16   one single entry in one pediatrician's record, in a medical

17   record, in a therapist's record, in a speech counselor's record

18   that indicates this child had any hearing problem?  So he's

19   going to say and project it very well the otitis media is the

20   reason that this child has speech problems, because he can't

21   hear properly.  That's the reason, or one of.

22           Now, if I may, (Perusing documents.)

23           There are certain things in the transcripts that I

24   think are important to point out and you may know a lot of this

25   and so I apologize if I say something or I read something in

LISA SCHMID, CCR, RMR

Summation - Frankel

1  that's, yeah, we know that already.  It's too important to take

2  a chance on the job that Mr. Cantor and I have to do to

3  represent this family and this child.  So, again, forgive me if

4  I go too far.

5          But at page 277, Dr. Troast, if you remember the

6  gentleman long time ago.  That's the other issue.  Some of

7  these witnesses from eight, nine days ago, and who could expect

8  you to remember everything?  But maybe it will ring a chord.

9          He was with the EPA, and he talked about -- he's a

10  toxicologist, and he was asked by me about certain things

11  that -- in the EPA files and at the CDC.

12          Page 277, line 25:  "Doctor, in terms of the CDC and

13  EPA, what were their findings from the studies with regard to

14  what parts of the body in an infant can be affected by exposure

15  to lead under ten?"  And by the way, nine is under ten, but

16  it's pretty close.

17          Answer:  "Primarily, you're looking at the neurologic,

18  the brain and the transmission of messages to the brain.  So

19  they will impact the ability of the cognitive development of

20  child."

21          "And what does that mean in layman's terms, please?"

22          Answer:  "The child won't develop fully and mature and

23  become a mature citizen, recognizing potentiality --

24  potentially" -- I'm sorry -- "how to interact in a population,

25  how to develop, how to get a job."

LISA SCHMID, CCR, RMR

Summation – Frankel

1    Bottom of page 278, line 25:  "I'm sorry.  Please

2    continue.  The various organs of the body?"

3    Answer, top of page 29, line two:  "Lead will impact

4    all external organs, not just the brain.  It will deposit in

5    the teeth.  It will deposit in the bone.  It will deposit in

6    soft tissue organs, such as the liver and the kidney, and have

7    significant toxicological impacts in those organs."

8    Bottom of page 279, line 20.  "Well, aside from the IQ

9    decline" -- answer.  I'm sorry.  Answer:  "Aside from the IQ

10   decline, the U. S. EPA published in 2013 an integrated science

11   assessment with a linked exposure to causation of certain

12   effects and one of those effects was ADHD, and externalizing

13   and internalizing behavioral changes with exposure to lead."

14   Question:  "Anything other than that in terms of

15   potential acting out, violent behavior, focused?"

16   Answer:  "They covered that under externalizing.  That

17   was covered under their description of externalizing behavior."

18   And then I asked him -- and I don't have to read it --

19   why sometimes a lead level goes down and then it spikes, and he

20   explained also at page 280 and 281 about how it leaches back

21   into the blood because it hides in the soft tissue organs and

22   in the bone.

23   And the question about a threshold where some of the

24   defendant's witnesses said, well, it used to be ten and he only

25   has a nine.  Well, they lowered it to five.

LISA SCHMID, CCR, RMR

Summation - Frankel

1       From his -- from the CDC, he testified at page 284 --

2   I'm sorry.  284, the question at line 6:  "And what do you base

3   that upon, these other things?"

4       Answer:  "I base that upon the fact that we have

5   published data which shows there is no threshold level for

6   lead.  There is no safe level."  And then he goes on to explain

7   where that comes from.

8       Finally, his opinion at page 285, I asked him, 285,

9   line 15:  "Have you reviewed the records from

10  neuropsychological tests?"

11      Answer:  "I did look them over."

12      Question:  "Yes?  And the determination as to what

13  deficits Geronimo is suffering and other behavioral issues?"

14      Answer:  "Yes."

15      Question:  "Can you, Dr. Troast, testify" -- and

16  here's the key -- "to a reasonable degree of toxicological and

17  scientific certainty that the exposure this child suffered in

18  the first year of his life is the reason or proximate cause for

19  his issues now as a four year old -- almost a four year old?"

20      Answer, top of page 286:  "Yes.  There's no doubt,

21  based upon toxicological certainty, that the exposure he's

22  accumulated by living in that residence for the first year

23  resulted in blood lead of 9 micrograms per deciliter of blood

24  lead.  I look at the record and I saw no other source of lead

25  in the environment he was subjected to."  And then he goes on

LISA SCHMID, CCR, RMR

Summation - Frankel

1  to talk about the water was tested, the air was tested and

2  there was no issue of lead in either of those.

3          Now, Dr. Gordon testified, if you recall -- he's also

4  from NYU, as Dr. Auciello had also practiced there as well --

5  and they talk about stuff, both of them.  It was somewhat

6  technical for all of us.  And what are some of the exams they

7  were trying to evaluate?  One is communication.  Obviously, we

8  know expressive language, expressive language skills and

9  receptive skills.  Second one is daily living.  The third,

10 community skills.  Four, socialization skills and five, motor

11 skills.

12         Today and some day recently one of the defense

13 witnesses both testified, he wasn't accepted in Dallas for the

14 program because he didn't meet the standards, and therefore,

15 you know, he's not that bad off, you know, he's doing pretty

16 well.

17         Well, both neuropsychologists, including Dr. Auciello

18 who testified for the defendant, said these are his deficits.

19 These are his issues.  And when a child is going to go to a

20 school, whether it's a public school, private school, smaller

21 school -- if he won't sit still and he won't pay attention and

22 he won't listen and worse, he's punching, pushing and biting or

23 kids, does it really matter whether he meets the criteria to

24 get free services from a state in the south?  Is that going to

25 make a big difference to him?

Summation - Frankel

1       Now, the IQ of both doctors at -- withdrawn.

2       Dr. Gordon told you that his first test was 87 when

3   the child was two years, eight months and then it was 65 when

4   the child was three years, eight months.  And I said to him,

5   that doesn't make sense.  Nobody loses that many IQ points.

6   And he said, oh, no.  I don't think his IQ is 65 or anywhere

7   near that.  I think it's probably 75 to 80.  But so how do

8   account for that?  Because if he won't respond to the test and

9   you try to ease him into it and he doesn't answer the questions

10  or he becomes a little belligerent or pulls away, you still

11  have to grade the test.  You can't grade it on anticipating,

12  but you take all that into consideration.

13      So when Dr. Auciello testified and Mr. Archibald said,

14  well, you know that it was -- he said 65.  Did you know that's

15  ridiculous.  It can't be.  And so of course, he didn't mention

16  to him that when Dr. Gordon had testified here, as he told you,

17  it's not 65.  It's not 87.  It's somewhere in between.  But

18  that's very low, at best, low normal.  And very -- and even

19  under the best of circumstances without behavioral issues, they

20  testified, he's not likely to go very far in school.

21      Yeah, I'm sure there are exceptions.  But someone with

22  a 75 or 80 IQ and then you add the behavioral issues, what are

23  the chances that this child's ever going to get through a

24  normal high school?  And Dr. Gordon said, probably it's kind of

25  a special school.  He's going to have to have not a real high

LISA SCHMID, CCR, RMR

Summation - Frankel

1 school.  He's going to have to have one of the special studies

2 high schools.  And the chances of him ever going to a college

3 of any -- any proper college of any significance is not going

4 to happen.  Sorry.  Excuse me.

5          In his opinion, Dr. Gordon testified again that it's

6 permanent.  All the damage has been done.  And you can't expect

7 that anything's ever going to improve in terms of his brain

8 damage.

9          Now, let's get back to Mr. Kimpson, if we can for a

10 minute, and I'll try to -- if you could all -- the jurors can

11 excuse me for a second.

12          I'm sorry, Judge.  I thought the other one is on.

13 This one doesn't seem to be --

14          THE COURT:  Would you get up and take care of it?

15          There's a switch on the side.

16          MR. FRANKEL:  I thought so.

17          THE COURT:  You can show it on the --

18          MR. FRANKEL:  I know, the other one.  Will be couple

19 exhibits in evidence.

20          THE COURT:  All right.

21          MR. FRANKEL:  I'm sorry.  We have one.  I apologize,

22 but obviously.  Let me know if -- moving it one way or the

23 other, now, unless we get the other one going, most of you can

24 see that?  (Exhibit published.)

25          This is Exhibit 3 in evidence.  This is -- let me see

LISA SCHMID, CCR, RMR

Summation – Frankel

1   if I can zoom a little bit.  Okay.  Now, if I remember, this is

2   the form that Ms. Cosby brought to the rental with the lease

3   and if you remember her the testimony, she said that she put

4   this down, and the first thing she said, she asked Mr. Kimpson

5   to take a look at this and he said, I don't know anything about

6   lead.

7          And right here, there are the initials.  Mr. Kimpson's

8   testified those are not his initials.  He doesn't know how they

9   got there.  She testify, Ms. Cosby, those are his initials.  I

10  saw him put them there.  I was standing next to him.

11         And more than that, that's when they had the

12  conversation with the Mendez couple that he's not aware of any

13  lead, and so the subject never came up again.  I asked her, did

14  she say anything to you about, gee, a man 20 years he's a

15  landlord.  He doesn't know anything about lead?  Did he say

16  what's this form?  What's he talking about?  Lead –- lead

17  warning statement is a federal statute.  We'll go down to

18  lessor.  That's him.  The landlord, his disclosure.  He didn't

19  say a word.  He just initialed, yeah, there's no lead.  It's

20  okay.

21         So unfortunately, that was the worse thing that could

22  ever happen to the Mendez family and to this little boy,

23  because they were confident.  They didn't know anything about

24  lead.  There was no issue.  He said it's not around issue.

25         And Mr. Kimpson also testified the pamphlet was given

LISA SCHMID, CCR, RMR

Summation - Frankel

1    to them by Natalie Cosby.  Well, he also testified he never

2    heard of the pamphlet before.  He didn't know there was a

3    pamphlet.  But he now remembers, Ms. Cosby testified, I gave

4    them the pamphlet, but it was inside a packet, so I never took

5    it out and I never talked to them about it.  They didn't ask

6    any questions.  But Mr. Kimpson remembers, I saw her give the

7    couple that pamphlet.

8          But even if it had happened, which with all due

9    respect, why would Ms. Cosby lie about something like that, he

10   said there's no lead.  So anything you read is interesting.

11   It's educational, but if there's no lead, it's not your problem

12   and who better than the landlord?

13         And I asked Ms. Cosby, when he made that

14   representation, was there any feeling that you didn't believe

15   him or trust him?  She said no.  Would there be any reason why

16   the Mendez family wouldn't trust him or about be comfortable

17   with his representation?  She said no.  And yet, comparative

18   negligence, when the dog scratched the molding, so they say,

19   and that's the reason and she should be held responsible for

20   his son being poisoned.

21         Now, the agency acknowledgment.  She issued initialed

22   and she told us -- I'm blocking it -- "Agent has informed the

23   lessor of the lessor's obligations under 42 USC, United States

24   Code, Section 4862(d), and is aware of his or her

25   responsibility to ensure compliance."

LISA SCHMID, CCR, RMR

Summation - Frankel

1    Part of that's the pamphlet and part of that is to

2    know your property and the possibilities of lead, and why

3    that's important because everyone who testified, including Ms.

4    Cosby about the property and the engineers, any property built

5    before 1960 has a presumption of lead-based paint and it's not

6    a defense for this man to say, but I didn't know, because the

7    statute doesn't require that he know.  It requires only that

8    there's a presumption.  He's got to find out.  He's got to

9    inspect and we'll go --

10    MR. ARCHIBALD:  Your Honor, I object.  The law should

11    be left to Your Honor to instruct the jury on and that's what

12    this defense -- rather plaintiff's counsel is doing at this

13    point.

14    THE COURT:  You may continue.

15    I'll tell you what the law is later.

16    You may continue your argument.

17    MR. FRANKEL:  Now, the other thing is, if you see at

18    the bottom, Ms. Mendez said they signed there.  Above where the

19    agent signed, they signed "lessor," which is not where they

20    should have signed.  That's not Mr. Kimpson's signature.

21    That's the couple.  And then it was dated.  And then they left

22    and they were happy as could be that they were going to have

23    this dream apartment that they had been looking for.

24    And again, just so it's clear, and you can judge also

25    from your own experiences, when you rent an apartment, when you

Summation – Frankel

1   buy a house, when you buy an apartment, there's always a lead

2   disclosure form.  That's part of what's done.  It's a city law

3   as well as obviously it's a federal law, but apparently not for

4   Mr. Kimpson over the last 20 years.

5        Now, I won't go through Dr. Gordon's neuro-psych

6   exams, but I will, if I can, read to you --

7        THE COURT:  Before you do that, Mr. Frankel, would you

8   put something on the board there, so the technician can check?

9        MR. FRANKEL:  Thank you.

10       THE COURT:  Put that on, please.

11       MR. FRANKEL:  Oh, I'm sorry. (Complies.)

12       THE COURT:  Okay.  Thank you very much.

13       MR. FRANKEL:  Okay.  For so for future documents, we

14   should light until we get back to that.

15       Now, Dr. Gordon's opinion at page 360, line 14,

16   answer:  "Well, attention and memory and behavior functions are

17   the function for learning academics and relating to peers and

18   benefiting from school.  So it would have a significant impact

19   and often executive functioning problems get more prevalent as

20   a child gets older, particularly in junior high school.  The

21   executive functioning demands great" -- I'm sorry -- "demands

22   get stronger as the child goes on in school."

23       Line 21:  "How about socialization?"

24       "Again, attention and memory have a major impact and

25   frustration tolerance have a major impact on relating to peers

LISA SCHMID, CCR, RMR

Summation − Frankel

1   and picking up cues or handling conflicts and problems in

2   relationships."

3         Page 361, "In your training, Doctor" -- I'm sorry,

4   line eight, "your education and the studies that you have

5   continued to review, does it talk about -- do they talk about

6   or address the possibility of aggressive behavior later in life

7   for a child like Geronimo, as you evaluated him?"

8         Answer:  "Yes."

9         Line 14:  "And what is that?"

10        "There's a higher risk for antisocial and delinquent

11   aggressive behavior as a result of lead poisoning."

12        Question:  "And you have read those studies as

13   recently as how long ago?"

14        Answer.  "Over the last couple of weeks."

15        And then he says, "To a reasonable degree of medical

16   certainty," page 362, his opinion, line three, "it's with a

17   high degree of neuropsychological certainty that his problems

18   in attention and working memory and executive functioning and

19   behavioral self-regulation are causally related to his high

20   level of lead poisoning."

21        And then line seven:  "Doctor, what is your prognosis,

22   assuming the child gets the same type of positive aggressive

23   intervention with speech therapy, things of that nature, that

24   this child will be able to attend a regular high school program

25   when he's at the appropriate age?"

LISA SCHMID, CCR, RMR

Summation – Frankel

1      Answer:  "He'll need some special education services,

2  such as occupational therapy, speech therapy and counseling to

3  do well in school."

4      Question:  "In your opinion, what is the likelihood he

5  could attend a four year college and graduate?"

6      Answer:  "That would be very unlikely."

7      Last witness who testified said that not only is this

8  child capable of going to a four year college and graduating,

9  he could probably get a Master's degree.  With all due respect,

10  have you seen anything in this trial from any of the doctors

11  and medical people that lead you to think that that evaluation

12  is an accurate one?

13      Now, if I could go back to Mr. Kimpson for a minute,

14  because once again, you're going to hear from Mr. Archibald

15  that Mr. Kimpson didn't know anything about lead and therefore,

16  he's not responsible because luckily –– he won't say luckily ––

17  he encapsulated properly, followed the rules and therefore, he

18  didn't expose this child to lead poisoning.

19      Now, how honorable and how honest is Mr. Kimpson?

20  First, we have the fact that he testified before you that he

21  certainly had no idea that she was pregnant, although she not

22  only looked pregnant, she said she told him and she was proud

23  of it and talked about it, but again, Ms. Cosby said

24  absolutely, she was glowing.  She was happy.  She was looking

25  forward to it.

LISA SCHMID, CCR, RMR

Summation - Frankel

1    So he knew that not only was there going to be a baby

2    in that apartment, there was going to be a newborn baby and

3    they did home birth.  And it just for a second, speaking about

4    Niki Mendez, we may not agree with some of the things she

5    chose, like home birth, not inoculating your children, and

6    those are choices they made.  We may think those are poor

7    choices.  The doctors, certainly her own doctor said, every

8    time they came, I said, you ought to do it.  You ought to do

9    it.  You ought to do it.  And you'll hear that again I guess

10   because you've heard it about six or seven times from

11   Mr. Archibald.

12       There's nowhere in the record anywhere at age four,

13   where this child had suffered anything relating to any of those

14   things, the inoculations, immunizations, would have covered,

15   which doesn't mean it's not a good idea, but the factor that it

16   is one of the reasons why he's suffering some of the deficits

17   that he's suffering, one more red hearing, one more

18   distraction.  Oh, it's one of those things.  He wasn't

19   immunized.  Maybe that's the reason.

20       But I tried to get Mr. Kimpson to focus on the

21   demolition of the apartment before they moved in.  And then the

22   reconstruction and he was talking about he said full demo.

23   Full demo.  Everything went.  I took out everything.  The base

24   floor might have still been there.  I don't recall.  And I

25   covered it with drywall, a coat of primer, two coats of paint,

LISA SCHMID, CCR, RMR

Summation - Frankel

1  and then his experts came in and they say, perfect

2  encapsulation.  He did what was required under the law, under

3  the regulations.  But his experts came in 2015, this year.  The

4  Mendez family moved out in August and in September of 2012.  So

5  the question I asked and I would ask you to ask -- excuse me

6  one second.  I'm just wondering if I could get one exhibit.

7  (Publishes exhibit.)

8           I'll take two exhibits, Defendant's Exhibit O-5 and

9  O-3.  If could you start with O-5.

10          So Brian Flynn testified, the PE, and he said this is

11  consistent with dogs scratching, and it's clearly dogs biting

12  and dogs scratching.  So Mr. Flynn was hired, and took the

13  photographs in February I think 2015, this year.

14          So here's the question that came to our minds

15  initially.  Child gets lead poisoning.  Doctors come back with

16  the report.  The New York City comes in, they test.  Lead.

17  Mr. Kimpson hires his own lead experts.  They come in.  Lead.

18  The wipes who came, that young fellow with the T-shirt who came

19  and testified.  I guess he hasn't been in court a lot, but and

20  the judge was very decent and didn't say ask him why he

21  wouldn't -- didn't you know you're coming to court?

22          But in any event, he testified and then the supervisor

23  of the lab came and testified about the wipes.  Three tests

24  were done, one of which was people Mr. Kimpson hired, and they

25  all found lead in September 2012.  That's just before they

LISA SCHMID, CCR, RMR

1272

Summation – Frankel

1   moved out.

2         So now, 2012, Mr. Kimpson knows this child's been lead

3   poisoned.  His explanation as it's been all along is the dogs

4   scratched and the dogs scratched and the dogs scratched and

5   she's responsible because she should have stopped it.

6         So first question, why didn't you take pictures in

7   September or October 2012?  That's the first question.  Second

8   question, the lawsuit in this case was filed in 2013.  So let

9   there be any question in Mr. Kimpson's mind, he's being sued

10  for a lot of money for some serious stuff that happened to this

11  little baby.  No photographs from 2013.  What could that

12  possibly mean?  Instead, we have photographs from 2015.  So

13  that's one set of questions.

14        The second question is, Mr. Kimpson testified that

15  after the Mendez family moved out, a woman, a single woman

16  moved in.  And she then had a baby while she was living in the

17  apartment.  So she lived there for over a year, he said.

18        Now, I don't know about you, and again, it's your

19  decision, but when you move into an apartment and you're paying

20  17, $1800 a month, and it's partly because of the pristine

21  woodwork and molding and all that, you wouldn't say to the

22  landlord, you're kidding.  You think I'm going to move in and

23  you're going to leave it like that?  And I'm going to move in

24  and pay this kind of rent?

25        I'm not going to show you all the photos, but the

LISA SCHMID, CCR, RMR

Summation - Frankel

1 other photo is Defendant's O-5 and again, I'm not

2 representing -- again, it's not my speciality.  Sort of looks

3 like it was sanded in places, but, again, the tenant moves in,

4 paying considerable rent and she don't say to Mr. Kimpson,

5 Mr. Kimpson, you got to do something to paint it over, scrape

6 it, do something.  No.  She lived through it and it went on to

7 live for three more years, so that his expert could take a

8 picture and tell you it looks to me like it happened in 2012.

9 Even Houdini couldn't testify to something like that.

10         But here's something that we never would have known,

11 but it's with all due respect frightening, the defendant called

12 Mr. Arthur Morales as one of his witnesses, and he was a lead

13 paint specialist and determined he did testing.

14         Again, he did testing in 2015.  And he said that

15 there's lead behind the walls, the theory of what they're

16 telling you, and that's not uncommon and -- but I asked

17 Mr. Morales, could you tell us what the situation was three

18 years before, in 2012?  He said no.  How could I possibly know

19 that?  But of course then you can get the pictures and then you

20 can say there's lead behind the walls.

21         But I asked him because he said that he saw the

22 scratches and other thing, and it was pretty badly scratched

23 and I asked him, did you take any lead readings from the

24 moldings like this?  And he said, yes.

25         And I said, Mr. Morales, you said you got some

LISA SCHMID, CCR, RMR

Summation - Frankel

1    possible -- this is page 944, paragraph -- I'm sorry, line

2    eight and nine and ten:  "You said you got some positive

3    readings from lead on the moldings?"

4            He said, answer:  "On the painted moldings."

5            In 2015, after that woman had lived there for a year

6    with her baby, it was still on the moldings.  And guess what?

7    The two dogs were living in Dallas.  How did that happen?

8    Because he didn't care even in 2015, because all you have to do

9    is scrape it or cover it completely, but obviously, it wasn't

10   worth spending the money, and he testified he recently sold the

11   building this year, within a few months of all this happening.

12           And I asked Mr. Morales, line 14, same page:  "Yes,

13   the scratched ones did not did not test positive for lead.  But

14   the painted ones that were covered did test positive for lead?"

15           Answer:  "The painted ones did."

16           Question:  "You're not talking about behind the wall

17   again.  You're talking about the moldings?"

18           Answer:  "We're talking about the moldings."

19           Question:  "Did you know that there was or did you

20   know that there was or did Mr. Kimpson tell you that another

21   tenant had moved in and had a baby while living in that

22   apartment?"

23           Answer:  "No."

24           So that's one thing that just brought something to

25   mind.  I'm sorry to jump around.  I just want to make sure I

LISA SCHMID, CCR, RMR

Summation – Frankel

1   get everything in and don't take too much more of your time,

2   because we have to talk about damages and other parts of the

3   verdict sheet.

4        But, Dr. Auciello seems like a bright guy.  He came in

5   and he testified as the defense neuropsychologist, and he

6   testified as consistent, bilirubin could be a problem.

7   Jaundice could be a problem.  Otitis could be a problem.

8   Anesthesia could be a problem.  This could be a problem.  That

9   could be a problem.

10        And he said, we don't know, but I can't say.  He's not

11   a doctor and he couldn't say anyway to a reasonable degree of

12   medical certainty.  And then I said to him, because he said the

13   more information -- which makes sense -- that a witness or a

14   doctor has, the better it is and the more prepared he'd be and

15   better his opinion would be.

16        So I said to him, well, you mentioned all these

17   possibilities.  Did Mr. Archibald, who you said you spoke with

18   the other night, tell you that the pediatrician, Dr. Rachel

19   Frank, who took care of the little boy for all 12 months had

20   testified?  And he said no.  Did you know she testified and I

21   asked her about every one of these issues, the bilirubin, the

22   anesthesia, the jaundice, and she explained how they treated it

23   and why and she even said, well the thing on his head was not a

24   problem.  It's not as one of the witnesses said the other day,

25   who's treated a hundred thousand children, Dr. Klein, she said

LISA SCHMID, CCR, RMR

Summation – Frankel

1    no and it resolved, which it always does and we always watch

2    it.

3         But I said she had testified that when there was a

4    heart murmur, she thought it could potentially be serious, even

5    though they didn't think it was.  They sent the baby with the

6    mother and father to a pediatric cardiologist.  It's in the

7    file.  It's in her medical records.  Came back.  No problem, no

8    issue.  Resolved.  They were satisfied.

9         Careful.  They're in Park Slope.  You know the kind of

10   clientele you have in Park Slope that doesn't --

11            MR. ARCHIBALD:  Objection, Your Honor.  I said

12   clientele.

13            THE COURT:  Read that back for me.

14            (Record read.)

15            THE COURT:  Well, strike the Park Slope or the

16   clientele.  Go on from there without the Park Slope.

17            MR. FRANKEL:  I withdraw it, Judge.

18         But you evaluated -- you will evaluate the credibility

19   and what appears to be the ability as a pediatrician of

20   Dr. Rachel Frank.

21         And so, Dr. Auciello, I asked him, well, you spoke

22   with Mr. Archibald after she testified, that she addressed

23   every one of these issues, that they been raising and they told

24   you about to include in your report with concerns, don't you

25   think it would have been helpful, Dr. Auciello, had you been

LISA SCHMID, CCR, RMR

Summation - Frankel

1   told that she addressed these and how she addressed them?  He

2   said, absolutely.  The important information the better,

3   honest.

4            So I said now that you take for as given, that she as

5   the pediatrician and her partner, never thought any of these

6   things were serious issues, never saw anything complex,

7   anything that came out of this, any injuries to the child, any

8   other problems.  Could that perhaps change your testimony?  He

9   said, I have to hear it, but I might.

10           So now, what does that tell us?  It tells us that

11   they're concerned that if Dr. Auciello is honest and honorable

12   and has an opinion, you can't tell him something and risk he

13   might say, oh, I'm not going to testify about that.  The

14   pediatrician did and she took care of that all.

15           MR. ARCHIBALD:  Objection, Your Honor.

16           THE DEFENDANT:  Maybe he would not have testified.

17           THE COURT:  Excuse me.  Don't speculate on what the

18   attorneys did, please.  They're not on trial.

19           MR. FRANKEL:  But he did say, that certainly, in any

20   event, it would have been a helpful.  It would have been

21   something he certainly would have considered, and I mean,

22   common sense, I mean a lot of this stuff.  I apologize.  I'm

23   beating a lot of this stuff and I shouldn't be, but common

24   sense, you're a doctor.  You make a decision.  You come with an

25   opinion and you find someone withheld something that could be

LISA SCHMID, CCR, RMR

1278

Summation - Frankel

1  beneficial, that could be helpful in your opinion, but they

2  withheld it from their own witnesses.

3        MR. ARCHIBALD:  Objection, again, Your Honor.  He's

4  saying exactly the same thing you just told him not to do.

5        THE COURT:  Just strike that last statement, please.

6        MR. FRANKEL:  And also, Mr. Flynn testified that he

7  didn't know that there had been another tenant who had lived in

8  the apartment for over a year.  So when he testified about the

9  condition in 2015, he didn't know that 13, 14 months, a woman

10  with a baby had lived in that apartment.  They didn't tell him

11  either.

12        So open, truthful, candid evidence, red herrings,

13  evidence, distractions, but less there be any question -- if

14  you recall, I had asked Mr. Kimpson to bring in any of the

15  documents which from -- I'm sorry from the demolition or

16  reconstruction.

17        So he said, first asked him about money he paid in

18  cash for all the workers.  Now, listen, sometimes people, you

19  have some work done in your house.  You have a tile -- a new

20  roof or you have maybe a plumber come in and put a sink in.

21  You give him cash.  Happens.  Nobody makes a big deal.

22        But $75,000 was his testimony, $75,000, he paid these

23  guys off the street in cash.  Why?  He had no receipts.  He

24  doesn't know their name and he certainly didn't comply with the

25  IRS and New York State regulations and filing --

LISA SCHMID, CCR, RMR

Summation - Frankel

1        MR. ARCHIBALD:  Objection Your Honor.

2        MR. FRANKEL:  It's his testimony, Your Honor.

3        THE COURT:  Well, there's regulations with respect to

4   records.

5        You may continue your argument.

6        MR. FRANKEL:  So, how does he feel about following the

7   law and regulations?  But, wait a minute.  I'm sorry.  Excuse

8   me one second.  I apologize.

9        Perhaps one of the things that is as strong as any of

10  the others about Mr. Kimpson's believability or lack of

11  believability is when I had asked him about having any

12  documents to pay -- showing you paid the workers and all he --

13  and he said no.  I said and you don't have any documents to

14  show the work that was done in terms of supplies, so we could

15  see whether all those materials that went into demolition and

16  reconstruction were actually used.

17       Because after all, as you sit here today, we have no

18  idea if any of that stuff was done.  When the people who

19  testified on his behalf said it was good encapsulation, that

20  was in 2015.  We had no one testifying other than it looked

21  pristine and it's lovely.  Yes.  All that's true, but that has

22  nothing to do with lead exposure and problems that it caused.

23       But I asked him, so you don't have any documents,

24  credit card statements, canceled checks, invoices from Home

25  Depot and he said, yes, I think I have them at home.  So His

LISA SCHMID, CCR, RMR

Summation - Frankel

1    Honor directed him to go home and bring those records in the

2    next day.

3            Now, at page 76 of the transcript with Mr. Kimpson

4    under oath still, The Court, His Honor asked, line 19:  "Did

5    you have any records, sir?"  Withdrawn.  I'm sorry.  Line 17 by

6    me:  "There was an issue of Mr. Kimpson bringing in his

7    records, Your Honor.  You directed him yesterday."

8            Line 19, His Honor:  Did you have any records, sir?

9    Take this stand, please."  Mr. Kimpson goes back to the stand.

10           The Court:  "Do you have any records, sir?"

11           The witness:  "No, sir.  The records got damaged in

12   the flood that I had.  I thought I had records in the

13   basement."

14           The court, top of page 77:  "You have not one piece of

15   paper, is that correct?"

16           The witness:  "No, sir."

17           His Honor:  "Am I correct when I say you have not

18   piece of paper available showing any anything with respect to

19   the cost of building, the cost of repairs or anything else,

20   correct?"

21           The witness "The cost of the building?"

22           The Court:  The cost of encapsulation and your other

23   repairs?"

24           The witness:  "No.  I thought I had the receipts, but

25   the receipts, I had them in a shoebox in the basement and they

LISA SCHMID, CCR, RMR

Summation - Frankel

1   all got damaged, and they got thrown away."

2           The Court:  "So you don't have a single sheet of

3   paper?"

4           The witness:  "No, sir."

5           The Court:  "Is that right?"

6           The witness:  "Yes, sir."

7           Now, this is addressing His Honor.

8           First off, take this in perspective.  He's doing his

9   repairs, demolition.  He said it was a major job, in addition

10  to $75,000 in money to the workers and for tax purposes you can

11  write off things you get, gains against expenses and things,

12  and now, he didn't do that in 2011, January.  If he had them in

13  a shoebox in the basement.  Then, 2012, he says he had a flood.

14  The suit in this case was 2013.  The lawsuit again was filed

15  and he was served.

16          So now we has a lawyer.  So you got to produce

17  documents, show the work that was done, convince people you did

18  the right thing and it was honorable, and you did your

19  encapsulation.  No thought of that at all, never happened.

20          Doesn't say at any time the documents were destroyed

21  in a flood, that it was in a shoe box in the basement.  Nobody

22  hears that.  It's not written anywhere.  His lawyer in this

23  case just produced an insurance statement showing that there

24  had been a flood in the basement.

25          So now, he comes to court, and I asked him for the

LISA SCHMID, CCR, RMR

Summation - Frankel

1    records.  And His Honor directs him to come back with the

2    records and that he says, I think I have them at home.  And

3    he'd have you believe that the first time he looked and

4    realized that the records had been destroyed in the flood and

5    he didn't have any was when he came back to court here during

6    this trial.

7         With all due respect ladies and gentlemen, it's

8    ludicrous, absolutely ludicrous and what does it tell you about

9    this man and about how little he cared about the little boy and

10   the family and what he really cared about?  And following rules

11   and regulations and the law is nothing not of any significance

12   to him at all.

13        Now, I just want to show you before we get onto

14   damages, just quickly just showing you the three inspection

15   reports.  First one is, Plaintiff's Exhibit 5.  I won't go

16   through it.  It's a large document, but at least, I think that

17   once we get -- yeah, thank you for fixing -- for fixing for

18   getting that one going, as well.  I'm going to put it back a

19   little.

20        (Exhibit published to the jury.)

21        MR. FRANKEL:  This is in evidence, again, Plaintiff's

22   Exhibit 5.  Commissioner of Health Order to Remediate and it's

23   addressed to Mr. Kimpson and at his home address with regard to

24   the apartment at 490 Macdonough Street, basement apartment, and

25   it talks about the violations and it's signed by the director

LISA SCHMID, CCR, RMR

Summation - Frankel

1   and it says within five days, he has to -- with the health

2   code.  I'm sorry.  Health -- pursuant to Health Code 173.14E 1,

3   et cetera, et cetera, within five days of completing all work,

4   copies of the work that was done, and just above that the

5   therefore, if you look at all the sections that were violated

6   that had to be remediated.

7            Now, I won't go through the whole thing again.  It

8   talks about the report itself.  This is the actual inspection

9   report.  And again, if you recall, Mr. Eweke testified that

10  this is what the worker, Ms. Yulery (phonetic), who was on

11  vacation from what I hear, had done when he did the inspection

12  of the premises, which again, she would not have started doing

13  if there wasn't peeling and chipping paint.

14           So it's in the record.  You need to do that.  I won't

15  go through all the other things.  There were letters coming

16  back and forth from New York City.  And it's from the New York

17  City Department of Health and Mental Hygiene, Lead Poisoning

18  Prevention Program.  That's the first one.  The second one,

19  Plaintiff's Exhibit 4 in evidence is from Citywide Lead

20  Removal, Inc.  This is a company.

21           (Continued on the next page.)

22

23

24

25

LISA SCHMID, CCR, RMR

Summation - Frankel

1    (In open court.)

2    MR. FRANKEL:  This is a company that Mr. Kimpson hired

3    to do an inspection for lead, after the city found positive,

4    perhaps hoping maybe they would say the city was wrong, that

5    they didn't do the test correctly, which you might hear again

6    about the equipment and the city didn't know how to use it

7    correctly, and it talks about testing and tells what they used.

8    And this is important.  Again, Exhibit 4 in evidence, because

9    it shows all of the -- let me see if I can zoom in a little.

10   Oops.  Too far.

11   All of the places his inspectors investigated and

12   where they found levels where it says positive or negative.  I

13   don't know how easy it is to read it, but you have it with you

14   in the jury room if you would like.  And it talks about all the

15   places, including not just door frames and not molding only.

16   It shows some negatives but it also shows, if you look

17   at the last entries towards the bottom, closets.  So maybe the

18   dogs were just going into the closets and scraping paint off

19   the closets.  We didn't get that from Mr. Kimpson.

20   So when you go through this report as well you will

21   see that his own testing folks found lead everywhere in the

22   apartment, not just in one room.  It's in the living room and

23   it was in the hall and it was in the, I guess, private hallway,

24   and then in the foyer.  It was everywhere.

25   The third report is from -- this is the letter, if you

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Summation − Frankel

1    remember, from young Mr. Strulovitch, who came in and testified

2    from his company about doing the wipes.  We have copies of the

3    results, which we will have before you.  I won't take the time

4    now, but seven of the 14 wipes came back positive for lead.

5    Why is that significant?  The wipes were all done on the

6    floors, not molding, different places on the floor throughout

7    the apartment; and they found seven out of 14 were positive

8    above the acceptable lead level.

9              When the witness, the woman, Ms. Kogan, testified −−

10   and it was a little hard to understand some of what she said −−

11   but what she testified is the procedure, it's FedEx'd, it's

12   kept, here is the chain of custody, here is what they do.  You

13   are probably going to hear why it's unreliable, we don't know

14   who actually did it in the lab, whatever.

15             But then go back to Mr. Morales, because Mr. Morales,

16   in addition to testifying about finding lead-based paint still

17   on parts of the molding, also his company does wipes, lead

18   paint wipes; and he said −− I asked him what's your procedure.

19   I take them, we put them in the tube, we number them, we put

20   them in a bag, and we sent it by FedEx.  I said, oh, to New

21   Jersey?  He said, no.  Our testing company is in Michigan, but

22   they are very reliable.  So that's the practice in the

23   industry, and it's gone on for every, and these three exhibits

24   are in evidence as well.

25             Now, I would like to move on to damages.  His Honor is

MICHELE NARDONE, CSR, RPR, CRR −− Official Court Reporter

Summation – Frankel

1   going to give you the law, and nothing any lawyer says or

2   anyone else is admissible as any explanation.  You will be

3   asked to go to the verdict sheet after you hear his instruction

4   and consider what it is you need to determine.

5        Now, the reason I just want to read from the verdict

6   sheet is to make sure it's not confusing, not that I expect it

7   will be, but if you are in any way concerned or not certain,

8   you will ask the judge how to do something.

9        With the first count, New York City Childhood Lead

10   Poisoning Prevention Act.  Now, under the act there are several

11   subdivisions.  You will see each one of them.  It's a code

12   number.  For example, code -- the first one, code Section

13   27-2056.3, reads, "owner's responsibility to remediate."

14        MR. ARCHIBALD:  Objection, your Honor.  He can't be

15   reading the law to the jury.

16        THE COURT:  Excuse me.  I will let him argue, of

17   course.

18        MR. FRANKEL:  That's one of the many sections, but

19   look in that section.  It doesn't say that the owner has to

20   have actual knowledge of lead-based paint in his facility, in

21   his apartment.  And then in another very important one is the

22   one we spoke about that you heard from Ms. Cosby when she

23   testified.  It's 27-2056.5.a, Presumption:  In any multiple

24   dwelling -- and three apartments constitutes a multiple

25   dwelling; that's not an issue -- erected prior to 1960 --

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Summation - Frankel

1   that's also not an issue -- it shall be presumed that the paint

2   or other similar surface coating material in any dwelling unit

3   where a child of applicable age resides or in a common area is

4   lead-based paint.  There you are, the presumption part of this

5   statute, as to why Mr. Kimpson was not truthful about the

6   pregnancy of Niki Mendez, because if he read this he might

7   think that a child of applicable age resides and will reside.

8   They are pretty clear, you are renting.  So all of a sudden he

9   felt the need to not be truthful to you.

10          I won't go on to read the others, except one more.

11  Right under that, it's just called "Violation in a Dwelling

12  Unit Upon Turnover," and that's the 2056.8.a.  There is no way

13  to follow this until you actually get it and read it, and it

14  talks about, again, an apartment in a building built after --

15  before 1960 where you turn over the apartment, your obligations

16  to remediate the lead, to do an inspection, to notify people,

17  and to make sure that when you turn it over it's a safe place.

18          So that's one set of statutes, and the important thing

19  is where the jury -- the verdict sheet says it's just part one,

20  did the defendant violate the New York City Childhood Lead

21  Poisoning Prevention Act?  You are asked to decide yes or no.

22  That's any of the provisions.  It doesn't have to be all of

23  them.

24          Of course, you have to have a unanimous vote to decide

25  anything.  It doesn't matter what it is you are voting on

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Summation - Frankel

1 throughout any of the things the judge gives you.  It's got to

2 be all 12 of you, and if you need it, then you answer the

3 question yes or no.  In this case, as you go through it, please

4 recall the charge, which talks about all the different aspects

5 of that statute.

6      Now, the second one is the one that I -- I'm sorry.

7 Was the defendant in violation of the statute, a substantial

8 factor in causing the child plaintiff's cognitive and

9 behavioral injuries?  Again, a yes or no is requested.

10      Third one:  Was the plaintiff mother negligent, yes or

11 no?  And I think again you are going to hear if those dogs

12 hadn't scraped away the molding, this child would have never

13 been sick.  It was his parents' fault.  They should never let

14 that happen, but Mr. Kimpson said there was no lead.  Yeah,

15 there could have been dust on the floor, there could have been

16 paint.  It's not going to give the kid lead poisoning, brain

17 damage, all these other things.

18      You can't have it both ways.  You say there is no

19 lead, you can't blame them for poisoning their child.  That's

20 what you did.

21      Next question was:  Was the mother's negligence a

22 substantial factor in causing the child plaintiff's cognitive

23 and behavioral injuries, yes or no?  And then you are asked to

24 pick a percentage, if you have answered yes to Mr. Kimpson

25 and/or the mother, the percentage of responsibility or

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Summation - Frankel

1    culpability.

2         The second count is the Federal Residential Lead Paint

3    Hazard Reduction Act, and it talks about several things; and

4    the first question:  Did they violate the act, and the judge

5    will read it to you.  I'm not going to do that.

6         Second question is if you answer no then you move past

7    that; but if you answer yes, was the defendant's violation of

8    the statute a substantial factor in causing the child

9    plaintiff's cognitive and behavioral injuries.  Then they ask

10   again about the mother's responsibility and goes on to was it a

11   substantial factor causing cognitive, behavioral injuries; and

12   it goes on to the apportion and percentage.

13        But if I could just say this with number two, if you

14   remember, again -- I know I have said this before, but I have

15   been talking a lot and I apologize, but it needs to be done --

16   that Ms. Cosby said she never took out the pamphlet and gave it

17   to them, but it was there in the packet.  So when Mr. Kimpson

18   said no lead -- and he knew full well there was lead, and I

19   believe you are going to make that determination yourself for

20   all the reasons we have discussed, not just his dishonesty but

21   his ownership of buildings for 20 years -- but if they read the

22   pamphlet, having heard there could possibly be even -- I don't

23   know if there is lead or not.  I have no knowledge of any lead.

24   I don't know if there is lead.

25        You saw Niki Mendez.  She would have read the booklet

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Summation - Frankel

1   and come back possibly, and then say what's with the lead.  You

2   know there is no lead, was it tested.  She was given assurance,

3   her husband was given assurance.  It's not there.  So you don't

4   have to worry about it.  So if they got home and read the

5   booklet, if the booklet was really in the packet, they wouldn't

6   have known.  So this is interesting, lead problems in some

7   people.  Anyway.

8           The next is the breach of:  Did the defendant breach

9   section 235B of New York Real Property Law?  The judge will

10  charge you as to what that is.  And then you will be asked if

11  you find that Mr. Kimpson was responsible or liable for the

12  damages, at least in part, if not wholly, to this child.

13          You have to make a determination, and the judge will

14  give you all the categories -- and I'm not going to read them;

15  they are self-explanatory -- and you will be able to decide how

16  many years going forward, how many years he will suffer, how

17  many years he might be entitled to damages, and then same

18  questions with regard to his mother, a little bit different,

19  about her medical expenses for her child, up to what age, up to

20  18, and emotional damages for her, which is page 7 of 7,

21  compensatory damages awarded to Mrs. Hernandez-Adams.

22          What emotional damages is Mrs. Hernandez-Adams

23  entitled to, if any, from the date of her son's diagnosis

24  throughout the period of time she is expected to live; and then

25  it goes on for the values and the awards.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Summation - Frankel

1    So I believe you will have no problem going through it

2    and making the decisions that you think are appropriate, but

3    I -- just one more thing -- excuse me a second.

4        (Pause.)

5        MR. FRANKEL:  Just a few minutes, I promise.

6        Now, this forgive me when I speak sideways.  This

7    exhibit is also in evidence as Plaintiff's Exhibit 31.  It

8    was -- remember Dr. Frank Tinari, the gentleman with the bow

9    tie?  He brought the charts and explained.  Again, you will

10   determine whether he or the Dr. Lentz who was here is telling

11   you what you believe is appropriate.  You will make the

12   determination.

13       With all due respect, he's got the numbers and he has

14   explained why, and he told you why these numbers are important

15   and how they work.  He did change his position slightly based

16   upon, one, the rate of growth of the economy had slowed and

17   also based upon certain statistics on a model.

18       You will hear this Spizman thing over and over and

19   over.  You will hear that again too.  It's just a guy -- their

20   own witness said Spizman is important but he is just one of the

21   guys.  They will have you believe if Spizman says it, it's the

22   word from above.  So let's see what you hear about Spizman

23   because that's going to be another red herring.

24       Anyway, this is the report from doctor -- I'm sorry --

25   Tinari, and if you see the category he is going for the age the

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Summation - Frankel

1   child and life expectancy statistically to age 76 and the

2   components of his analysis, the adjusted pre-impairment

3   earnings, adjusted post-impairment earnings, and cost of

4   lifetime care.  This, as the judge explained -- and we will

5   get, I'm sure, his charge -- talks about present value.  You

6   don't talk about numbers without bringing them to what's

7   supposed to be present value.  You will start at the top.  It

8   says education and earnings scenarios.  The first one is

9   pre-impairment.

10          Now, I believe counsel misspoke before when his

11   witness was on the stand.  It's your recollection that governs.

12   Dr. Tinari did not say that he is likely to get a professional

13   license.  He said it's less than -- it's less likely -- it's

14   than likely, it's more unlikely than likely, had he not been

15   injured, had he not been poisoned with lead; and he did say

16   that he would have likely did achieve a master's degree.

17          Again, this is where your life will come into play.

18   Let me give you the numbers under that, if I can for now.  So

19   while I'm speaking to you, you can at least look at, and he

20   gives you the breakdown.

21          Now, whether or not if your parents have a college

22   education is it or is it not more likely they are going to push

23   you on to get a college education, and maybe even go farther,

24   to get a master's degree; and if your mother has a master's

25   degree, even if it's in costume design, these people believe in

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Summation - Frankel

1    education.

2              (Continued on the next page.)

3                        o O o

4    Certified to be a true and accurate transcript.
     /s/ Michele Nardone
5    MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Summation - Frankel

1    (In open court.)

2    MR. FRANKEL:  You can be a costume designer without

3    having a masters degree if you're good at it, I'm sure.  But

4    anyway.

5    So you'll determine from your life, your loved ones,

6    and your neighbors whether you think that their experts who

7    said, Oh, he could go, you know.  On even now with all of his

8    disabilities, he could go on and get a masters degree and

9    graduate from a good college.  And remember what Dr. Auciello

10   said, 75 to 80 IQ those kids, unless they're extraordinary,

11   don't get through college.  Very rare.  Anyway.

12   So there's the numbers for the masters degree and his

13   age in the labor force, possible professional degree.

14   Now, here at Page 3 is the pre-impairment lifetime

15   earnings, and it's broken down by the number of years through

16   to 74.  And you see again:  Masters degree or professional

17   degree and, again, he said it's "less likely."  Doesn't mean

18   it's impossible, but he even said less likely than a masters

19   degree which is relatively likely, moderately high likely.  I

20   believe he used high moderate, high normal, and likely.  So a

21   masters degree would not be a surprise.

22   Now, pre-adjustment, pre-impairment adjusted earnings,

23   and it talks about masters degree scenario, 19,322,000.  It's a

24   lot of money, but if you take it over how many years, when you

25   have a four-year-old, if he's going to work to be 60 something

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation - Frankel

1  or 70 breaks down into not a lot of money each year

2  comparatively.  We're not talking about earning 200,000 a year.

3  We're talking about, with a degree like that, and the numbers

4  and they're all here.  Of course, the scenario for

5  professional, degree the would have adjusted loss would have

6  been 30 million but they're talking about the masters is 19

7  million.  On Page 5, he gives you the breakdown, let me just

8  start at the top.

9          Adjusted pre-impairment lifetime earnings for a

10  masters degree, and he breaks down from 2035 when the child

11  would likely attain a masters telling had he not been impaired

12  and poisoned all through the 2080, that's a long time away, but

13  he's four years old August 1st and he gives you the categories:

14  Wages based years, gross earnings, and then the adjusted

15  earnings and what that comes to.

16          Even their expert, although I believe that Dr. Reagles

17  said something around 3 million in lost earnings.  Their expert

18  said 1.3, 1.4 based on a different category.

19          Now, they're not conceding that Mr. Kimpson did

20  anything wrong, but in the event that you find that he did,

21  they come up with numbers over a million.  We don't agree with

22  them, Dr. Tinari did not agree with them, and does not agree

23  with them and you have these figures to look at and to

24  consider.

25          And the yearly increase, future years, is 3.8.  Their

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation - Frankel

1 witness said 3.0, and if you need their various testimonies

2 that'll be available.  And this is post-impairment adjusted

3 earnings, and it shows you the percentage based upon various

4 things -- fringe, adjusted earning factors, work life

5 expectancy, reduced earning capacity.  And, in the bottom, just

6 with a GED, post-impairment 4,285,101.  So that's the

7 difference if he gets a GED.

8        And lifetime care this talks about the numbers going

9 through the years, the component, the percentages.  Now,

10 whether or not some physician services will be covered and all

11 of that the judge will instruct you.  Again, he's already told

12 you once or twice about how to consider that and he will again

13 during his instruction.  And the number that is listed is

14 425,588.

15        And then there's periodic evaluations and then here's

16 the summary.  Here's the summary with a masters degree had he

17 been able to attain that.  That's the adjusted pre-impairment

18 earnings of the future and the post-impairment you see the

19 number with the cost of lifetime care and with a number

20 15,462,742.

21        Excuse me one second.

22        I just want to -- I have not mentioned the negligence,

23 excuse me, I'm sorry.

24        (A brief pause in the proceedings was held.)

25        MR. FRANKEL:  I omitted to mention that one of the

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation - Frankel

1   causes of action is for negligence and the judge will, of

2   course, instruct you as to what negligence is and whether or

3   not it caused the injuries to young GMM.  And I believe, with

4   all due respect, at this point, having learned as you have

5   about what is in the records you should not have much

6   difficulty but I don't mean that with any disrespect.

7           It's evidence, evidence, evidence.  The evidence from

8   the doctors, the evidence from the medical reports, the

9   evidence from the neuropsychologists.  The evidence from the

10  lead, from three tests including Mr. Kimpson's all of the

11  evidence.

12          Now, in damages, there's pain and suffering, there's

13  compensatory damages.  Judge Weinstein will tell you what could

14  constitute compensatory damages which is as it sounds to

15  compensate.  But then there's also the question, I mean, lost

16  earnings as you've seen, pain and suffering, emotional pain and

17  suffering, but punitive damages will be charged.

18          Now, what are punitive damages.  Judge Weinstein will

19  tell you what the standard is.  It applies in the case where

20  somebody does things basically egregious, serious, a bad wrong.

21  This is such a case, ladies and gentlemen because had he told

22  them the truth, or had he done what he should have done, this

23  child -- we wouldn't be here today and they'd probably be

24  living in New York and this child would be a healthy, normal

25  baby and a healthy, normal 4-year-old and that's never going to

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation – Frankel

1    happen and that's not a red herring or a distraction.

2            All the other stuff that you're going to hear again,

3    please, again I ask you remember I only get ten minutes after

4    lunch after we have an opportunity to listen to Mr. Archibald.

5    Answer the questions in your mind if you can and think about

6    what it is that you might think for those things like the dogs

7    did it, like, all the bilirubin stuff, and why are you hearing

8    that again.

9            Why aren't you hearing about evidence.  Why is she

10   being blamed for the dogs disrupting lead that shouldn't have

11   been there, that legally wasn't allowed to be there, that is

12   presumed to have been there, and that he told them isn't there.

13   And yet, without the dogs, the dogs, the dogs.

14           And then the other questions are is somebody trying to

15   fool you.  If you think in any way we've tried to fool you, I

16   don't believe that you're going to make that determination at

17   all.  But 2015 photographs, not telling some of your own

18   witnesses things that happened in court so that they could

19   perhaps adjust their testimony if they think it's appropriate,

20   and the records that were in the basement and telling the judge

21   that they're still there at home.  When he was going to check

22   it only for the first time in this court last week realized,

23   oh, they were destroyed.  If you can do that, and you cannot

24   have a single record to show what you did, what demolition was

25   done, what reconstruction was done.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation – Frankel

1    The only word you have and the only word his experts

2  had was Mr. Kimpson's words.  Oh, he said that he put up the

3  walls and he did this and not a single document and not even a

4  worker, and not even a friend who came in to help during the

5  course of that.  Every witness who testified about going 2015

6  it was done correctly.  When you hear "encapsulation," wait

7  until you hear from Mr. Archibald who tells you who else other

8  than in 2015 sought, testified about it, provided any

9  documents.  Provided any information.

10    Now, money.  You heard from Plaintiff's 24, 25, and 26

11  are the only way you're ever going to personally, as close to

12  personally, meet GMM.  Handsome kid, looks perfectly normal.

13  Because of what this man did to him, he's never going to have a

14  normal life.  Doesn't matter how he looks, doesn't matter what

15  his parents do, it's always going to be struggle and they'll

16  pray for the best.  Fortunately for him, he has wonderful

17  parents, and a little sister, and they're going to do

18  everything they can.  And all the doctors said that other than

19  how own, well, he didn't take him for occupational therapy.

20  They didn't have insurance, they don't have money, they told

21  you that.  As soon as it comes in, they're going to go.

22    And the neuropsychologists both said Dr. Auciello

23  she's a very involved, loving, caring mother.  And the last

24  thing I asked her was, realistically, you know from what these

25  people have testified to that your child is never going to be

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

1300

Summation – Frankel

1  anywhere near normal and he's going to suffer.  That she said,

2  We're optimistic.  We're never going to give up.  We're going

3  to fight him.

4          I'm sorry.  Forgive me.

5          So, ladies and gentlemen, you have to decide on

6  numbers and the judge will give you the form to decide how much

7  is her suffering worth to raise a child that got poisoned for

8  no reason except that's what he does, and truth doesn't matter,

9  and caring about kids doesn't matter.  And when you think about

10  punitive damages, think about the other woman who moved in

11  without a child and then gave birth to a child.

12          THE COURT:  Excuse me.  Stop.

13          MR. FRANKEL:  I'm finished.

14          THE COURT:  Don't consider that.

15          MR. FRANKEL:  How much money --

16          THE COURT:  Excuse me.  Occupation in connection with

17  punitive damages.

18          Punitive damages, if you give them at all, are to be

19  based on what happened up to the time she left.  Plaintiff left

20  not thereafter.

21          MR. FRANKEL:  I'm going to finish now, Judge.

22          When you talk about millions of dollars, and it sounds

23  like a ridiculous amount of money, it certainly doesn't in this

24  case.  And to these people you look at the lost earnings, those

25  are numbers that are easier to look at because you have the

Summation – Frankel

1  charts.  But is the pain and suffering of this child present

2  and future and past worthwhile?  How many millions of dollars?

3  Don't think it's worth that much money?  It's not going to make

4  him normal but give him a chance at life in the future to live

5  better, to go for all the therapy.  If he doesn't have a decent

6  job, or maybe no job and can't graduate even high school

7  possibly he can still survive.  How many millions?  2 million,

8  3 million.  How about the mother's pain and suffering?  Heaven

9  forbid any of us are in that position.

10       THE COURT:  I don't want you to mention specific

11  amounts, strike that.

12       Don't mention specific amounts except as they're in

13  the record based upon the expert's statements.

14       MR. FRANKEL:  We just ask that when you consider the

15  numbers that you try to equate what happened here, why it

16  happened, how it happened, and how avoidable it's been and it

17  isn't.

18       And you know that this woman and her husband, the

19  parents of this child, would pay ten times that amount of money

20  if they had to to make sure he was normal for the rest of his

21  liver and that's never going to happen.  Thank you.

22       THE COURT:  All right.  Thank you.  Be back at 20 to

23  3:00.  Don't discuss the case.

24       (Jury exits courtroom at 1:41 p.m.)

25       THE COURT:  Thank you.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

G.M.M. v. Kimpson

1      MR. ARCHIBALD:  Thank you.

2      MR. FRANKEL:  Thank you.

3      (Luncheon recess taken at 1:41 p.m.)

4      (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G.M.M. v. Kimpson

1    A F T E R N O O N   S E S S I O N

2         (In open court.)

3         (Parties present.)

4         THE COURT:  Are you ready?

5         MR. ARCHIBALD:  I'm prepared, your Honor.

6         THE COURT:  All right.  We'll start as soon as the

7    jury comes in.

8         (A brief pause in the proceedings was held.)

9         THE COURT:  We should have a list of the witnesses

10   that the parties can make up and a list of the documents.

11        MR. FRANKEL:  I think your clerk was one of the

12   exhibits, the Enviro-Probe.  I want to give him one of the

13   exhibits.  That is all except the Enviro-Probe.

14        COURTROOM DEPUTY:  Jury entering.

15        (Jury enters courtroom at 2:47 p.m.)

16        THE COURT:  Be seated.  Proceed, please.

17        MR. ARCHIBALD:  Good afternoon.

18        THE JURY:  (Collectively) Good afternoon.

19        MR. ARCHIBALD:  Well, this is the part of the trial

20   that you get to hear from me, and this is the last time you're

21   going to get to hear from me because I don't get a chance to

22   come back when Mr. Frankel comes back on rebuttal.  So anything

23   he says at that point in time I can't respond.  So, to assist,

24   I'm going to do my best to try and anticipate what he's going

25   to say.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation - Archibald

1    Now, one of the things that he did, and he did a very

2    good job at is thanking you, and I'm going to do the same thing

3    because it's not easy to put your lives on hold it be here.

4    And we all decided this is the country we love whether we were

5    born here or not but we live here, and part of living in this

6    country is jury service.  And some people like to do things to

7    get out of it but you guys didn't and that's appreciated.

8    So on behalf of the Court, Judge Weinstein, my client,

9    Mr. Kimpson, and the plaintiffs we want to thank you for your

10   service.  It's greatly appreciated.  Because without you we

11   can't do our jobs, so we thank you and appreciate the fact that

12   you are helping us do what we're supposed to do.

13   Now, remember when in my closing, or rather, in my

14   opening statement I gave you a few scenarios.  And I said to

15   you, well, I want you to suspend your judgment, right?  I want

16   you to wait until you hear everything, and then make your

17   decision.  I don't want you to do like the folks that listen to

18   that Orson Wells program did back in the '30s and make rash

19   decisions because they thought something was going to happen.

20   I also told you about one my favorite movies

21   "Goodfellas," the 1990 Martin Scorsese film, and I told you in

22   that film the person that had the greatest performance wasn't a

23   big star, wasn't Robert DeNiro was Joe Pesci and he won an

24   award that year, and I told you to look out for the Joe Pescis

25   in this case.  Because there would be Joe Pescis.  And didn't

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation - Archibald

1    you see Joe Pesci, Mr. Eweke.  He testified, he had an amazing

2    performance.

3            I asked him on seven occasions whether or not the XRF

4    device sees through the Sheetrock like my expert testified to

5    and he obfuscated and he wiggled like when you put salt on a

6    worm and it wiggles and it contorts.  That's what he did, but

7    at the end of day he had to answer my question because he said,

8    yeah, he's experienced and he knows this.  He said absolutely

9    and that's in the transcript.

10           Now, those three binders is the transcript.  That's my

11   copy of it, but the Court will provide you with a copy of

12   anybody's testimony there's been quite a bit of testimony.

13   Somewhat a little technical, somewhat a little exciting, some

14   was not so exciting.  But there's quite a bit of testimony and

15   you're entitled to get a read back of anybody's testimony.

16   Anybody.  Whether it was an expert, whether it was a plaintiff,

17   whether it was the young man Mr. Strulovitch or anybody you are

18   entitled to see that and you can.

19           Now, in these types of cases we got two issues to

20   decide.  The first issue you need to decide is what we call

21   "liability," meaning, who is at fault.  And then if you

22   determine that anybody's at fault then you might need to do

23   what is called, "an apportionment," and Judge Weinstein will

24   wet into the intricate details of the law with you on that.

25           And then there's damages, and damages means, Okay, if

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation – Archibald

1   this person's responsible then what's the value of it?  And we

2   had very learned experts, right?  That went to very impressive

3   schools, that did appropriate analyses to determine what the

4   value of this would be, and we'll get into that later as well.

5       And at the end of the day, if you did what you swore

6   that you would do, and you all did it, there would be one

7   inescapable conclusion here.  And that is, my client,

8   Mr. Kimpson, is not responsible for this infant.  And remember

9   the judge told you already, and several times he's told you,

10  that sympathy and emotionalism, those are not the things that

11  you're going to use to make the determination here.  You're

12  going to look at the facts and then you're going to take those

13  facts and the law that the judge is going to give you.  You're

14  going to synthesize them and you're going to make an

15  appropriate decision.  So you don't see any emotionalism coming

16  from this side because it's not.  I'm going to tell you what's

17  involved here.

18      Now, we both made opening statements, and the judge

19  told you that what we said in opening statement is not

20  evidence.  And I agreed with that because that's the law;

21  however, we tell you what we believe the evidence would show,

22  right?  Let me tell you some of the things my opponent said the

23  evidence would show.

24      First thing he says.  He claims that the evidence

25  would show that the baby was born at home healthy with no side

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation – Archibald

1   effects.  Three days later, went to the doctor for the first

2   visit; no issues.  That's what he said the evidence would show.

3           Now, we all know that's not correct, right, that's not

4   what the evidence showed.  The evidence showed that the child

5   had a birth canal injury.  Cephalohematoma, pool of blood to

6   the side of his head.  And you heard Dr. Klein yesterday,

7   right?  Pediatrician, very good pedigree, where he went to

8   school, the amount of patient he has seen.  Remember he says

9   seen in his 35 years he has seen over what?  10,000; 30,000

10  because he saw so many patients with all sorts of

11  presentations.  And he said the reason why that bleeding occurs

12  is when the child is coming through the birth canal, there is a

13  fracture that happens to the skull that causes the blood to

14  seep out and pool.  He told you that.  So, right there, what my

15  good colleague, Mr. Frankel, said is going to prove that there

16  was no issues that's not correct, is it, right?  The evidence

17  didn't show that.  Says when they went to the doctor three days

18  later, no issues.  We all know that is absolutely untrue,

19  right?  The child had elevated bilirubin.  You heard what that

20  does to the child.  And you heard Dr. Klein tell, you know

21  what, when children are born in the hospital and they are

22  monitored that's taken care of immediately the same day.

23  Because the higher the bilirubin elevates, the more damage it

24  can do neurologically to the brain.

25          He says there's no evidence of that.  You better

Summation – Archibald

1  believe there is.  What's the evidence?  I'll tell you what the

2  evidence is:  The child was lethargic.  Remember he discussed

3  lethargy.  And when we asked him to describe what lethargy.  He

4  says that's when the brain is having difficulty, it's slowing

5  down, you're getting tired, you're listless, you're sleeping.

6  And he used a very fancy term, he said, somnolence, remember?

7  Because the child is sleeping and won't wake up.  And that's

8  why the child was losing weight because if you're sleeping and

9  you won't wake up you're not feeding.  And if you're not

10  needing as a newborn, you will lose weight.

11        What did the evidence show?  The child lost ten

12  percent of its body weight.  Dr. Klein told you that that was

13  significant, right?  That was significant.

14        So the evidence clearly showed that the child was born

15  with difficulties from the get-go.  From coming through the

16  birth canal to the point at which he had to go get therapy.

17        Then we also learned that, yeah, he had to be

18  hospitalized, and you heard their Dr. Frank said it was an

19  emergency, we had to get that child to the hospital immediately

20  for treatment.  The mom testified initially that it was only

21  eight hours, it was no big deal.  It was actually 18 hours

22  worth of phototherapy and IV hydration.  And Dr. Klein told you

23  that, yeah, the longer the period of time that you're under the

24  lamp suggests the longer the bilirubin is in the system and the

25  more damage it's doing.

Summation - Archibald

1    So if the child had eight hours versus 18, that would

2    be a difference, wouldn't it?  It certainly would.  Was he able

3    to testify that, yeah, well, long-term whatever effects this

4    bilirubin may have had on the child in its first day or two of

5    life that could come back later to cause deficits, he said

6    that.  We don't know how high that bilirubin went, do we?  We

7    don't know if it was at 20, if it was at 30 during those first

8    three days.  And he testified that the peak spiking period is

9    72 hours.  That was a day before the child went to the doctor

10   for the first time.

11   So you got to consider that, right?  That's part of

12   the matrix here to make a decision and a determination, well,

13   wait a minute, maybe this will be a problem.  So that's one

14   thing that they claim the evidence would prove, didn't.

15   Next thing he said that the evidence will prove that

16   Mr. Kimpson failed to give the lead paint pamphlet.  The

17   evidence didn't prove that.  It showed that she did get the

18   pamphlet.  It's because it was Mr. Kimpson's agent.  That's

19   easy, everybody knows that.  He gave her the listing to rent

20   the apartment, she brought the Mendez family in, and that's how

21   the connection was made.  The agent give it to him, gave it to

22   her, rather, so she got the pamphlet.  Did the evidence then

23   prove that he didn't do it, of course not.  The evidence shows

24   quite the opposite.

25   Now, there was some mixup about, well, did he sign

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation - Archibald

1    this, did he initial this, did he -- you know what the evidence

2    showed about that, right?  That their client signed where my

3    client should have signed.  So my client never signed that, so

4    he was telling the truth when he said he didn't sign it.  But

5    as you hear the testimony of Ms. Cosby and had you made the

6    decision, you know what, Mr. Kimpson really didn't do this, or

7    he really didn't do this, you'd be making a rush judgment,

8    wouldn't you?  You'd be rushing to judgment because you

9    wouldn't have heard everything.  Now that you heard everything

10   you can say, a-ha, now I can see how that comes together.

11   Mr. Kimpson wasn't lying Mr. Kimpson was correct when he says

12   he didn't sign it.  So he was telling the truth, right.

13          Then another claim was that, you know, nobody, no

14   doctor, no expert would be able to testify that the choices

15   made by this mother to not vaccinate or not inoculate this

16   child.  The CDC have any effect, nothing, it was okay what she

17   did.  That's not what the evidence showed.  Dr. Klein testified

18   yesterday, right?  He's a pediatrician, he's versed in this

19   area.  He said, yeah, the vaccine this child didn't give covers

20   a strain of infections, and one of those otitis media and I

21   could link the otitis media for the lack of reception of those

22   vaccines.

23          There is no evidence from the plaintiff's side to

24   controvert Dr. Klein, none.  So the evidence showed the

25   opposite whether he claimed there would be no evidence that the

Summation - Archibald

1   vaccination caused anything.  There was evidence to the

2   contrary and you got to think about that.  Think how important

3   that is.  Think about the otitis media and, yeah, he said, I'm

4   going to say otitis media and I'm not going to give him the

5   satisfaction.

6          I'll tell you this.  Otitis media, nobody was able to

7   testify to the contrary, is an infection of the ear, fluid.

8   And what's important about that fluid is the consistency of it,

9   right.  Both doctors agreed on that.  Dr. Frank said so and so

10  did Dr. Klein and on Dr. Frank's report which is all we lad to

11  go on there is no mention of an examination; there is no

12  mention of her findings.  She said whatever she wanted to say

13  on the stand, but a doctor has certain responsibility to put

14  things in the record.  She said, "I didn't."

15         You got to think about that in determining how much

16  credit you're going to give the testimony that she gave,

17  whether or not that makes sense.  Whether or not that is

18  credible.  You're going to have to decide that.

19         Another thing she didn't do is, well, remember when

20  she said be she called the hospital to keep track of what was

21  going on.  You all heard that testimony.  But then when I asked

22  her, Did you make any notation of that in your file because

23  that would be important.  What she said was she checked the

24  levels.  But she checked the levels, she said she checked the

25  levels before asking the follow-up question.  When I asked her

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation - Archibald

1  the follow-up question, she was caught between a rock and a

2  hard place that she had to admit, I didn't put it in the

3  record.  Then I asked her, Isn't that important?  Isn't that

4  something that should have been put in the record?  She had to

5  say yes.  Why didn't you put it in the record Dr. Frank?  I

6  don't know.  Wasn't in her record.

7        You also heard yesterday with regard to the

8  vaccinations from Dr. Klein there's a vaccination schedule.

9  And you heard from the plaintiff's mouth that, yeah, every time

10  I went to the doctor, I signed a waiver.  And why did you sign

11  a waiver?  Because the doctor wouldn't see me if I didn't.

12  They wouldn't continue the relationship because that was their

13  protection that if something happened to this child and he

14  wasn't receiving vaccinations they couldn't come back and sue

15  Dr. Glasser and Dr. Frank.

16        So every time she signed a waiver and in the record

17  itself, "Parent refused to take vaccine."  "Parent refused to

18  take vaccine."  And went on and on and on.  But yet, in the

19  vaccination schedule, they claimed that, wait a minute, we gave

20  this vaccine and this vaccine and this vaccine.  And then when

21  we compared the vaccination schedule to the diagnosis that was

22  written out, they didn't match.  Is that a problem?  I think

23  so.  Their recordkeeping was less than accurate.

24        What else then is less than accurate?  The bilirubin

25  levels while in the hospital that wasn't clocked.  The otitis

Summation – Archibald

1    media examination that wasn't clocked.  And that's important

2    because depending on the consistency of the fluids in the ear

3    that arise from the ear infection determines the course of

4    treatment.  It determines how serious it is.  And thereafter,

5    nowhere in the record is there any mention that any treatment

6    was given and you heard Dr. Klein what he said.  You want to

7    treat that with antibiotics to make sure that it's cleared up

8    because as we all know now if you can't hear properly, you will

9    have difficulty with speech and language; and thus, some of the

10   problems that this young man is experiencing, right?

11        Nowhere in his record do you see anything about him

12   going to an audiologist, and that's the only person who could

13   make that appropriate diagnosis.  No audiologist.  Is that

14   something you should consider.  Absolutely.

15        Now, in his opening statement he also claimed that the

16   parents gave the child every conceivable type of therapy.  They

17   did everything, they were great parents.  Evidence didn't show

18   that, did it?  They certainly did not.

19        For example, they got a referral from their doctor to

20   take the child for occupational therapy and they chose not to.

21   You heard what Dr. Kincaid said.  That goes to mitigation, that

22   goes to help the child.  Every single expert said the child

23   would benefit from that.  They chose not to take the child.

24        You got to think about that and ask yourself:  What

25   kind of parent wouldn't want to give their child every

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

1    conceivable opportunity to do better?

2          Dr. Walters also recommended that they take

3    multivitamins with iron.  Why?  That helps in the treatment of

4    a child with lead in their blood.  There's no question about

5    that.  And the father even admitted, you know what, we can do

6    better.  We can do better.  His words, "We can do better."

7          Now, because the blood levels had elevated when the

8    child was in Dallas, they gave their doctor an opportunity to

9    think about, well, something is still not right here.  You

10   should check the environment, do an assessment of your current

11   home.  Let's make sure the child isn't being reexposed.  Is

12   that something you'd want to do?  I would think so.  Does that

13   go to mitigation.  I would say yes.  Dr. Kincaid testified to

14   that.

15         You need to ask yourself:  Why didn't she do it?  What

16   was the motivation?  Wouldn't you want to do everything to make

17   sure that this child is getting everything conceivable?  You

18   need to ask yourself that question.  And the judge is going to

19   tell you and instruct you on the law as it relates to

20   mitigation; that if you have an injury as a plaintiff, you have

21   to do certain things.  And the judge will explain that in great

22   detail to you, but I just want to touch on it so you have a

23   roadmap to what's to come to assist you in a very serious

24   deliberation that you're going to undertake shortly.

25         Then we had the construction, and I want to go back to

Summation - Archibald

1    the Joe Pesci of our case confirms the construction.

2         Now, my colleague witness you to believe that there

3    are no pictures here.  There are in pictures of how the place

4    looked back in 2012 or 2011.  On the contrary, there is.  There

5    is a picture.  The picture that was painted by the gentleman

6    that took the stand, Mr. Eweke from the Department of Health in

7    his report, or the report that he is now espousing to be a

8    proper report.  Remember when I had him read the comments

9    section, what did it say, "Walls intact.  Ceiling intact.

10   Floor intact.  Windows proper."

11        He was telling you everything that Mr. Kimpson and

12   Mr. Flynn told you about, right?  In this exhibit, I hope you

13   can all see it, Mr. Flynn wrote down everything that

14   Mr. Kimpson told him, right?  My colleague wants you to believe

15   that Mr. Kimpson told him nothing but lies.  Nothing but lies.

16   But remember what this guy said with all his experience.  He's

17   done over 700 of these, right?  He knows what a freshly painted

18   surface looks like versus one that maybe was done five or six

19   years ago.

20        Now, he tried to get cute with my witness and asked

21   him if there was a date stamp on it.  Of course, there's no

22   date stamp.  That's ridiculous, right?  But common sense would

23   tell you that if this person is an expert and he goes and he

24   looks at properties each and every day he has certain knowledge

25   after awhile.  He didn't say it was painted last week or last

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation - Archibald

1  month because he couldn't say that.  But he said it was

2  consistent with something that was painted two, three, four

3  years ago.  That's what testified to, and he said the walls

4  were intact, they were free of blemishes.  The floor was

5  intact, the ceiling was intact, the mouldings were intact but

6  for the ones that had the scratches.

7       He said, well, there were two kinds of mouldings,

8  right?  Painted mouldings and mouldings that had polyurethane

9  and stain on then.  Some of the polyurethane and stained were

10 scratched, others weren't.  Some of the mouldings that were

11 painted were scratched and gnawed at.  And you saw the pictures

12 and I will show you them again with all the teeth marks, all

13 the claw marks.  And he told you what it is.  Evidence of pet

14 damage, right?  So when the folks in the Department of Health

15 went out and did their inspection, it confirms and it

16 corroborates.

17      Now, wait a minute, the place was in good condition.

18 Remember when I went through that litany with the gentleman:

19 Intact, intact, intact.  Everything down the line, intact.

20 Then he gave us a tortured explanation of what fair means.

21 "Condition, fair."  Well, fair really kind of, sort of means

22 poor.  Remember that tortured discussion?  It kind of, sort of

23 means poor and peeling.

24      But that's not what his report said, right?  Report

25 said it was in fair condition.  And what's of importance here

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation - Archibald

1   is that every room that they went through, and I could read

2   some of it to you, said, "Radiator is in intact.  Base board is

3   intact.  Floor board is intact.  Ceiling is intact.  Everything

4   intact.  Fine."  Then he said, well, there were violations

5   there, we saw violations, about 23 of them.  And again another

6   tortured explanation he tried to give us when I kept asking

7   him, Well, could you please tell me what are the majority of

8   the locations where you testified that came up for violations

9   and he wiggled again a worm that you put salt on and he had to

10  agree it was on the wooden surfaces?  And where are the wooden

11  surfaces?  The wooden surfaces are the historically preserved

12  mouldings and wainscoting, that's where it was, and on the

13  doors.

14          Does that not make sense and does that not corroborate

15  everything that Mr. Kimpson told Mr. Flynn that is on this flow

16  chart.  These are the things.  Look what he did.  He gutted all

17  the walls.  He replaced them with Sheetrock.  He primed them

18  and painted them with two coats of non-lead pain.  How do we

19  know the paint is not leaded because they outlawed leaded paint

20  30 years ago, you can't buy it, right?  So any paint you buy

21  today is lead-free paint, that's what he did.  He gutted them.

22  He removed all ceilings, he got rid of them and what did he do?

23  He put up new Sheetrock, primed, painted.

24          And you're going to go down the list.  What did he do

25  with the bathroom?  Well, for that, he did a gut renovation.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation – Archibald

1  He took it all out, he threw it out and he put in a brand new

2  bathroom.  New fixtures, you'll see the picture again, new tile

3  floors, new tub, new sink, new ceiling.

4        And remember Ms. Hernandez confirmed that, right?  I

5  asked her those same questions.  Beautiful brand new kitchen,

6  gutted all of that, threw it out.  Brand new kitchen, new

7  appliances.  New marble floor, new marble counter top, new

8  kitchen cabinets, new fixtures.  New electrical, new plumbing.

9  We asked her.  What she said.  "Pristine, no issues."  No

10  issues.

11        You heard testimony about, well, you know the friction

12  from those hold windows created that dust, the black stuff that

13  you see around the windows, and that could be inhaled or picked

14  up or fall all on toys and create problems.  What did Mr.

15  Kimpson do about that?  He took them out, gutted those windows,

16  and he put new vinyl windows.  New vinyl windows, incapable of

17  he creating that dust.  Incapable because you don't paint them.

18  There's vinyl, there's plastic.  No need for paint, no issues.

19  That's what he did, replaced the windows.

20        And let's talk about the floor.  What did he do with

21  the floor.  Did he keep the old flooring?  No, he did not.  He

22  put down three-quarter-inch plywood followed by

23  three-quarter-inch hardwood floor.  That's what he did.

24  Mr. Flynn said, yeah, that's what I saw there.  How did you

25  notice?  Well, there's a that sliding door.  There's a pocket

Summation - Archibald

1    door in that brownstone and you have to leave the space so the

2    door could slide.  So, through that opening, you could see the

3    old flooring and you could see the new flooring and everything

4    is fine.  That's what he did.  So from top to bottom, he took

5    care of this property, right?

6         Then what did he do with the painted mouldings?  Where

7    anything was chipping or cracking, he cleaned it off and it was

8    primed and two coats of paint was applied.  Our expert, and

9    they didn't provide an expert, so we got to listen to what our

10   expert had to say.

11        Our expert said, Well, under the law, and they can't

12   controvert that and say that's not the law.  Under the law

13   there are two methods you could use.  The first one you could

14   rip everything out all the way down to the beams.  Get rid of

15   everything and start over.  You can do that, but the law

16   doesn't mandate that you do that.  Or you could encapsulate.

17   You could encapsulate.  An encapsulation is the burying of the

18   lead paint.  You could bury it under, as we did with the floor

19   with the plywood floor and the hardwood floor.  That's proper

20   encapsulation for the floor.

21        You could encapsulate by putting Sheetrock, priming

22   and painting encapsulating any possible lead or lead dust

23   behind that wall.  Solid, we did that.

24        Painted surfaces.  You can paint them once the paint

25   is not disturbed.  It's safe.  Nobody but nobody gave testimony

1  to the contrary, did they?  There was nothing that the

2  plaintiff could have said, Wait a minute, that's not safe.

3  He's talking about red herrings, let me give a red herrings

4  well, Mr. Kimpson didn't spend a lot of money so he didn't do

5  all of what he -- that's not what the law says.  Yes, it's more

6  expensive to rip everything out and start from scratch, but the

7  law doesn't say you have to do that.  So you can't hold him to

8  that.

9          You got to hold him to what the law says is

10  permissible.  And what's permissible is the encapsulation.  So

11  we know now that he encapsulated and we know now that the

12  encapsulation was proper.  And you know how it was proper

13  because of what all of the testing came back.  The majority of

14  the locations was wooden.  And then we heard about again the

15  XRF device, right.  What's that all about?  It reads through

16  the wall.  It reads through the wall.

17          Now, if on the surface of that wall there was any

18  peeling, chipping, bubbling, caulking, cracking different

19  story.  Not one person was able to say that.  They all said

20  Ms. Cosby, "It was in pristine condition."  The plaintiff,

21  "Pristine condition."  Folks in the Department of Health,

22  "Intact.  Nothing wrong."  And this goes back to 2011 and 2012.

23          So we do have a picture after all, don't we.  We do

24  have a pick what this place looked like.  Ms. Hernandez said,

25  "Everything else was pristine.  Everything was new.  Everything

Summation – Archibald

1    was great except on some of the wooden mouldings there was

2    chipping a little."  So then that prompted me to ask the most

3    obvious question.  Okay then, did you make a complaint to

4    Mr. Kimpson so he knew that the paint was chipping?  No, I did

5    not.  What type of individual was he?  He's a good guy.  He's a

6    responsive landlord.  These are not words coming out of the

7    mouth a defense attorney.

8           These are the words coming out of the mouth of the

9    plaintiff herself.  "If there was a problem, I told Mr. Kimpson

10   and he was there and he took care of it."  Her words.  That's

11   what she said.

12          And he testified and guess what, "I'm there two to

13   three days a week."  "Why are you there, Mr. Kimpson?"  "I'm

14   there cleaning.  I want to see if anybody has any problems.  If

15   there's any issues.  I take out the garbage."  That's what he's

16   doing.  That's what he's doing.

17          (Continued on the next page.)

18

19

20

21

22

23

24

25

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Summation - Archibald

1    (In open court.)

2    MR. ARCHIBALD:  Another red herring that got in there

3    that was a little troubling because they knew better is that

4    well, he paid in cash.  He paid in cash.  Before you heard my

5    client was -- is a retired police officer that served this city

6    for ten years and was shot in the line of duty and rendered

7    disabled and receives a pension, received disability, received

8    workmen's compensation, and received rental income.

9    Mostly you probably would have thought, hum, well, I

10   wonder where he is getting this money from, right, because they

11   made a big deal about that to give you the false impression

12   that maybe he is doing something illegal.  It's not illegal to

13   pay in cash.  He could read you a law in any book that says

14   it's illegal to pay in cash.  That's not an illegal act.

15   That's appropriate.  In America you can pay in cash, if you so

16   choose.  That's what he did.

17   Was it cash he was hiding somewhere?  No.  It was

18   money in his bank account.  He told you about his money.  He

19   told you about his money.  So that's a red herring.

20   You know, maybe he didn't pay people or maybe pay

21   stubs or maybe the taxes.  This is not what this case is about.

22   He is not on trial because he doesn't have a pay stub for

23   somebody he paid or he didn't have a receipt.  That's not what

24   this case is all about.  That's thrown in there to muddy the

25   waters for you to think, hum, remember what he said, this guy

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Summation – Archibald

1   is dishonest, this is guy is a liar, this guy doesn't obey the

2   law this guy, goes on and on and on trying to paint a picture

3   of Mr. Kimpson that simply isn't so.

4          But you know the whole story now.  So you know, well,

5   wait a minute, maybe if I thought he was starting to do

6   something wrong, maybe if I thought he had illegal money, now I

7   know better.  I know where his money is coming from so it's a

8   nonissue.  So in your deliberation whether he paid in cash or

9   not is immaterial, immaterial.

10         Now, you've got to ask yourself:  Didn't the plaintiff

11  have an equal opportunity to hire an engineer, if they wanted?

12  He kept reminding you -- I'm glad he did -- when this suit

13  started in 2013.  Two years ago.  They could have hired an

14  engineer.  Engineer, go look at the premises first.  They

15  didn't do that.

16         They could have hired a lead assessor, like

17  Mr. Morales, and sent him out two or three years ago.  They

18  didn't do that; but we did because we wanted to know what was

19  going on.  Remember what Mr. Morales said.  He said even on the

20  painted surface, on the molding, when I checked, yeah.  He said

21  there was lead.  He didn't say lead was on the outside.  That

22  wasn't his testimony, and you can read his testimony.  That's

23  speaking of the lead that's buried, that's encapsulated.

24         And the law says encapsulation is proper.  So you

25  can't hold him responsible for doing something that the law

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Summation - Archibald

1   says is proper to do.  Encapsulation is proper.

2        Then when Mr. Kimpson was finished with all of these

3   renovations, he told you what he did.  He cleaned the place

4   thoroughly.  It was mopped, it was dusted, it was swept.  And

5   that's in keeping with these pictures that you saw in evidence.

6   Right.

7        Take a look at this place.  Other than the

8   scratched-up moldings, other than the scratched-up moldings.

9        THE COURT:  Would you indicate the number on them.

10        MR. ARCHIBALD:  Certainly, your Honor.  This one is O4

11   and O6 I'm holding up.  Look how beautiful that apartment is.

12   Look at that.  It's a place any one of us would want to live

13   in.  Ms. Cosby told you how beautiful it was.  Mr. Kimpson told

14   you how beautiful it was.  Ms. Hernandez told you how beautiful

15   it was.

16        This is the apartment.  There has been no change in it

17   other than the scratched-up areas that was repainted, in

18   accordance with what the department of health instructed my

19   client to do.  That's it.  That's the only difference.

20        Did they bring their client to say, nope, it wasn't

21   like that?  No, they didn't.  Did they bring any other witness

22   to say, nope, it wasn't like that?  My client told you it was

23   like that.  And the department of health also told you it was

24   like that.  Intact, all walls intact, good condition, fair

25   condition, intact, over and over and over again.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Summation – Archibald

1    So the witness that they felt was going to blow us up

2    actually helped us, and that's why he is Joe Pesci.  He is the

3    one that stole the show.  He gave us what we needed.  Think

4    about it.  He gave us this picture that my adversary says we

5    are liking, but we got it, don't we?

6        He is telling us in his report the condition of the

7    place.  Room number one:  Comment, no windows.  Ceiling,

8    radiator and wall, floor, intact.  All other walls are intact.

9    Exterior door casing, intact.  This is not my witness.  This is

10   not somebody that I hired.  This is the department of health

11   saying that's the condition on the date that they went out

12   there was August of 2012, when the plaintiff was still living

13   in the apartment.

14       So when he says you don't have a picture, that's far

15   from the truth.  This is your picture.  This is it, and every

16   room is saying the same thing.

17       And the only places where they found lead were on the

18   moldings primarily, things that were scratched, on a couple of

19   walls, and on those walls their device was reading through.

20   There is no testimony that on the walls it was reading paint

21   that was on the outside of the wall.  Nobody testified to that

22   because they can't, because there was new paint on the wall,

23   which cannot possess lead.  So then that becomes a nonissue,

24   right.

25       What the else could have –– what else could

MICHELE NARDONE, CSR, RPR, CRR –– Official Court Reporter

Summation – Archibald

1   Mr. Kimpson do?  What else could he have done?  He took care of

2   his place.  He was a responsive landlord.  He was there, and

3   that's not just him talking.  That's Ms. Hernandez-Adams saying

4   that.  That's the kind of guy he was.

5           Now, then we got to get into this whole exposure stuff

6   and how is it that possibly this kid got exposed.  There are a

7   variety of ways.  Remember, there was testimony from that stand

8   that indicated that, hum, you most -- you could probably get

9   pregnant and while in utero there could be exposure.  I think

10  Dr. Troast testified to that, right; and Dr. Troast, yeah, he

11  is a doctor now, but remember when I questioned him on his

12  resume.  He was claiming he was a doctor 20 and 30 years ago

13  when he wasn't.  Is that something you should consider in

14  determining his credibility, to figure out whether or not what

15  he is saying is worthy of your consideration?  I think so.

16          Now, you heard testimony from Ms. Cosby and from

17  Ms. Hernandez-Adams that they lived in another prior, another

18  similar structure, another old brownstone, right, a duplex this

19  time; and they moved because they wanted to be private.  But we

20  know she was already pregnant when she was living in that old

21  apartment, right?

22          And remember she testified that her ill-tempered

23  beagle, Russell, used to scratch the walls over there and the

24  doors.  We didn't say that.  She did.

25          We know buildings built before 1960 has a presumption

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Summation – Archibald

1  of lead, right?  So was there lead in that apartment?  It's

2  quite possible, obviously.  When Russell was being ill

3  tempered.  So that's one possible area of lead exposure, since

4  Dr. Troast said, yes, it could happen that way.  Absolutely

5  could have happened that way at their old apartment.

6       Then you heard her agree and acknowledge that she had

7  a little hobby.  She had stripped old furniture, old painted

8  furniture, in the backyard.  Remember that?  Then I asked her

9  would G.M.M. be out there with you.  She said, yeah, he was

10 there.  He was there.  And you heard testimony that lead is in

11 the soil as well, right.  You heard that.

12      Whether it's from old leaded gasoline from cars, dust,

13 we know from the paint, could the baby have picked up lead from

14 that?  It's possible, right?  Of course when you strip and

15 paint, some of it gets into the atmosphere, some of it gets

16 into the grounds.  She was out there doing that with her son.

17 Is that something you need to consider?  I would yes to that.

18      Now, the judge is going to tell you all about the

19 burden of proof and what that is.  But I'm not going to get

20 into it other than to tell you that as a defendant we have no

21 burden.  Right.  We don't have to prove anything.  They have to

22 prove it.

23      When I say prove it, I don't mean they just have to

24 prove it in a general sense.  They brought a lawsuit, and they

25 have four claims in this action, four; and each claim have

MICHELE NARDONE, CSR, RPR, CRR –– Official Court Reporter

1    elements.  So, for example, if claim number one has three

2    elements and they were only able to prove two, then you

3    couldn't find for them because they have to prove three.  Other

4    claims have five elements.  And the same analysis flows

5    therefrom.  So you have to look at each and every element and

6    make a determination as to whether or not they proved all the

7    elements based on the burden that the judge is going to tell

8    you that they have.

9          I dare say when you are ready and when you are

10   finished and you are finished deliberating, there is no way you

11   would be able to say they proved all the elements on all of the

12   crimes -- or all of the charges rather.

13         Now, in making your determination, you are equipped

14   with an arsenal of tools.  The judge is going to explain this

15   arsenal.  The others just touch on a few, because at the end of

16   the day, it's all about credibility; and you are the only ones

17   that's going to make that determination, but you have some

18   tools to help you.

19         For example, if somebody said yes today and three days

20   later they said no, that's something you need to take into

21   consideration in determining their credibility, because they

22   are being inconsistent.  And do they have a reason for being

23   inconsistent?  Sometimes they do.  It could be bias why they

24   are being inconsistent.  Why they are being inconsistent, it

25   could be prejudice.  Why they are being inconsistent, it could

Summation – Archibald

1    be because they didn't have an opportunity to evaluate all the

2    information.  That's a reason why they could be inconsistent.

3    That's something you need to think about.

4          The law permits you to do what we call draw

5    inferences, logical inferences, logical inferences that you

6    need to draw.  For example, if tonight you went to bed and it

7    was dry outside and in the morning you wake up and the cars are

8    wet, the streets are wet, the trees are wet, but you didn't see

9    it rain, it's a logical inference to draw that it rained last

10   night while you were asleep.  That's logical, and you could do

11   that.  You could draw those logical inferences, and I am asking

12   you to draw those inferences from the evidence.

13         Now, you heard testimony from Mrs. Hernandez-Adams,

14   and she says, you know, Russell, our ill-tempered beagle, he

15   only scratched the door.  He scratched no place else.  But you

16   remember the old apartment?  She testified he scratched the

17   door and he scratched the walls.  Isn't it logical a dog like

18   Russell could have had emotional problems?  That's a hunting

19   dog.  Those beagles are bred for hunting, and she acknowledged

20   that.  She didn't acknowledge some of the other

21   characteristics, but she acknowledged that one.  Right.  That's

22   a hunting dog.

23         Do you think in the new apartment, my client's

24   property, that he wouldn't have scratched and gnawed his way in

25   other places too?  A logical inference.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Summation – Archibald

1    Then we get to how Russell acted towards this young

2  fellow, G.M.M.  The mother said, well, one day Russell was

3  asleep or laying down and G.M.M. jumped on his back, and he

4  instinctively turned around and bit him, and he bit him on his

5  lips and his mouth and he had to get stitches.  Okay.  That

6  shows some degree of ill temperament.

7    But then in the records, their records from their

8  doctor, there is a bite on the arm that she took him to the

9  doctor for.  Should we then conclude that he was bitten twice

10  by this animal?  I would say yes.  Because she testified with

11  clarity in respect of the bite on the face and the mouth, with

12  clarity.  She didn't say, well, it could have been someplace

13  else maybe.  No, on his mouth.  He had to go get stitches.

14  Tell me about what kind of animal is that?

15    And thereafter, remember she said the dog has to wear

16  a muzzle now in their home.  A muzzle, all the time, because he

17  is attacking the -- their own family members.

18    Now, the whole thing about her pregnancy and the

19  hydrocodone use as well as the general anesthesia, you

20  certainly need to think about that.  Right?  Now, think about

21  her testimony.  When she had the surgery she didn't know she

22  was pregnant.  Now, use your common sense.  When you are going

23  to go have a surgery, anyplace, there are certain preoperative

24  procedures.  They are going to test your blood.  If you are a

25  woman of child-bearing age they are going to see if you are

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Summation – Archibald

1    pregnant.

2         She knew she was trying to get pregnant.  Right.  So

3    what's the possibility that she was pregnant?  She said, we

4    were trying for two years, we were trying to get pregnant, and,

5    boom, we got pregnant with G.M.M.  She is an educated woman.

6    She has a master's degree.  It's not someone who is uneducated.

7    Would you want to subject your unborn child to anesthesia?  She

8    says, well, the doctor didn't know either, and we went ahead

9    with the surgery.  How credible is that?

10        And then she didn't find out she was pregnant.  She

11   said two, maybe three months later she found she was pregnant.

12   And I asked her, well, what about your menstrual?  Well, I have

13   irregular menstrual my entire life.  Okay.  I grant her that.

14   Any symptoms of pregnancy?  No, no symptoms.  So she was

15   pregnant for three or four months with no symptoms.

16        And the most incredulous part of her testimony on this

17   topic was, well, when I went to my physical therapist, he poked

18   at my stomach and asked me if I was gaining weight and just out

19   of curiosity I took a pregnancy test.  That's when I learned I

20   was pregnant.  Hum.  Does that make you want to scratch your

21   head and twitch your eye and wonder if something is wrong with

22   this picture?  It should, because that doesn't make any sense.

23        The only logical explanation that she knew she was

24   pregnant and went ahead and did the surgery regardless,

25   exposing her unborn fetus to anesthesia.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Summation – Archibald

1    Then she took hydrocodone, an opiate.  Opiates are

2    very powerful narcotics, and they have the same propensity to

3    cause neurological deficits in newborns if taken in the first

4    trimester.  You heard the experts testify what was going on in

5    the first trimester.  That's when the nervous system is being

6    formed, the brain, all the functioning is taking place; and if

7    you disrupt that, yes, it could have long-term complications.

8    But she took it anyway.  She couldn't tell us how long she took

9    it for except, she said, well, maybe a few days; but she

10   couldn't tell us the dosage.  That's important.  It comes in

11   different strengths.  She couldn't tell us whether it was a

12   pill or whether it was a capsule.  Is that something you should

13   consider in evaluating anything that she is saying to you?  I

14   think so.

15   Then she spoke about all of the falls this young man

16   had.  The first one was here in Brooklyn.  What was he doing?

17   In the backyard, soil, climbing on a fence.  He fell, busted up

18   his lip, busted up his teeth, had to go to the hospital.  Lots

19   of bleeding.  She was concerned.

20   Then they go to Dallas.  Testimony is the following:

21   Yeah, he had several falls, he was always crashing; and she

22   used a term that I never heard before but I know what it means

23   now.  She said he face planted on our deck.  Face planted.  How

24   many times he did that?  I don't know how many times, but it

25   was quite a few times.  He had a lot of crashes.  These are the

MICHELE NARDONE, CSR, RPR, CRR –– Official Court Reporter

Summation – Archibald

1     types of things this young man was exposed to.

2            Now, let's look at the experts now.  All right.  We

3     have already established, in my view, that based on the

4     evidence here my client didn't do anything wrong.  He did what

5     he was supposed to do.  He encapsulated, and the expert said it

6     was proper.  Nobody said it was wrong.  Nobody.  It was proper.

7     The dog or dogs disturbed the properly's encapsulated paint and

8     released it into the atmosphere.

9            My client had no reason whatsoever to know that the

10    place was being chewed up like that until the clients moved out

11    and there was an issue with lead in G.M.M.'s blood.  And when

12    he found out, he went into action immediately.  And that's

13    confirmed.  That's confirmed by Ms. Hernandez–Adams.  Yes,

14    immediately he took care of it.  He came in, he tried, he did

15    this, he had a company.  That's the kind of landlord he was.

16           So do you think if Ms. Hernandez–Adams had said to

17    Mr. Kimpson, look, Mr. Kimpson, there is a chip here, could you

18    fix it, do you think he wouldn't have fixed it?  And she did

19    testify, no, I didn't tell him.  I didn't tell him.

20           So if he did the encapsulation appropriately,

21    according to the experts, he did it appropriately, what else

22    could Mr. Kimpson have done?  What else could he have done?  He

23    did what he was supposed to do.  Then counsel said, well, it's

24    illegal to have paint, lead paint, in there.  That's not true.

25    That's not what the law says.  The law says it's got to be

MICHELE NARDONE, CSR, RPR, CRR –– Official Court Reporter

Summation - Archibald

1   safely encapsulated, and we have the testimony that it was

2   encapsulated.  That's what the law says.  There is no evidence

3   to the contrary, that he didn't safely encapsulate the paint.

4         All the evidence points to him safely encapsulating

5   the paint.  Let me tell you why you know that.  You know that

6   because when the good folks from the department of health went

7   there, every single surface of that, 86 or so, would have some

8   up with lead paint.  That would make sense, if he didn't do it.

9   But instead, it was on the moldings.  The comments keep saying

10  all upper walls are intact, all ceilings are intact.  No

11  issues.  The walls, the ceilings, intact, no problem

12  whatsoever.  So it stands to reason that the encapsulation was

13  properly done and was disturbed by plaintiffs' dogs.

14        Then we had our good friend Mr. Strulovitch.  Yeah, he

15  tested for lead.  He had the wipes and he wiped and he put it

16  in a bag and he sent it away.  When did he do that test?

17  Around the same time that the city came in and did their test.

18  So you don't need to be a brain surgeon to figure out, well, if

19  the dogs are scratching and there is dust in the paint and

20  there was lead paint chips in the place, that if you came and

21  you tested for lead dust he would find it.  Does that make

22  sense?  Sure.  Absolutely.

23        Does that mean, though, that Mr. Kimpson is

24  responsible for that?  No, he is not.  And the judge will tell

25  you that.  He is not responsible if you determine that the

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Summation – Archibald

1  level of renovations that he did was adequate under the

2  circumstances.  Mr. Flynn tells you that it was.

3       And if the city, when they came in and it wasn't

4  adequate, they would have said, well, problem, problem, you

5  need to do.  They didn't do that, right?  So that's something

6  you need to take into consideration.

7       Let me change pace a little and tell you a little bit

8  about these claims.  There are four of them.  The first one is

9  a violation of New York City Childhood Lead Poisoning Act.

10  That's their first claim.

11       This first claim they have to prove, based on the

12  standard the judge gives you, these two elements.  But I'm only

13  going to tell you the second element.  The second element says

14  that the defendant did not take reasonable steps to remedy the

15  hazardous lead condition.  Then at the end of that paragraph,

16  it says the following:  Complete gut or other adequate

17  renovation of the building unit is also considered reasonable.

18  That's all he has to do, and they are going to have to prove

19  that what he didn't wasn't reasonable, that he didn't

20  reasonably do the renovation.

21       I will repeat.  Complete gut or other adequate

22  renovation of the building unit is also considered reasonable.

23  Here it is, ladies and gentlemen.  This is what he did.  This

24  is reasonable.

25       It goes on to say:  The key question you must answer

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Summation - Archibald

1    is, under the city statute, did the defendant take reasonable

2    steps to abate any lead-based paint hazard?  Was he reasonable?

3    Did he take reasonable steps?  It goes on to tell you about the

4    third element.

5        To prove damages, the plaintiff have the burden of

6    proving that the child plaintiff suffered an injury and that

7    injury would not have occurred without the wrongful conduct or

8    omission of the defendant.  In our view, there is no wrongful

9    conduct or omission.  He did what he was supposed to do.  So

10   they are not going to be able to meet this element.  Therefore,

11   you can't find against them.  You can't find liability against

12   my client based on that.

13       The second one is the Federal Residential Lead Based

14   Hazard Reduction Act.  That's the second claim.  This one has

15   one, two, three -- four elements.  I'm reading you from the

16   fourth element.  In order to prevail on this claim, the

17   plaintiff mother must establish that the defendant knew that

18   there was lead-based paint or lead-based paint hazards on the

19   property and failed to disclose them to her.

20       In considering whether the defendant provided false

21   assurances to the plaintiff, you must reflect on the fact that

22   the defendant does not, does not, have a positive obligation to

23   conduct any evaluation of the property or lead abatement

24   activities under this statute.  So when my adversary is jumping

25   up and down and screaming that he knew, he didn't know, he

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Summation - Archibald

1   didn't conduct an investigation, he didn't do this, this is the

2   law.  He doesn't have to.  Claim number two then evaporates.

3   Right?  He can't prove that.  He didn't prove it.

4           Negligence, claim number three.  I will go down to the

5   second element.  You need to show to find him negligent that

6   the defendant failed to remedy the hazardous lead condition,

7   that he failed to remedy it.  Here is your chart again, ladies

8   and gentlemen.  He remedied it.  He did everything that he was

9   supposed to do.  He remedied it.

10          And how do we know that?  Mr. Flynn, the professional

11  engineer, came by and said this is what was done and it's

12  appropriate.  It's lead-safe renovation.  Remember that term,

13  lead-safe.  It doesn't have to be lead-free.  The plaintiff

14  wants you to believe that it needs to be lead-free, but it does

15  not.  That's not what the law says.  Lead-safe.  And

16  encapsulation equals lead-safe.

17          (Continued on the next page.)

18                      o O o

19  Certified to be a true and accurate transcript.
    /s/ Michele Nardone
20  MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

21

22

23

24

25

Summation – Archibald

1    MR. ARCHIBALD:  Finally, the fourth way.  On the New

2  York Real Property Law Section 235(b).  This one, they have two

3  elements.  The first element is that first, they said the

4  landlord had notice of a condition that's dangerous to the

5  plaintiff and that he didn't -- I'll read it for you.  It says,

6  "Defendant was not required to ensure that the premises were

7  perfect, but he was under an obligation to ensure that no

8  conditions were present that would materially affect the lives

9  and safety and health of the tenant."

10    By doing his lead-safe renovation -- now, the

11  plaintiff is trying to say, well, he didn't know lead was a

12  problem.  He didn't know he had lead.  He testified he didn't

13  know about lead.  That's immaterial.  You know why?  Because

14  the expert came forward and testified that and said, look, the

15  renovations that was done is lead-safe.  That's it.  So the

16  fact as to Mr. Kimpson's knowledge or when he knew it?

17  Immaterial.  The renovation was lead-safe.

18    Now, we could talk about their witnesses.  They put on

19  for you Dr. Gordon, who had the benefit, unlike anybody else in

20  the case, to interview and evaluate this young man on two

21  occasions, approximately a year apart.  So he had two

22  opportunities to get it right.

23    And you heard him.  He had to agree with me that his

24  evaluation and his conclusions then lacked intellectual rigor

25  because he didn't take all of these things into consideration.

Summation - Archibald

1 First of all, he had no idea that Ms. Hernandez Adams had

2 surgery under anesthesia or was on hydrocodone.  He didn't know

3 that.  But he found that out between examination number one and

4 examination number two.  He testified that's when he found out.

5 He didn't take that into consideration.

6         He didn't take bilirubin into consideration.  He

7 didn't take the cephalohematoma into consideration.  He didn't

8 take the otitis media into consideration.  He didn't take the

9 lack of proper vaccination into consideration.  He took none of

10 that into consideration.  What kind of an expert is that that

11 leaves out all of these possible other contributing factors of

12 causes?

13         But he was very careful when he did his dissertation.

14 Remember when I spoke to him about the dissertation and the

15 things that you need to do to put forth a proper dissertation?

16 You would look at potential reasons, causes, causality factors

17 and you would synthesize all of that into an original product

18 of your own -- which he did for his dissertation.

19         And part of what you've got to consider is, hum, when

20 the doctor is doing work that's not litigation related, he was

21 very careful and proper with what he did, but because he's

22 doing this litigation type evaluation, he's ignoring a lot of

23 important information.  That definitely should be considered by

24 you, because his report lacked the intellectual rigor

25 necessary.

Summation - Archibald

1    Then he took a leap of faith, and he thought we

2  weren't going to uncover it in his final diagnosis.  Remember

3  that?  ADHD is his diagnosis.  Attention Deficit Hyperactivity

4  Disorder.  That's characterized by certain times of

5  symptomology and behaviors and what have you.

6    And we've all heard of the authoritative book that

7  gives you the right to call a diagnosis in the area of mental

8  health.  And we know what's necessary.  Six out of nine.  Six

9  out of nine symptoms, you have to see before you can say

10  somebody has a particular disorder.  Six out of nine.

11    He had to agree with me, though, because he knew we

12  knew what was in that authoritative manual.  So he had to say,

13  yes, you have to have six of nine, because had he said no, then

14  I would have confronted him with the authoritative manual, and

15  he would have had a problem.  Again, salt on a worm.  Right?

16  He would have had to wiggle.

17    So then he would have to say, you know what?  I saw

18  six, but I only put four.  Why is that, Doctor?  Well, I had --

19  I saw them, but I just didn't put them.  Well, wouldn't that be

20  something that you would need to put in there?  Yes, I agree.

21  That is important, right?  Because you're making a diagnosis

22  which would require certain types of treatment modalities.  So

23  if you're going to make that type of a diagnosis, you'd better

24  be in a position to defend it.  And he couldn't.  Did he?  He

25  couldn't.  He couldn't.

LISA SCHMID, CCR, RMR

Summation - Archibald

1    So does this child have AH -- no.  I'm confusing.

2  Attention Deficit Hyperactivity Disorder.  I always confuse

3  that acronym.  Does he have that?  No, he doesn't.

4    According to Dr. Auciello -- Dr. Auciello was

5  vigorously cross-examined.  He didn't come off of his position.

6  He had the authority, right?  He was able to demonstrate why

7  this child doesn't have that disorder.  Dr. Gordon wasn't to

8  able to that, and he had two bites at the apple and he missed

9  it both times.

10    Dr. Auciello says, well, he has some of this and some

11  that, but none to give us a specific diagnosis.  Yeah, he's a

12  child that has some, you know, probably developmental delays,

13  but that's part of the human life experience.  You heard that

14  testimony.  Yeah, he's low average, but he's not clinical.

15  He's subclinical.  You heard that testimony.

16    So the testimony of Dr. Gordon is just there to try

17  and boost whatever damages they think they would be entitled

18  to, but Dr. Auciello was able to clearly show that that is

19  erroneous -- erroneous.

20    And again, Dr. Gordon had to admit, yes, I agree.

21  Coming up with this diagnosis without putting all six, that

22  lacked intellectual rigor, but it's in there and you should

23  trust me because I'm telling you I saw it.  I just didn't put

24  it in there.  I know I should have put it in there, but it's

25  not in there.  That's Dr. Gordon.  Should he be credited with

LISA SCHMID, CCR, RMR

Summation - Archibald

1    what he did?  I don't think so.  I don't think so.

2           We've already talked about Dr. Troast.  He's a

3    nonentity.  I'm not even going to waste any more time on

4    Dr. Troast, but let's talk about the bow-tie wearing Dr.

5    Tinari.

6           Dr. Tinari, the forensic economist that did the number

7    crunching for us -- and he had an opportunity to correct his

8    number crunching.  Remember?  He had a nice edition.  Put it up

9    on the screen, was all fancy and explaining.  He had his

10   pointer out and the whole nine yards.

11          But he still got it wrong, just like Dr. Gordon.  This

12   was his second opportunity, because he wanted his figures to be

13   accurate for trial, so he redid them.  Still got them wrong.

14   He still screwed it up.  Right?  He still used inappropriate

15   assumptions.  He didn't consider the things that he needed to

16   consider.  I'm not going to get into the specifics, because it

17   got a little technical in terms of the things you look at, the

18   things you look to, the things you rely on in making your

19   assumptions.

20          Well, let me tell you his fatal error.  His fatal

21   error was he relied on Dr. Reagles.  I asked him 15, 20

22   questions about where did you get that from?  Where did you

23   make that assumption from?  Oh, Dr. Reagles.  Dr. Reagles.

24   Dr. Reagles.  Dr. Reagles.  So he took everything from

25   Dr. Reagles.

LISA SCHMID, CCR, RMR

Summation - Archibald

1      And we saw how Dr. Reagles wiggled like a worm also,

2  didn't he?  When I hit him with the Spizman article, based upon

3  what he said Spizman said, then he would have to come back and

4  change his mind again.  He didn't think we would read the

5  Spizman article.  I'm sure he was of the view that, hey, if I

6  put it in my report, that's it.  It's as good as gold.  That's

7  not how it's done.

8      Everything he cited in his report, we researched it.

9  That's what you're supposed to do.  We researched everything.

10  And when he realized that he was exposed, he had to distance

11  himself from Spizman.  He walked away from Spizman, because

12  Spizman didn't say what he said Spizman said.  He walked away

13  from it.

14      And he said, well, you know, that's an old article,

15  and there are more recent.  Old nothing.  The Spizman report

16  was published in 2013.  And the assumptions he was making

17  couldn't be supported by the sources that he cited.  That is

18  intellectual dishonesty.

19      He couldn't support it, so he had to back away from

20  it.  And you need to think about in determining whether or not

21  to give any credit to anything Dr. Reagles had to say and of

22  course, by extension, Dr. Tinari.  Think about it.  Tinari

23  based his assumptions exclusively on the assumptions made by

24  Dr. Reagles.

25      And in end -- in the end, Dr. Reagles had to admit

LISA SCHMID, CCR, RMR

Summation - Archibald

1    that he was no more accurate than a weatherman.  That was it.

2    He was no more accurate than a weatherman.  So any assumptions

3    that he had in there, you now how the weather goes.  I'm going

4    to leave that to your deliberation.

5        We then heard from Ms. Cogan, the lab manager.  And

6    the lab manager, she testified to procedure and policy and ray

7    and ray and ray.  She spoke very fast.  It was difficult to

8    follow her.  But thank God we have a very good stenographers.

9    They got everything she said.  So if you need to read anything

10   Ms. Cogan said, you can read it.  It's in there.

11       But the long and short of what she had to say was

12   following.  We're a lab.  We do testing.  We have records of

13   the people.  We do calibration.  We do this.  But at the end of

14   day, you know what?  She couldn't tell you if the test was done

15   appropriately, right?  She couldn't tell you that.  Why?  She

16   wasn't there.

17       I'm not sure how valuable that is to you.  She could

18   just say, well, I'm the manager of the lab.  We did this step,

19   this step.  We use this machine, that machine.  Okay.  What

20   does that have to do with the test that was performed on this

21   particular day?

22       Now, she did testify though that VM -- I'm not going

23   to try to pronounce VM's name -- but she said and you can read

24   it, was with her for a long time and is still an employee.  Why

25   not produce VM, right?  Let VM take the stand and tell us what

LISA SCHMID, CCR, RMR

Summation - Archibald

1    he did.  You've got to determine why they didn't produce VM.

2    Why not produce the person that did the test?  No VM.  So we

3    have to take her word that VM did the test on the day in

4    particular the correct way.  Hum, that's kind of dubious,

5    wouldn't you agree?  VM is still an employee.

6         Now, there's one person that we haven't really talked

7    about yet in terms of physical being, and that's Geronimo.

8    Wouldn't it make sense, ladies and gentlemen, for you to have

9    seen Geronimo?

10        This court is probably once of the most technological

11   courts in the city.  We could do video conferencing.  We could

12   have seen Geronimo on television with his parents if they

13   didn't want to bring him here, right?  They chose not to.  They

14   showed you a picture of him.

15        In coming up with your analysis, wouldn't you want to

16   see, they say he's hyperactivity.  He has this problem, that

17   problem the other problem.  If he was in court for the two or

18   the three hours, however long they keep him in here, you would

19   have an opportunity to observe him.  Maybe he'd be sitting

20   there.  Maybe he's sitting there.  I don't know where they'd

21   put him to sit.

22        Wouldn't that be something you would want to see?

23   Wouldn't you want to see this young man that we keep talking

24   about?  They chose not to bring him to court.  Okay?  So then

25   they're depriving you of the opportunity to make a complete

LISA SCHMID, CCR, RMR

Summation – Archibald

1   assessment.

2        Remember the Michael Jordan flew game I told you about

3   earlier?  It's similar to that, right?  You're going to have

4   make a decision without knowing all of the facts.  Is that what

5   you want to do as a juror to make a decision?  But they're

6   depriving you of that.  You need to ask yourself why.  You need

7   to ask yourself why.

8        But Dr. Auciello told you, based on his scores, yeah,

9   he's low average.  But that's what they call human variability,

10  right?  Everybody develops at different stages.  Everybody have

11  a different intelligent quotient.  We all can't be nuclear

12  physicists.  Based on his testing that he had, he's in that low

13  average range.  Does that mean normal?  Yeah, normal but low

14  average.  Subclinical.  There's nothing clinically wrong in

15  that aspect.  Yeah, he's a little slower.  That's it.

16       So ladies and gentlemen, I think there's enough meat

17  here for you to make the only decision that the evidence

18  supports -- not the emotionalism.  We don't need any of that --

19  the evidence or lack thereof.  Right?  Lack thereof.  And

20  there's a lack of a lot of evidence here.

21       And you can't guess.  You can't speculate.  You have

22  to have evidence, and there's no evidence here that number one,

23  my client did anything wrong because he encapsulated.

24  Everybody said the place was in great condition, even their own

25  client said so.

LISA SCHMID, CCR, RMR

Summation - Archibald

1     The folks on the Board of Health came out.  And where

2     did they say problems were?  Everybody saw this.  Right?  This

3     is the apartment.  This is the beautiful brownstone,

4     beautifully renovated.  This is what it looked like before.

5     You saw these pictures.

6           Based upon the testimony, you probably say that must

7     be some kind of a dump right?  Some kind of a slob, with paint

8     peeling off the wall, the place falling apart.  You have no

9     idea you'd see pictures like this.  But these pictures are

10    confirmed by everybody else.  That's the condition the place

11    was in.

12          So he did what he was supposed to do.  And nobody ever

13    complained to him and we know that because Ms. Hernandez Adams

14    says so.  What else could he have done to be reasonable?  That

15    was reasonable.  That's lead-safe.  Reasonable.  And that's all

16    the law says he has to be is reasonable.  And this is

17    absolutely reasonable.  That's what he did.

18          So he has no liability here.  I'm not going to go over

19    again all of the experts and what they came up with and the

20    numbers and why their numbers are off, but they're off, first

21    of all, and you saw why they are off, because they used the

22    wrong assumptions.

23          I just want to say thank you so much for the past two

24    weeks, for listening to all of what we had to say, and I hope

25    when you start your deliberations, you come back at the end of

LISA SCHMID, CCR, RMR

G.M.M. v. Kimpson

1    the day with a right decision, which is no liability on

2    Mr. Kimpson, because under the law, what he did was reasonable.

3    I thank you for your time and attention.

4              THE COURT:  Thank you.

5              Why don't you take a break, about five minutes.  I'm

6    not going to be able to charge you tonight.  The charge is just

7    too long.  So we'll have a brief rebuttal, and then I'll allow

8    you to go home.  So take 15, please.  Don't discuss the case.

9              (Jury exits.)

10             THE COURT:  Applications?

11             MR. FRANKEL:  I'm sorry, Judge, no, not by plaintiff.

12             THE COURT:  All right.  Fifteen minutes, and we'll

13   charge in the morning.  It's just too long.

14             MR. FRANKEL:  That makes sense.  I'll be very quick,

15   and that's it.

16             THE COURT:  Well, you take what you need.

17             MR. FRANKEL:  Thank you, Judge.

18             THE COURT:  I'm not going to cut you off.

19             (Recess.)

20             (In open court, outside the presence of the jury.)

21             THE COURT:  Sit down, please.  It's my impression that

22   Vladimir, who is the man who actually did testing was not

23   available.

24             MR. FRANKEL:  No, that's what she said.  I thought --

25             MR. ARCHIBALD:  That's not what she said.

LISA SCHMID, CCR, RMR

G.M.M. v. Kimpson

1    THE COURT:  I looked at the record it's not on the

2  record.  I'm just looking through the record.  That was my

3  assumption.

4    MR. FRANKEL:  I know that she said that he doesn't

5  know the procedures that she had to explain to the Court how

6  it's done, where it comes from.  He just sits in the lab.

7    THE COURT:  Well, I'll not reopening case.  I think

8  the argument was a valid argument that defendant made.  He's

9  the one that did it, and why didn't they bring him in?  But I

10  was under the clear impression that you had tried to get him

11  and he didn't come in.  Otherwise, why would you not?

12    MR. FRANKEL:  We asked and they said no one was coming

13  until we got your order, but the only person we could speak

14  with was her and we didn't know if he was even there.  So to

15  get your order with his name and they say, oh, too bad.  He's

16  not here.  We figured we have to come get someone in here and

17  she's the boss.

18    THE COURT:  Well, did you try to get him in?

19    MR. FRANKEL:  Yes, we did.

20    THE COURT:  Who did you ask?

21    MR. FRANKEL:  We asked her.  We spoke with her -- Mr.

22  Cantor -- two or three times and she said no one's coming.  We

23  had sent the subpoena.

24    THE COURT:  You tried to get --

25    MR. FRANKEL:  Yes, we did.  We asked her to bring him

Rebuttal - Frankel

1    with her.

2              THE COURT:  We don't have a record of it.

3              MR. FRANKEL:  Okay.

4              THE COURT:  But that was my assumption.  I couldn't

5    believe you would bring in somebody when the person we wanted

6    was clearly under the cases when he had personally did the

7    test.  I mean, that's why I got involved in it -- excessively,

8    possibly.

9              Well, I'm not going to reopen the case.  That's -- the

10   case is what it is.  Bring in the jury.

11             MR. ARCHIBALD:  Your Honor, while we're waiting on the

12   jury, if I may.

13             THE COURT:  What?

14             MR. ARCHIBALD:  While we're waiting -- I'm

15   tongue-tied.  While we are waiting for the jury, if I may, we

16   have the same issue as it relates to the Department of Health.

17   The person who did the test --

18             THE COURT:  The person is on vacation.  I think that's

19   clear on the record.

20             MR. ARCHIBALD:  Yes, that's clear.

21             THE COURT:  I understand.

22             (Jury enters.)

23             THE COURT:  Proceed.

24             MR. FRANKEL:  Thank you, Judge.

25             Thank you, again.  Another long day, but this is it.

LISA SCHMID, CCR, RMR

Rebuttal - Frankel

1  Just a few minutes, that's all I'm allotted and so, anything

2  that you've heard that I don't answer now, it's for you to talk

3  about and decide what you have heard.  If you think perhaps

4  there's another issue, then the record is here.  The evidence

5  is here.

6        But I will say, as I am not surprised and I don't

7  think you are either, there are now three new distractions or

8  red hearings that you have learned about in the summation.

9        One, Dr. Rachel Frank is incompetent.  She didn't keep

10  the right records.  She's didn't do the right follow-ups.  So

11  all of the witnesses who testified for the defendant who never

12  met the child, never had anything to do with him clinically and

13  saw all the records that showed everywhere else there was no

14  problem, that doesn't count because she's a terrible record

15  keeper and therefore, basically, the argument is, don't believe

16  her.  She was incompetent, as well.  So that's one of the new

17  three.

18        The second one is the parents are bad parents now,

19  because they didn't take the little boy to the program.  As the

20  mother explained, we don't have the money.  The insurance

21  doesn't cover it.  We didn't get it yet.  As soon as my

22  husband's new job insurance kicks in, we're going to get every

23  program we possibly can.  If you think that she was not a good

24  mother and is not trying hard, that's for you to decide.  But

25  that's number two.

LISA SCHMID, CCR, RMR

Rebuttal - Frankel

1      And number three, why didn't we as plaintiffs, hire an

2  engineer in 2013, if we wanted to check and see?  That's just

3  ridiculous, among other things.  What right do we have to go

4  into the apartment to do anything?  But secondly, there were

5  three positive lead reports from the contemporary time in 2012.

6  They would have liked us to do that because who knows what he

7  did between the time the Mendez family left and the time in

8  2015, which is all that you hear from Mr. Archibald?

9      And I keep asking you -- and I apologize again, keep

10 in mind there was no remediation.  He didn't know about lead.

11 He didn't talk to his street contractor Randy whoever about

12 lead.  He knew nothing about remediating lead.  He knew nothing

13 about encapsulation.  You heard 20 times.  He encapsulated.  He

14 encapsulated.  There is no one shred of evidence he did any of

15 that.  In 2015, his witnesses testified when they went to the

16 apartment, it was correctly encapsulated with all the proper

17 things that should have been done.  So again, is that the way

18 it was in 2012, when this kid, this child, this infant got

19 poisoned?

20     And something that struck me while Mr. Archibald was

21 providing his summation.  There were three tests done by three

22 different agencies.  Now, one was just the wipes, so that's on

23 the floor, where they found lead in seven out 14 places, so

24 it's not behind the wall and consistent with their witness,

25 Mr. Morales.  I said that already.  Don't need to beat a dead

LISA SCHMID, CCR, RMR

Rebuttal - Frankel

1   horse.

2        But try to find in any of the three reports or any

3   place in records where Mr. Kimpson once told anyone this

4   apartment is messed up because the dogs scratched and created

5   lead and that's what happened and that's why it happened.

6        And the City came, and you read the report, it has

7   attachments with letters saying if you don't do it by this

8   time, you have to do this by then.  We're going to -- they

9   could fine you.  They could do all sorts of things.

10       Never did he at least say, look, I'll do the best I

11   can, but it's not my fault.  They had these crazy wild dogs

12   that were scratching everything up.  And those are the people,

13   the tenants and they're out of here now -- I'll do what I'm

14   supposed to do, but don't be so hard on me.  Not even a mention

15   of that anywhere, not once anywhere in the record.

16       Now, don't you think that would be --

17       THE COURT:  Go ahead.

18       MR. FRANKEL:  And the second part about still all the

19   lead behind the walls only, that's not the evidence.  The

20   evidence is, among other things, which is frightening, and

21   which is why I asked you to think about what this man is really

22   made of, is that in 2015, Mr. Morales, his lead contractor,

23   searching for lead, found lead still inside the moldings and

24   outside the walls -- not behind walls -- after a woman had

25   lived there and had a baby who also lived there.

LISA SCHMID, CCR, RMR

Rebuttal - Frankel

1    MR. ARCHIBALD:  That's not the testimony, Your Honor.

2  That's not what Mr. Morales testified to, that he found paint

3  out -- lead paint on the outside of the walls.  That was not

4  his testimony.  He testified --

5    THE COURT:  Well, the jury will recollect --

6    MR. FRANKEL:  Was not behind any walls.

7    THE COURT:  Excuse me.

8    MR. FRANKEL:  I'm sorry.  I thought you finished.

9    THE COURT:  I won't rule on it at the moment.  If

10  there is any question about it, the jury will ask for the

11  transcript.

12    MR. ARCHIBALD:  Fair enough, Your Honor.

13    MR. FRANKEL:  Please do, if you have any question

14  about what Mr. Morales said about the molding, which is outside

15  the wall.

16    But here's another question.  When you look at the

17  City's -- this again is O-3 and O-5.  When you look at the

18  City's report where they talk about fair condition, fair

19  condition -- now, don't you think perhaps that if the inspector

20  from the City came in and saw these pictures in 2012,

21  somewhere, it wouldn't be fair condition?

22    This happened in 2015, ladies and gentlemen, because

23  if it was in 2012, the City would have remarked.  He would have

24  told them, look at what these dogs did.  He didn't tell them.

25  The City didn't note it.  The other report doesn't show it.

LISA SCHMID, CCR, RMR

Rebuttal - Frankel

1    And they're asking you now to accept his good faith

2    because he did everything to encapsulate, not knowing anything

3    about lead, not knowing anything to talk to the -- his street

4    builder about.  He just luckily say somehow did that.  Find

5    something in the record that shows you that that man did

6    anything in 2011, when the demolition and construction

7    happened, before our clients, before the Mendez family moved

8    in.  You won't find a single note, piece of paper, witness.

9    He has friends.  He has relatives.  Nobody testified

10   that in 2012, they went to the apartment and as soon as they

11   went there, this is what they found.  Nobody.  Not a friend,

12   not a neighbor, not a relative.  Does that make sense?

13   Lastly, I don't want to take any more of your time,

14   the last distraction was Mr. Archibald saying to you, well,

15   remember, he didn't qualify in Dallas.  He took was test.  The

16   test, he was subclinical.  That means he was not that serious.

17   He couldn't qualify for some of the programs that they have

18   there.  This little boy --

19   MR. ARCHIBALD:  Your Honor, this is going beyond his

20   ten minute rebuttal, Your Honor.

21   THE COURT:  I didn't cut you off, sir.  I'm going to

22   allow some leeway.

23   MR. ARCHIBALD:  Okay, Your Honor.

24   THE COURT:  Thank you.

25   MR. FRANKEL:  He called it subclinical based upon the

LISA SCHMID, CCR, RMR

1356

Rebuttal – Frankel

1  testing in Dallas.  This little boy, who is four years old in a

2  couple weeks, has significant cognitive deficits, undisputed,

3  serious antisocial behavior issues now, and permanent brain

4  damage.  Subclinical.

5       Thank you.  Thank you very much, ladies and gentlemen.

6       THE COURT:  Would you be here at ten o'clock tomorrow?

7  I caution you again don't discuss the case.  Don't do any

8  search.  Thanks very much.

9       (Jury exits.)

10      THE COURT:  Any applications?

11      MR. FRANKEL:  No application, Your Honor.

12      MR. ARCHIBALD:  Your Honor, my applications are

13  already in the record.  I have no additional applications under

14  the circumstances.

15      THE COURT:  Thank you.  All right.  Good night,

16  everybody.

17      I want to say that I appreciated the professional way

18  that the attorneys presented the case.  Good night.

19      MR. FRANKEL:  Thank you, Your Honor, for your

20  patience, as well.  Thank you.

21      MR. ARCHIBALD:  And you want the attorneys here at

22  what time tomorrow, Your Honor?

23      MR. FRANKEL:  Quarter to ten?

24      THE COURT:  Why don't you get here about quarter to

25  ten, just in case there's something that occurred for you all.

LISA SCHMID, CCR, RMR

1357

G.M.M. v. Kimpson

1  I'll be loathe to change the charge, since the summations were

2  based on the agreement the charge was satisfactory.

3          MR. ARCHIBALD:  Your Honor, would you be issuing a

4  formal written order or judgment in respect of my motions that

5  was made and briefs that I filed in the case?

6          THE COURT:  On what issue.

7          MR. ARCHIBALD:  Well, on the punitive damages issue,

8  as well as the admissibility of those records, the Enviro-Pro

9  issue.

10          THE COURT:  No.  At this moment, I'm not inclined to

11  go further than I have orally, but I'll consider your

12  application.

13          MR. ARCHIBALD:  Okay.  Thank you Your Honor.

14          THE COURT:  Good night.  I expect the attorneys to get

15  a full list of witnesses available and a full list of exhibits,

16  so we can send them in.

17          MR. ARCHIBALD:  That's fine, Your Honor.

18          (Trial adjourned to Friday, July 10th, 2015, at

19  10:00 a.m.)

20

21

22

23

24

25

LISA SCHMID, CCR, RMR

G.M.M. v. Kimpson

1       I N D E X

2           Kincaid – Direct/Archibald        1183

3           Kincaid – Cross/Frankel           1213

4           Kincaid – Redirect/Archibald      1229

5           Summation – Frankel               1244

6           Summation – Archibald             1304

7           Rebuttal – Frankel                1350

8

9                           o O o

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MICHELE NARDONE, CSR, RPR, CRR –– Official Court Reporter